## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                              :

ALEXANDRA M. CLANCY
1418 N. Beverly Drive
Beverly Hills, CA 90210,           :

                            :

        *Plaintiff*,

                            :

v.                           :

                            :   **FILED UNDER SEAL**

J. W. THOMPSON WEBB,
as Personal Representative of the   :
Estate of THOMAS L. CLANCY, JR.
and Trustee of the Trusts Under   :
the Last Will and Testament of
THOMAS L. CLANCY, JR.   :   Civil No. ELH-17-3371
100 Light Street
Baltimore, Maryland 21202   :

and                   :   **AMENDED COMPLAINT FOR**
                              **DECLARATORY JUDGMENT**

JACK RYAN ENTERPRISES, LTD.   :
5930 Sheridan Point Road
Prince Frederick, Maryland 20678   :

and                   :

JACK RYAN LIMITED PARTNERSHIP   :
5930 Sheridan Point Road
Prince Frederick, Maryland 20678   :

and                   :

RUBICON, INC.             :
100 Light Street
Baltimore, Maryland 21202,   :

        *Defendants*.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Alexandra M. Clancy ("Mrs. Clancy"), by her undersigned attorneys, sues J. W. Thompson Webb ("Webb" or "Personal Representative"), as Personal Representative of the Estate of Thomas L. Clancy, Jr. (the "Estate"),[1] and as Trustee of the Trusts established under Thomas L. Clancy Jr.'s Last Will and Testament; Jack Ryan Enterprises, Ltd. ("JREL"); Jack Ryan Limited Partnership ("JRLP"); and Rubicon, Inc. ("Rubicon"), and states:

## NATURE OF PROCEEDING

1.      This Complaint seeks a declaration of the ownership of Tom Clancy's literary legacy pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.*  Mrs. Clancy seeks a declaration that certain intellectual property is property of her late husband's estate and *not* the property of JREL or JRLP.  Specifically, Mrs. Clancy seeks the following declarations:

(a)      that Jack Ryan, the famous literary character first created by Tom Clancy in early drafts of *Patriot Games*, and subsequently featured in the published work *The Hunt for Red October*, is property of the Estate;

(b)      that the character "John Clark," created by Tom Clancy in the early 1970s, is property of the Estate;

(c)      that the works *Red Storm Rising* (1986), *Patriot Games* (1987), *The Cardinal of the Kremlin* (1988), *Clear and Present Danger* (1989), and *The Sum of All Fears* (1991) do not qualify as works for hire for JREL within the meaning of 17 U.S.C. § 101, and were not assigned to JREL, and therefore the Estate owns (or, in the case of *Red Storm Rising*, co-owns) these works, and alternatively, to the extent these works were validly assigned to JREL, any assignments are terminable by Tom Clancy's heirs pursuant to 17 U.S.C. § 203;

(d)      that the works *Without Remorse* (1993), *Debt of Honor* (1994), and *Executive Orders* (1996) do not qualify as works for hire for JRLP within the meaning of 17 U.S.C. § 101, and to the extent these works were validly assigned to JRLP, any assignments are

---

[1]   The "Estate" means and refers to the Estate of Thomas L. Clancy, Jr., Estate No. 101962, in the Orphans' Court for Baltimore City.

terminable by Tom Clancy's heirs pursuant to 17 U.S.C. § 203; and

(e)     that, at Tom Clancy's death, JREL and JRLP had no interest in or right to the characters Jack Ryan, Jr., Dominic and Brian Caruso, and other "Campus" characters created by Tom Clancy.

## PARTIES

2.     At his death, Tom Clancy was survived by his spouse, Plaintiff, and their daughter, Alexis J. B. Clancy.  He was also survived by four children from his first marriage, Michelle E. Bandy, Christine C. Blocksidge, Thomas L. Clancy, III, and Kathleen W. Clancy ("Older Children").

3.     Defendant Webb is an attorney with Miles & Stockbridge, P.C., and is the Personal Representative of Tom Clancy's Estate and Trustee of the Trusts established under Tom Clancy's Last Will and Testament.  Webb was appointed Personal Representative on October 10, 2013.

4.     Defendant JREL is a Maryland corporation, formed on May 28, 1985.  It has its principal place of business in Baltimore, Maryland.  When Tom Clancy was alive, he had a 40% interest in JREL, Wanda King (Tom Clancy's ex-wife whom he divorced in 1999) had a 40% interest, and the Older Children held the remaining 20%.  Tom Clancy was President of JREL. After Tom Clancy's death, JREL is owned by the Estate (40%), Wanda King (40%), and Older Children (20%).  Wanda King is President of JREL.

5.     Defendant JRLP is a Maryland limited partnership, formed on February 26, 1992. It has its principal place of business in Prince Frederick, Maryland.  When Tom Clancy was alive, Tom Clancy and Wanda King each held a 1% general partner interest and a 49% limited partner interest in JRLP.  After Tom Clancy's death, JRLP is owned in equal shares by the Estate and by Wanda King, who is also the General Partner.

6.      Defendant Rubicon is a Maryland corporation, formed on November 15, 1995. Prior to Tom Clancy's death, he owned 100% of Rubicon.  After Tom Clancy's death, Rubicon is owned 100% by the Estate.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action on the basis of federal questions raised in the counterclaims presented by JREL and JRLP. Memorandum to Counsel, Feb. 5, 2018, ECF No. 34.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1454.

8.      Further, 28 U.S.C. § 2201 gives this Court jurisdiction to grant declaratory relief in "a case of actual controversy within its jurisdiction."  There exists a genuine controversy between Mrs. Clancy and the Defendants concerning ownership of certain of the decedent's literary rights.

