## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

ALEXANDRA M. CLANCY,                           :

       Plaintiff,                                :

v.                                            :  

J.W. THOMPSON WEBB, individually,             :       Civil No. ELH-17-3371
as Personal Representative of the
Estate of THOMAS L. CLANCY, JR.               :
and Trustee of the Trusts under the
Last Will and Testament of THOMAS             :
L. CLANCY, JR., et al.,
                                              :
       Defendants.                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

### PLAINTIFF/COUNTERCLAIM DEFENDANT
### ALEXANDRA M. CLANCY'S MEMORANDUM OF LAW IN
### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF
### DEFENDANT/COUNTERCLAIM PLAINTIFF J.W. THOMPSON WEBB

Respectfully submitted,

/s/ Norman L. Smith
Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
**NUSINOV SMITH LLP**
The Marbury Building
6225 Smith Avenue, Suite 200B
Baltimore, Maryland 21209
(410) 554-3600

- and –

/s/ Lansing R. Palmer
Lansing R. Palmer, Fed. ID 807931
(admitted pro hac vice)
lansing.palmer@akerman.com
**AKERMAN LLP**
666 Fifth Avenue, 20th Floor
New York, New York 10103
(212) 880-3800

*Attorneys for Plaintiff Alexandra M. Clancy*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

PROCEDURAL HISTORY ................................................................................... 3

      (a)    The Complaint ............................................................................ 4

      (b)    The Counterclaims ..................................................................... 5

      (c)    The Amended Complaint ........................................................... 6

      (d)    Webb's Motion for Summary Judgment ................................... 7

ARGUMENT ..................................................................................................... 8

   I.    The Court Lacks Jurisdiction Over Webb's Counterclaim ................................... 8

   II.   Summary Judgment Must Be Denied Because Of The Existence Of
       Disputed, Material Facts ...................................................................... 12

      (a)    Legal Standard on Summary Judgment ................................... 12

      (b)    Disputed Facts Material to Webb's Motion ............................. 13

   III.  Contrary to Webb's Motion, Plaintiff's Claims Are Supported By
       Copyright Law ...................................................................................... 14

      (a)    A Character is A Protected Element of A Copyrighted Work ................. 14

      (b)    Copyright In A Work Exists From Creation, Not Registration, And
           Is Owned By the Individual Author If The Work Is Not A "Work
           for Hire" ..................................................................................... 16

      (c)    Tom Clancy Individually Owned And Never Assigned the
           Character Jack Ryan, As Evidenced By the 1988 Settlement
           Agreement ................................................................................... 19

      (d)    General Assignments of An Underlying Work's Copyright Do Not
           Include Exclusive Character Rights ........................................... 22

   IV.  None of the Authorities Cited By Webb Addresses Whether Rights in
       Characters Can Be Owned Separately From Ownership of the Copyright
       in the Underlying Work .......................................................................... 26

CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Smith*,
    558 U.S. 87, 130 S. Ct. 576, 175 L. Ed. 2d 447 (2009)....................................................11, 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).........................................................13

*Bond v. Blum*,
    317 F.3d 385 (4th Cir. 2003), *abrogated on other grounds by Kirtsaeng v.*
    *John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 195 L. Ed. 2d 368 (2016). ...................................17

*Burroughs v. Metro-Goldwyn-Mayer*, Inc.,
    519 F. Supp. 388 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 610 (2d Cir. 1982).................................15

*Collins & Aikman Corp. v. Carpostan Indus., Inc.*,
    905 F.2d 1529 (4th Cir. 1990) ................................................................................................17

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730, 109 S. Ct. 2166, 104 L.Ed. 2d 811 (1989)...............................................1, 6, 19

*Conan Properties Int'l LLC v. Sanchez*,
    No. 1:17-CV-00162-FB-RLM, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018) ...............26, 27

*Conan Properties Int'l LLC v. Sanchez*,
    No. 17-CV-162, 2018 WL 4522099 (E.D.N.Y. June 8, 2018) .................................................26

*Cook v. SCI Md. Funeral Servs.*,
    No. 14-3770-GLR, 2016 WL 890298 (D. Md. Mar. 9, 2016)....................................................9

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) .................................................................................................22

*Edgerton v. UPI Holdings*,
    No. CCB-09-1825, 2010 WL 2651304 (D. Md. July 1, 2010).........................................16, 17

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
    342 F.3d 149 (2d Cir. 2003).........................................................................................7, 18, 27

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
    No. 00 CIV. 9569 (DLC), 2002 WL 398696 (S.D.N.Y. Mar. 15, 2002),
    *aff'd sub nom. Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342
    F.3d 149 (2d Cir. 2003)............................................................................................................18

iii

*Fourth Estate Public Benefit Corp. v. Wall-Street.com*,
   139 S. Ct. 881, 203 L. Ed. 2d 147 (2019) .......................................................................16

*Hogs and Heroes Foundation Inc. v. Heroes, Inc.*,
   202 F. Supp. 3d 490 (D. Md. 2016) ...............................................................................11

*Jim Henson Productions v. John T. Brady & Assocs.*,
   16 F. Supp. 2d 259 (S.D.N.Y. 1997) ........................................................................22, 24

*Klinger v. Conan Doyle Estate, Ltd.*,
   755 F.3d 496 (7th Cir. 2014) .........................................................................................15

*Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*,
   777 F.3d 678 (4th Cir. 2015) ...........................................................................................9

*Leisure Time Entertainment v. Cal Vista*,
   No. 94-56407, 1996 WL 115167 (9th Cir. Mar. 14, 1996).............................................23

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) .........................................................................................13

*Long v. Welsh & Rushe, Inc.*,
   28 F. Supp. 3d 446 (D. Md. 2014) ..................................................................................9

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002).........................................................................................17

*Matsushita Elect. Indust. Co. v. Zenith, Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ..............................................12

*McGovern v. Braun*,
   No. CV-12-672-PHX-GMS, 2012 WL 1946600 (D. Ariz. May 30, 2012)............................10

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)...........................................10, 11, 12

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
   722 F.3d 591 (4th Cir. 2013) .........................................................................................21

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
   900 F. Supp. 1287 (C.D. Cal. 1995) ...............................................................................15

*Olson v. Nat'l Broad. Co.*,
   855 F.2d 1446 (9th Cir. 1988) ......................................................................................15

*Philipp v. Jerome H. Remick & Co.*,
   145 F. Supp. 756 (S.D.N.Y. 1956) .................................................................................23

*Selseth v. Darwit*,
   536 F. Supp. 2d 883 (N.D. Ill. 2008) ...................................................................10

*Settlers Crossing, L.L.C. v. U.S. Home Corp.*,
   383 Fed. Appx. 286 (4th Cir. 2010) ..................................................................12

*Silverman v. CBS, Inc.*,
   870 F.2d 40 (2d Cir. 1989) ...............................................................................15

*State Farm Life Ins. Co. v. Cai*,
   No. 09-CV-00396-LHK, 2010 WL 4628228 (N.D. Cal. Nov. 4, 2010) ................10

*Temkin v. Frederick County Commissioners*,
   945 F.2d 716 (4th Cir. 1991) ............................................................................13

*Toho Co. v. William Morrow & Co.*,
   33 F. Supp. 2d 1206 (C.D. Cal. 1998) ...............................................................15

*Trust Co. Bank v. MGM*,
   593 F. Supp. 580 (N.D. Ga. 1985), *aff'd*, 772 F.2d 740 (11th Cir. 1985) ..............25

*Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*,
   216 F.2d 945 (9th Cir. 1954) .................................................................22, 23, 24, 25

*Weinstein Co. v. Smokewood Entertainment Group, LLC*,
   664 F. Supp. 2d 332 (S.D.N.Y. 2009)................................................................23

*Worsham v. U.S. Dep't of the Treasury*,
   No. ELH-12-2635, 2013 WL 5274358 (D. Md. Sept. 17, 2013).........................11

*Yassa v. EM Consulting Group., Inc.*,
   261 F. Supp. 3d 564 (D. Md. 2017) ....................................................................8

*Zachair, Ltd. v. Driggs*,
   965 F. Supp. 741 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998) .................8

**Statutes**

17 U.S.C. § 101 ...................................................................................................17

17 U.S.C. § 102 ...................................................................................................17

17 U.S.C. § 106 ...................................................................................................17

17 U.S.C. § 201(a) ...............................................................................................17

17 U.S.C. § 201(b) ...........................................................................................1, 17

17 U.S.C. § 204(a) ...............................................................................................21

17 U.S.C. § 408(a) ..................................................................................................16

17 U.S.C. § 411(a) ..................................................................................................16

28 U.S.C. § 1367 ..................................................................................................3, 9

28 U.S.C. § 1367(a) ..................................................................................................9

**Rules**

Fed. R. Civ. P. 13(b) .................................................................................................8

Fed. R. Civ. P. 56(a) ...............................................................................................12

Fed. R. Civ. P. 56(c)(1) .............................................................................................2

**Other Authorities**

U.S. Copyright Office,
    Compendium of U.S. Copyright Office Practices § 313.4(H) (3d ed. 2017) .........................27

Plaintiff and Counterclaim Defendant Alexandra M. Clancy ("Plaintiff"), by her undersigned counsel, respectfully submits this Memorandum of Law in Support of her Opposition to the Motion for Summary Judgment ("Motion") (ECF 82) filed by Defendant and Counterclaim Plaintiff J.W. Thompson Webb ("Webb").

## PRELIMINARY STATEMENT

Webb asks this Court to declare that he acted "reasonably" and "prudently" in entering into numerous publishing and allocation contracts as Personal Representative on behalf of the Estate of Tom Clancy[1] based upon, "among other things," a single "legal premise that the copyright to literary character is an extension of and tied to the copyright for the underlying work in which the character was created, as a derivative work thereof." ECF 82 at 3.

In his Motion, Webb misstates relevant copyright law and mischaracterizes the legal grounds on which Plaintiff seeks a declaratory judgment of the Estate's ownership of the character Jack Ryan as well as other characters and works created by Tom Clancy. In fact, Plaintiff asserts two separate bases for these declarations of ownership: first that Tom Clancy created the character Jack Ryan in early works preceding the publication of *The Hunt for Red October* ("*Hunt*"), explicitly withholding his rights in the character Jack Ryan from his assignment to his publisher of *Hunt*, and never later assigned those rights; and second, that under the governing standards set forth by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L.Ed. 2d 811 (1989), the later works created by Tom Clancy featuring the character Jack Ryan and other characters do not qualify as "works for hire" under the Copyright Act. *See* 17 U.S.C. § 201(b).

---

[1] The "Estate" means and refers to the Estate of Thomas L. Clancy, Jr., Estate No. 101962, pending in the Orphans' Court for Baltimore City.

Moreover, the propriety of Webb's administration of the Estate is within the province of the Orphans' Court for Baltimore City.  The declaration that Webb seeks – that as Personal Representative he acted properly in his administration of the Estate – is a thinly-veiled attempt to usurp the authority of the Orphans' Court where Webb's conduct as Personal Representative is currently under scrutiny in two proceedings.  First, Plaintiff filed Exceptions on February 21, 2017 to Webb's Revised Second Administration Account, alleging that the Estate had failed to collect the appropriate proceeds from post-death publishing contracts.  Ex. A.  Second, on June 21, 2019, Plaintiff filed a Petition in the Orphans' Court seeking the removal of Webb as Personal Representative on multiple grounds, including Webb's mismanagement of the proceeds from the contracts in violation of an Order of the Orphans' Court.  Ex. B.  Both proceedings are pending before the Orphans' Court and this Court should deny Webb's Motion as an inappropriate "end run" around the Orphans' Court.

Even if Webb had accurately set forth the bases for Plaintiff's requested declaration of ownership (which he has not), Webb would still not be entitled to a declaration that he acted "reasonably" and "prudently."  As "undisputed facts," Webb asserts that, as Personal Representative, he negotiated and executed publishing and revenue allocation agreements on behalf of the Estate; that in negotiating and executing those agreements, he relied on the advice of counsel; and that the legal premise upon which such advice was based is correct as a matter of law.  In support, Webb offers no admissible evidence, as required by Fed. R. Civ. P. 56(c)(1).  He cites no documents, affidavits, or admissions; his pleading is unverified; and he offers no expert testimony to support the allegedly undisputed fact of his reasonable reliance on advice of counsel.  Nor does he identify the "other things" upon which his "reasonable and prudent" actions were based.  But, as this Memorandum shows – and Webb fails to mention – he received

advice from counsel on the issue of character ownership that not only contradicts his asserted legal premise but also supports the Estate's ownership of the character Jack Ryan. Thus, the Court lacks sufficient undisputed facts upon the current record to judge the reasonableness or prudence of Webb's conduct.[2]

Finally, this Court lacks jurisdiction over Webb's counterclaim. First, the counterclaim is insufficiently related to the "case or controversy" between the real parties in interest to meet the standard of supplemental jurisdiction under 28 U.S.C. § 1367. Second, his counterclaim is barred by the "probate exception" to federal jurisdiction as it relates only to the propriety of Webb's actions as Personal Representative of the Estate. Third, the counterclaim seeks nothing more than an advisory opinion that will result in piecemeal adjudication of defenses on claims that are properly within the province of the Orphans' Court.

## **PROCEDURAL HISTORY**

This case began in the Orphans' Court for Baltimore City with the filing by Plaintiff Alexandra M. Clancy of Exceptions to the Revised Second Administration Account of Webb, as Personal Representative of the Estate. Specifically, Mrs. Clancy objected to the allocation of proceeds from post-death book contracts among the Estate and Defendants Jack Ryan Enterprises, Ltd. ("JREL") and Jack Ryan Limited Partnership ("JRLP") (collectively, the "JR Entities"), as negotiated by Webb and reported in the Administration Account. Ex. A.

As grounds for her objection, Mrs. Clancy maintained that, at his death, her husband Tom Clancy owned the exclusive rights to his literary characters including the famous character "Jack Ryan" and that those characters are now owned by the Estate. Thus, revenues from books

---

[2]     If Webb sets forth purported undisputed facts in his reply memorandum, Plaintiff respectfully requests the right to a surreply.

published after Tom Clancy's death under the name Tom Clancy and exploiting Clancy-created characters belong exclusively to the Estate and not to the JR Entities.

Because the Orphans' Court lacks the power to adjudicate the ownership of literary characters, or to enter declaratory judgment, the Orphans' Court, by Consent Order dated July 25, 2017, directed Mrs. Clancy to file a declaratory action in a court of general jurisdiction.

**(a)** **The Complaint**

Mrs. Clancy filed her complaint in the Circuit Court for Baltimore City, naming as Defendants Webb, the JR Entities, and Rubicon, Inc. (a nominal defendant, being wholly-owned by the Estate). The Complaint sought a judicial declaration that certain literary characters created by Tom Clancy in *Hunt*, including the character Jack Ryan, were owned by Tom Clancy at his death; that those characters are now owned by the Estate and not by the JR Entities; and therefore revenues from books published after Tom Clancy's death under the name Tom Clancy and exploiting Clancy-created characters belonged exclusively to the Estate and not to the JR Entities. ECF 2.

