## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ALEXANDRA M. CLANCY,          :

        Plaintiff,         :        Case No. 17-cv-03371-ELH

v.          :

JACK RYAN ENTERPRISES,    :
LTD., *et al.*,

                 :

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF
## CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANTS AND COUNTER-PLAINTIFFS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
NUSINOV SMITH LLP
The Marbury Building
6225 Smith Avenue, Suite 200-B
Baltimore, Maryland 21209
(410) 554-3600

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  The 1983 Contract for HUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Jack Ryan Depicted in HUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  The 1988 Character Dispute and Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.  John Clark: Jack Ryan's "Dark Side.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.  The Clancy Divorce Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F.  Clancy's Retained Copyright Interests Are Disregarded in
        Postmortem Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.  Plaintiff's Action is Not Barred by Limitations. . . . . . . . . . . . . . . . . . . . . . . . 15

        1.  The Law of Limitations As Applied to Copyright
            Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        2.  Ms. Clancy's Jack Ryan Claim Accrued, At the
            Earliest, on January 8, 2015 When She Learned of
            Her Husband's 1988 Settlement With USNI. . . . . . . . . . . . . . . . . . . 18

            a.  The Jack Ryan Entities Did Not Assert
                Ownership of the Jack Ryan Character
                Through the February 19, 2014
                Correspondence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            b.  Ms. Clancy First Learned on January
                8, 2015 of Facts Suggesting that the
                Estate, and Not the Jack Ryan Entities,
                Owned the Jack Ryan Character. . . . . . . . . . . . . . . . . . . . . . . . . 19

        3.  The Work for Hire Claims Accrued, At the Earliest,
            On December 11, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.  The Undisputed Facts Entitle Plaintiff to Summary Judgment on

Count I of the Amended Complaint and Counts I and II of the Counterclaim: Clancy's Estate Owns the Jack Ryan Character As Presented in HUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1.    By Statute, A Copyright Interest Is Created in Only One of Two Ways. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.    An Author Alienates His Copyright Interest Only by a Signed, Written Assignment that Clearly Evinces the Author's Intent to Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.    A Character is a Protected Element of A Copyrighted Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.    The General Assignment of An Underlying Work's Copyright Does Not Include Exclusive Character Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5.    Under the 1976 Amendments to the Copyright Act, A Character May Be Owned Separately from Its Work. . . . . . . . . . . . . . . . 31

6.    Tom Clancy Individually Owned and Never Assigned the Jack Ryan Character. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C.    The Undisputed Facts Entitle Plaintiff to Summary Judgment on Counts II, III and IV of the Amended Complaint and Counts I and II of the Counterclaim: Clancy Did Not Create Works for Hire for JREL or JRLP and Both the Works and the Characters, Including John Clark, Remained His Property At Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    Tom Clancy's Works Written During the JRE Years Were Not Created as Works for Hire. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.    A Work for Hire Must Meet the Statutory Standard Recognized in *Reid* and Cannot Be Created by Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3.    Any Purported Assignment to JREL Was Ineffective and Any Assignment to JRLP Is Terminable. . . . . . . . . . . . . . . . . . . . . . 44

4.    Because Clancy Did Not Write Works for Hire, His John Clark Character, as Depicted in WITHOUT REMORSE, Remained His Property At Death and

Devolved to His Estate.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

D.      Any Incremental Character Development in Assigned Works Enjoys
         Copyright Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

E.      Any Assigned Interests Are Terminable and Plaintiff Validly
         Terminated the Interest in HUNT Assigned to USNI. . . . . . . . . . . . . . . . . . . . 48

        1.      The Right of Recapture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        2.      The Effect of Recapture on Assigned Rights.. . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Stallone*, Case No. 87-0592, 11 U.S.P.Q.2D (BNA) 1161,
    1989 U.S. Dist. LEXIS 11109 (C.D. Cal. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bozzio v. EMI Group Ltd.*, 811 F.3d 1144 (9th Cir. 2016 ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Brown v. Flowers*, 297 F. Supp.2d 846 (M.D.N.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388 (S.D.N.Y. 1981). . . . . . . . . . . . . 27

*Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . 38

*Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777 (10th Cir. 2001). . . . . . . . . . . . 34

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). . . . . . . . . . . .   36-38, 41-43

*Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Davis v. Meridian Films, Inc.*, 14 F. App'x 178 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*,
    375 F.2d 639 (2d Cir. 1967), *cert. denied*, 389 U.S. 1036 (1968). . . . . . . . . . . . . . . . . . . . . . 40

*Edgar Rice Burroughs, Inc. v. Manns Theatres*, 195 U.S.P.Q. (BNA) 159,
    1976 U.S. Dist. LEXIS 11754 (C.D. Cal. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990),
    *cert. denied*, 498 U.S. 1103 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 37

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958 (9th Cir. 2011). . . . . . . . . . . . . . . . . . 32

*Gaiman v. McFarlane*, 360 F.3d 644, *reh. den., reh. en banc den.* (7th Cir. 2004). . . . . . . 16, 17

*Gardner v. Nike, Inc.*, 279 F.3d 774 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*,
    716 F.3d 302 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Goodis v. United Artists TV, Inc.*, 425 F.2d 397 (2d Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hendrie v. Sayles*, 98 U.S. 546, 25 L. Ed. 176 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jim Henson Productions v. John T. Brady & Assocs.*,
    16 F. Supp.2d 259 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010). . . . . . . . . . . . 41

*Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496 (7th Cir.),
    *cert. denied*, 574 U.S. 976 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 47

*Klinger v. Conan Doyle Estate, Ltd.*, 988 F. Supp. 2d 879 (N.D. Ill. 2013). . . . . . . . . . . . . . . . . 47

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388 (5th Cir. 2005),
    *cert. denied*, 547 U.S. 1054 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 35

*M & A Associates, Inc. v. VCX, Inc.*, 657 F. Supp. 454 (E.D. Mich. 1987). . . . . . . . . . . . . . 22, 41

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990). . . . . . . . . . . . . . . 37

*MacLean Assocs., Inc. v. William M. Mercer-Meidinger-Hansen, Inc.*,
    952 F.2d 769 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Marco v. Accent Publishing Co.*, 969 F.2d 1547 (3d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary
Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005). . . . . . . . . . . . . . 41

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996), *cert. denied*, 519 U.S. 1108 (1997). . . . . . . . . . . . 16

*Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*,
    722 F.3d 591 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 35

*Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533 (M.D. Fla. 1990). . . . . . . . . 43

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930),
   *cert. denied*, 282 U.S. 902 (1931). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Olson v. National Broadcasting Co.*, 855 F.2d 1446 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 27

*Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933 (N.D. Cal. 1992). . . . . . . . . . . . . . . . . . . . . 43

*Parker v. Nagel (In re Nagel)*, 556 B.R. 336 (Bankr. N.D. Ohio 2016). . . . . . . . . . . . . . . . . . . . 34

*Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 51 Cal. Rptr. 2d 907 (1996). . . . . . . . . . . . 26

*Roger Miller Music, Inc. v. Sony/ATV Publishing*, 477 F.3d 383 (6th Cir. 2007). . . . . . . . . . 16, 18

*Salinger v. Colting*, 641 F. Supp. 2d 250 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006),
   *cert. denied*, 550 U.S. 936 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Shanklin v. Fitzgerald*, 397 F.3d 596 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Silverman v. CBS Inc.,* 870 F.2d 40 (2d Cir.), *cert. denied*, 492 U.S. 907 (1989). . . . . . . . . . 27, 47

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992),
   *cert. denied*, 508 U.S. 906 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Tjeknavorian v. Mardirossian*, 56 F. Supp.3d 561 (S.D.N.Y. 2014). . . . . . . . . . . . . . . . . . . . 25, 26

*Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206 (C.D. Cal. 1998). . . . . . . . . . . . . . . . 28

*Trust Co. Bank v. MGM*, 593 F. Supp. 580 (N.D. Ga. 1985),
   *aff'd*, 772 F.2d 740 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latino Americana*,
   424 F.3d 50 (1st Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . 32

*Warner Brothers Pictures, Inc. v. CBS, Inc.*, 216 F.2d 945 (9th Cir. 1954),
   *cert. denied*, 348 U.S. 971 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 33

*Welles v. Turner Entertainment Co.*, 503 F.3d 728 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 17

*Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

**Statutes**

17 U.S.C. § 102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17 U.S.C. § 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 32

17 U.S.C. § 201(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 43

17 U.S.C. § 201(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

17 U.S.C. § 201(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

17 U.S.C. § 203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

17 U.S.C. § 203(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

17 U.S.C. § 203(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

17 U.S.C. § 204(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26, 35

17 U.S.C. § 507(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Other Authorities**

Marilyn Barrett, *Independent Contractor/Employee Classification in the Entertainment Industry: The Old, the New and the Continuing Uncertainty*, 13 U. MIAMI ENT. & SPORTS L. REV. 91 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Mary LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 VAND. L. REV. 879 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Michael H. Davis, *The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright: Once a Story is "Pitched," a Studio Can Never Obtain All Copyrights in the Story*, 18 CARDOZO ARTS & ENT. L.J. 93 (2000). . . . . . . . . . . . . . . . . . . . . . . . 38, 48

Peter Carlson, *What Ticks Tom Clancy Off?*, THE WASHINGTON POST (June 27, 1993). . . . . . . 10

Peter Masey and David Streifeld, *Novelist Clancy Embroiled in Dispute Over Copyright*, THE WASHINGTON POST (March 10, 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**MEMORANDUM OF LAW**

Alexandra M. Clancy, by her attorneys, submits this Memorandum of Law in support of her Cross-Motion for Summary Judgment and in opposition to the Defendants and Counter-Plaintiffs' Motion for Summary Judgment.

## I.   INTRODUCTION

Plaintiff's Amended Complaint addresses the postmortem use of Tom Clancy's ("Clancy" or "Tom") literary brand. Clancy, following in the tradition of some of the greatest fiction writers, created sustainable characters that he deployed repeatedly in dozens of books. The most iconic of these characters is Jack Ryan who debuted in THE HUNT FOR RED OCTOBER. For more sinister drama, he created John Clark, who he termed Jack Ryan's "dark side."

Clancy's literary estate was, and is, sprawling and complex. At various times, he established three separate business entities to shield himself from taxes and personal liability – Jack Ryan Enterprises, Ltd. ("JREL"), Jack Ryan Limited Partnership ("JRLP") (collectively the "Jack Ryan Entities"), and Rubicon, Inc. ("Rubicon"). Clancy correctly saw these entities as mere extensions of himself – tools that he could deploy to minimize taxes, shield himself from liability, and distribute the proceeds from his lucrative literary enterprise. He never intended to surrender control of his literary bounty.

In fact, Clancy was fiercely protective of his literary rights. When, in the early days of his writing career, his first publisher sought to interfere with his use of Jack Ryan in derivative works, Clancy came out swinging. His attorney, Robert Youdelman, was quoted by THE WASHINGTON POST as saying: "When an author has a contract with a publisher to do a book, does he give the publisher ownership rights to his characters? They say they own the rights; we say they don't. There is no specific reference in the contract to sequels or characters. [] Just because they published one book

doesn't mean they own his life as a writer, or his characters."[1] His attorneys submitted a mediation brief that emphatically defended his continued ownership of Jack Ryan. Ex. 1. Needless to say, Tom won that battle. The publisher capitulated and no one ever again questioned Tom's ownership of, or right to use, Jack Ryan. Until his death.

In Tom's death, his former spouse, Ms. King, sees an opportunity to relitigate her divorce and to score a larger share of the literary enterprise than was provided under the divorce settlement. Ms. King seeks to corral the most significant asset of the literary enterprise – Jack Ryan – as well as the rights to John Clark and most of Clancy's post-HUNT canon. As a divorced wife, Ms. King has no rights in Clancy's estate. Moreover, he would never have relinquished control over Jack Ryan to her. But as a surviving owner of JREL and partner of JRLP, Ms. King perceives an opportunity to get the best of her former spouse now that death has silenced him.