9.      Venue is proper because the Defendants conduct business within the Northern Division of the District of Maryland.

## FACTS

**A.      Tom Clancy's Estate**

10.     Tom Clancy, the renowned author and resident of Baltimore City, died on October 1, 2013.

11.     Alexandra Clancy is Tom Clancy's surviving spouse and a legatee and a beneficiary of certain testamentary trusts created under his Last Will and Testament.

12.     Tom Clancy's Last Will and Testament, dated June 11, 2007, as amended by a First Codicil dated September 18, 2007, and a Second Codicil, dated July 25, 2013 (collectively, the "Will"), was admitted to probate on October 10, 2013 in the Orphans' Court for Baltimore City.  The administration of the Estate remains open.

13.     Under his Will, Tom Clancy bequeathed his personal and real property to Mrs. Clancy.  He directed that the remainder of his Estate be held in three parts: first, a "Marital Trust" for the benefit of Mrs. Clancy (representing one-third of the residue adjusted for certain specific bequests); second, a "Family Trust" for the benefit of Mrs. Clancy and their minor child (equal to one-half of the residue remaining after the creation of the Marital Trust); and, third, two "Older Children's Trusts" (consisting of the remaining one-half of the residue after the creation of the Marital Trust).[2]

14.     On February 1, 2017, the Personal Representative filed his Revised Second Administration Account.  Mrs. Clancy filed exceptions to the Account, based in part on the Personal Representative's failure to assert Tom Clancy's ownership of the Jack Ryan character. The resolution of such questions are outside the jurisdiction of the Orphans' Court.  Moreover, the Orphans' Court lacks jurisdiction to grant the declaratory relief sought here.

15.     On July 26, 2017, the Orphans' Court stayed proceedings in that court and authorized and directed Mrs. Clancy to file a declaratory judgment action in a court of general jurisdiction within 30 days.  In compliance with the Orphans' Court Order, Mrs. Clancy filed this action in the Circuit Court for Baltimore City.  On November 13, 2017, the Defendants JREL and JRLP removed the Baltimore City action to this Court.

**B.     Tom Clancy's Ownership of the Jack Ryan Character**

16.     On November 21, 1983, Tom Clancy, as "Author," entered into a contract with the United States Naval Institute ("USNI"), as "Publisher" (the "USNI Agreement"), to publish his first novel, *The Hunt for Red October* ("*Hunt*").

---

[2]   As a result of the decision in *Bandy v. Clancy*, 449 Md. 577 (2016), the Older Children's interest in the residue of the Estate has been reduced from approximately 37% to 20%, and Mrs. Clancy's share of the residue has increased from approximately 63% to more than 80%.

17.     *Hunt* featured the first public appearance of the now world-famous character Jack Ryan, who was the novel's main character.

18.     Under the USNI Agreement, Tom Clancy, as "Author," "grant[ed] and assign[ed] to the Publisher the exclusive worldwide rights and any subsisting copyright, including the right to secure copyright and any renewals or extensions thereof," in connection with *Hunt*.

19.     Under the USNI Agreement, Tom Clancy, as "Author," also agreed "that he will not, without the written permission of the Publisher, publish or permit to be published any material based on, or derived from, or directly competitive with [*Hunt*], so long as this agreement shall remain in force."

20.     There were no other parties to the USNI Agreement.  Neither JREL nor JRLP had been formed when Tom Clancy executed the USNI Agreement.

21.     The USNI Agreement did not specifically reference the Jack Ryan character.

22.     *Hunt* was first published on October 3, 1984.

23.     USNI applied for and received a certificate of copyright registration for *Hunt*, dated October 29, 1984, identifying Tom Clancy as the author.

24.     In late 1987 and early 1988, a dispute arose between Tom Clancy and USNI concerning ownership of the Jack Ryan character.

25.     In January 1988, counsel for USNI wrote Tom Clancy's intellectual property lawyer, Robert Youdelman ("Youdelman"), asserting that USNI had acquired all rights to *Hunt* under the USNI Agreement, and that use of *Hunt* characters by Tom Clancy in subsequent works would constitute copyright infringement for which USNI was entitled to compensation.[3]

---

[3]  Youdelman, together with Frank R. Curtis ("Curtis"), who was Of Counsel to Youdelman's firm, represented Tom Clancy for intellectual property matters until Tom Clancy's death in 2013.  Beginning in October 2013, Curtis and Youdelman, until Youdelman's death in December 2017, represented not only the Estate and Rubicon, but also represented JREL and JRLP.

26.     Youdelman responded that Tom Clancy, not USNI, owned the Jack Ryan character.

27.     In February 1988, Youdelman filed a demand for arbitration with the American Arbitration Association, as required by their agreements with USNI, on behalf of Tom Clancy and another USNI first-time author, Stephen Coonts (who had a similar dispute with USNI over the ownership of characters in his first novel, *Flight of the Intruder*).

28.     In the arbitration, Tom Clancy asserted that he alone held the rights to the character Jack Ryan, and demanded a declaration that he owned the exclusive rights to the use of the character Jack Ryan in other novels, sequels and prequels, as well as other relief.  Stephen Coonts asserted similar claims.

29.     In its reply to the arbitration demand, USNI contended that it had the rights to the Jack Ryan character, and counterclaimed for an order barring Tom Clancy from using any *Hunt* characters in future books without compensating USNI.

30.     The dispute with USNI was scheduled for mediation beginning September 28, 1988.  On September 27, 1988, Youdelman and Curtis filed a 24-page "Claimant's Memorandum for Arbitrator" ("September 27, 1988 Memorandum") in which they presented the compelling case that Tom Clancy had never relinquished his ownership of Jack Ryan.  In the September 27, 1988 Memorandum they set forth the history of Tom Clancy's relationship with USNI, a history replete with opportunities for USNI to have asserted character ownership, opportunities that USNI repeatedly let pass – consistent with Tom's Clancy's contention that USNI did not own his famous character.