Based on her knowledge at that time, Plaintiff assumed that *Hunt*, which was published by the United States Naval Institute Press ("USNI"), was the first work created by Tom Clancy that featured the character Jack Ryan. Also based on her knowledge at the time, Plaintiff admitted in her Answers that certain Jack Ryan books published after *Hunt* had been written by Tom Clancy as "works for hire" in his capacity as an "employee" of the JR Entities, and therefore were owned by these entities. ECF 19, 27.

Although Plaintiff did not assert any claim against Webb for breach of fiduciary duty as Personal Representative, there were allegations in the Complaint that he entered into agreements with the JR Entities that erroneously allowed these entities to share in post-death book revenues.

(b)     **The Counterclaims**

All Defendants answered the Complaint and both the JR Entities and Webb filed

counterclaims.  In their counterclaim, the JR Entities alleged the existence of an actual

controversy concerning Plaintiff's asserted ownership rights to Clancy-created characters and

claimed such rights for the JR Entities.  ECF 9.  Based on their counterclaim, the JR Entities

removed the case to this Court, alleging federal copyright issues.  ECF 10.

Webb also purported to allege an "actual controversy" in his counterclaim for declaratory

relief.  ECF 4.  In his counterclaim, Webb asserted that "Mrs. Clancy repeatedly accuses Webb

of failing to effectively discharge his duties and powers . . . " and that "contrary to Mrs. Clancy's

allegations. . . Webb has acted in a prudent and businesslike manner and in good faith reliance

upon the advice and counsel of intellectual property lawyers . . . "  ECF 4 at ¶¶ 6-7.  Therefore,

the "actual controversy" alleged in Webb's counterclaim appears to rest solely upon the

allegations in Plaintiff's Complaint directed towards Webb's conduct.  Webb's counterclaim

seeks a broad declaration that "Webb, in connection with the negotiation and execution of the

publishing and allocation agreements that he has executed on behalf of the Estate and Rubicon

following Mr. Clancy's death, acted in a prudent and businesslike manner and effectively

discharged his duties and powers as Personal Representative of the Estate, properly managed

property belonging to the Estate, and adhered to his fiduciary responsibilities as Personal

Representative of the Estate."  ECF 4 at 23-24.

Following initial discovery in the case, Plaintiff amended her Complaint, as described

below and *excluded* every allegation relating to Webb's conduct.  Webb, however, never

amended his counterclaim.  As a result, the purported "actual controversy" upon which his

entitlement to declaratory relief is based addresses allegations in a superseded pleading.

**(c)    The Amended Complaint**

During the course of initial discovery, Plaintiff uncovered documentary evidence that further supports and enhances her claims that the Estate owns the character Jack Ryan, and that buttresses additional claims that the Estate owns later works written by Tom Clancy because those works were not "works for hire," as claimed by the defendants in their counterclaims.  This evidence formed the basis for the filing of the Amended Complaint.  ECF 60.

In particular, Plaintiff's counsel discovered two additional works written by Tom Clancy in 1983 (or even earlier): (1) early draft chapters of *Patriot Games*, and (2) "*The Jack Ryan Saga*" (collectively, these two works are referred to as the "Early Jack Ryan Works").  This evidence establishes that the Jack Ryan character was fully delineated in the Early Jack Ryan Works prior to the publication of *Hunt* in 1984.  Moreover, because the Early Jack Ryan Works were created before the JR Entities even existed, it is undisputed they could not have been works made for hire.

In addition, other newly-discovered evidence, including the deposition of Wanda King (Tom Clancy's former wife and business partner in the JR Entities), and the JR Entities' tax returns from the 1980s, demonstrates that many of the books written by Tom Clancy following *Hunt*, including *The Cardinal of the Kremlin*, *Clear and Present Danger*, *Sum of all Fears*, *Without Remorse*, *Debt of Honor*, and *Executive Orders* (collectively, these works are referred to as the "Later Jack Ryan Works") were not written as "works for hire," as claimed by the JR Entities in their counterclaim, because Tom Clancy and the JR Entities had no genuine employer-employee relationship as required by the Copyright Act and as explicated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L.Ed. 2d 811 (1989).  Such evidence contradicted and rebutted any statements made in

6

copyright registrations that the works were made for hire. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003), discussed *infra* at 18.

In her Amended Complaint, Plaintiff seeks a declaration that the Estate owns the character Jack Ryan by reason of the Estate's ownership of the Early Jack Ryan Works, and because Tom Clancy never assigned the character Jack Ryan as featured in *Hunt*. ECF 60 at ¶¶ 41-42. Plaintiff also seeks a declaration that the Estate owns the Later Jack Ryan Works as they are neither works made for hire nor were they ever assigned by Tom Clancy to the JR Entities. ECF 60 at ¶¶ 72, 79. Finally, Plaintiff seeks declarations that the Estate owns the character John Clark, and that, at Tom Clancy's death, the JR Entities had no interest in the literary characters Jack Ryan Jr., Dominic and Brian Caruso, and other "Campus" characters created by Tom Clancy. ECF 60 at ¶ 88.

At the same time, Plaintiff removed all background allegations regarding Webb's actions as Personal Representative. Webb answered the Amended Complaint, but failed to amend his counterclaim. Thus, as noted above, any "actual controversy" he alleges arise from a pleading that is no longer in the case.

**(d)** **Webb's Motion for Summary Judgment**

Webb filed his Motion on June 21, 2019, in apparent response to Plaintiff's Orphans' Court Petition to Remove Webb as Personal Representative. The Petition was based on Webb's further breaches of fiduciary duty, including his willful violation of an Orphans' Court Order directing that all proceeds from post-death intellectual property contracts be held in escrow pending resolution of the dispute over allocation of proceeds. Ex. B.

In his Motion, Webb attempts to narrow his counterclaim to a declaration limited in scope to whether a specific legal premise purportedly provided to him by intellectual property lawyers – namely, "that the copyright to literary character is an extension of and tied to the

copyright for the underlying work in which the character was created, as a derivative work thereof " – is "correct," such that his reliance on this legal premise when entering into agreements could not have been a breach of fiduciary duty.  Webb cannot narrow his pleading by Motion. *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998) ("[plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint") (internal citations omitted).  Moreover, viewing Webb's Motion through the lens of the underlying ownership dispute between the real parties in interest – the Estate and the JR Entities – there is simply no portion of the ownership dispute that will be resolved by application of the legal principle Webb asks this Court to declare.

As outlined herein, Webb's Motion must be denied because:

(1)   The Court lacks jurisdiction over Webb's counterclaim.

(2)   There exist disputed, material facts that preclude summary judgment.

(3)   The Motion's mischaracterizes Plaintiff's claims, which are well supported by relevant copyright law.

(4)   The Motion fails to cite any authorities in support of its argument that rights in characters cannot be owned separately

## ARGUMENT

## I.   The Court Lacks Jurisdiction Over Webb's Counterclaim

Webb's counterclaim is undisputedly permissive under Fed. R. Civ. P. 13(b), and thus may be asserted only if the court has subject matter jurisdiction to hear the claim.  The court, however, retains the discretion to refuse permissive counterclaims that threaten to unduly complicate the litigation. *Yassa v. EM Consulting Group., Inc.*, 261 F. Supp. 3d 564, 565 (D. Md. 2017) (citing Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1420 (3d ed. 2017)).