Tom's true intent was reflected in instructions he gave his personal attorney just weeks before his death. On July 25, 2013, he and Ms. Clancy met with their attorney of long-standing to discuss Clancy's estate and the future control of his literary legacy. The attorney's memorandum of that meeting was sent to Tom and confirmed his intent that Ms. Clancy was to "control your literary assets and the use of your name after your death." Ex. 2. Ms. Clancy could not possibly control Tom's literary assets if, as the Jack Ryan Entities contend, they own them.

Shortly after Clancy's death, the administrator of his Estate, in order to quickly seize postmortem publishing opportunities, arranged for publishing contracts before the ownership of Tom's literary rights had been sorted out. To that end, the Personal Representative entered into

---

[1] Peter Masey and David Streifeld, *Novelist Clancy Embroiled in Dispute Over Copyright*, THE WASHINGTON POST, page A 1 (March 10, 1988).

allocation agreements with the Jack Ryan Entities which, the Personal Representative stressed, were not intended to bind anyone. Exs. 3, 4, 5. Initially, Ms. Clancy was not made privy to these publishing contracts. When she learned more about them, and about the rationale for the allocation agreements, she understood that these arrangements did not mirror reality. Allocations had been made to the Jack Ryan Entities on the assumption that JREL owned the Jack Ryan character. Ex. 6. When the relevant documents were finally disclosed to her in January 2015, Ms. Clancy learned that there was serious reason to question this assumption. Additional investigation ultimately revealed that the Jack Ryan character belongs to her husband's estate. Accordingly, she brought this declaratory judgment action to clarify the true ownership of her late husband's literary assets. Ms. King's subsequent deposition, as well as document discovery, revealed that the Jack Ryan Entities' assertion of "work for hire" rights was also erroneous and Plaintiff's Complaint was amended to address work for hire.

With respect to Count I of the Amended Complaint, Ms. Clancy is entitled to summary judgment because her husband individually owned, and never assigned, his copyright interest in the Jack Ryan character. She is further entitled to summary judgment as to Count II, because the John Clark character was fully delineated in WITHOUT REMORSE, a novel that was not a work for hire, and thus Clancy owned Clark at his death. Finally, she is entitled to summary judgment as to Count III because her husband neither created works for hire for JREL, nor assigned his interests in works to it. Finally, she is entitled to summary judgment as to Count IV because any interests assigned to JRLP are terminable.

For the same reasons, Ms. Clancy is entitled to summary judgment on the Defendants' Counterclaim and the Defendants' motion for summary judgment must be denied.

3

## II.     FACTS[2]

### A.     The 1983 Contract for HUNT.

On November 21, 1983, Clancy entered into a contract with the United States Naval Institute

("USNI") to publish his first novel, THE HUNT FOR RED OCTOBER ("HUNT"). Ex. 7. HUNT was first

published on October 3, 1984. HUNT was not only Tom's first published work, it was also the first

published work to feature the fictional character, Jack Ryan. Clancy incorporated the Jack Ryan

character into most, but not all, of his subsequent fiction.

Paragraph 1 of the contract provides:

The Author grants and assigns to the Publisher the exclusive worldwide rights and
any subsisting copyright, including the right to secure copyright and any renewals or
extension thereof, in connection with a certain unpublished work provisionally
entitled THE HUNT FOR RED OCTOBER.

The contract does not grant to USNI the rights to sequels or derivative works. Paragraph 9 of the

contract required Clancy to seek the publisher's permission before publishing a derivative work:

The Author agrees that he will not, without the written permission of the publisher,
publish or permit to be published any material based on, or derived from, or directly
competitive with the Work, so long as this agreement shall remain in force.[3]

USNI was not in the business of publishing fiction and its contract attests to this. The word

---

[2]  The Defendants' statement of the facts relies on three exhibits that are plainly inadmissible. *See* Defendants' Exhibits 7, 16, 17. These unsigned documents, purportedly authored by Mr. Clancy, suffer from multiple authentication and hearsay deficiencies that preclude their admission. Defendants have not offered any argument in defense of their admissibility. Defendants have failed to offer any proof as to authorship or authenticity. They have offered no proof that the documents were finalized, signed, or sent. They have not identified any witness competent to serve as a sponsor. Because Fed. R. Civ. Proc. 56 requires this Court to consider only admissible evidence, it must disregard these exhibits. The exhibits also should be stricken from the record. *See Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (affirming district court order striking unauthenticated and inadmissible exhibits submitted in support of summary judgment).

[3] A work "derived" from the original work would include novels that continue the story of Jack Ryan. *See, e.g., Salinger v. Colting,* 641 F. Supp. 2d 250, 267 (S.D.N.Y. 2009) (holding that a novel that continues the story of CATCHER IN THE RYE and its protagonist constitutes a derivative work).

"character" does not appear anywhere in the 1983 contract.

### B.    The Jack Ryan Depicted in HUNT.

Jack Ryan is a fictional character created by Clancy who appears in many of his novels and in the film treatments based on those novels. In HUNT, Clancy drew an unconventional action/thriller hero. Clancy gave Ryan three attributes that blend to form his unique flavor of action/thriller hero: his training as an academician, his independence and, somewhat uneasily married to his academic facet, his military background. Ryan's deviation from more stereotypical action/thriller characters made him a human, likeable and instantly recognizable icon of the genre.

Ryan is no superman. He is not an imposing physical specimen. Clancy describes him as a "physically unremarkable" man of average build who is slightly out of shape from lack of exercise. HUNT at 35.[4] Ryan places little value on appearance and wears inconspicuous, conservative suits and white shirts. *Id.* His only jewelry is a wedding band, a university ring and an inexpensive digital watch. *Id.* Ryan, we are told, is a modest man with no ambition to celebrity. *Id.* He has a wife who is an ophthalmic surgeon and two young children, first-grader, Sally, and a toddler also named Jack. *Id.* at 218, 38. He is a devoted father who worries about getting Christmas gifts for his children. *Id.* at 43, 67.

Although Ryan has served in the military, he is anything but the typical grunt. Ryan is an intellectual, a young military historian. He received his doctorate in history from Georgetown University and he has written several books on naval history. *Id.* at 95, 218, 282. He likes having a job that "test[s] his intellect." *Id.* at 36. He can spontaneously quote Shelley even when drunk. *Id.* at 387. He is known to CIA and military colleagues as analytical and having the ability to "sort

---

[4] Citations are to hardbound edition of THE HUNT FOR RED OCTOBER (USNI 1984).

through a pile of data and come out with the three or four facts that mean something." *Id.* at 44.

Clancy describes Ryan as having eyes with a "deceptively vacant look," stemming from the fact that

he is often lost in thought. *Id.* at 35. Ryan is a seeker of truth. He says that the "trick … was finding

that truth," and while he doubted that he would ever attain that goal, "he took quiet pride in his

ability to pick at it, one small fragment at a time." *Id.* at 37. Ryan is never quite comfortable with

having left the purely contemplative life. At one point in the story, he announces that if he had "half

a brain, I would have stayed in Annapolis and kept writing my books." *Id.* at 282.

That said, Clancy establishes early in the novel that Ryan is where he is because he made a

conscious choice. Ryan, the reader is told, is a thoroughly independent man who "could always walk

away." *Id.* at 43. He has "sufficient financial independence to choose his own path." *Id.* at 36. Clancy

tells us that this "came from having money and being married to more money." *Id.* at 44. Ryan was

a stockbroker for four years and he "scored big" before leaving it all behind. *Id.* As a consequence,

Ryan is "not afraid to speak his mind." *Id.* He is also apt to "short-circuit normal procedure." *Id.* at

50. He felt that he could always go back to writing history books full time. *Id.* at 44.He cannot be

"bought, bribed or bullied." *Id.* Ryan knows "how to make a decision and was not afraid to say what

he thought, whether his bosses like it or not." *Id.*

Finally, Ryan is outfitted for Clancy's mission with an abiding interest in, and involvement

with, the military. To be sure, Ryan's military experience is atypical. He was briefly in active service

but his Marine career ended after only three months when his platoon's helicopter crashed on Crete.

*Id.* at 100, 289. He injured his back, was nearly crippled, and developed a pronounced aversion to

flying. *Id.* at 100. (Ryan's fear of flying may also have been rooted in the loss of his parents in an

aircraft accident. *Id.* at 339.) To the regular military types, Ryan's fear of "being smashed to red pulp

6

in a plane crash" is amusing and it results in some frat-boy ribbing – a fighter pilot is ordered to give Ryan a special treat in aeronautic acrobatics. *Id.* at 99, 117. Combined with his propensity for seasickness, *id.* at 217, Ryan's vulnerabilities mark him as a slightly awkward man in uniform. Still, he *has* worn the uniform and thus Ryan commands a certain degree of grudging respect.

Ryan is not eager to engage in heroic military exploits. He is not only afraid of flying, he is not particularly attracted to gun play. *Id.* at 285-90 (Ryan vomits violently after killing a Soviet agent). Clancy's Ryan regularly strikes the reader as ill-suited for his mission. Yet Ryan is not without heroic potential. Clancy tells us that some years earlier, Ryan had received an honorary knighthood for having broken up a terrorist incident that "erupted around him in St. James's Park" when he was visiting London as a tourist. *Id.* at 41. Moreover, Ryan's sensible fear of armed conflict does not cause him to shrink from using a gun when the need arises. *Id.* at 285-90. He proves himself tactically and operationally adept.

While in graduate school, Ryan was asked to serve on a team of academics assembled to study the CIA's intelligence estimates. *Id*. at 339. At the time, he was busy writing his books on naval history. *Id.* He spent two months at Langley which led to a job offer at the CIA. *Id.* The connections that he made in London after the terrorist incident made him especially attractive to the CIA. *Id.* at 41. At the time of the action, Ryan has been working for the CIA for two years, stationed in London, working on a joint intelligence evaluation team with the British Secret Service. *Id.* Ryan has deduced that the captain of a Soviet submarine is preparing to defect.

Clancy's characterization of Ryan has been remarkably consistent from the beginning. In an early character sketch that he submitted to his publisher before HUNT was published, Clancy described a college-educated Ryan who was injured in a helicopter crash in Crete, suffers from a fear

of flying, is independently wealthy from a brief stint as a stockbroker, leaves the investment business to pursue a Ph.D. in history at Georgetown, goes on to teach at Annapolis, and has authored two major works on naval history. Ex. 8. It is the same Jack Ryan who appears in print three years later in PATRIOT GAMES (which is set in time three years before HUNT): a Marine Corps career that lasted only thee months, cut short by a back injury sustained in a helicopter crash in Crete (PATRIOT GAMES at 35);[5] still wearing a back brace when he meets his wife due to inadequate repairs made by the Navy surgeons (*id.* at 46); parents died in a crash at Chicago's O'Hare International Airport only 19 months after his crash in Crete (*id.* at 140); hobbled by an intense fear of flying (*id.* at 39); father of four-year-old Sally (*id.* at 14, 94); slated to be invested as a Knight Commander of the Victorian Order for his heroism in a terrorist incident that he averts while traveling in London as a tourist (*id.* at 53); and a former stockbroker (*id.* at 46); who teaches history at the Naval Academy (*id.* at 38, 78-79). It is also the same Jack Ryan that Clancy described in the initial chapters for PATRIOT GAMES that he submitted to his publisher in 1983. Ex. 9.

Clancy took his Jack Ryan and turned him into an icon of popular culture. Ryan, a self-effacing, bookish man whose career trajectory seemed predestined for the halls of the academy, survives repeated harrowing physical confrontations with grit and smarts in Clancy's trove of derivative novels and films.[6] Of course, Ryan did not remain static. He evolved in Clancy's

---

[5] Citations are to hardbound edition of PATRIOT GAMES (Putnam 1987).

[6] During his lifetime, Clancy authored or co-authored the following Jack Ryan novels: PATRIOT GAMES (1987); THE CARDINAL OF THE KREMLIN (1988); CLEAR AND PRESENT DANGER (1989); THE SUM OF ALL FEARS (1991); DEBT OF HONOR (1994); EXECUTIVE ORDERS (1996); THE BEAR AND THE DRAGON (2000); RED RABBIT (2002); THE TEETH OF THE TIGER (2003); DEAD OR ALIVE (2010); LOCKED ON (2011); THREAT VECTOR (2012); and COMMAND AUTHORITY (2013). Posthumously, his Estate has published the following additional Jack Ryan novels: FULL FORCE AND EFFECT (2014); COMMANDER IN CHIEF (2015); POWER AND EMPIRE (2017); and OATH OF OFFICE (2018).

successive works. For example, HUNT'S Jack Ryan is in his thirties whereas later novels depict Ryan

as a political leader in his sixties. Post-HUNT novels not only fill in Jack Ryan's back story, but they

have him progress and age. That said, the Jack Ryan in all of the post-HUNT works is derived from

the Jack Ryan first presented to the public in THE HUNT FOR RED OCTOBER.