31.     Youdelman and Curtis also argued that the author first developed the Jack Ryan character not in *Hunt*, but in *Patriot Games*, portions of which, together with an outline of the plot and a sketch of the Jack Ryan character, Tom Clancy had created before *Hunt*[4]:

> The fact that <u>Red October</u> was published before <u>Patriot Games</u> is irrelevant. Under the Copyright Revision Act, statutory copyright exists from the moment a work is fixed in a tangible medium of expression (17 U.S.C. §102(a) and see §302(a)) -- i.e., from the moment that Clancy wrote his first partial draft of <u>Patriot Games</u>.  In fact, not only was the character first portrayed in <u>Patriot Games</u>, Ryan is also more fully portrayed in that novel, in which he plays a much more prominent role and his entire family appears.  As noted above, Ryan was not even included in the original version of the <u>Red October</u> story.  He was added as an afterthought, to help fill in as narrator and alter ego for the author.

32.     The mediation commenced on September 28, 1988.  Following testimony by Tom Clancy, the parties initiated settlement discussions, and ultimately resolved their disputes before the end of the day.

33.     The terms of the settlement between Tom Clancy, Stephen Coonts and USNI were embodied in a handwritten agreement, dated September 28, 1988 (the "USNI Settlement Agreement"), in which the parties expressly acknowledged that Tom Clancy owned the rights to the characters in *Hunt*, including Jack Ryan.

34.     Specifically, under the USNI Settlement Agreement, USNI agreed to release any rights in post-*Hunt* works by Tom Clancy, and agreed to "reassign the copyright[] in THE HUNT FOR RED OCTOBER . . .  to Tom Clancy . . .  or [his] designees, exclusive of book publishing rights."

35.     Addressing the gravamen of the dispute – ownership of the Jack Ryan character – the USNI Settlement Agreement provided further:  "Without limiting the foregoing, *the parties*

---

[4]     Since the filing of the Complaint, Plaintiffs have discovered two original chapters of *Patriot Games* as well as a document titled "*The Jack Ryan Saga*," in which Tom Clancy delineates the character Jack Ryan as well as the plot of Patriot Games.

*acknowledge that all rights in and to the characters are the sole property of the respective authors."* (emphasis added).

36.      The USNI Settlement Agreement also provided:  "The use of the characters in connection with RED OCTOBER is subject to the other terms of this agreement."  The other terms of the agreement permitted USNI to retain certain book publishing rights.

37.      Tom Clancy named JREL, then-owned 40% by Tom Clancy, 40% by Wanda King, and 20% by the Older Children, as his "designee" to receive the reassignment of the *Hunt* copyright from USNI.  Tom Clancy, however, did not assign to JREL or to anyone else his rights in the characters he had created in *Hunt*.  He retained those rights individually.

38.      Approximately three months after the execution of the USNI Settlement Agreement, on December 19, 1988, as required by the USNI Settlement Agreement, USNI executed a "Transfer of Ownership of Copyright and Assignment," transferring and assigning to JREL "[t]he exclusive worldwide rights of every kind and nature (now or hereafter known), any subsisting copyright, (including the right to secure copyright and any renewals or extensions thereof)," in *Hunt*, "in accordance with the terms of the Agreements between Assignor and Thomas L. Clancy, Jr. dated November 21, 1983 and September 28, 1988."

39.      The assignment made no mention of the character Jack Ryan.

40.      Because the "Transfer of Ownership of Copyright and Assignment" was made "in accordance with the terms of the Agreements between Assignor and Thomas L. Clancy, Jr. dated November 21, 1983 and September 28, 1988," and because the earlier USNI Settlement Agreement provided expressly that "all rights in and to the characters" of *Hunt* were the sole property of Tom Clancy, the USNI grant of "exclusive worldwide rights" and "copyright" in *Hunt* could not and did not include ownership of the Jack Ryan character.

41.     Accordingly, unless Tom Clancy subsequently assigned his rights to the character Jack Ryan, he remained the exclusive owner of the character Jack Ryan – as developed in *Hunt*, *The Jack Ryan Saga*, and draft chapters of *Patriot Games*, at a minimum – until his death on October 1, 2013.

42.     Tom Clancy did not assign his rights to the character Jack Ryan to JREL (or any entity) after 1988.  This fact was confirmed by Curtis recently in 2016, when he wrote:  "My file does not reveal any separate assignment from Clancy to JREL of [character] rights."

**C.     Tom Clancy's Ownership of "John Clark"**

43.     The Estate, Rubicon, JREL and JRLP have assumed that ownership of the character "John Clark" (also known as "John Kelly") belongs to JREL and JRLP, and that these entities are entitled to share in any proceeds from the exploitation of that character.

44.     However, Tom Clancy began creating the "John Clark" character as early as 1971 – prior to the formation of JREL or JRLP.

45.     The first published work in which the character John Clark appeared was *Cardinal of the Kremlin*, published in 1988, in which he is mentioned 84 times.  John Clark is a featured character in the novel *Clear and Present Danger*, published in 1989, in which he is mentioned 457 times.  He also appears in *Sum of All Fears* (1991), in which he is mentioned 262 times.

46.     All three of these works, claimed to be owned by JREL, were published prior to the existence of any employment agreement between Tom Clancy and JREL.

47.     John Clark is also featured in Tom Clancy's *Without Remorse*, a prequel published in 1993.  Both JREL and JRLP assert that *Without Remorse* is a JRLP property.

48.     The character "John Clark" cannot be the result of any "work made for hire" for JREL or JRLP because the character was created long before either entity existed.