Here, the Plaintiff not only asserts no claim against Webb but also the reasonableness of his conduct as Personal Representative is not a part of and does not arise out of the Plaintiff's claim for a declaration of ownership to intellectual property. Thus, subject matter jurisdiction over Webb's counterclaim depends solely upon the Court's supplemental jurisdiction under 28 U.S.C. § 1367, the exercise of which is in turn dependent upon the counterclaim's relation to the Plaintiff's (now amended) Complaint. *See Cook v. SCI Md. Funeral Servs.*, No. 14-3770-GLR, 2016 WL 890298, at *5-6 (D. Md. Mar. 9, 2016). *See also Long v. Welsh & Rushe, Inc.*, 28 F. Supp. 3d 446, 451 (D. Md. 2014) ("Because the court has neither federal question nor diversity jurisdiction over the counterclaims, 28 U.S.C. § 1367(a) provides the only possible basis for jurisdiction.").

To be cognizable under the court's supplemental jurisdiction, the claims must be "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution." 28 U.S.C. § 1367(a). Even if a claim is otherwise cognizable under 28 U.S.C. § 1367(a), the court may decline to exercise its supplemental jurisdiction if the claim "raises a novel or complex issue of State law." Here, the issue of whether Webb "acted in a prudent and businesslike manner and effectively discharged his duties as powers as Personal Representative of the Estate," is completely unrelated to the Plaintiff's request for a declaration of intellectual property ownership. ECF 82-1 at 2.

Furthermore, Webb's claims are barred by the "probate exception" to federal jurisdiction, which "reserves to state probate courts the probate or annulment of a will *and the administration of a decedent's estate*." *Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*, 777 F.3d 678, 680 (4th Cir. 2015) (citing *Marshall v. Marshall*, 547 U.S. 293, 311-12, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006)) (emphasis added). Webb requests a declaration from this Court concerning

9

matters of estate administration that are properly before the Orphans' Court and beyond this Court's jurisdiction. *See Selseth v. Darwit*, 536 F. Supp. 2d 883, 887 (N.D. Ill. 2008) ("[R]esolution of the RICO action hinges on the determination of whether [the former personal representative] acted properly with respect to his administration of the Estate during his tenure as co-trustee and co-executor. *If plaintiffs succeed on this claim would necessarily interfere with the administration of the estate by the probate court . . .*") (emphasis added). *See also State Farm Life Ins. Co. v. Cai*, No. 09-CV-00396-LHK, 2010 WL 4628228, at *4 (N.D. Cal. Nov. 4, 2010) ("[T]o the extent [the defendant] requests removal of the Special Administrator or otherwise asks this Court to take over administration of estate assets, the Court lacks subject matter jurisdiction under the probate exception to federal jurisdiction.").

Also subject to the exclusive jurisdiction of the Orphans' Court are Mrs. Clancy's allegations challenging Webb's decisions, as Personal Representative, with regard to Estate assets; namely, his determination of what assets belong to the Estate, collection of revenues for the Estate, and allocation of intellectual property revenues – all matters outside of this Court's jurisdiction. *See McGovern v. Braun*, No. CV-12-672-PHX-GMS, 2012 WL 1946600 (D. Ariz. May 30, 2012) (determinations of "who should administer [the] Estate, what property is in the Estate, and to whom the Estate should distribute that property" primarily concern "'the administration of a decedent's estate'" and are subject to the probate exception) (citing *Marshall*, 547 U.S. at 312, 126 S. Ct. 1735).

Moreover, Webb's counterclaim should not be entertained by this Court because it does not constitute a "case or controversy." To satisfy the case or controversy requirement of Article III, a declaratory judgment action such as Webb's counterclaim must present a dispute that is "'definite and concrete . . . .'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.

Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)).  "[A] court must consider the particular facts of each case, and weigh 'whether the facts alleged show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of declaratory judgment.'"  *Hogs and Heroes Foundation Inc. v. Heroes, Inc*., 202 F. Supp. 3d 490, 494 (D. Md. 2016) (quoting *MedImmune, Inc.*, 549 U.S. at 127, 127 S. Ct. 764).

The burden is on the declaratory judgment plaintiff to show, in a fact-specific inquiry, that "'all of the circumstances' establish a 'substantial controversy.'"  *Id.* at 495 (quoting *Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d 888, 901 (D. Md. 2008)).  A controversy that is too vague and unsubstantiated, *id.*, or which has been mooted by subsequent developments, will not support jurisdiction.  *Alvarez v. Smith*, 558 U.S. 87, 93, 130 S. Ct. 576, 175 L. Ed. 2d 447 (2009).

A claim for declaratory judgment must request a "'decree of conclusive character'" as opposed to "'an opinion advising what the law would be upon a hypothetical state of facts.'"  *MedImmune, Inc.*, 549 U.S. at 127, 127 S. Ct. 764 (quoting *Aetna*, 300 U.S. at 240–41, 57 S. Ct. 461).  "A 'federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.'"  *See, e.g., Worsham v. U.S. Dep't of the Treasury*, No. ELH-12-2635, 2013 WL 5274358 at *8 (D. Md. Sept. 17, 2013) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975)).  Therefore, a litigant may not use a declaratory judgment action to "obtain piecemeal adjudication of defenses that would not finally and conclusively resolve the underlying controversy."  *MedImmune, Inc.*, 549 U.S. at 127 n.7, 127 S. Ct. 764 (citing *Calderon v. Ashmus*, 523 U.S. 740, 749, 118 S. Ct. 1694, 140 L. Ed. 2d 970 (1998))  Nor may a litigant use a declaratory judgment

action to obtain a court's observations of historical fact about a transaction (*see, e.g., Settlers Crossing, L.L.C. v. U.S. Home Corp.*, 383 Fed. Appx. 286, 288 (4th Cir. 2010) (citing *MedImmune, Inc.*, 549 U.S. at 127, 127 S. Ct. 764)), or the meaning of a law, abstracted from any concrete harm. *See Alvarez*, 558 U.S. at 93, 130 S. Ct. 576.

Webb's counterclaim for declaratory judgment is no longer founded on any "definite and concrete" controversy under Article III. Webb claims only that "Plaintiff's assertions" about him in the original Complaint created the "controversy" for which he seeks resolution (ECF 4 at 21-22), but these allegations were excluded from the Amended Complaint. As a result, the claimed "controversy" was mooted by subsequent developments. *See Alvarez*, 558 U.S. at 93, 130 S. Ct. 576.

Moreover, Webb's counterclaim requests an advisory opinion that Webb hopes to use in the Orphans' Court in defense of the Petition to remove him as Personal Representative. This amounts to "piecemeal adjudication of defenses" on claims that have not yet arisen before this Court. *MedImmune, Inc.*, 549 U.S. at 127 n.7, 127 S. Ct. 764 (citing *Calderon v. Ashmus*, 523 U.S. 740, 749, 118 S. Ct. 1694, 140 L. Ed. 2d 970 (1998)).

Since the Court lacks jurisdiction over Webb's counterclaim, the Court should deny his Motion for this reason alone.

## II.     Summary Judgment Must Be Denied Because Of The Existence Of Disputed, Material Facts

### (a)     Legal Standard on Summary Judgment

Summary judgment shall only be granted when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The award of summary judgment is precluded where the non-moving party demonstrates there are disputes of material fact. *Matsushita Elect. Indust. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586, 106 S.