### C.       The 1988 Character Dispute and Settlement.

In late 1987 and early 1988, a dispute arose between Clancy and USNI regarding his use of

the Jack Ryan character in post-HUNT works.[7] In February 1988, Clancy filed an arbitration demand

with the American Arbitration Association and on September 27, 1988 his attorneys submitted their

Mediation Memorandum. Ex. 1. Clancy sought a declaration, *inter alia*, that he owned the exclusive

right to the use of his HUNT characters in other novels, sequels and prequels.

On September 28, 1988, Clancy and USNI resolved their differences. Ex. 11.[8] USNI agreed

to release any claimed rights to two post-HUNT works, PATRIOT GAMES and THE CARDINAL OF THE

KREMLIN, and to any subsequent writings. *Id.* It agreed to assign the rights to HUNT, exclusive of

book publishing rights, to Clancy. *Id.* Significantly, USNI acknowledged in writing that all rights

in and to the characters of HUNT were Clancy's "sole property." *Id.* On this important point, USNI

capitulated and conceded that it had no valid claim to Jack Ryan. On December 19, 1988, as part of

---

[7] In describing this episode, Defendants mischaracterize January 29, 1988 correspondence Clancy received from his attorney, Robert Youdelman. Defendants attribute to Youdelman a statement that USNI "acquired the copyright in" *Hunt* which gave it a continuing "interest in new books using the same characters." Def. Memo. at 7. This is not what Youdelman wrote. The letter actually reads: "The Naval Institute Press acquired the copyright in your work. The author of a novel usually retains the copyright. (The practice with text/technical books is somewhat different.) The publisher customarily has no interest in new books using the same characters." *See* Ex. 10.

[8] The 1988 Settlement was embodied in a handwritten "Points of Agreement," dated September 28, 1988, and a December 15, 1988 letter, and several enclosures. A Declaration of the scrivener of the Points, authenticating an attached transcription of this handwritten document, is included in this Exhibit.

the September 28, 1988 settlement, USNI executed an assignment and transfer of the copyright for HUNT, exclusive of book publishing rights, to JREL. Ex. 12. This assignment did not include character rights and, in fact, expressly incorporated the September 28, 1988 agreement recognizing that Clancy had retained individual ownership of the Jack Ryan character.

At no point following the 1988 mediation did Clancy assign or alienate his exclusive ownership of the Jack Ryan character.

### D.      John Clark: Jack Ryan's "Dark Side."

While Jack Ryan is Clancy's single most important character, John Clark (a.k.a. John Terence Kelly) is probably a close second. During Tom's life, Clark appeared in more than a dozen of his novels and not just as a bit player. In WITHOUT REMORSE, for example, Clark has the starring role as he deftly switches between two distinct and tenuously connected storylines involving drug runners in Baltimore and POWs in North Vietnam.

In a 1993 WASHINGTON POST interview, Clancy described Clark as "Ryan's dark side."[9] Clancy explained, "He's a hell of a nice guy but I wouldn't mess with his wife or kids. 'Cause God'll show mercy to you but he wouldn't. And he knows how not to show mercy."[10] Clark, Clancy tells us in tongue-in-cheek understatement, is "more inclined to take physical action than Jack is."[11]

In the POST interview, Clancy also reported that Clark had previously appeared in PATRIOT GAMES, CARDINAL OF THE KREMLIN, CLEAR AND PRESENT DANGER and SUM OF ALL FEARS, but

---

[9] Peter Carlson, *What Ticks Tom Clancy Off?*, THE WASHINGTON POST, Magazine page W12 (June 27, 1993).

[10]   *Id*.

[11]   *Id.*

he felt it was time to "explain to the world how he got into the CIA." The result was WITHOUT REMORSE, published in 1993, which not only gave Clark a starring role, but also filled in much of his back story.[12]

WITHOUT REMORSE is set in the early 1970s. Kelly[13] is retired from the Navy, but in spirit he is all military. Whereas Jack Ryan is not an imposing physical specimen, Kelly is. He is "football player big," around six feel tall and 195 pounds. WITHOUT REMORSE at 629, 684, 315. He possesses unnaturally good hearing. *Id.* at 311. He is a fitness junkie and, in ironical role reversal, he lectures his doctor about not getting enough exercise. *Id.* at 221. In temperament, Kelly is known as "serious" and a "cool customer." *Id.* at 102, 647. His one sign of weakness is a profound aversion to rats. They give him a "creeping chill." *Id.* at 265, 269.

Kelly joined the Navy two weeks after his 18th birthday and stayed six years. *Id.* at 682. He rose to the rank of chief bosun's mate, or chief petty officer, and was honorably discharged. *Id.* at 19, 29, 101, 682. Kelly is a trained diver (*id.* at 101) who continues to use his skills for underwater demolition. *Id.* at 560. During his Vietnam service, he fought in the brown-water Navy in the Mekong Delta. *Id.* at 101. Kelly knows guns as Jack Ryan never could and is very comfortable with them. *Id.* at 103. Among the citations in his military records are awards for distinguished rifleman and master pistol. *Id.* at 684. It was said of him that "[h]e could hit a human head with a single aimed shot from ten yards, day or night." *Id.* at 103. (WITHOUT REMORSE gives him multiple opportunities

---

[12]  According to Clancy, he started WITHOUT REMORSE in 1971 but failed to complete it until, in 1992, he picked it up again, finishing the novel in 4 ½ months of four hour days. *See* Peter Carlson, *What Ticks Tom Clancy Off?*, THE WASHINGTON POST, Magazine page W12 (June 27, 1993).

[13]  He acquires the *nom de guerre* "John Clark" midway through the novel. *See* WITHOUT REMORSE at 234, 257 (Berkley ed. 1994). All following citations are to this paperback edition.

11

to demonstrate his prowess as a marksman as he cooly and methodically assassinates several members of a drug and prostitution ring.) Kelly is never rattled under fire (*id.* at 103) and staying alert comes easily to him. *Id.* His list of military citations includes the Navy Cross, Silver Star, Bronze Star with Combat "V" and two clusters, and a Purple Heart with two clusters. *Id.* at 682.

Kelly lives on Maryland's Eastern Shore, but he was originally from Indianapolis where he attended St. Ignatius High School. *Id.* at 144, 319. Kelly did not, however, go on to college, passing up an opportunity for a scholarship. *Id.* at 230-31, 688. While Kelly does not have Ryan's academic bent, he is no slouch. He scored 147 on several IQ tests and learning had always been one of his passions. *Id.* at 230, 109. His high school education steeped him in the classics: he studied Latin, Aristotle, and Virgil. *Id.* at 219, 319, 697. He can quote from the AENEID in the original Latin and he recalls Aristotle's principles of tragedy. *Id.*

Kelly has endured repeated personal losses and his psyche is palpably scarred. His father, a firefighter, died of a heart attack when Kelly was in Vietnam. *Id.* at 297, 331. His mother died of cancer when he was still in grade school. *Id.* at 331. He lost his wife less than a year before the action commences. *Id.* at 49, 142. He has no siblings and is alone in the world. *Id.* at 424. People notice that he can be perfectly emotionless when resorting to violence, that there is something very scary about him, and that he has the capacity to "turn things on and off." *Id.* at 328, 425. He has a preternatural impatience with bureaucracy and politics and he feels justified in taking unilateral action when he perceives the system to be failing. *Id.* at 481. In short, unlike Ryan, Kelly has the physicality and sense of mission that make him a confident, adventurous, but somewhat frightening, superman.

### E.     The Clancy Divorce Settlement.

Clancy married Wanda King in 1969. They separated in 1996. As the result of their

separation, Clancy and his first wife entered into a Property Agreement on December 28, 1998. Ex.

13. The Property Agreement (which was incorporated into the divorce decree dated January 6, 1999),

designates, in Exhibits A and B, the literary works deemed "assets" respectively of JREL and JRLP.

The Property Agreement does not purport to assign any works and does not contain words of transfer

except as to a single work, RAINBOW SIX. Clancy's intent to assign *only* RAINBOW SIX is reinforced

by the separate assignment he executed for that work. *See* Ex. 33.

As discussed below, notwithstanding the lack of a signed assignment or any document

including words of transfer, the Property Agreement erroneously attributed ownership of certain

works to the Jack Ryan Entities. Nonetheless, it correctly acknowledges Clancy's retention of

ownership of the Jack Ryan character. Specifically, Paragraph 15 of the Property Agreement

provides:

> B.      … In the event that Husband or an entity affiliated with him (other than JRLP
> and JREL) signs a contract with any third party relating to the story line, in whole or
> in part (and characters in connection therewith), from works owned by JRLP or JREL
> (other than incidental use, such as flashbacks), Husband shall cause the contract to
> be assigned to JRLP or JREL as the case may be. Otherwise, Husband shall be free
> to use the characters in the works owned by JRLP and JREL in any sequel to any of
> those works in any future work that Husband may create without the approval of or
> obligation to Wife.

*Id.* Paragraph 15 recognized Mr. Clancy's continuing right to the use of his characters in derivative

works.

### F.      Clancy's Retained Copyright Interests Are Disregarded in Postmortem Contracts.

After Tom's death, Ms. Clancy found herself in the unenviable position of lacking control

over her husband's literary estate. The literary assets were undistributed. Consequently, it was the

Personal Representative, not Ms. Clancy, who had all the information and, acting in conjunction with

the Jack Ryan Entities, made all the decisions. Ms. Clancy, the largest beneficiary of the Estate, was effectively powerless to control or influence contract negotiations.

In 2014, the Estate signed an agreement with Putnam (as publisher), Rubicon, JREL, and JRLP (collectively as "Author") and agreed to the publication of two literary works as "Tom Clancy" novels. One of these Novels, FULL FORCE AND EFFECT, featured the Jack Ryan character. Based on flawed legal advice rendered by Clancy's IP lawyers, the Estate acceded to the demand of the Jack Ryan Entities that revenues from FULL FORCE AND EFFECT be allocated 1/3 to JREL, 1/3 to the Estate, and 1/3 divided equally among JREL, JRLP, Rubicon, and the Estate. Exs. 3, 6. In March 2015, the Estate signed a four-book deal with Putnam. Two of the novels in this deal were "Jack Ryan" novels: UNDER FIRE and COMMANDER IN CHIEF and the Estate gain agreed to the same flawed allocation of royalties. Ex. 14.

On or about March 4, 2016, Ms. Clancy served notice, pursuant to 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10, to terminate and recapture the rights to THE HUNT FOR RED OCTOBER (including all character rights). Ex. 15. This prompted the Personal Representative to return to Clancy's intellectual property lawyers, Robert Youdelman and Frank Curtis (who were now advising both the Estate and the Jack Ryan Entities), for additional legal advice. In a May 10, 2016 memorandum, Curtis beat a hasty retreat from the advice provided in 2013 and 2014:

> … I went back through my [1988] files and, as a result,
> I believe there is a well-founded position that the Naval
> Institute Press (the "Press") did not acquire broad
> character rights to Jack Ryan ("Ryan") as a result of
> Clancy's agreement with the Naval Institute Press (the
> "Press"). This is based on the arguments that we made at
> the time of Clancy's dispute with the Press in 1988.

Ex. 16. Curtis explained that JREL could not have obtained rights in the Jack Ryan character,

because USNI never had the rights under the 1983 agreement:

```
If, for these reasons, Clancy did not assign to the
[Naval Institute] Press broad ownership of the [Jack]
Ryan character, the Press's later copyright assignment to
JREL also did not convey to JREL broad ownership of the
[Jack] Ryan character, since the Press could not
effectively transfer what it never owned.
```

*Id.* This memorandum was concealed for two years, being revealed to Ms. Clancy only in October

2018. In 2016, attorneys for the Jack Ryan Entities urged the Personal Representative to not disclose

it, correctly perceiving the significant damage it would do to their position. Ex. 17 at page 2, n. 1.