49. Thus, Tom Clancy retained ownership of the John Clark character at his death and his ownership interest in John Clark passed to the Estate.

50. Plaintiff alleges, upon information and belief, that the Estate and Defendants Rubicon, JREL and JRLP have negotiated, in the past, or will negotiate in the future, book and media contracts that fail to recognize and give full effect to the Estate's ownership of the John Clark character.

**D.      Business Entities Created by Tom Clancy that Assert Ownership of His Literary Rights**

51. Defendants JREL and JRLP assert interests in Tom Clancy's literary legacy.

52. Defendant JREL was formed on May 28, 1985.

53. From 1985 to 1991, Tom Clancy completed writing the books *Patriot Games* (1987), *The Cardinal of the Kremlin* (1988), *Clear and Present Danger* (1989), and *The Sum of All Fears* (1991), and completed co-writing *Red Storm Rising* (1986) ("JREL Books").

54. Defendant JREL claims the JREL Books were written as "works made for hire" for JREL.

55. The JREL Books were not works made for hire under the Copyright Act of 1976.

56. Defendant JRLP is a Maryland limited partnership that was formed on February 26, 1992.

57. From 1992 to 1996, Tom Clancy completed writing the books *Without Remorse* (1993), *Debt of Honor* (1994), and *Executive Orders* (1996) ("JRLP Books").

58. Defendant JRLP claims the JRLP Books were written as "works made for hire" for JRLP.

59. The JRLP Books were not works made for hire under the Copyright Act of 1976.

60.     JREL and JRLP did not conduct regular business operations during the period in which the JREL Books and JRLP Books were completed.

61.     Neither JREL nor JRLP had an office – the entities "operated" out of the Clancy home and continue to "operate" out of Wanda King's home.

62.     JREL and JRLP did not have their own letterhead.  They did not have email addresses or an internet domain.

63.     Neither JREL nor JRLP directed Tom Clancy's work.  Neither of these entities had any kind of management structure or personnel capable of directing Tom Clancy's work.  He enjoyed complete freedom to decide what he was going to write, when he was going to write, and how he was going to write.

64.     During the period of time when the relevant JREL Books were created, JREL did not withhold income tax, social security and Medicare (or pay the employers' matching amounts) as required by the law for traditional employment relationships, nor did it provide customary employment benefits such as healthcare, a pension, unemployment insurance and workers' compensation.

65.     During a substantial period of time when the relevant JRLP Books were created, JRLP did not withhold income tax, social security and Medicare (or pay the employers' matching amounts) as required by the law for traditional employment relationships, nor did it provide customary employment benefits such as healthcare, a pension, unemployment insurance and workers' compensation.

66.     Although Tom Clancy signed "employment agreements" with JREL and JRLP in 1992 and 1994, Tom Clancy was not a true employee and these entities were not employers.

67.     As a consequence, none of the JREL Books nor JRLP Books created by Tom

Clancy during these years was a "work made for hire" as that term is defined in the Copyright

Act, 17 U.S.C. § 101.  Therefore, JREL and JRLP are not owners of the JREL Books and JRLP

Books, respectively, unless Tom Clancy assigned his interest in these works to JREL and JRLP.[5]

68.     After the JREL Books were published, Tom Clancy was presented with two

documents styled as "employment agreements" in 1992 and 1994.  The first employment

agreement with JREL contained no language of assignment.  The second employment agreement

with JREL, dated January 1, 1994, contains the following language:

> 7.     In consideration of the receipt of compensation as provided
> hereunder, Employee hereby continues to assign and transfer to Employer his
> entire right, title and interest in and to any books written by Employee either
> solely or jointly with others pursuant to any third party contract or agreement of
> Employer.

69.     This purported assignment language was ineffective to transfer any ownership

interest in or to the JREL Books to JREL.

70.     Tom Clancy could not "continue" to assign books to JREL because he had no

prior history of assigning his books to JREL.  Rather than execute assignments of his works to

JREL, Tom Clancy was consistently presented with contracts in which he was asked to represent

that the works he was creating for these entities were "works for hire."  He and JREL were

mistaken then, and these characterizations are erroneous now.

71.     The last JREL book was published in 1991.  Because the purported assignment

contains no language assigning works created before January 1, 1994, Tom Clancy did not assign

the JREL Books to JREL.

---

[5]     Moreover, to the extent that *Patriot Games* and *Without Remorse*, and other novels, were created prior
to the existence of JREL or JRLP, these works also cannot be "works made for hire."

72.     Because the JREL Books were not works for hire and were not effectively assigned, Tom Clancy owned the JREL Books and upon his death, the Estate owns the JREL Books.[6]

73.     Tom Clancy signed a document styled as an "employment agreement" with JRLP with a purported effective date of February 26, 1992.  This agreement with JRLP contains the following language of assignment:

> 7.     In consideration of the receipt of compensation as provided hereunder, Employee hereby assigns and transfers to Employer his entire right, title and interest in and to any and all books written by Employee either solely or jointly with others during the course of his employment with Employer.

74.     Assuming the lack of a *bona fide* employment relationship does not otherwise invalidate the purported assignment, and the Court finds that the language in the February 26, 1992 agreement effectively assigns Tom Clancy's rights in the JRLP Books to JRLP, then any such interest is terminable.

**E.     Tom Clancy's 1998 Marital Settlement Agreement Erroneously Attributes Ownership of Works to JREL and JRLP**

75.     In connection with their 1999 divorce, Tom Clancy and Wanda King entered into a Marital Settlement Agreement, dated December 28, 1998 ("MSA").

76.     The MSA attributes ownership of JREL Books and JRLP Books to JREL and JRLP, respectively as "assets" of JREL and JRLP.