Ct. 1348, 89 L. Ed. 2d 538 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

In considering a motion for summary judgment, the court should believe the evidence of the nonmovant and draw justifiable inferences in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S. Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). Summary judgment is inappropriate if "there are genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 250.

The moving party bears the initial burden of showing that there is no genuine issue as to any material fact." *Anderson*, 477 U.S. at 256, 106 S. Ct. 2505. Only once the moving party has met this burden does the burden shift to the non-moving party to present evidence sufficient to create a triable issue of fact. *See Temkin v. Frederick County Commissioners*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505).

In his Motion, Webb fails to meet his initial burden of showing there is no genuine issue as to any material fact by stating three vague sentences of "undisputed facts" unsupported by any citation to the record. Therefore, Plaintiff submits the burden has not shifted to Plaintiff to present evidence sufficient to create a triable issue of fact.

### (b)    Disputed Facts Material to Webb's Motion

As "undisputed facts," Webb asserts that, as Personal Representative, he negotiated and executed publishing and allocation agreements on behalf of the Estate; that in negotiating and executing those agreements, he relied on the advice of counsel; and that the legal premise upon which such advice was based is correct as a matter of law. ECF 82 at 2-3. Webb cites no record

13

evidence, nor does he even connect the asserted legal premise to the actual facts underpinning Plaintiff's claims of ownership as asserted in the Amended Complaint.

By contrast, Plaintiff asserts that the intellectual property lawyers upon whose advice Webb claims to have relied provided advice to Webb that contradicts the "legal premise" asserted in the Motion. ██████████████████████████

████████████████████████████████████

██████████████████████████ Ex. C. █████████

████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████ Ex. D.  Nevertheless, Webb continued to execute publishing and allocation agreements without regard to this clear advice.

Notably, Webb's Motion fails to explain why the legal premise repeated throughout his Motion supports his conclusion about character ownership, or even what that conclusion was. Thus, Webb's Motion rests not upon undisputed facts, but upon an erroneous assumption: that as long as Webb relied upon a "correct" legal premise, no matter how skewed his application of that legal premise to the facts before him, or his ultimate conclusion about character ownership, he should be declared to have acted "reasonably" and "prudently."  This further illustrates that Webb has failed to establish the undisputed facts that would be material to the Court's determination on his Counterclaim.

**III.** **Contrary to Webb's Motion, Plaintiff's Claims Are Supported By Copyright Law**

    **(a)** **A Character is A Protected Element of A Copyrighted Work**

Contrary to Webb's Motion, Plaintiff contends a character is a protected copyrightable element of a copyrighted work, just like plots, settings, dialogue, narrative descriptions and other

expressions.  Where sufficiently developed, characters are uniformly protected by copyright.[3]

*See Burroughs v. Metro-Goldwyn-Mayer*, Inc., 519 F. Supp. 388, 391 (S.D.N.Y. 1981) (as a

distinctive character, "Tarzan" is copyrightable), *aff'd*, 683 F.2d 610 (2d Cir. 1982); *Metro-*

*Goldwyn-Mayer, Inc. v. Am. Honda Motor Co*., 900 F. Supp. 1287, 1295–96 (C.D. Cal. 1995)

(holding James Bond protectable because he is a "unique character"); *Toho Co. v. William*

*Morrow & Co*., 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998) (as an iconic fictional character,

Godzilla is copyrightable); *Klinger v. Conan Doyle Estate, Ltd*., 755 F.3d 496, 502–03 (7th Cir.

2014) ("Holmes and Watson were distinctive characters and therefore copyrightable").

     The copyright in a work protects all such copyrightable elements including

characters.  Webb mischaracterizes Plaintiff's position when he alleges that she claims that

protection for characters originates independently from any underlying work or that a character

is capable of being independently registered for copyright.  Webb's misunderstanding of

Plaintiff's position results from his misreading, or misstating, the facts and allegations in the

Amended Complaint.

     In her Amended Complaint, Plaintiff alleges that the character Jack Ryan was sufficiently

developed in the Early Jack Ryan Works, and that the Estate owns the character Jack Ryan *by*

*reason of its ownership of the copyright* in these first works featuring Jack Ryan.  ECF 60 at ¶

41.  Subsequent works featuring Jack Ryan are "derivative works," as acknowledged by Webb.

ECF 82-1 at 2.  Plaintiff also alleges that the Estate owns the copyrights in the Later Jack Ryan

---

[3]    Cases discussing the copyrightability of characters often turn on whether the character is sufficiently developed and delineated to warrant protection. *See, e.g., Olson v. Nat'l Broad. Co*., 855 F.2d 1446, 1452 (9th Cir. 1988) (characters copyrightable only when "especially distinctive"); *Silverman v. CBS, Inc*., 870 F.2d 40, 50 (2d Cir. 1989) ("Amos 'n' Andy" characters were sufficiently delineated as to be copyrightable).  In his Motion, Webb does not question whether the Jack Ryan character was sufficiently developed and delineated to be protected in the Early Jack Ryan Works, *Hunt*, or any of the subsequent works written by Tom Clancy that Plaintiff contends to be owned by the Estate.

Works, ECF 60 at ¶ 131, and therefore the Estate owns the character Jack Ryan as developed in these works.

Finally, Plaintiff contends that the JR Entities have no ownership in the characters created in the works for which Rubicon owns the copyright, including the characters Jack Ryan Jr. and Dominic Caruso. ECF 60 at ¶ 88. Webb has failed to challenge this position, and has also failed to justify why the revenues from the sales of post-death books featuring these characters must be shared with the JR Entities.

**(b)**     **Copyright In A Work Exists From Creation, Not Registration, And Is Owned By the Individual Author If The Work Is Not A "Work for Hire"**

Webb implies in the Motion that the absence of copyright registrations is fatal to Plaintiff's claims of ownership. He is wrong. Registration, while a prerequisite for an infringement suit under 17 U.S.C. § 411(a), is not a prerequisite to a determination of ownership, nor is registration necessary to create federal copyright protection.[4] *Fourth Estate Public Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881, 887, 203 L. Ed. 2d 147 (2019) (acknowledging that "[a]n author gains 'exclusive rights' in her work immediately upon the work's creation," and that "an owner's rights exist apart from registration . . ."). *See also Edgerton v. UPI Holdings*, No. CCB-09-1825, 2010 WL 2651304 at *5 (D. Md. July 1, 2010) (citing 17 U.S.C. § 302(a)).

Copyright protection applies to "original works of authorship fixed in any tangible medium of expression. . . ." 17 U.S.C. § 102. The requirement of "fixation," or physical embodiment, is met where a work is sufficiently permanent or stable to permit it to be perceived,

---

[4]    Webb has acknowledged this expressly in a prior filing in this case: "[w]hile *registration with the United States Copyright Office is not a condition of copyright protection*, pre-registration or registration are required before an action for infringement may be initiated. 17 U.S.C. §§408(a), 411(a)." ECF 18 at p. 4. (emphasis added). Therefore, Webb's repeated incantation of the registration requirement for commencing an infringement action is a blatant attempt at misdirection that improperly conflates a procedural step in infringement litigation (not present here) with the underlying substantive ownership issues for the Court to decide on the merits in this declaratory judgment action.

reproduced, or otherwise communicated for other than transitory duration.  *See* 17 U.S.C. § 101; *Collins & Aikman Corp. v. Carpostan Indus., Inc.*, 905 F.2d 1529 (4th Cir. 1990).