## III.   ARGUMENT

### A.   Plaintiff's Action is Not Barred by Limitations.

Relying upon a February 19, 2014 letter from the Personal Representative of Clancy's Estate

to the Decedent's intellectual property lawyers, Ex. 3, Defendants contend that Plaintiff's action is

barred by limitations. Def. Memo. at 21-22. They further contend that Plaintiff's work for hire claims

are barred because Clancy did not himself present them while alive. Def. Memo. at 23.

Defendants' limitations argument as to Jack Ryan fails because the earliest that Ms. Clancy

could have concluded that she had a basis for initiating a declaratory judgment action with respect

to this character was January 8, 2015. It was on this date that the Personal Representative's counsel

first disclosed to Ms. Clancy's counsel a 1988 settlement between Clancy and his original publisher

that addressed Clancy's continued individual ownership of Jack Ryan.

To the Defendants' suggestion that the work for hire claims are barred because Clancy did

not himself assert them, the short answer is that the claims had not accrued. *The Jack Ryan Entities

never asserted claims of ownership adverse to Clancy during his lifetime*. The Jack Ryan Entities

were never true entities. They *were* Clancy's alter egos. They had no independent ownership, no

management, no employees or genuine function. Clancy used these shells to funnel money into his bank accounts and to lower his tax burden. For obvious reasons, Clancy never had the Jack Ryan Entities assert ownership claims adverse to his own. They did not do so until control of those entities had shifted, at Clancy's death, to his ex-spouse.

> **1.      The Law of Limitations As Applied to Copyright Ownership.**

Under the Copyright Act, all civil actions, including claims of ownership, must be commenced "within three years after the claim accrued." 17 U.S.C. § 507(b).[14] An ownership claim accrues only once, when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993); *see also Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020); *Roger Miller Music, Inc. v. Sony/ATV Publishing*, LLC, 477 F.3d 383, 390 (6th Cir. 2007) (same).

With respect to ownership claims, in contradistinction to infringement claims, courts recognize that no single defining event characterizes the moment of accrual. *See Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) ("any number of events can trigger the accrual of an ownership claim, including "[a]n express assertion of sole authorship or ownership"). A claim accrues when "the plaintiff 'knows or has reason to know of the act which is the basis for the claim.'" *Santa-Rosa v. Combo Records*, 471 F.3d 224, 227-28 (1st Cir. 2006), *cert. denied*, 550 U.S. 936 (2007) (citations omitted). Thus, a claim for declaratory judgment of ownership accrues when the plaintiff "knew of the alleged grounds for the [ownership] claim." *Id.* at 228.

---

[14]   *See also Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020); *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316-17 (2d Cir. 2013); *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011); *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996), *cert. denied*, 519 U.S. 1108 (1997); *Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004); *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996).

In determining the accrual date for a claim of copyright ownership between co-authors, "'the statutory period for any action to establish ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against the other.'" *Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020) (citations omitted); *see also Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) ("claims of co-ownership, as distinct from claims of infringement, accrue *when plain and express repudiation* of co-ownership is communicated to the claimant …."); *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016 (10th Cir. 2013) ("[i]n the copyright co-ownership context, no form of notice or constructive notice is clearer than 'plain and express repudiation of co-ownership … communicated to the claimant'"); *Welles v. Turner Entertainment Co.*, 503 F.3d 728, 734 (9th Cir. 2007) (no evidence that company plainly and expressly repudiated plaintiff's claim to ownership of home video rights before litigation commenced).[15] Moreover, the express repudiation must come directly from the party claiming ownership, it cannot be made by a third party. *See Everly v. Everly*, 958 F.3d 442, 453 (6th Cir. 2020) (repudiation "must come from someone asserting authorship of the work, not from a third party").

The accrual of an heir's claim may not be coincident with that of the original creator. Whereas an author knows from the moment of creation that he created the work and hence has rights, *Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006), the beneficiary of an estate may be ignorant of facts establishing ownership. Public acts do not necessarily suffice to place an heir on notice. *See, e.g., Gaiman v. McFarlane*, 360 F.3d 644, *reh. den., reh. en banc den.* (7th Cir. 2004) (statute of limitations was not triggered by publication of copyright notice, and registration of

---

[15] Although several federal circuits have embraced some formulation of this test, the sole Fourth Circuit decision interpreting the test is unpublished: *Davis v. Meridian Films, Inc.*, 14 F. App'x 178, 181-82 (4th Cir. 2001) (*per curiam*).

17

copyright, that did not mention scriptwriter); *Roger Miller Music, Inc. v. Sony/ATV Publishing*, LLC, 477 F.3d 383 (6th Cir. 2007) (filing the application for renewal of copyrights, openly and exclusively licensing songs during their renewal term, and paying artist royalties for exploitation of the renewal copyrights, held not  to constitute a plain and express repudiation of artist's ownership claims).

Furthermore, an heir's claim may turn not just on the facts of ownership, but on legal mechanisms that are independent of copyright. For example, in *Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993), the triggering event was not when Hank Williams created the works. The triggering event was, instead, the state court's recognition of the plaintiff's status as Williams' daughter. She could not assert any copyright interest, and her claim did not accrue, until there had been a judicial determination that she was in fact his daughter and heir.

> ### 2. Ms. Clancy's Jack Ryan Claim Accrued, At the Earliest, on January 8, 2015 When She Learned of Her Husband's 1988 Settlement With USNI.
>
> #### a. The Jack Ryan Entities Did Not Assert Ownership of the Jack Ryan Character Through the February 19, 2014 Correspondence.

Defendants' limitations argument has two principal flaws. The first stems from the fact that the February 19, 2014 letter was not written by them or addressed to Ms. Clancy. Ex. 3. Thus, even if it could be construed as *someone's* assertion of ownership, it would not qualify as *their* assertion of ownership.

The correspondence memorializes an expedient arrangement employed by the Personal Representative to complete a book deal after Clancy's death. Tom's intellectual property lawyers stressed the need for an agreement between the Personal Representative and the Jack Ryan Entities

regarding the division of proceeds in order to close the deal. Ex. 6. The Personal Representative, describing his agreement with counsel for the Jack Ryan Entities, writes: "… the Jack Ryan book would be viewed principally as a JREL property. This is largely based on your advice that the Jack Ryan character is owned by JREL …." Ex. 3 at 1. This was not, and was not meant to be, an express assertion of ownership by anyone. *Id.* Rather, it was simply a provisional agreement reached by the Personal Representative that was intended to "suffice for the two 2014 books." *Id.* The Personal Representative stressed that "[b]y agreeing to the arrangement for proceeds of these two books, we do not intend to bind any of the current parties nor future owners of Tom's name or any of the business entities." *Id.*

> **b.     Ms. Clancy First Learned on January 8, 2015 of Facts Suggesting that the Estate, and Not the Jack Ryan Entities, Owned the Jack Ryan Character.**

The second principal flaw with the Defendants' limitations argument is that the February 19, 2014 letter did not place Ms. Clancy on notice of anything. She had been a widow for a little more than four months. Having married Tom in 1999, she did not know him when he published THE HUNT FOR RED OCTOBER in 1984, or when he became enmeshed, in 1988, in a battle over character rights with his original publisher, USNI. Unlike Tom's first wife, Ms. King, Ms. Clancy was not an officer, owner or partner of JREL or JRLP. Exs. 13, 18 & 19. Thus, when she was copied on the February 19, 2014 letter from the Personal Representative to Clancy's New York intellectual property lawyers, she was unaware of any evidence suggesting that anyone should be disputing the intellectual property rights attributed by the Personal Representative to JREL.

On or about April 29, 2014, Ms. Clancy retained Lansing Palmer of New York and Norman

Smith of Baltimore to represent her interests regarding her late husband's estate. Ex. 20. On May 8, 2014, in response to Mr. Palmer's request, the Personal Representative supplied several documents including (i) a posthumous Penguin book contract dated March 14, 2014, (ii) the February 19, 2014 correspondence, (iii) the Limited Partnership Agreement of JRLP, (iv) the corporate charter and bylaws of JREL, and (v) documents reflecting the election of new officers of JREL and designation of Wanda King as JRLP's sole general partner. Ex. 21. While Ms. Clancy had not seen the March 14, 2014 contract before,[16] these documents, standing alone, did nothing to either substantiate, or refute, JREL's purported ownership.

After receiving and studying these documents and observing that there was nothing in them to confirm the Personal Representative's assertion of JREL's ownership, on November 23, 2014, Ms. Clancy's lawyers asked the Personal Representative to explain the basis for his assertion. This request was addressed in a November 24, 2014 email from George Reynolds, one of the lawyers for the Personal Representative, to Norman Smith:

> **From**: Reynolds, George
> **Sent**: Monday, November 24, 2014 3:06 PM
> **To**: Norman Smith (nlsmith@fisherwinner.com)
> **CC**: Webb, J.W. Thompson; Brennen, Robert S.
> **Subject**: Ownership of Clancy Characters
>
> Norman,
>
> I have addressed your question of last evening with Topper and he has confirmed that Robert Youdelman is the one who determined that the Jack Ryan character is owned by JREL. His basis for this determination is that a character belongs to the author who first creates the character in a published work of intellectual property, which in this case was Tom in Hunt for Red October. Tom transferred all his rights regarding HFRO to JREL sometime ago, making it the owner of the Ryan character.

Ex. 23.

---

[16]   She had not been consulted about it and she played no role in its negotiation. Ex. 22 at page 2.

On December 2, 2014, Mr. Palmer followed up with a letter to Mr. Reynolds in which he stated that "[w]hile we believe that the Estate, through its ownership in Rubicon, may be entitled to all proceeds from the current proposed book deals, and that the Estate, through Rubicon, also may have been entitled to the entire proceeds from the two book deal described in Topper's February 19, 2014 letter, *we invite you to send us any evidence to the contrary*." Ex. 24 (emphasis added).

When no documents were forthcoming, Mr. Palmer repeated his request on December 30, 2014. Noting that the Personal Representative's December 29, 2014 correspondence "refer[red] to and at times quote[d] from documents that we do not have," Mr. Palmer stressed the need to receive all of the documents relevant to this issue. In particular, he asked "that you provide us with the documents you describe in footnote 2 of your letter, including Tom Clancy's 'publishing agreement with the U.S. Naval Institute,' and all documents relating to his 'later settlement with the Naval Institute, [in which] it assigned the copyright in Hunt to JREL.'" Ex. 25.

In response, on January 8, 2015, Robert Brennen, one of the Personal Representative's attorneys, wrote to Norman Smith enclosing a disk containing, *inter alia*, the following documents: (i) November 21, 1983 publishing contract with U.S. Naval Institute; (ii) September 28, 1988 Points of Agreement; (iii) December 15, 1988 R. Youdelman letter supplementing Points of Agreement; and (iv) December 19, 1988 Transfer of Ownership of Copyright and Assignment. Ex. 26. These crucial documents revealed to Ms. Clancy, for the first time, that in 1988 Clancy became embroiled in an ownership dispute with his original publisher, USNI, and that the dispute was resolved by an agreement recognizing Tom's continued individual ownership of all rights to the Jack Ryan character. An assignment from USNI to JREL was also signed. The revelation of this settlement led to Ms. Clancy's recognition that the Personal Representative's attribution of ownership to JREL was

21

unfounded. Simply stated, USNI could not assign to JREL what it did not own.

### 3. The Work for Hire Claims Accrued, At the Earliest, On December 11, 2018.

Defendants' contention that Plaintiff's "work for hire" claims are time-barred relies on the assumption that the claims existed during Clancy's lifetime. To the contrary, the Jack Ryan Entities never asserted ownership while Clancy was alive for the simple reason that the entities were merely Clancy's alter egos. *M & A Associates, Inc. v. VCX, Inc.*, 657 F. Supp. 454, 459 (E.D. Mich. 1987) (rejecting work for hire where artist "exercised complete control of the corporation, which served as his mere alter ego"). It was only after Clancy's death that the Jack Ryan Entities came to the conclusion that they enjoyed certain "work for hire" rights as the result of consultation with Robert Youdelman. Ex. 27 at 2-3, Ex. 17 at 3. They never presented any such claim directly to Ms. Clancy. Had they done so at any time before December 2018, however, Ms. Clancy, having no prior knowledge of, or involvement in, the Defendants' affairs, would have had no reason to dispute the validity of the claim.