77.     The list of assets in the MSA purporting to reflect ownership of books by JREL and JRLP is incomplete and erroneous.

---

[6]     Tom Clancy was the co-author of *Red Storm Rising* with Larry Bond.  Therefore, the Estate owns 50% of this work.

78.    The attribution of JREL Books to JREL is erroneous because they are not works made for hire within the meaning of the Copyright Act, and were never assigned to JREL by Tom Clancy.

79.    The JRLP Books were also not written as works made for hire and to the extent that the JRLP works were assigned by Tom Clancy to JRLP, the interests assigned are terminable.

80.    Notwithstanding its erroneous attribution of ownership of entire works to JREL and JRLP, the MSA correctly acknowledged Tom Clancy's continuing ownership of the Jack Ryan character, contemplated that Tom Clancy would continue to exploit the Jack Ryan character, and provided for division of revenue that he might receive from exploiting his rights in the Jack Ryan character as part of the division of the marital estate.

81.    Specifically, Paragraph 15(B) of the MSA provides, in relevant part:

> In the event that Husband or an entity affiliated with him (other than JRLP or JREL) signs a contract with any third party relating to the story line, in whole or in part (and characters in connection therewith), from works owned by JRLP or JREL (other than incidental use, such as flashbacks), Husband shall cause the contract to be assigned to JRLP or JREL as the case may be. *Otherwise, Husband shall be free to use the characters in the works owned by JRLP or JREL in any sequel to any of those works or in any other future work that Husband may create without the approval of or obligation to Wife.*

(emphasis added).

82.    Thus, in harmony with the USNI Settlement Agreement, the MSA specifically contemplated that Tom Clancy would be signing contracts relating to the characters in *Hunt*, including Jack Ryan, and confirmed – on a date 10 years after the USNI Settlement Agreement – that the USNI assignment of *Hunt* did not include any rights to the characters in *Hunt*.

F.   **"The Campus" Characters Including Jack Ryan, Jr. and Dominic and Brian Caruso**

83.   Beginning in 2000 and continuing until his death in 2013, Tom Clancy authored or co-authored the following post-divorce best-sellers:

| No. | Title | Pub. Date | Characters |
|---|---|---|---|
| 1 | *The Bear and the Dragon* | 2000 | Jack Ryan; John Clark |
| 2 | *Red Rabbit* | 2002 | Jack Ryan |
| 3 | *The Teeth of the Tiger* | 2003 | Jack Ryan, Jr; Caruso brothers |
| 4 | *Dead or Alive* | 2010 | Jack Ryan; Jack Ryan, Jr.; Caruso brothers; John Clark |
| 5 | *Against All Enemies* | 2011 | Max Moore; Dominic Caruso |
| 6 | *Locked On* | 2011 | Jack Ryan; Jack Ryan, Jr.; Dominic Caruso; John Clark |
| 7 | *Threat Vector* | 2012 | Jack Ryan; Jack Ryan Jr.; Dominic Caruso; John Clark |
| 8 | *Command Authority* | 2013 | Jack Ryan; Jack Ryan Jr.; Dominic Caruso; John  Clark |

84.   The last six books from this period feature The Campus characters, including Dominic Caruso, Brian Caruso (collectively the "Caruso Brothers") and Jack Ryan, Jr.

85.   JRLP and JREL have shared in revenue from the exploitation of The Campus characters in post-death works.

86.   The Campus characters were not created pursuant to contracts between Tom Clancy and either JREL or JRLP.

87.   The Campus characters were not assigned by Tom Clancy to either JREL or JRLP.

88.   At the time of Tom Clancy's death, neither JREL nor JRLP had any legal right to The Campus characters or to the exploitation of those characters in post-death works.

G.      **Post-Death "Jack Ryan" Book Deals**

89.     At Tom Clancy's death, neither JREL nor JRLP had any interest in Jack Ryan, John Clark, Jack Ryan Jr., Dominic Caruso or the other Campus characters.

90.     Documents recently received in this litigation show that the Estate has repeatedly entered into post-death agreements that have failed to comport with the Estate's ownership interests.

91.     Before Tom Clancy died, plans were already underway for 2014 book deals. After his death, his long-time publisher Putnam[7] devised a new proposal for the publication of certain post-death books authored by contract-writer Mark Greaney.

92.     Together, the Estate, JREL and JRLP, consulted with Youdelman and Curtis, the New York-based publishing lawyers who had, in the past, represented Tom Clancy in such matters, including the 1988 USNI arbitration and settlement.

93.     Shortly after Tom Clancy's death, on November 26, 2013, Youdelman and Curtis advised these entities that "in connection with [a 2014] publishing agreement, there also needs to be an agreement on the division of proceeds among the Clancy entities."

94.     Youdelman and Curtis detailed their view of how allocation should be made:

> As we see it, there are four entities involved and what each can contribute to future books is as follows:
>
> Jack Ryan Enterprises Ltd. can contribute material from Tom's first six novels books [*sic*], of which five involve Jack Ryan (the exception is <u>Red Storm Rising</u>). Thus, *JREL can contribute the character of Jack Ryan* as created and developed in those books, plus a number of secondary characters and other elements, including the first appearances (in secondary roles) of John Clark and Ding Chavez.

---

[7]  Putnam refers to the publisher now known as G.P. Putnam's Sons, an imprint of Penguin Publishing Group, a division of Penguin Random House LLC.

Jack Ryan Limited Partnership can contribute material from Tom's next four novels, which include the emergence of Clark and Chavez as major characters, as well as the further development of Ryan and other characters and elements.