"[C]opyright in an original work exists from the moment of creation. . . . "  *Edgerton*, 2010 WL 2651304 at *5 (citing 17 U.S.C. § 302(a) ("Copyright in a work created on or after January 1, 1978, subsists from its creation . . .")).  Generally, copyright automatically vests in the individual creator.  *See* 17 U.S.C. § 201(a) ("Copyright in a work protected under this title vests initially in the author or authors of the work").  The ownership of a copyright confers exclusive rights over the work.  *See* 17 U.S.C. § 106.  *See also Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003), *abrogated on other grounds by Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 195 L. Ed. 2d 368 (2016).

The only exception to the general rule that copyright vests in the individual creator is found where a copyrightable work is one that is "made for hire."  In that case, the employer owns the copyright initially upon the creation of a copyrightable work.  *See* 17 U.S.C. § 201(b). "Courts engaging in [a work for hire] analysis have focused on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (holding that creator was not bound by the statement in an agreement that stated that work was a "work for hire").

In her Amended Complaint, Plaintiff asserts, consistent with copyright law, that ownership of the copyright in the Jack Ryan character as part of the Early Jack Ryan Works existed upon the works' fixation in a tangible medium of expression, *i.e.*, when Tom Clancy hand-wrote or typed them in 1983 or earlier.  Thus, ownership vested in Tom Clancy automatically upon creation and fixation because the works were not created as works for hire (and of course could not possibly have been made for hire for the JR Entities did not exist in

17

1983).  Upon Tom Clancy's death, ownership of the copyright in these works passed to the Estate.  Although the Early Jack Ryan Works are not registered, registration is not a necessary prerequisite for this action, which seeks a declaration of ownership.

Additionally, in her Amended Complaint Plaintiff asserts that, because Later Jack Ryan Works do not qualify as works for hire under the Copyright Act, Tom Clancy owned the copyright in these works individually and these copyrights also passed to the Estate.  ECF 60 at ¶ 67.  Although the JR Entities hold copyright registrations in the Later Jack Ryan Works that describe these as "works for hire," the copyright registrations merely provide rebuttable, *prima facie* evidence of the facts stated in the registrations, and lose any evidentiary weight in the face of the contrary evidence that Plaintiff has found that establishes individual authorship in Tom Clancy.  *See Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, No. 00 CIV. 9569 (DLC), 2002 WL 398696, at *17 (S.D.N.Y. Mar. 15, 2002) ("Extending a presumption of validity to a certificate of copyright merely orders the burdens of proof. . .  [W]here other evidence in the record casts doubt on the question, validity will not be assumed") (citations and internal quotation marks omitted), *aff'd sub nom. Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003).

In *Hogarth*, based on the evidence before it, the Second Circuit rejected the statement of individual authorship in Hogarth's registration and upheld Edgar Rice Burrough, Inc.'s ("ERB's") characterization of Hogarth's illustrations as works made for hire for ERB.  In doing so, the Court relied upon a letter it had requested from the Register of Copyrights, Marybeth Peters, concerning the effect of a copyright registration, in which the Register advised:

> Of course, as noted above, examiners cannot verify all the facts on a certificate.  While, as noted above, works deposited for registration are examined for copyrightability, examiners generally cannot make judgments whether a particular work is a work made for hire.  For that reason, the fact that the

18

application and deposit are examined by the Office would not appear to play any role in determining what weight to give a statement of authorship on a certificate with respect to the work-for-hire status of the registered work.[5]

Thus, in the Register of Copyright's view, a statement characterizing the work-for-hire status of a work is not even entitled to the *prima facie* evidentiary effect accorded, in the absence of contrary evidence, to the validity of the registered copyright.

In her Amended Complaint, Plaintiff sets forth the circumstances of the creation of the Later Jack Ryan Works which, under the controlling Supreme Court decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), Plaintiff submits will establish that they do not qualify as works for hire, but instead are works of individual authorship owned first by Tom Clancy and now by his Estate. ECF 60 at ¶ 52-67. Webb's Motion fails utterly to address Plaintiff's dispositive claims that the Later Jack Ryan Works were not "works for hire." Nor does Webb's Motion challenge any of these factual allegations, or present any evidence to contradict them.

The appropriate manner for resolution of the underlying "individual ownership" versus "work for hire" dispute is not on Webb's Motion; rather, that issue should be decided on a full record marshaled by the real parties in interest – Mrs. Clancy and the JR Entities – after discovery has concluded.

> **(c)  Tom Clancy Individually Owned And Never Assigned the Character Jack Ryan, As Evidenced By the 1988 Settlement Agreement**

Webb takes the position that JREL owns the character Jack Ryan because JREL owns the copyright to *Hunt*. Webb is incorrect.

---

[5]   *See* April 8, 2003 letter from Register of Copyrights Marybeth Peters to Roseann MacKechnie, Clerk, United States Court of Appeals for the Second Circuit in *Estate of Burne Hogarth v. Edgar Rice Burroughs* (*"Peters Letter"*), at page 27. Ex. E.

In 1983, Tom Clancy entered into a publishing contract with USNI for publication of *Hunt*, a novel featuring the character, Jack Ryan ("1983 Contract"). Pursuant to the 1983 Contract, Tom Clancy transferred the *Hunt* copyright to USNI for publication of the work. The 1983 Contract, however, makes no reference to characters and does not assign rights to characters featured in *Hunt*:

> The Author grants and assigns to the Publisher the exclusive worldwide rights and any subsisting copyright, including the right to secure copyright and any renewals or extension thereof, in connection with a certain unpublished work provisionally entitled THE HUNT FOR RED OCTOBER.

Ex. F.

In 1987, a dispute arose between Tom Clancy and USNI concerning ownership of the character Jack Ryan. Tom Clancy maintained that he held the exclusive rights to the character. The parties resolved their dispute by entering into a settlement agreement which acknowledged and reaffirmed that the characters in *Hunt*, including Jack Ryan, were individually owned by the author, Tom Clancy ("1988 Settlement"). Addressing the gravamen of the dispute – ownership of the Jack Ryan character – the 1988 Settlement provided: "*Without limiting the foregoing, the parties acknowledge that all rights in and to the characters are the sole property of the respective authors.*"[6] Ex. G. (emphasis added).

The 1988 Settlement also provided for USNI to transfer the copyright in *Hunt* to Tom Clancy or his designee. Tom Clancy designated JREL as the assignee of the *Hunt* copyright; and the subsequent assignment by USNI, drafted "in accordance with the terms of the Agreements between Assignor and Thomas L. Clancy, Jr. dated November 21, 1983 and September 28, 1988," made no mention of character rights. Ex. H. Because USNI could not transfer to JREL

---

[6]   The 1988 Settlement was embodied in a handwritten "Points of Agreement," dated September 28, 1988, and a December 15, 1988 letter, and several enclosures. A Declaration of the scrivener of the Points, authenticating an attached transcription of this handwritten document, is annexed as Ex. G.

what it did not own, there was never any transfer to JREL of the rights to the character Jack

Ryan.  ECF 60 at ¶ 40.

Tom Clancy never specifically assigned the characters in *Hunt* to any other entity.  ECF

60 at ¶ 42.[7]  Webb denies this assertion.  In his Answer to the Amended Complaint, Webb quotes

from an unsigned letter purportedly written by Tom Clancy to Robert Youdelman in 1988 as

support for his assertion that, "if and to the extent Mr. Clancy retained any rights to characters . .

. those rights were assigned in 1985 to JREL. . . ."  ECF 78 at ¶ 37.  However, other than this

unsigned and unauthenticated letter quoted by Webb, Defendants have offered no evidence of

any explicit written transfer by Tom Clancy of his character rights in Jack Ryan to JREL or

anyone else.