The earliest notice to Ms. Clancy that the Jack Ryan Entities' reliance on the "work for hire" doctrine was without merit was Ms. King's December 11, 2018 deposition. Ms. King revealed for the first time important details about the Jack Ryan Entities that showed that the Defendants' reliance on "work for hire" was not grounded in reality. Accordingly, Plaintiff's claim did not accrue until December 11, 2018.[17]

---

[17] Because the claim to John Clark also turns on work for hire, Ms. King's deposition also triggered the accrual of the Clark character claim.

22

**B.     The Undisputed Facts Entitle Plaintiff to Summary Judgment on Count I of the Amended Complaint and Counts I and II of the Counterclaim: Clancy's Estate Owns the Jack Ryan Character As Presented in HUNT.**

Tom Clancy owned the Jack Ryan character at his death and it passed to his estate. Although Clancy assigned to USNI, the publisher of HUNT, the copyright for the work, he never sold, assigned or alienated the rights to the Jack Ryan character. An author's ownership of the rights to a character cannot be alienated by a general grant. Clancy never signed an agreement containing a clear and explicit grant of the right to Jack Ryan to anyone.[18] Thus, when he died, he retained ownership of the character.

**1.     By Statute, A Copyright Interest Is Created in Only One of Two Ways.**

Copyright is a creature of statute. The statute defines both the creation of the right and its mode of transfer.

17 U.S.C. § 201 provides precise and limited mechanisms for the creation of a copyright:

**Ownership of copyright**

(a)     Initial ownership. Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

(b)     Works made for hire. In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

The Copyright Act protects "original works of authorship fixed in any tangible medium of

---

[18] At no point during Clancy's lifetime did either of the Jack Ryan Entities assert ownership of the character. This is hardly surprising because, as discussed further below, the Jack Ryan Entities were merely an extension of Clancy. He could hardly be expected to dispute ownership with himself.

expression." 17 U.S.C. § 102. The statute's "protection commences as soon as the original work is

created and fixed in some tangible form, becoming the author's property immediately upon fixation."

*Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d

591, 596 (4th Cir. 2013).

> **2.   An Author Alienates His Copyright Interest Only by a Signed, Written Assignment that Clearly Evinces the Author's Intent to Transfer.**

The copyright statute expressly provides the mode of transfer for any or all of the interests

created under it. 17 U.S.C. § 201 provides, in relevant part:

> (d)   Transfer of ownership.
>
> > (1)   The ownership of a copyright may be transferred *in whole or in part* by any means of conveyance or by operation of law, and *may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.*
> >
> > (2)   *Any of the exclusive rights* comprised in a copyright, including any subdivision of any of the rights specified by section 106, *may be transferred* as provided by clause (1) and *owned separately.* The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

(Emphasis added.) *See also Metropolitan Regional Information Systems, Inc. v. American Home

Realty Network, Inc.*, 722 F.3d 591, 596 (4th Cir. 2013) ("Although ownership vests initially with

the author of the work, the author may transfer any of the exclusive rights attendant to copyright

ownership by granting an assignment or exclusive license.").

The statute requires any transfer of an interest in copyright to be in a signed writing. 17

U.S.C. § 204(a) provides, in relevant part:

24

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

The signed writing contemplated by the statute must unambiguously evince an intent to transfer ownership. *Tjeknavorian v. Mardirossian*, 56 F. Supp.3d 561, 565 (S.D.N.Y. 2014) ("writing sufficient to satisfy Section 204 … must explicitly convey a party's intention to sign away his or her copyright interests"). Section 204 "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine *precisely what rights are being transferred* and at what price." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991) (emphasis added); *see also Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591 (4th Cir. 2013) ("signed writing requirement also serves the purpose of 'enhanc[ing] predictability and certainty of ownership – Congress's paramount goal when it revised the Act in 1976'").

Section 204's protection is comprehensive even "'protecting authors [] from *themselves* if need be.'" *Tjeknavorian*, 56 F. Supp.3d at 565 (quoting 2 PATRY ON COPYRIGHT § 5:106) (emphasis in original). Thus a composer's signing of a spreadsheet, allegedly as part of intended transfer of his copyright to music publisher, and testimony that the publisher treated some of songs at issue as its own, was held too "cryptic" to establish transfer of ownership under the Copyright Act. *Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latino Americana*, 424 F.3d 50, 60 (1st Cir. 2005). Similarly, a written agreement to incorporate a partnership was held to not meet the statutory requirements because it did not mention transfer of copyright ownership.

*Brown v. Flowers*, 297 F. Supp.2d 846, 853 (M.D.N.C. 2003).

Section 204 is said to be more stringent than a statute of frauds. *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391-92 (5th Cir. 2005), *cert. denied*, 547 U.S. 1054 (2006) (noting that Section 204(a)'s requirement, while sometimes called the copyright statute of frauds, is in fact different from a statute of frauds because, rather than serving an evidentiary function and making otherwise valid agreements unenforceable, § 204(a) makes the noncompliant transfer completely invalid); *Tjeknavorian*, 56 F. Supp.3d at 565 ("writing requirement of Section 204 is more stringent than traditional statutes of frauds"). Section 204 "imposes a rigid default in favor of letting creators retain their interests in copyrighted work." *Id.* Consequently, where no signed writing exists, "it is the copyright owner who has the exclusive right to produce derivative works." *Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 662, 51 Cal. Rptr. 2d 907, 923 (1996).

### 3. A Character is a Protected Element of A Copyrighted Work.

A character is a protected copyrightable element of a copyrighted work, just like plots, settings, dialogue, narrative descriptions and other expression.

In *Nichols v. Universal Pictures Corp*., 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931), Judge Learned Hand first suggested that characters might enjoy copyright protection "quite independently of the 'plot,'" although he conceded that he knew of no example of this.[19] Judge Hand wrote that copyright protection might be granted to a character if it is developed with enough specificity so as to constitute protectable expression. In 1954, the Ninth Circuit affirmed the view that copyright protection might be granted to a character if the character constituted "the

---

[19] This may be accounted for, in part, by the fact that prior to 1976 the courts applied the judge-made "doctrine of indivisibility" to interpret the copyright statute. *See infra* at III.B.5.

story being told." *Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*, 216 F.2d

945, 950 (9th Cir. 1954), *cert. denied*, 348 U.S. 971 (1955).[20]

Generally, today, characters are recognized as enjoying copyright protection provided that

they are sufficiently "delineated,"[21] or "especially distinctive."[22] The more iconic the character, the

more likely it is to be deemed copyrightable. *See, e.g., Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d

496, 502-03 (7th Cir.), *cert. denied*, 574 U.S. 976 (2014) ("[f]rom the outset of the series of Arthur

Conan Doyle stories and novels that began in 1887 Holmes and Watson were distinctive characters

and therefore copyrightable"); *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F.

Supp. 1287, 1296 (C.D. Cal. 1995) (holding that James Bond is a protectable character because he

"is a unique character whose specific qualities remain constant despite the change in actors" and

because audiences watch Bond, Tarzan, Superman and Sherlock Holmes not for the story "but to see

their heroes at work"); *Anderson v. Stallone*, Case No. 87-0592, 11 U.S.P.Q.2D (BNA) 1161, 1989

U.S. Dist. LEXIS 11109 (C.D. Cal. 1989) (Rocky characters found to be sufficiently delineated to

be copyrightable, particularly because "movies did not revolve around intricate plots or story lines,"

and "the focus of these movies was the development of the Rocky characters"); *Burroughs v.*

---

[20] The decision has two fundamental components, the first being that of contractual interpretation, and the second an analysis of the copyrightability of characters. The second component has been the subject of sustained criticism and, although its guiding principle that characters enjoy copyright protection has been widely embraced, the specific test it announced for assessing the copyright protection of characters has been largely abandoned as unworkable.

[21] *Edgar Rice Burroughs, Inc. v. Manns Theatres*, 195 U.S.P.Q. (BNA) 159, 1976 U.S. Dist. LEXIS 11754 (C.D. Cal. 1976) ("Characters which are distinctly delineated in copyrighted works are protected by the copyrights in those works."); *Silverman v. CBS, Inc.*, 870 F.2d 40, 50 (2d Cir.), *cert. denied*, 492 U.S. 907 (1989) ("Amos 'n' Andy" characters were sufficiently delineated as to be copyrightable).

[22] *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1451-52 n.6 (9th Cir. 1988) ("cases subsequent to *Warner Bros*. have allowed copyright protection for characters who are especially distinctive").

*Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388, 391 (S.D.N.Y. 1981) (as a distinctive character, "Tarzan" is copyrightable); *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998) (as an iconic fictional character, Godzilla is copyrightable).

### 4. The General Assignment of An Underlying Work's Copyright Does Not Include Exclusive Character Rights.

Under copyright law, the general transfer of an underlying work's copyright does not transfer exclusive character rights. Although a character is a protected element of an underlying work, it does not necessarily follow that a transfer of a copyright in an underlying work must include a transfer of the author's character rights. To the contrary, a general grant of a copyright in a work is insufficient to convey exclusive character rights. *See Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*, 216 F.2d 945 (9th Cir. 1954), *cert. denied*, 348 U.S. 971 (1955).

In *Warner Brothers*, the issue was whether the author Dashiell Hammet surrendered all rights to the character Sam Spade, created by Hammet in THE MALTESE FALCON, when Hammet assigned the FALCON movie rights to Warner Brothers. The Ninth Circuit decided the case as a matter of basic contract interpretation, holding that the contract's silence on the subject of character rights belied any suggestion that Hammet had conveyed the rights to his characters:

> We are of the opinion that since the use of characters and character names are nowhere specifically mentioned in the agreements, but that other items, including the title, 'The Maltese Falcon', and their use are specifically mentioned as being granted, that the character rights with the names cannot be held to be within the grants, and that under the doctrine of *ejusdem generis*, general language cannot be held to include them.

*Id.* at 949. Under the court's analysis, the "clearest language is necessary to divest the author of the fruits of his labor." In the absence of such clear language, the owner of the copyrighted work reserves

those rights not expressly granted.

As support for its conclusion, the court looked to the customary practice of authors routinely to reuse characters once created:

> The conclusion that these rights are not within the granting instruments is strongly buttressed by the fact that historically and presently detective fiction writers have and do carry the leading characters with their names and individualisms from one story into succeeding stories. This was the practice of Edgar Allen Poe, Sir Arthur Conan Doyle, and others; and in the last two decades of S. S. Van Dine, Earle Stanley Gardner, and others. The reader's interest thereby snowballs as new 'capers' of the familiar characters are related in succeeding tales.  If the intention of the contracting parties had been to avoid this practice which was a very valuable one to the author, it is hardly reasonable that it would be left to a general clause following specific grants.

*Id.* The court also cited the post-contract conduct of the parties, specifically, Warner Brothers' failure to object to Hammett's 1932 publishing of three stories in which leading Falcon characters were used. *Id.* Furthermore, the court reasoned, the relatively modest consideration paid by Warner Brothers would not likely have included character rights. *Id.* at 949-50. Finally, the court's interpretation was consistent with the copyright statute itself:

> The practice of writers to compose sequels to stories is old, and the copyright statute, though amended several times, has never specifically mentioned the point … If Congress had intended that the sale of the right to publish a copyrighted story would foreclose the author's use of its characters in subsequent works for the life of the copyright, it would seem Congress would have made specific provision therefor.

*Id.* at 950.

Contrary to Defendants' attack on *Warner Brothers* (Def. Memo. at 41-42), the decision's logic was then, and remains, compelling. In *Goodis v. United Artists TV, Inc.*, 425 F.2d 397 (2d Cir. 1970), the court embraced *Warner Brothers'* holding noting:

> Many authors have used characters they created in one novel in a whole series of subsequent works; surely it would be rash of us to hold on summary judgment that

29

> the sale of rights in one of an author's works ends, without specific mention that it
> ends, the author's exclusive ownership of the valuable characters he created in that
> one work, when he may well desire to create sequels of his own using these same
> characters.