Rubicon, Inc. can contribute material from Tom's last eight novels, of which seven involve Jack Ryan (the exception is <u>Against All Enemies</u>). These books introduced The Campus, whose primary participants are two characters from the earlier books (John Clark and Ding Chavez) and several new characters, including Dominic Caruso, Gerald Hendley, Jack Ryan Jr., Sam Driscoll and Gavin Biery. The books also involve some further development of the earlier characters (Ryan Sr., Clark and Chavez) and other elements.

The *Clancy Estate can authorize the use of Tom's name* on new books.

The relative importance of each of these elements is obviously somewhat subjective and not subject to some precise mathematical formula. As we see it, *the most important (indeed, indispensable) elements for each book are the main character (Ryan or Caruso) and the use of Tom's name*, though the other characters and elements from Tom's past books are also important.

(emphasis added).

95.     Simply put, Youdelman and Curtis attributed character ownership of Jack Ryan to JREL.

96.     As recently-disclosed records reveal, however, Youdelman and Curtis had not reviewed their 1988 file relating to the 1988 USNI arbitration before rendering the foregoing advice.  Incredibly, in their 2013 advice to the Estate, JREL, and JRLP, they failed to address, or even acknowledge, their winning position that Tom Clancy, with their assistance, had asserted in 1988 – that the Jack Ryan character rights were his and his alone.

97.     In 2014, based on this flawed legal advice, the Estate signed an agreement with Putnam (as publisher), Rubicon, JREL, and JRLP (collectively as "Author"), and agreed to the publication of two literary works as "Tom Clancy" novels.  One of these novels, *Full Force and Effect*, featured the Jack Ryan character.

98.     The Estate acceded to the demands of JREL and JRLP that revenues from *Full Force and Effect* be allocated as follows: 1/3 to JREL, 1/3 to the Estate, and 1/3 divided equally

among JREL, JRLP, Rubicon, and the Estate, notwithstanding Tom Clancy's 100%-retained ownership of the Jack Ryan character.

99.     In March 2015, the Estate signed a four-book deal with Putnam.  Two of the novels in this deal were "Jack Ryan" novels:  *Under Fire* and *Commander in Chief*.  Again, the Estate joined with counsel for JREL and JRLP in an agreement to allocate proceeds in the same manner as in the 2014 two-book deal, failing to take into account or to protect the Estate's ownership of the Jack Ryan character.

100.     On or about March 4, 2016, Mrs. Clancy served notice, pursuant to 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10, to terminate and recapture the rights to *Hunt* (including all character rights to the extent such rights were not already owned by the Estate).

101.     This prompted Webb to return to Youdelman and Curtis for additional legal advice, which Curtis provided in several legal memoranda addressed to both the Estate, JREL and JRLP.  These memoranda directly contradict the advice Youdelman and Curtis provided in 2013 and 2014.

102.     The first memorandum from Curtis, dated May 10, 2016 (but intentionally withheld from Mrs. Clancy until late 2018), attaches Curtis' original September 27, 1988 Memorandum submitted in the USNI arbitration proceeding.

103.     In the May 10, 2016 memorandum, Curtis makes an astonishing admission:

> … I went back through my [1988] files and, as a result, *I believe there is a well-founded position that the Naval Institute Press (the "Press") did not acquire broad character rights to Jack Ryan* ("Ryan") as a result of Clancy's agreement with the Naval Institute Press (the "Press"). This is *based on the arguments that we made at the time of Clancy's dispute with the Press in 1988.* Based on my review of the record, I now think those arguments are stronger than I remembered.

(emphasis added).

104.     In an analysis nearly identical to the Plaintiff's reasoning here, Curtis explains

that JREL could not have obtained rights in the Jack Ryan character, because USNI never had

the rights under the USNI Agreement:

> If, for these reasons, Clancy did not assign to the [Naval Institute] Press broad
> ownership of the [Jack] Ryan character, the Press's later copyright assignment to
> JREL also did not convey to JREL broad ownership of the [Jack] Ryan character,
> since the Press could not effectively transfer what it never owned.

105.     Curtis' May 10, 2016 Memorandum – based on his September 27, 1988

Memorandum – indisputably contradicts JREL's claim of ownership of the Jack Ryan character.

106.     Webb revealed his understanding of the implications of Curtis' May 10, 2016

Memorandum when he acknowledged to Youdelman in an August 23, 2016 email: "I am

concerned about our ability to agree to an allocation of cash proceeds" in light of Curtis'

revelations.

107.     Despite Webb's concerns, he caused the Estate to continue to enter into deals for

"Tom Clancy" books from 2016 to the present, including allocation agreements with JREL and

JRLP to share in book revenues based upon the previously received advice he now knew to be

flawed.

**H.     Post-Death Book Deals for Works Featuring "The Campus" and
        Campus Characters**

108.     As with the post-death book deals featuring Jack Ryan, notwithstanding that

neither JREL nor JRLP has any interest in the copyrights for Jack Ryan Jr., Dominic Caruso and

other copyrightable Campus characters, the Estate, JREL and JRLP have entered into post-death

book deals and revenue allocations that implicitly and impermissibly accorded JREL and JRLP

an ownership interest in the Campus characters.

I.      **Post-Death Media Deals**

109.    In addition to the above-referenced book contracts, the Estate, JREL, and JRLP have entered into various agreements for media rights that do not account for true ownership interests.  For example, the Estate and JREL, entered into an agreement with Paramount Pictures Corporation ("Paramount"), subsequently acknowledged by JRLP and Rubicon, for the recently-acclaimed television series "Tom Clancy's Jack Ryan" streamed on Amazon in late 2018.