The lack of any written and signed assignment is fatal to Webb's assertion.  A transfer of

copyright ownership is not legally effective "unless an instrument of conveyance, or a note or

memorandum of the transfer, is in writing and signed by the owner of the rights conveyed . . . ."

17 U.S.C. § 204(a).  Without such a writing, "a transfer of copyright is simply not valid . . . ."

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013)

(quoting *Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 391 (5th Cir. 2005)).

In fact, there is evidence that no such written assignment exists.  In May 2016, Frank

Curtis (who, along with Robert Youdelman was Tom Clancy's lawyer during the 1988 dispute

with USNI) admits in correspondence to Webb and to counsel for the JR Entities that he could

not locate any such assignment despite a search of his (and presumably Youdelman's) files.  Ex.

I at 3.  In the same correspondence, Curtis summarizes the contents of a 1988 memorandum in

---

[7]    In her Amended Complaint, Plaintiff also contends that a marital settlement agreement between Tom
Clancy and his ex-wife, Wanda King, evidences that Tom Clancy never transferred his rights to Jack
Ryan.  ECF 60 at ¶ 82.

his file that recites facts inconsistent with any 1985 assignment of character rights by Tom Clancy to JREL.  Ex. I at 3.

Since Tom Clancy never assigned his copyrights his rights to the characters in *Hunt* (or his rights in the Early Jack Ryan Works), to USNI, JREL, or any other entity, he retained those rights and they passed to the Estate at his death.

**(d)     General Assignments of An Underlying Work's Copyright Do Not Include Exclusive Character Rights**

Throughout his Motion, Webb repeatedly states that the copyright to the character is "tied to" the copyright for the underlying work, but Webb glosses over the question of whether the copyright to a work may be transferred without also conveying the author's exclusive character rights.  Webb neglects to mention that he was *specifically advised* by his intellectual property attorneys that, under copyright law, the general transfer of an underlying work's copyright does not transfer exclusive character rights – which negates his primary legal premise that character rights cannot be owned separately from the work's copyright.

Although a character is a protected element of an underlying work, *see supra* at 14, it does not necessarily follow that a transfer of a copyright in an underlying work must include a transfer of the author's rights to the characters.  To the contrary, a general grant of a copyright in a work is insufficient to convey exclusive character rights.  *See Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*, 216 F.2d 945 (9th Cir. 1954).[8]

In *Warner Brothers*, the issue was whether the author Dashiell Hammet surrendered all rights to the character Sam Spade, created by Hammet in *The Maltese Falcon*, when Hammet

---

[8]     Although the *Warner Brothers* decision has been criticized on other grounds, the proposition cited here concerning contractual interpretation remains good law.  *See e.g., Jim Henson Productions v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259, 277 (S.D.N.Y. 1997).  *See also DC Comics v. Towle*, 802 F.3d 1012, 1019 n.5 (9th Cir. 2015) (explaining that the holding in *Warner Brothers*, regarding the standard for copyrightability of literary characters, was dicta or an alternative holding).

assigned the *Falcon* movie rights to Warner Brothers.  The Ninth Circuit decided the case as a

matter of basic contract interpretation, holding that the contract's silence on the subject of

character rights belied any suggestion that Hammet had conveyed away the rights to his

characters:

> We are of the opinion that since the use of characters and character names are
> nowhere specifically mentioned in the agreements, but that other items, including
> the title, 'The Maltese Falcon', and their use are specifically mentioned as being
> granted, that the character rights with the names cannot be held to be within the
> grants, and that under the doctrine of ejusdem generis, general language cannot be
> held to include them.

*Id.* at 949.  Under the Court's analysis, the "clearest language is necessary to divest the author of

the fruits of his labor."[9]  In the absence of such clear language, the owner of the copyrighted

work reserves those rights not expressly granted.[10]

As support for its conclusion, the Court looked to the customary practice of authors

routinely to reuse characters once created:

> The conclusion that these rights are not within the granting instruments is strongly
> buttressed by the fact that historically and presently detective fiction writers have
> and do carry the leading characters with their names and individualisms from one
> story into succeeding stories. This was the practice of Edgar Allen Poe, Sir Arthur
> Conan Doyle, and others; and in the last two decades of S. S. Van Dine, Earle
> Stanley Gardner, and others. The reader's interest thereby snowballs as new
> 'capers' of the familiar characters are related in succeeding tales.  If the intention
> of the contracting parties had been to avoid this practice which was a very

---

[9]    *See also Philipp v. Jerome H. Remick & Co.,* 145 F. Supp. 756, 758 (S.D.N.Y. 1956) ("The clearest
language is necessary to divest the author of the fruits of his labor"); *Weinstein Co. v. Smokewood
Entertainment Group, LLC,* 664 F. Supp. 2d 332, 341 (S.D.N.Y. 2009) (recognizing, under the 1976 Act,
that "intention of a copyright owner seeking to transfer an ownership interest must be clear and
unequivocal").

[10]    In further support of this principle, the doctrine of indivisibility – the principle that rejects partial
assignments of copyrights and requires a proprietor or assignee of a copyright to hold nothing less than all
the rights in a copyrighted work – was expressly eliminated in the Copyright Act of 1976. *See, e.g.,
Leisure Time Entertainment v. Cal Vista,* No. 94-56407, 1996 WL 115167, at *2 (9th Cir. Mar. 14, 1996)
(rights under copyright statute are divisible and may be "owned separately," may be "transferred in whole
or in part by any means of conveyance").

> valuable one to the author, it is hardly reasonable that it would be left to a general
> clause following specific grants.

*Id.* As a further fact supporting its conclusion, the Court cited the post-contract conduct of the

parties, specifically, Warner Brothers' failure to object to Hammett's 1932 publishing of three

stories in which leading *Falcon* characters were used. *Id.* Furthermore, the Court reasoned, the

relatively modest consideration paid by Warner Brothers would not likely have included

character rights. *Id.* at 949–50. Finally, the Court's interpretation was consistent with the

copyright statute itself:

> The practice of writers to compose sequels to stories is old, and the copyright
> statute, though amended several times, has never specifically mentioned the point
> . . . If Congress had intended that the sale of the right to publish a copyrighted
> story would foreclose the author's use of its characters in subsequent works for
> the life of the copyright, it would seem Congress would have made specific
> provision therefor.

*Id.* at 950.

The continuing vitality of the *Warner Brothers*' holding and its effect on the publishing

industry can be seen in *Jim Henson Productions v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259

(S.D.N.Y. 1997). In *Henson*, the Court found the expert testimony of well-known copyright

lawyer, Harry Olsson, "persuasive" on the topic of the post-*Warner Brothers* legal climate:

> In the late 1950s, when a copyright user wanted to obtain perpetual rights in a
> character (distinct from rights in a work in which the character appeared) it was
> the practice of the copyright bar to spell this out in no uncertain terms. One
> compelling reason for this is [the *Warner Brothers* decision.] In the wake of this
> watershed case, the copyright bar was on notice that there was the strongest
> presumption that even when an author transferred the copyright in a work in
> which a character was fully delineated, the author retained the right to use the
> character in sequels or other works. After that decision any copyright lawyer
> representing a user wishing to buy exclusive rights in a character would make
> certain that the assignment documents said so unmistakably and unequivocally.

*Id.* at 277.

24

Plaintiff contends that the *Warner Brothers*' holding governs the interpretation of the 1983 Contract in which Tom Clancy assigned the copyright to *Hunt* to USNI, and further supports Plaintiff's assertion that the Estate owns the Jack Ryan character as it was developed in *Hunt*.