*Id.* at 406.

Similarly, in *Trust Co. Bank v. MGM*, 593 F. Supp. 580 (N.D. Ga. 1985), *aff'd*, 772 F.2d 740

(11th Cir. 1985), where the court found that Margaret Mitchell's general grant of motion picture

rights for *Gone With the Wind* did not implicitly carry with it a grant of sequel rights, the court

explained:

> MGM was fully aware both of the Sam Spade decision and of all the commentary
> that had followed that decision. After the Sam Spade decision, MGM could no longer
> rely upon an *implicit grant* of sequel rights in an agreement conveying motion picture
> rights to it.

*Id.* at 586 (emphasis added). Courts have repeatedly recognized that mere general grants are

insufficient to transfer sequel or character rights. *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d

261, 271 (2d Cir. 1965) ("where an assignee has prepared the assignment, absent clear evidence of

a contrary intent, rights not expressly granted will be held to have been reserved by the assignor");

*Caldwell v. ABKCO Music & Records, Inc.*, 269 A.D.2d 206, 207, 703 N.Y.S.2d 97, 98 (App. Div.

1st Dept. 2000) ("[r]ights not specifically granted by an artist in an agreement are reserved to the

artist and the owner of such property, absent the clearest language, is not free to do with it whatever

the owner wishes").

In fact, *Warner Brothers*' holding transformed the intellectual property bar's approach as can

be seen in *Jim Henson Productions v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259 (S.D.N.Y. 1997).

In *Henson*, a well-known copyright lawyer, Harry Olsson, described the decision's effect on contract

drafting:

30

> In the late 1950s, when a copyright user wanted to obtain perpetual rights in a character (distinct from rights in a work in which the character appeared) it was the practice of the copyright bar *to spell this out in no uncertain terms*. One compelling reason for this is [the Warner Brothers decision.] In the wake of this watershed case, the copyright bar was on notice that there was the strongest presumption that even when an author transferred the copyright in a work in which a character was fully delineated, the author retained the right to use the character in sequels or other works. After that decision any copyright lawyer representing a user wishing to buy exclusive rights in a character would make certain that the assignment documents said so unmistakably and unequivocally.

*Id.* at 277 (emphasis added).

### 5.   Under the 1976 Amendments to the Copyright Act, A Character May Be Owned Separately from Its Work.

Defendants contend that the "copyright in the Jack Ryan character (as delineated in *Hunt*) cannot be divorced from the copyright in *Hunt* itself …." Def. Memo. at 40. Their argument blithely ignores the import of the 1976 amendments to the Copyright Act.

Prior to 1976, the courts applied the judge-made "doctrine of indivisibility" to interpret the copyright statute. *See Goodis v. United Artists TV, Inc.,* 425 F.2d 397, 399-400 (2d Cir. 1970). The doctrine of indivisibility "rejects partial assignments of copyrights and requires a proprietor or assignee of a copyright to hold nothing less than all the rights in a copyrighted work." *Id.* at 400. As a practical matter, this made it impossible for one party to own the publishing rights to a book and another party to own the characters. At most, a party could enjoy a license to certain rights. There could only be one copyright holder.

Congress, however, rejected this reading of the statute. The doctrine of indivisibility was expressly eliminated in the Copyright Act of 1976. *See Gardner v. Nike, Inc.*, 279 F.3d 774, 778-79 (9th Cir. 2002) (rights under copyright statute are divisible and may be "owned separately"). As the

*Gardner* court observed, Section 201 provides that "*any* of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred …and owned separately." *Id.* at 778 (quoting 17 U.S.C. § 201(d)(2)) (emphasis added). It constitutes "the first explicit statutory recognition of the principle of divisibility of copyright." *Id.* at 779 (citing Notes of Comm. on Judiciary, H. Rep. No. 94-1476).[23]

Simply stated, the plain text of the statute renders Defendants' position untenable.

### 6.    Tom Clancy Individually Owned and Never Assigned the Jack Ryan Character.

The principles reviewed thus far establish that Ms. Clancy is entitled to judgment in her favor with respect to the ownership of Jack Ryan.

First, Jack Ryan is a fully delineated, distinctive and iconic character in the same sense as James Bond, Tarzan, Superman, Sherlock Holmes and Rocky. He has specific qualities that remain constant and readers turn to new Jack Ryan novels to see their hero at work. During Clancy's lifetime, Jack Ryan appeared in thirteen novels and he has appeared in four additional novels posthumously. Jack Ryan is so important to the Clancy franchise that the covers of his Ryan books prominently declare, "A Jack Ryan Novel." *See, e.g.,* Ex. 28.

Second, contrary to the Defendants' contention (Def. Memo. at 41-43), Clancy owned and never assigned his rights to Jack Ryan. The initial ownership of both the novel and its characters vested in Clancy. 17 U.S.C. § 201(a). When he signed the 1983 contract for HUNT'S publication, the

---

[23]  There is authority for the proposition that even under the 1909 Copyright Act, the divisibility of character rights is recognized. *See, e.g., Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 962 n.1 (9th Cir. 2011) (holding of *Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) "does not lead to the conclusion that once created, the character copyright cannot be transferred or sold separately from the copyright-creating work").

law governing character ownership required that assignments including character rights be expressed in the clearest language possible, and provided that an author's rights to a character were not alienated by a general grant of the work in which the character is created. The 1983 Contract *does not* grant USNI any rights to the characters featured in HUNT or to sequels or derivative works. None can be inferred. *See, e.g., Trust Co. Bank v. MGM*, 593 F. Supp. 580 (N.D. Ga. 1985), *aff'd*, 772 F.2d 740 (11th Cir. 1985) (citing *Warner Brothers Pictures, Inc.*, 216 F.2d at 950) (finding that Margaret Mitchell's general grant of motion picture rights for GONE WITH THE WIND did not implicitly carry with it a grant of sequel rights).

As in *Warner Brothers*, the facts and circumstances underlying the 1983 Contract indicate that the intent of the parties was not to include character rights. The 1983 Contract makes no reference to characters and contains no assignment of them. Having already received three draft chapters of PATRIOT GAMES, which also featured Jack Ryan, USNI was well aware that Clancy intended to use Jack Ryan in derivative works. Moreover, as in *Warner Brothers*, the relatively modest compensation ($5,000 plus royalties ranging from 14% to 21% of net) paid by USNI to Tom Clancy, was insufficient to support the "complete surrender of the characters made famous" in HUNT. *See* Ex. 7 at page 2.

Subsequently, in 1987, USNI saw what it thought was an opportunity to lay claim to the increasingly lucrative Jack Ryan franchise. It asserted for the first time that it owned Jack Ryan. Clancy insisted that he held the exclusive rights to the character. The parties resolved their dispute by entering into a settlement agreement which acknowledged and reaffirmed that the characters in HUNT, including Jack Ryan, were individually owned by Clancy. Addressing the gravamen of the dispute – ownership of the Jack Ryan character – the 1988 Settlement provided: "*Without limiting*

33

*the foregoing, the parties acknowledge that all rights in and to the characters are the sole property of the respective authors.*" Ex. 11 at p. 1 (emphasis added).

The 1988 Settlement also required USNI to transfer the copyright in HUNT to Clancy or his designee. Clancy designated JREL as the assignee of the HUNT copyright; and the subsequent assignment by USNI, drafted "in accordance with the terms of the Agreements between Assignor and Thomas L. Clancy, Jr. dated November 21, 1983 and September 28, 1988," made no mention of character rights. Ex. 12. The 1988 Settlement made explicit that Clancy, not USNI, owned the HUNT characters.

USNI could not transfer to JREL what it did not own. *Hendrie v. Sayles*, 98 U.S. 546, 551, 25 L. Ed. 176, 178 (1878) (patent assignee receives no greater rights than those held by assignor, "as the maxim *Nemo dat qui non habet* applies to the assignee of the patentee"); *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 783-84 (10th Cir. 2001) (applying principle adopted by Kansas Supreme Court that an assignee can acquire rights no greater than those held by the assignor – or *nemo dat qui non habet*); *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 436 (S.D.N.Y. 2007) (recognizing "the well-established doctrine of *nemo dat qui non habet*: an assignor cannot give more than he has"); *Parker v. Nagel (In re Nagel)*, 556 B.R. 336, 342 (Bankr. N.D. Ohio 2016) ("you cannot transfer property that you do not own"). Thus, there was never any transfer to JREL of the Jack Ryan character.

The Defendants have offered no evidence of any subsequent assignment of the HUNT characters. There is no evidence that such a written assignment exists. In May 2016, Frank Curtis (one of Clancy's lawyers during the 1988 USNI dispute) admitted in correspondence to the Defendants that he could not locate any assignment despite a search of his files. Ex. 16 at 3. Curtis

also summarized the contents of a 1988 file memorandum that recited facts inconsistent with the alleged assignment by Clancy of character rights to JREL. Ex. 16 at 3.

The lack of any written and signed assignment is fatal to the Defendants' claims. A transfer of copyright ownership is not legally effective "unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed …." 17 U.S.C. § 204(a). Without such a writing, "a transfer of copyright is simply not valid …." *Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (quoting *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391 (5th Cir. 2005)).

Since Tom Clancy never assigned his copyrights to the characters in HUNT to USNI, JREL, or any other entity, he retained those rights and they passed to his Estate at death.

C.  **The Undisputed Facts Entitle Plaintiff to Summary Judgment on Counts II, III and IV of the Amended Complaint and Counts I and II of the Counterclaim: Clancy Did Not Create Works for Hire for JREL or JRLP and Both the Works and the Characters, Including John Clark, Remained His Property At Death.**

Defendants also assert interests in Tom Clancy's post-HUNT literary legacy. Def. Memo. at 24-37. As shown below, however, their claims lack merit and Plaintiff is entitled to judgment in her favor with respect to Counts II, III and IV of the Amended Complaint and Counts I and II of the Counterclaim.

JREL was formed on May 28, 1985. Ex. 18. From 1985 to 1991, Tom Clancy completed writing PATRIOT GAMES (1987), THE CARDINAL OF THE KREMLIN (1988), CLEAR AND PRESENT DANGER (1989), and THE SUM OF ALL FEARS (1991), and completed co-writing RED STORM RISING (1986) ("JREL Books"). JRLP is a Maryland limited partnership that was formed on February 26,

35

1992. Ex. 19. From 1992 to 1996, Tom Clancy completed writing the books WITHOUT REMORSE (1993), DEBT OF HONOR (1994), and EXECUTIVE ORDERS (1996) ("JRLP Books"). Defendants claim these books were written as "works made for hire." Def. Memo. at 24-31.

Contrary to their contention, the Jack Ryan Entities acquired no rights in either completed works (or in incremental character developments contained in those works) by virtue of § 201(b) (the "work for hire" provision). Supreme Court precedent establishes that Clancy never attempted, much less succeeded, in bringing his one-man literary operation within the ambit of § 201(b).

### 1.   Tom Clancy's Works Written During the JRE Years Were Not Created as Works for Hire.

Section 101 of the Copyright Act provides that a work made for hire must meet one of two tests. The first is that the work was prepared by an "employee" within the scope of his employment. The second is that the work was "specially ordered" or "commissioned for use" for one of the nine listed categories[24] of works and there is a written agreement between the parties specifying that the work is a work made for hire. Tom's novels are not within the nine listed categories. His works therefore qualify as works for hire only if he was writing as an employee.