110.    Under this agreement, the Estate and JREL will each receive one-half of the proceeds.

111.    As another example, the Estate, JREL, and JRLP entered into an agreement with Paramount for movie rights to *Without Remorse* and *Rainbow Six*, as films featuring Tom Clancy's character John Clark, as well as other sequel rights.  The agreement allocates no revenues to the Estate.

112.    The post-death book and media contracts agreed and entered into by the Estate, JREL, and JRLP fail properly to allocate revenue based on the actual ownership interests of the respective parties.

113.    Declarations of true ownership are necessary for these and future deals.

## COUNT I

*(Declaratory Judgment – Jack Ryan)*

114.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 113 of the Amended Complaint.

115.    In view of the Defendants' position that JREL and JRLP own the rights to the Jack Ryan character, and Plaintiff's position that the Estate owns the character rights, an actual controversy exists between Plaintiff and the Defendants regarding ownership of the rights.

116.    Plaintiff states further that antagonistic claims are presented indicating the likelihood of imminent and inevitable litigation.

117.    A declaratory judgment would serve to terminate uncertainty and would terminate the controversy giving rise to this cause.

118.    A declaratory judgment is necessary to resolve a question of title and ownership, essential to the administration of the Estate, that is outside the jurisdiction of the Orphans' Court.

119.    A declaratory judgment would afford certainty to the Estate and to parties interested in entering into contracts with the Estate.

120.    There exists a justiciable controversy between Plaintiff and Defendants.

121.    Accordingly, Plaintiff is entitled to a declaratory judgment under 28 U.S.C. § 2201.

WHEREFORE, Alexandra M. Clancy prays:

A.    That this Court determine and adjudicate the rights of the parties and declare as follows:

(1)    Tom Clancy owned the Jack Ryan character at the time of his death;

(2)    At his death, ownership of the Jack Ryan character passed to the Estate;

(3)    As of the date of Tom Clancy's death, the Defendants JREL and JRLP had no ownership interest in the Jack Ryan character; and

(4)    As of the date of Tom Clancy's death, the Defendants JREL and JRLP had no right to share in revenue from any post-death published works on the basis of any ownership of the Jack Ryan character;

B.    That the Court award Plaintiff costs of these proceedings and award reasonable attorney's fees pursuant to 17 U.S.C. § 505; and

C.      That this Court award such other and further relief as the nature of this cause may require.

## COUNT II

*(Declaratory Judgment – John Clark)*

122.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 113 of the Amended Complaint.

123.    In view of the Defendants' position that JREL and JRLP own the rights to the John Clark character, and Plaintiff's position that the Estate owns the character rights, an actual controversy exists between Plaintiff and the Defendants regarding ownership of the rights.

124.    Plaintiff states further that antagonistic claims are presented indicating the likelihood of imminent and inevitable litigation.

125.    A declaratory judgment would serve to terminate uncertainty and would terminate the controversy giving rise to this cause.

126.    A declaratory judgment is necessary to resolve a question of title and ownership, essential to the administration of the Estate, that is outside the jurisdiction of the Orphans' Court.

127.    A declaratory judgment would afford certainty to the Estate and to parties interested in entering into contracts with the Estate.

128.    There exists a justiciable controversy between Plaintiff and Defendants.

129.    Accordingly, Plaintiff is entitled to a declaratory judgment under 28 U.S.C. § 2201.

WHEREFORE, Alexandra M. Clancy prays:

A.      That this Court determine and adjudicate the rights of the parties and declare as follows:

(1)     Tom Clancy owned the John Clark character at the time of his death;

(2)     At his death, ownership of the John Clark character passed to the Estate;

(3)     As of the date of Tom Clancy's death, the Defendants JREL and JRLP had no ownership interest in the John Clark character; and

(4)     As of the date of Tom Clancy's death, the Defendants JREL and JRLP had no right to share in revenue from any post-death published works on the basis of any ownership of the John Clark character;

B.     That the Court award Plaintiff costs of these proceedings and award reasonable attorney's fees pursuant to 17 U.S.C. § 505; and

C.     That this Court award such other and further relief as the nature of this cause may require.

### COUNT III

*(Declaratory Judgment – JREL's Claim to Certain Works)*

130.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 113 of the Amended Complaint.

131.     JREL contends that the JREL Books (*Red Storm Rising* (1986), *Patriot Games* (1987), *The Cardinal of the Kremlin* (1988), *Clear and Present Danger* (1989), and *The Sum of All Fears* (1991)) were created as works made for hire, within the meaning of 17 U.S.C. § 101, and that JREL therefore owns the copyrights to them.

132.     Plaintiff contends that the JREL Books were not created as works for hire.

133.     Plaintiff contends the JREL Books were not assigned to JREL.

134.     In view of the parties' contrary positions, an actual controversy exists between Plaintiff and the Defendants regarding ownership of the JREL Books.

135.    Plaintiff further states that antagonistic claims are presented indicating the likelihood of imminent and inevitable litigation.

136.    A declaratory judgment would serve to terminate uncertainty and would terminate the controversy giving rise to this cause.

137.    A declaratory judgment is necessary to resolve a question of title and ownership, essential to the administration of the Estate, that is outside the jurisdiction of the Orphans' Court.

138.    A declaratory judgment would afford certainty to the Estate and to parties interested in entering into contracts with the Estate.