By the time Tom Clancy signed the 1983 Contract, the law governing character ownership required that assignments including character rights be expressed in the clearest language possible, and provided that an author's rights to a character were not alienated by a general grant of the work in which the character is created. Notably, the 1983 Contract fails to grant to USNI any rights to the characters created or featured in *Hunt* or to sequels or derivative works, and none can be inferred. *See, e.g., Trust Co. Bank v. MGM*, 593 F. Supp. 580 (N.D. Ga. 1985), *aff'd*, 772 F.2d 740 (11th Cir. 1985) (citing *Warner Brothers Pictures, Inc.*, 216 F.2d at 950) (finding that Margaret Mitchell's general grant of motion picture rights for *Gone With the Wind* did not implicitly carry with it a grant of sequel rights).

As in *Warner Bros.*, the facts and circumstances underlying the 1983 Contract indicate that the intent of the parties was not to include character rights. USNI was well aware that Tom Clancy had begun *Patriot Games*, which also featured Jack Ryan, and that he intended to complete that work. Ex. I at 10. Moreover, like in *Warner Brothers*, the relatively modest compensation ($5,000) paid by USNI to Tom Clancy, was insufficient to support the "complete surrender of the characters made famous" in *Hunt*.

Plaintiff's reliance on *Warner Bros.* to support the Estate's ownership of the Jack Ryan character as developed in *Hunt* should not come as a surprise to Webb. These identical arguments based on the *Warner Bros.* case were raised by the intellectual property lawyers upon whom Webb claims to have relied. In May 2016, one of these lawyers, Frank Curtis, wrote to

25

Webb and outlined the above facts and arguments regarding Tom Clancy's, and thus the Estate's, ownership of the Jack Ryan character as developed in *Hunt*.  Ex. I.  At this time, Webb even acknowledged that this advice from Curtis raised genuine concerns about the true ownership of the Jack Ryan character.  Nevertheless, Webb fails to acknowledge this legal advice in his Motion, which is clearly not consistent with Webb's primary argument that the copyright to literary character must be inextricably "tied to" the copyright for the underlying work.  This further underscores the existence of disputed facts that preclude summary judgment.

IV.     <u>**None of the Authorities Cited By Webb Addresses Whether Rights in Characters Can Be Owned Separately From Ownership of the Copyright in the Underlying Work**</u>

Webb relies on *Conan Properties Int'l LLC v. Sanchez*, No. 1:17-CV-00162-FB-RLM, 2018 WL 3869894, at *3 (E.D.N.Y. Aug. 15, 2018) as support for his proposition that the Estate could not own the rights to a character developed in an underlying work without also owning the copyright for the underlying work.  However, *Conan* did not address whether rights in characters delineated in a work could be owned separately from ownership of the copyright in the underlying work.  That question could not have arisen in *Conan* because plaintiff owned both the underlying work and the characters in it.  Instead, the *Conan* court merely held that the copyright registration in the work enabled the owner to sue for infringement of the copyrightable elements in the work, including the character.[11]

---

[11]     *Conan* came before the District Court on a Magistrate Judge's 77-page Report and Recommendation granting in part and denying in part the plaintiff's uncontested motion for a default judgment.  This fact was not lost on the Magistrate Judge, who commented that its conclusions were "a product of the procedural posture of the case – that is, an uncontested motion for default judgment," and opined that "[h]ad defendant opted to defend this case, he may well have successfully challenged the continued validity of plaintiffs' character copyrights at the time of purported infringement." *Conan Properties Int'l LLC v. Sanchez*, No. 17-CV-162, 2018 WL 4522099 at *17 (E.D.N.Y. June 8, 2018).

Similarly, the Copyright Office's practice not to register characters separately from the works in which they appear does not in any way suggest that characters are not separately protectable if sufficiently delineated. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 313.4(H) (3d ed. 2017). The Copyright Office's practice of not separately registering a character apart from the literary or visual work in which it appears does not preclude ownership of the copyright in the character in a work by one party and ownership of the remainder of the copyrightable elements in the work by another party. The administrative rule, however, would require each party to file its own registration for the literary work containing the copyrightable character before commencing an infringement action. There would then be two conflicting registrations with adverse ownership claims whose resolution the Copyright Office would leave to the courts. *See, e.g., Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d at 166 (the Copyright "Office will register adverse claims by more than one party") (quoting from *Peters Letter* at 10).

None of the authorities cited by Webb in his Motion touches upon the issue of whether an author can retain ownership rights in a character in a work of fiction he has assigned to a publisher or others. They, like *Conan*, hold merely that the copyright registration for the underlying work enables the owner of the registration to sue for infringement of both the underlying work and the character. Webb's authorities and arguments are, therefore, irrelevant to the actual facts and circumstances of Tom Clancy's ownership of the Jack Ryan character in *Hunt* and the retention of his character rights when he contracted with USNI in 1983. As a result, no "declaration" of the claimed "legal premise" underpinning Webb's Motion could be dispositive of the allegations of ownership in the Amended Complaint.

## CONCLUSION

Webb's Motion must be denied because Plaintiff submits that Webb is wrong on the facts and the law, and has mischaracterized Plaintiff's positions on both.  Apparently, Webb is still operating under the facts and legal positions alleged in the original Complaint.  Plaintiff respectfully requests that the Court deny Webb's Motion in all respects.

Dated:  July 12, 2019

/s/  Norman L. Smith
Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
**NUSINOV SMITH LLP**
The Marbury Building
6225 Smith Avenue, Suite 200B
Baltimore, Maryland 21209
(410) 554-3600

- and –

/s/ Lansing R. Palmer
Lansing R. Palmer, Fed. ID 807931
(admitted pro hac vice)
lansing.palmer@akerman.com
**AKERMAN LLP**
666 Fifth Avenue, 20th Floor
New York, NY 10103
(212) 880-3800

*Attorneys for Plaintiff Alexandra M. Clancy*

## **APPENDIX - INDEX OF EXHIBITS**

| | |
|---|---|
| Ex. A | Exceptions of Alexandra M. Clancy to Revised Second Administration Account of Special Administrator, filed February 21, 2017 |
| Ex. B | Petition of Alexandra M. Clancy for Removal of the Personal Representative, filed June 21, 2019 |
| Ex. C | Letter from J.W. Thompson Webb to Robert Youdelman and Frank R. Curtis, dated February 19, 2014 |
| Ex. D | Memorandum from Frank R. Curtis to Robert Youdelman, copy to Topper Webb, Robert Brennen, Sheila Sachs and Jerry Thrope, dated July 27, 2016 |
| Ex. E | Letter from Marybeth Peters, Register of Copyrights of the United States of America, to Roseann MacKechnie, Clerk, United States Court of Appeals for the Second Circuit in *Estate of Burne Hogarth v. Edgar Rice Burroughs*, No. 02-7312, dated April 8, 2003 |
| Ex. F | Agreement between Thomas L. Clancy, Jr. and the United States Naval Institute for publication of *The Hunt for Red October*, dated November 21, 1983 |
| Ex. G | Declaration of Robert C. Osterberg, with exhibits, dated June 26, 2018 |
| Ex. H | Transfer of Ownership of Copyright and Assignment, dated November 30, 1988 |
| Ex. I | Memorandum from Frank R. Curtis to Robert Youdelman, copy to Topper Webb, Robert Brennen, Sheila Sachs, and Jerry Thrope, dated May 10, 2016 |