Although Clancy had "employment agreements" with JREL and JRLP from 1992 to 1997, this is not dispositive. The U.S. Supreme Court held in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), that the determination of whether an author is an employee or an independent contractor must be made with reference to agency law. Prior to the *Reid* decision, some federal circuit courts had broadly construed Section 101's use of the term "employee" to include

---

[24] The nine categories are: (1) a contribution to a collective work, (2) as a part of a motion picture or other audiovisual work, (3) as a translation, (4) as a supplementary work, (5) as a compilation, (6) as an instructional text, (7) as a test, (8) as answer material for a test, or (9) as an atlas. Obviously, novels are not included in this list.

situations where the hiring party had the right to control the product even if that control was never practically exercised. *Reid*, 490 U.S. at 742-42; *see also Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991). The *Reid* court eschewed this facile approach as inconsistent with the statute and insisted upon proof that satisfies general agency principles. *Id.*

Therefore, to determine whether the work is the work of an "employee," the court must consider the following factors: (1) the hiring party's right to control the manner and means by which the product is accomplished, (2) the skill required, (3) source of the instrumentalities and tools, (4) the location of the work, (5) the duration of the relationship between the parties, (6) whether the hiring party has the right to assign additional projects to the hired party, (7) the extent of the hired party's discretion over when and how long to work, (8) the method of payment, (9) the hired party's role in hiring and paying assistants, (10) whether the work is part of the regular business of the hiring party, and (11) whether the hiring party is in business. *Reid*, 490 U.S. at 751-52. The Supreme Court noted that Reid controlled his own work, worked in his own studio, was free to hire and control assistants, and operated with complete independence. *Id.* at 752-53. Accordingly, he was deemed an independent contractor and his sculpture could not, therefore, be a work made for hire.[25]

---

[25] *See also Marco v. Accent Publishing Co.*, 969 F.2d 1547 (3d Cir. 1992) (photographer who supplied studio, received no benefits, worked in a distinct occupation, and was paid by the job was an independent contractor); *MacLean Assocs., Inc. v. William M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769 (3d Cir. 1991) (jury could conclude that computer programmer was not defendant's servant where software was written in consulting relationship, task required skill and creativity, programmer worked at his own facility, had absolute discretion over hours and pace, was not salaried and defendant had no right to assign additional projects and did not pay payroll taxes); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990) (drafting service operated as an independent contractor where it provided skilled drafting services, provided its own office space, tools and supplies, was retained for a short period of time, was not subject to the assignment of new projects, was free to determine the days and hours on which its employees worked, had total discretion in hiring and firing its own employees and paid its own taxes and withholding).

37

When a court does a "work for hire" analysis, it "focuses on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002).[26] As the *Marvel* court emphasized, "'[i]t is relationship that in fact exists between the parties, and not their description of that relationship, that is determinative." *Id.* (quoting 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 11.02[A][2] (2000 ed.)). In assessing whether the purported agency is genuine, "the manner in which the parties designate the relationship is not controlling …." *Id.*

> ### 2.     The Jack Ryan Entities Are Loan-Out Companies, Created to Avoid Personal Liability and to Minimize Taxes, and Clancy Was Neither Their Employee Nor Their Agent.

After achieving some success, Tom Clancy was advised to take steps to reduce his taxes and to avoid personal liability. He resorted to a commonplace practice in book and media contracting – the use of a so-called "loan-out" corporation.[27] These "loan-out" corporations were often little more

---

[26] Relying on *Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir. 1997), Defendants urge this Court to consider an additional factor not relied upon by *Reid* – the parties' intent to create an employment relationship. Def. Memo. at 25. *Cilecek* was *not* a copyright case. There, the appellant physician was under contract with two hospitals. When his contract was cancelled, he sued the hospitals under Title VII of the Civil Rights Act of 1964, alleging that his termination was retaliatory. *Id*. at 259. In determining that the doctor was an independent contractor, the court referred to the conventional master-servant relationship as stated in *Reid*, but set forth its own 10 factors to consider "in determining whether a doctor performing emergency room services at a hospital is an employee or an independent contractor," including for consideration "whether the parties believe they have created an employment relationship or an independent contractor relationship." *Id.* at 261. Reliance on this subjective element cannot be squared with the relevant authority requiring an objective focus on the parties' actual relationship.

[27] *See* Michael H. Davis, *The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright: Once a Story is "Pitched," a Studio Can Never Obtain All Copyrights in the Story*, 18 CARDOZO ARTS & ENT. L.J. 93, 116-17 (2000) ("Loan-out companies, originally designed for tax purposes, are the vehicles by which production companies acquire the services of a writer who, employed by his own loan-out company, is already a worker for hire."); *see also* Marilyn Barrett, *Independent Contractor/Employee Classification in the Entertainment Industry: The Old, the New and the Continuing Uncertainty*, 13 U. MIAMI ENT. & SPORTS L. REV. 91, 108 (1995) (discussing loan-out corporations in the entertainment industry); Mary

than legal fictions used to satisfy the tax code.[28] While *Reid* had no apparent impact on the tax advantages of such relationships,[29] which are governed by the tax code, it made clear that the purported "work for hire" contracts of these companies would only qualify as such if they stemmed from a true agency relationship.

> As Davis observed:
>
> Although the studio writer of the 1930s might have satisfied some of those factors, the modern screenwriter clearly does not work under such conditions. The modern screenwriter is an independent contractor who works in his own office or home, by his own schedule, and determines almost all the details of his work. *Such an independent contractor cannot be a worker for hire* under the employee test.

*Id.* at 108 (emphasis added).

Like the modern screenwriters described above, Clancy's relationship with the Jack Ryan Entities had none of the earmarks of a true employee relationship. The Jack Ryan Entities were never true businesses and are, in reality, shells. Ms. King, Clancy's former wife who served as an officer of JREL and a general partner in JRLP, testified that they were "advised by our accountant that it would be better for us taxwise to funnel the money" from book sales through a corporation. Ex. 29, W. King Dep. Tr. at 78:10-79:2. While Clancy was alive, the Jack Ryan Entities essentially consisted of Tom and Ms. King and Tom did not even have an employment agreement until 1992. *Id.* at 125:10-14; *see* Exs. 30 & 31. The sole "employee" was a part-time accountant who accounted for

---

LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 VAND. L. REV. 879, 880-83 (1995).

[28] *See Bozzio v. EMI Group Ltd.*, 811 F.3d 1144, 1147 (9th Cir. 2016 ) ("loan-out corporation is a legal fiction employed for the financial benefit of successful artists and entertainers")

[29] Davis writes that such "writers are probably employees for purposes of the tax code," even though they fail to satisfy *Reid's* "work for hire" test. Davis, *Screenwriter's Indestructible Right*, 18 CARDOZO ARTS & ENT. L.J. at 117 (citing Mary LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 VAND. L. REV. 879 (1995)).

the book revenue. *Id.* at 96:9-20; 97:7-21. The companies owned virtually no assets other than Clancy's computer. *Id.* at 106:11-18. The revenue from Tom's books was the sole source of income. *Id.* at 95:8-12. The companies never rented office space and Tom worked from home. As Ms. King put it, the official office location was "[w]herever we were living." *Id.* at 103:18-20; 122:9-17. The companies never had their own letterhead, email addresses or internet domains, and never conducted annual meetings. *Id.* at 96:9-12, 97:7-9, 106:11-18, 109:1-4, 111:1-6. The proceeds from book sales would accumulate in the company account until the balance reached $100,000 at which point Ms. King distributed the money into the couples' personal bank account. *Id.* at 100:11-101:13; 102:15-103:5.

Although Ms. King was nominally an executive or partner in the companies, she admitted that she played no role in Clancy's work and did not read his books until completion, did not discuss plots or characters during their development, did not set deadlines for him, and did not tell him which books to write. *Id.* at 124:13-16, 124:17-19, 124:20-125:2, 125:3-5, 125:6-9. Clancy was free to hire his own secretary. *Id.* at 108:6-10. No one else had a role in the Jack Ryan Entities, other than the accountants and lawyers. *Id.* at 125:10-14. In short, Tom took direction from no one. The companies' complete lack of control over his creative work belies any suggestion of a plausible basis for asserting work for hire. *See, e.g., Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir. 1967), *cert. denied*, 389 U.S. 1036 (1968) (finding that the author was not an "employee" of his own closely-held corporation because the corporation did not exercise sufficient control over his work).

To reach the conclusion that Clancy created works for hire, this Court would have to first accept the risible premise that in his capacity as an officer of the Jack Ryan Entities, Clancy issued

40

orders to himself in his capacity as a corporate "employee," which orders he then "executed" wearing his "employee" hat. This would, of course, be unalloyed *fiction*. As the Ninth Circuit noted in *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010), a case relied upon by Defendants, there is no real distinction between an author and his "one-man shop":

> The problem with the district court's analysis is that *JJV was a one-man shop*. Gasper was the sole officer, director, and shareholder of JJV, exercised complete control over it, and made all decisions concerning JJV and production of the films. It was *all Gasper all the time*. JJV as employer and Gasper as employee could certainly agree as to the scope of the employee's employment, and could agree that Gasper should retain all copyrights. Since *JJV was Gasper*, JJV intended whatever Gasper intended, and if Gasper intended that his creative work be outside the scope of his employment with JJV, there was no one to disagree.

*Id.* at 1156 (emphasis added); *see also M & A Associates, Inc. v. VCX, Inc.*, 657 F. Supp. 454, 459 (E.D. Mich. 1987) (rejecting work for hire where creator "exercised complete control of the corporation, which served as his mere alter ego [and there] was no supervision of his work other than his own"). In only the rarest of circumstances, then, would an artist's one-man loan-out company ever satisfy the *Reid* test. This case is not such a rare exception.

The chart displayed below illustrates, in a direct comparison to *Reid*, this case's stark want of evidence supporting the proposition that Tom Clancy was operating within the ambit of Section 201(b). None of Tom's novels qualify as works made for hire under the Copyright Act.[30] The factors that satisfy *Reid's* test for establishing work for hire are shown in red.

---

[30] Defendants' reliance on *Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005), Def. Memo. at 26, is not to the contrary. In that case, the Center was not Graham's mere "alter ego," but a true employer with an active Board of Directors, employees, and physical premises. The Board "urged Graham to complete 'as many [new dances] as possible,' and 'teach[] [only] when permitted by schedule.' The Board even suggested possible themes for new dances for Graham to choreograph." *Id.* at 639. *Martha Graham* bears no resemblance to a situation, such as Clancy's, where an artist uses the legal fiction of a loan-out company to achieve tax savings.

41

| Application of the Supreme Court's Reid Factors to the Jack Ryan Entities Shows That Tom Clancy Was an Independent Contractor Who Did Not Create Works for Hire | | |
|---|---|---|
| **Factor** | **Reid** | **Clancy** |
| Hiring party's right to control the manner and means of product's creation | "CCNV members directed enough of Reid's work to ensure that he produced a sculpture that met their specifications." | Jack Ryan Entities were mere shells for funneling book revenue – they did not control Tom's work |
| Skill required | "Reid is a sculptor, a skilled occupation" | Tom was in a skilled occupation as a writer |
| Source of the instrumentalities and tools | "Reid supplied his own tools" | JREL paid for computer |
| Location of the work | Reid "worked in his own studio" | Tom worked at home |
| Duration of parties' relationship | Reid retained for "less than two months" | JREL: 2/4/92 to 12/31/97 JRLP: 2/26/92 to 12/31/97 |
| Whether hiring party has right to assign additional projects to hired party | "CCNV had no right to assign additional projects to Reid" | Jack Ryan Entities had no management structure and exerted no control over Clancy |
| Extent of hired party's discretion over when and how long to work | "Reid had absolute freedom to decide when and how long to work" | Clancy had absolute freedom |
| Method of payment | Reid was paid $15,000, dependent on "completion of a specific job" | Book proceeds deposited in company account; siphoned into personal account |
| Hired party's role in hiring and paying assistants | "Reid had total discretion in hiring and paying assistants" | Tom had total discretion in hiring and paying assistants |
| Whether the work is part of the regular business of the hiring party | "CCNV is not a business at all" | Jack Ryan Entities are "not businesses at all" and have always been mere shells for funneling book revenue |
| Whether the hiring party is in business | "CCNV is not a business at all" | Jack Ryan Entities are "not businesses at all" and have always been mere shells for funneling book revenue |
| The provision of employee benefits and tax treatment of the hired party | "CCNV did not pay payroll or Social Security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds" | Jack Ryan Entities did not treat Tom as an employee |

2.      **A Work for Hire Must Meet the Statutory Standard Recognized in *Reid* and Cannot Be Created by Estoppel.**

Notwithstanding *Reid's* direction, Defendants maintain that the evidence establishes that Clancy wrote works for hire. They note that Clancy made representations in agreements and letters affirming that particular works were works made for hire. Defendants would have this court conclude that these facts establish that the Jack Ryan Entities actually acquired "work for hire" copyright interests in works created during the JRE years.