139.    There exists a justiciable controversy between Plaintiff and Defendants.

140.    Accordingly, Plaintiff is entitled to a declaratory judgment under 28 U.S.C. § 2201.

WHEREFORE, Alexandra M. Clancy prays:

A.    That this Court determine and adjudicate the rights of the parties and declare as follows:

(1)    The following works were not created as works made for hire, within the meaning of 17 U.S.C. § 101, and were not assigned to JREL, and Tom Clancy owned (or, for *Red Storm Rising*, co-owned) the rights to these works at the time of his death: *Red Storm Rising* (1986), *Patriot Games* (1987), *The Cardinal of the Kremlin* (1988), *Clear and Present Danger* (1989), and *The Sum of All Fears* (1991) ("JREL Books");

(2)    At his death, ownership of the JREL Books passed to Tom Clancy's Estate;

(3)    Defendant JREL has no ownership interest in the JREL Books and no right to share in revenue derived from these works or from derivative works based on them or their characters; and

(4)    Alternatively, to the extent the JREL Books were validly assigned to JREL, any assignments are terminable by Tom Clancy's heirs pursuant to 17 U.S.C. § 203;

B.      That the Court award Plaintiff costs of these proceedings and award reasonable attorney's fees pursuant to 17 U.S.C. § 505; and

C.      That this Court award such other and further relief as the nature of this cause may require.

## COUNT IV

*(Declaratory Judgment – JRLP's Claim to Certain Works)*

141.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 113 of the Amended Complaint.

142.    JRLP contends that the JRLP Books (*Without Remorse* (1993), *Debt of Honor* (1994), and *Executive Orders* (1996)) were created as works made for hire, within the meaning of 17 U.S.C. § 101, and that JRLP therefore owns the copyrights to them.

143.    Plaintiff contends that the JRLP Books were not created as works for hire.

144.    Plaintiff contends that, if the Court determines that any of the JRLP Books was validly assigned to JRLP, including without limitation under the agreement dated February 26, 1992, any such assignment is terminable by Tom Clancy's heirs pursuant to 17 U.S.C. § 203.

145.    In view of the contrary positions of the parties, an actual controversy exists between Plaintiff and the Defendants regarding termination rights.

146.    Plaintiff further states that antagonistic claims are presented indicating the likelihood of imminent and inevitable litigation.

147.    A declaratory judgment would serve to terminate uncertainty and would terminate the controversy giving rise to this cause.

148.    A declaratory judgment would afford certainty to Plaintiff, JRLP and to parties interested in entering into contracts with the Estate.

149.    There exists a justiciable controversy between Plaintiff and Defendants.

150.    Accordingly, Plaintiff is entitled to a declaratory judgment under 28 U.S.C.

§ 2201.

WHEREFORE, Alexandra M. Clancy prays:

A.    That this Court determine and adjudicate the rights of the parties and declare as

follows:

(1)    The following works were not created as works made for hire,
within the meaning of 17 U.S.C. § 101: *Without Remorse* (1993),
*Debt of Honor* (1994), and *Executive Orders* (1996) ("JRLP
Books"); and

(2)    That, to the extent the JRLP Books were validly assigned to JRLP,
any assignments are terminable by Tom Clancy's heirs pursuant to
17 U.S.C. § 203;

B.    That the Court award Plaintiff costs of these proceedings and award reasonable

attorney's fees pursuant to 17 U.S.C. § 505; and

C.    That this Court award such other and further relief as the nature of this cause may

require.

## COUNT V

*(Declaratory Judgment – The Campus characters
including Jack Ryan, Jr. and the Caruso Brothers)*

151.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 113 of

the Amended Complaint.

152.    In view of the Defendants' position that, as of Tom Clancy's death, JREL and

JRLP were entitled to share in revenue from The Campus characters, including Jack Ryan, Jr.,

Dominic Caruso and Brian Caruso, and Plaintiff's position that JREL and JRLP have no interest

in these character rights, or in revenue derived from the exploitation of these characters in post-

death works, an actual controversy exists between Plaintiff and the Defendants.

153.     Plaintiff further states that antagonistic claims are presented indicating the likelihood of imminent and inevitable litigation.

154.     A declaratory judgment would serve to terminate uncertainty and would terminate the controversy giving rise to this cause.

155.     A declaratory judgment is necessary to resolve a question of title and ownership, essential to the administration of the Estate, that is outside the jurisdiction of the Orphans' Court.

156.     A declaratory judgment would afford certainty to the Estate and to parties interested in entering into contracts with the Estate.

157.     There exists a justiciable controversy between Plaintiff and Defendants.

158.     Accordingly, Plaintiff is entitled to a declaratory judgment under 28 U.S.C. § 2201.

WHEREFORE, Alexandra M. Clancy prays:

A.     That this Court determine and adjudicate the rights of the parties and declare as follows:

(1)     As of Tom Clancy's death, the Defendants JRLP and JREL had no ownership interest in Jack Ryan, Jr., Dominic Caruso, Brian Caruso or other copyrightable Campus characters; and

(2)     As of Tom Clancy's death, the Defendants JREL and JRLP had no right to share in revenue from any post-death published works on the basis of any ownership of the Jack Ryan, Jr., Dominic Caruso, or Brian Caruso or other copyrightable Campus characters;

B.     That the Court award Plaintiff costs of these proceedings and award reasonable attorney's fees pursuant to 17 U.S.C. § 505; and

C.     That this Court award such other and further relief as the nature of this cause may require.

/s/  Jeffrey E. Nusinov
Jeffrey E. Nusinov, Fed. Bar No. 26701

jnusinov@nusinovsmith.com
Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
**NUSINOV SMITH LLP**
The Marbury Building
6225 Smith Avenue, Suite 200B
Baltimore, Maryland 21209
(410) 554-3600
(410) 554-3636 (fax)

- and -


/s/ Lansing R. Palmer
Lansing R. Palmer, Fed. ID 807931
(admitted pro hac vice)
lansing.palmer@akerman.com
**AKERMAN LLP**
666 Fifth Avenue, 20th Floor
New York, NY 10103
(212) 880-3800
(212) 880-8965 (fax)

*Attorneys for Plaintiff Alexandra M. Clancy*

Dated:  February 12, 2019