These facts do not, however, create a triable issue on "work for hire." First, as already observed, copyright is a creature of statute and the statute alone dictates how a copyright interest is created or obtained. Fundamentally, there are two ways to acquire a copyright interest – (1) the creation of an original work[31] and (2) receipt of a written assignment of the creator's interest. *Reid* establishes that as to the first method, nothing short of a true employment relationship would be sufficient to grant the Jack Ryan Entities rights in the works.

Second, Defendants in effect argue for some form of copyright-by-estoppel. It is well-established that estoppel cannot be invoked to create or transfer ownership of a copyright. *See, e.g.,* *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992) ("this court will not allow the doctrine of equitable estoppel to be invoked to transfer ownership of the copyright which originally vested in the works' authors"); *Neva, Inc. v. Christian Duplications International, Inc.*, 743 F. Supp. 1533, 1548 (M.D. Fla. 1990) (while estoppel "may be properly asserted in an infringement action, they are not properly asserted in this action to determine the ownership of the

---

[31] *See* 17 U.S.C. § 201(a) ("Copyright in a work … vests initially in the author or authors of the work.").

43

copyright").

>  **3.     Any Purported Assignment to JREL Was Ineffective and Any Assignment to JRLP Is Terminable.**

After the JREL Books were published, in 1992 and 1994, Clancy signed two documents styled as "employment agreements" with JREL. The first "employment agreement" with JREL contained no language of assignment. Ex. 30. The second "employment agreement" with JREL, dated January 1, 1994, contains the following language:

> In consideration of the receipt of compensation as provided hereunder, Employee hereby continues to assign and transfer to Employer his entire right, title and interest in and to any books written by Employee either solely or jointly with others pursuant to any third party contract or agreement of Employer.

Ex. 31. For two reasons, this purported assignment language was ineffective to transfer to JREL any ownership interest in or to the JREL Books. First, Clancy could not "continue" to assign books to JREL because he had no prior history of assigning books to JREL. Instead, Clancy was consistently presented with publishing contracts in which he was asked to represent that the works he was creating were "works for hire."[32]

Second, the last JREL Book was published in 1991, before the purported assignment. The purported assignment contains no language retroactively assigning works created before January 1, 1994. Thus, the 1994 document did not effectively assign *any* of the JREL Books to JREL.  Because the JREL Books were not works for hire and were not effectively assigned, Clancy owned them and, upon his death, ownership of these works devolved to his Estate.

Clancy also signed a document styled as an "employment agreement" with JRLP with a

---

[32] As a matter of substantive law, he was mistaken then in supposing that this is how the Copyright Act worked and these characterizations are erroneous now.

purported effective date of February 26, 1992.  This agreement with JRLP contains the following language of assignment:

> In consideration of the receipt of compensation as provided hereunder, Employee hereby assigns and transfers to Employer his entire right, title and interest in and to any books written by Employee either solely or jointly with others during the course of his employment with Employer.

Ex. 32. This assignment, too, is of doubtful effectiveness owing to the lack of a *bona fide* employment relationship. Assuming however that the language effectively assigned to JRLP Clancy's rights in the JRLP Books, any such interest is terminable as discussed further in Section E below.

Lacking evidence of genuine works for hire, or a written assignment, Defendants argue that copyrights to Clancy's post-HUNT works were transferred to them by virtue of Guaranties Clancy signed for his publisher. Def. Memo. at 31-32. As Defendants are forced to acknowledge in a sheepish footnote, the authority upon which they rely rejected the suggestion that a Guaranty by itself sufficed to make a manuscript a work for hire. Def. Memo. at 33, note 17. Moreover, as detailed above, the efficacy of the loan-out approach requires the artist to execute contracts in the name of the loan-out company. The guarantees were required by Clancy's publisher, as they are routinely when publishers deal with artists operating through loan-out companies, to ensure that the company's obligation was indeed Clancy's – in other words, to give the publisher the assurance that Clancy would not breach, give a big shrug, and hide behind the loan-out company. Clancy's representations to his publisher contain no words of assignment or transfer. They do not satisfy the statutory test. The representations were not made to JREL or JRLP which, at the time, were merely extensions of Clancy and had no distinct legal interests. The Copyright statute requires a claimant to establish a

45

good deal more before its claim to a copyright will be sustained.

> **4.    Because Clancy Did Not Write Works for Hire, His John Clark Character, as Depicted in WITHOUT REMORSE, Remained His Property At Death and Devolved to His Estate.**

 A natural consequence of the collapse of the Defendants' "work for hire" argument is that their claim to ownership of the John Clark character also fails. Because WITHOUT REMORSE was not created as a work for hire, Clancy retained ownership of the characters featured in it. As demonstrated in the Statement of Facts, John Clark, like Jack Ryan, is a fully delineated, distinctive and iconic character in the same sense as James Bond, Tarzan, Superman, Sherlock Holmes and Rocky. Like Ryan, he has specific qualities that remain constant and readers turn to new John Clark novels to see their hero at work.

Clancy never assigned his rights to John Clark. Accordingly, the character remained Clancy's at his death and is now property of his estate.

> **D.    Any Incremental Character Development in Assigned Works Enjoys Copyright Protection.**

Defendants contend that "Plaintiff's claim that the Estate owns the Jack Ryan character outright … can *only* prevail if she can demonstrate that the Estate owns every JREL and JRLP Book that further develops Jack Ryan." Def. Memo. at 36. Ms. Clancy has never made any such claim. To the contrary, her Amended Complaint alleges that the Estate owns the Jack Ryan character *as developed in HUNT.*[33] Amended Complaint ¶ 43.

That said, with respect to post-HUNT character development, it is well-established that the

---

[33]  Beyond this, Defendants sudden assertion of an interest in incremental character developments stumbles on the obvious fact that, prior to Clancy's death, they asserted no such interest with respect to either pre-divorce or post-divorce fiction.

incremental developments of a character enjoy separate copyright protection. *Silverman v. CBS Inc.,* 870 F.2d 40, 49 (2d Cir.), *cert. denied*, 492 U.S. 907 (1989) ("copyrights in derivative works secure protection … for the incremental additions of originality contributed by the authors"); *Klinger v. Conan Doyle Estate, Ltd.,* 755 F.3d 496, 501 (7th Cir.), *cert. denied*, 574 U.S. 976 (2014) (same). In *Klinger*, the Seventh Circuit considered the issue as it pertains to the Sherlock Holmes character. The court rejected the Doyle Estate's suggestion that there was no "workable standard" to protect incremental character development:

> There are the early Holmes and Watson stories, and the late ones, and features of Holmes and Watson are depicted in the late stories that are not found in the early ones (though as we noted in the preceding paragraph some of those features are retrofitted to the earlier depictions). Only in the late stories for example do we learn that Holmes's attitude toward dogs has changed – he has grown to like them – and that Watson has been married twice. These additional features, being (we may assume) "original" in the generous sense that the word bears in copyright law, are protected by the unexpired copyrights on the late stories. But Klinger wants just to copy the Holmes and the Watson of the early stores, the stories no longer under copyright. The Doyle estate  tells us that "no workable standard exists to protect the Ten Stories' incremental character development apart from protecting the completed characters." But that would be true only if the early and the late Holmes, and the early and the late Watson, were indistinguishable – and in that case there would be no incremental originality to justify copyright protection of the "rounded" characters (more precisely the features that makes them "rounder," as distinct from the features they share with their earlier embodiments) in the later works.

*Id.* at 502-03. The "increments of expression" test "originates from the Copyright Act's discussion of the copyrightability of derivative works." *Klinger v. Conan Doyle Estate, Ltd.,*988 F. Supp. 2d 879, 891 (N.D. Ill. 2013), *aff'd*, 755 F.3d 496 (7th Cir. 2014), *cert. denied*, 574 U.S. 976 (2014).

These authorities establish that the ongoing development of Jack Ryan in derivative works is protected under copyright law. If the Court concludes, as Ms. Clancy contends, that Clancy retained the rights to post-HUNT works, then the incremental character development in those works

became property of his estate. To the extent, however, that the Court concludes that any work was validly assigned to either JREL or JRLP, the rights to any incremental development would belong to the relevant Jack Ryan Entity. Furthermore, the assignment of any such character interest is, like the assignment of an interest in the works themselves, terminable by Clancy's heirs.

**E.     Any Assigned Interests Are Terminable and Plaintiff Validly Terminated the Interest in HUNT Assigned to USNI.**

Any interests that Clancy assigned are terminable by virtue of Section 203 of the Copyright Act of 1976. Accordingly, Plaintiff is entitled to judgment on Count III of Defendants' Counterclaim.

**1.     The Right of Recapture.**

The Copyright Act of 1976 provides for the recapturing of copyrights under certain circumstances.[34] Specifically, section 203 of the Act provides that grants, assignments and licenses can by terminated within the five-year period beginning 35 years after the date of publication, by service of a notice of termination ("203 Notice") not less than two or more than ten years before the effective date of the termination, (which in the case of HUNT is October 2019). 17 U.S.C. § 203.

If the author dies prior to serving a 203 Notice, the termination interest is owned and may be exercised by the author's heirs, who are defined by statute to include the author's widow and children, among others. 17 U.S.C. § 203(a)(2). If the author dies leaving a spouse and children, the termination interest is owned 50% by the author's spouse and 50% by the author's children on a *per*

---

[34] Michael H. Davis, *The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright: Once a Story is "Pitched," a Studio Can Never Obtain All Copyrights in the Story*, 18 CARDOZO ARTS & ENT. L.J. 93, 95 (2000) ("the termination right was conceived as a new approach to an old problem – the tendency of young writers to sell their manuscripts far too cheaply, before time and growing reputations could enhance their bargaining positions. Under the termination right, any author who sells rights (such sales being assignments) to his work of authorship retains an indefeasible right to terminate such assignments approximately thirty-five years later.")

*stirpes* basis. *Id.* To exercise the termination right of a deceased author, a majority of the statutory heirs must be signators to the 203 Notice. 17 U.S.C. § 203(a)(1).

### 2.    The Effect of Recapture on Assigned Rights.

On March 4, 2016, Plaintiff and her daughter exercised the termination right with respect to HUNT. *See* Ex. 16.[35] Defendants contest the validity of this termination. Their objection is not well-taken.

Ms. Clancy, as Clancy's surviving spouse, holds 50% of the termination interest. Ms. Clancy, and the couple's daughter, Alexis J.B. Clancy ("Page"), holds another 10% (as one of five of Tom's children). Their combined 60% interest gives them a majority and thus standing to terminate the transfer of rights in HUNT. Upon the effective date of termination (October 2019), all rights in the work reverted to those persons owning the termination interest which in this instance includes Ms. Clancy (50%), Page (10%) and 10% to each of Clancy's children from his first marriage (the "Older Children").

Because the Jack Ryan character was originally created in HUNT, all works created after HUNT containing the Jack Ryan character are derivative works of HUNT. Thus, as of the effective date of termination, any party seeking to create a new work containing the Jack Ryan character must obtain a license from these parties.

### CONCLUSION

For the foregoing reasons, Plaintiff, Alexandra M. Clancy, respectfully requests that the Court grant her cross-motion for summary judgment and deny the Defendants and Counter-Plaintiffs' motion for summary judgment.

---

[35] The date for the Section 203 notice has not yet arrived for later works.

49

Respectfully submitted,


 /s/ Norman L. Smith
Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
NUSINOV SMITH LLP
The Marbury Building
6225 Smith Avenue, Suite 200-B
Baltimore, Maryland 21209
(410) 554-3600


*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 23, 2020, a copy of the foregoing document was served

in compliance with ECF guidelines on:

Robert S. Brennan, Esquire
Miles & Stockbridge, P.C.
100 Light Street
Baltimore, MD 21202

Jerrold A. Thrope, Esquire
Gordon Feinblatt, LLC
233 E. Redwood Street
Baltimore, Maryland 21202

Scott J. Bornstein, Esquire
Justin A. MacLean, Esquire
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166


_/s/ Norman L. Smith_____
Norman L. Smith