IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| ALEXANDRA M. CLANCY | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No.:  1:17-cv-03371-ELH |
| JACK RYAN ENTERPRISES, Ltd., et al. | * |
| Defendants. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS AND COUNTER-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

GREENBERG TRAURIG, LLP

Scott J. Bornstein (*pro hac vice*)
Justin A. MacLean (*pro hac vice*)
MetLife Building
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200
Fax:  (212) 801-6400
bornsteins@gtlaw.com
macleanj@gtlaw.com

GORDON FEINBLATT LLC

Jerrold A. Thrope (Fed. Bar No. 01376)
233 East Redwood Street
Baltimore, Maryland 21202
Tel.:  (410) 576-4295
Fax:  (410) 576-4269
jthrope@gfrlaw.com

*Attorneys for Defendants Jack Ryan Enterprises, Ltd. and Jack Ryan Limited Partnership*

## TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................... 1

II.     ARGUMENT ............................................................................................................... 3

    A.     The Statute of Limitations Precludes Plaintiff's Claims .................................... 3

       1.     Plaintiff Was on Inquiry Notice of the JR Entities' Claims to the Jack Ryan Character More Than Three Years Before Filing Suit ........................... 4

          a.     The February 2014 Letter need not have come explicitly from the JR Entities or be directly addressed to the Plaintiff ...................... 4

          b.     The February 2014 Letter Sufficiently Placed Plaintiff on Inquiry Notice, as Explicitly Demonstrated by Her Counsel's Investigation ........................................................................................ 6

       2.     Plaintiff's Claims Are Precluded Because Tom Clancy Would Be Time-Barred from Asserting Them, and Plaintiff Stands in His Shoes .......... 8

    B.     The JREL Books and JRLP Books Are Works Made for Hire .................................. 10

       1.     There Is No Evidence that JREL and JRLP Were Tom Clancy's "Alter Egos" ................................................................................................ 10

       2.     Even if the JR Entities Are Considered Analogous to "Loan-Out" Corporations, Tom Clancy Could Agree with the JR Entities to Perform Writing Duties As an Employee of Those Companies .................... 11

       3.     A Master-Servant Relationship Can Exist Between a Small Corporation or Partnership and One of Its Principals ...................................... 12

       4.     In Light of the Nature of the Relationship Between Tom Clancy and the JR Entities, the *CCNV* and Restatement Factors Favor a Conclusion that the JREL Books and JRLP Books Were Made for Hire ................................................................................................................ 13

          a.     The hiring party's right to control the manner and means by which the product is accomplished ...................................................... 14

          b.     The skill required ..................................................................................... 16

          c.     The source of the instrumentalities and tools ..................................... 16

          d.     The location of the work ......................................................................... 17

          e.     The duration of the relationship between the parties .......................... 17

f.     Whether the hiring party has the right to assign additional projects to the hired party ...................................................... 17

g.     The extent of the hired party's discretion over when and how long to work ................................................................................ 18

h.     The method of payment ..................................................................... 18

i.      The hired party's role in hiring and paying assistants ......................... 18

j.      Whether the work is part of the regular business of the hiring party and whether the hiring party is "in business" ............................. 18

k.     The provision of employee benefits and the tax treatment of the hired party ...................................................................................... 19

l.      Whether the parties believe they are creating the relation of master and servant .................................................................................. 19

C.    The Undisputed Material Facts Establish that the JREL Books and JRLP Books (and the Characters as Developed Therein) Are Owned by JREL and JRLP ............................................................................................................. 22

D.    At Tom Clancy's Death, JREL Owned the Jack Ryan Character As Developed and Delineated in *Hunt* as a Matter of Law ................................ 27

    1.   The Unambiguous Language of the USNI Agreement Conveyed the Entire Copyright in *Hunt*, Including Its Characters, to USNI ......... 27

    2.   Copyright in a Character Cannot Be Owned Separately from the Expression Delineating That Character ............................................. 29

    3.   JREL's Ownership of Jack Ryan Is Supported by Additional Evidence .............................................................................................. 30

    4.   The JR Entities Own Jack Ryan as Delineated in Post-*Hunt* Novels, and Are Entitled to Proceeds from Post-Death Works Featuring Jack Ryan ..................................................................................................... 32

E.    The Undisputed Material Facts Establish that the JR Entities Have Ownership Rights in the John Clark Character ...................................................................... 33

F.    There Is No Genuine Dispute of Material Fact that the Termination Notice, to the Extent It Is Valid, Is Overbroad in Its Purported Effect ............................. 34

III.   CONCLUSION .................................................................................................................. 35

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aalmuhammed v. Lee*,
  202 F.3d 1227 (9th Cir. 2000) ........................................................................5, 6

*Aday v. Sony Music Entm't, Inc.*,
  1997 WL 598410 (S.D.N.Y. Sept. 24, 1997).........................................................  9

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*,
  805 F.2d 663 (7th Cir. 1986) .............................................................................16

*Barefoot Architect, Inc. v. Bunge*,
  632 F.3d 822 (3d Cir. 2011).........................................................................24, 25

*Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*,
  275 Md. 295 (1975) ..........................................................................................10

*Bennett v. Baskin & Sears*,
  77 Md. App. 56 (1988) .........................................................................................8

*Brown v. Flowers*,
  297 F. Supp. 2d 846 (M.D.N.C. 2003) ................................................................26

*Burnett v. Warner Bros. Pictures, Inc.*
  493 N.Y.S. 2d 326 (App. Div. 1985), *aff'd* 492 N.E.2d 1231 (N.Y. 1986)............................28

*Caldwell v. ABKCO Music & Records, Inc.*,
  703 N.Y.S.2d 97 (App. Div. 1st Dep't 2000) ......................................................28

*Capital Concepts, Inc. v. Mountain Corp.*,
  2012 WL 6761880 (W.D. Va. Dec. 30, 2012) .................................................23, 24

*Cilecek v. Inova Health Sys. Servs.*,
  115 F.3d 256 (4th Cir. 1997) .......................................................................14, 20

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989).................................................................................. *passim*

*Conan Properties Int'l LLC v. Sanchez*,
  2018 WL 4522099 (E.D.N.Y. June 8, 2018) .......................................................30

*Davis v. Meridian Films, Inc.*,
  14 F. App'x 178 (4th Cir. 2001) ...........................................................................5

iv

*Dumas v. Gommerman,*
  865 F.2d 1093 (9th Cir. 1989) ........................................................17

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
  697 F.2d 27 (2d Cir. 1982)...........................................................24

*Everly v. Everly,*
  958 F.3d 442 (6th Cir. 2020) .......................................................5, 6

*Fleischer Studios, Inc. v. A.V.E.L.A.., Inc.,*
  654 F.3d 958 (9th Cir. 2011) ........................................................30

*Gaiman v. McFarlane,*
  360 F.3d 644 (7th Cir. 2004) ..........................................................5

*Gardner v. Nike, Inc.,*
  279 F.3d 774 (9th Cir. 2002) ........................................................30

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.,*
  716 F.3d 302 (2d Cir. 2013)............................................................5

*Goodis v. United Artists TV, Inc.,*
  425 F.2d 397 (2d Cir. 1970)......................................................28, 30

*Goodwin v. Hole No. 4, LLC,*
  2007 WL 2221066 (D. Utah July 31, 2007) .............................................1

*Gordon v. Vincent Youmans, Inc.,*
  358 F.2d 261 (2d Cir. 1965)..........................................................28

*Hildreth v. Tidewater Equipment Co., Inc.,*
  378 Md. 724 (2003) ...............................................................10, 11

*Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.,*
  70 F.3d 96 (11th Cir. 1995) ..........................................................24

*JAH IP Holdings, LLC v. Mascio,*
  2014 WL 6477923 (D. Colo. Nov. 19, 2014) ...........................................19

*Jim Henson Prods. v. John T. Brady & Assoc's,*
  16 F. Supp. 2d 259 (S.D.N.Y. 1997)...................................................28

*Jules Jordan Video, Inc. v. 144942 Canada Inc.,*
  617 F.3d 1146 (9th Cir. 2010) ................................................. *passim*

*JustMed, Inc. v. Byce,*
  600 F.3d 1118 (9th Cir. 2010) ................................................ *passim*

v

*Kwan v. Schlein*,
    634 F.3d 224 (2d Cir. 2011)......................................................................4, 5, 6

*Langman Fabrics v. Graff Californiawear, Inc.*,
    160 F.3d 106 (2d Cir. 1998)......................................................14, 16, 17, 19

*Lutheran Hosp. v. Levy*,
    60 Md. App. 227 (1984) ....................................................................................8

*Lyrick Studios, Inc. v. Big Idea Prods., Inc.*,
    420 F.3d 388 (5th Cir. 2005) ..........................................................................23

*M & A Assoc's v. VCX, Inc.*,
    657 F. Supp. 454 (E.D. Mich. 1987)...............................................................10

*Magnuson v. Video Yesteryear*,
    85 F.3d 1424 (9th Cir. 1996) ..........................................................................24

*Mahan v. Roc Nation, LLC*,
    634 F. App'x 329 (2d Cir. 2016) ......................................................................5

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
    Contemporary Dance, Inc.*,
    380 F.3d 624 (2d Cir. 2004)......................................................................15, 16

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002)............................................................................21

*Merchant v. Levy*,
    92 F.3d 51 (2d Cir. 1996)................................................................................5

*Metro. Reg'l Info. Sys, Inc. v. Am. Home Realty Network, Inc.*,
    722 F.3d 591 (4th Cir. 2013) ...........................................................2, 23, 25, 27

*Netzer v. Continuity Graphic Assoc's*,
    963 F. Supp. 1308 (S.D.N.Y. 1997)..................................................................8

*Radio Television Espanola S.A. v. New World Entm't, Ltd.*,
    183 F.3d 922 (9th Cir. 1999) ..........................................................................23

*Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*,
    126 Md. App. 294 (1999) ................................................................................10

*Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc's, Inc.*,
    119 F.3d 55 (1st Cir. 1997)..............................................................................20

*Santa-Rosa v. Combo Records*,
    471 F.3d 224 (1st Cir. 2006)............................................................................5

vi

*Schwartz v. Wasserburger,*
  30 P.3d 1114 (Nev. 2001) ................................................................8,9

*Stone v. Williams,*
  970 F.2d 1043 (2d Cir. 1992)........................................................5, 7, 8

*TD Bank N.A. v. Hill,*
  928 F.3d 259 (3d Cir. 2019)........................................................21, 24, 25

*Tjeknavorian v. Mardirossian,*
  56 F. Supp. 3d 561 (S.D.N.Y. 2014)........................................................26

*Trust Co. Bank v. MGM,*
  593 F. Supp. 580 (N.D. Ga. 1985), *aff'd,* 772 F.2d 740 (11th Cir. 1985) ..............28

*Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica
  Latinoamericana,*
  424 F.3d 50 (1st Cir. 2005)........................................................26

*Waite v. UMG Recordings, Inc.,*
  2020 WL 1530794 (S.D.N.Y. Mar. 31, 2020) ................................................11, 22

*Walton v. Mariner Health of Md., Inc.,*
  391 Md. 643 (2006) ........................................................31

*Warner Bros., Inc. v. Am. Broad. Cos.,*
  720 F.2d 231 (2d Cir. 1983)........................................................30

*Warner Bros. Pictures, Inc. v. Columbia Broad. Sys., Inc.,*
  216 F.2d 945 (9th Cir. 1954) ........................................................3, 28, 30

*Warren Freedenfeld Assoc's. v. McTigue,*
  531 F.3d 38 (1st Cir. 2008)........................................................6, 7

*Wilson v. Dynatone Publ'g Co.,*
  892 F.3d 112 (2d Cir. 2018)........................................................5

*Zuill v. Shanahan,*
  80 F.3d 1366 (9th Cir. 1996) ........................................................5

**Rules and Statutes**

17 U.S.C. § 102........................................................29

17 U.S.C. § 103........................................................32, 34

17 U.S.C. § 106........................................................27, 29

17 U.S.C. § 201........................................................22, 29

17 U.S.C. § 203 ................................................................................................4

17 U.S.C. § 204 ..........................................................................................23, 25

17 U.S.C. § 507 ................................................................................................4

37 C.F.R. § 201.10 ..........................................................................................31

Fed. R. Evid. 408 .............................................................................................1

Fed. R. Evid. 802 ...........................................................................................28

Md. Code Ann., Est. & Trusts § 7-401 ...........................................................8

## Other Authorities

34 C.J.S. Executors & Administrators § 893 ...................................................8

Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375 (2002) ..................................................................................12

Michael H. Davis, *The Screenwriter's Indestructable Right to Terminate Her Assignment of Copyright*, 18 Cardozo Arts & Ent. L.J. 93 (2000) .........................12

Restatement (Second) of Agency § 220 ..........................................................20

U.S. Copyright Office, Compendium of Copyright Office Practices (2d ed. 1984)......................30

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices (3d ed. 2017) ..........................................................................................................30

Jack Ryan Enterprises, Ltd. ("JREL") and Jack Ryan Limited Partnership ("JRLP") (collectively, the "JR Entities") respectfully submit this reply in support of their motion for summary judgment (Dkt. 135, "Motion") and in opposition to the Plaintiff Alexandra M. Clancy's ("Plaintiff" or "Ms. Clancy") cross-motion for summary judgment (Dkt. 139, "Opposition").

## I.     INTRODUCTION

Plaintiff's Opposition bears the hallmarks of one of Tom Clancy's techno-thriller novels: A dramatic picture of the main characters in those novels, a vivid depiction of the dispute between Mr. Clancy and the United States Naval Institute (the "USNI") about Mr. Clancy's alleged rights to use the Jack Ryan character, and a chronicle of the advice given to Mr. Clancy by his attorneys—which, if Plaintiff's narrative is to be believed, was often in conflict with itself. For good measure, Plaintiff even ascribes to Wanda King, Mr. Clancy's first wife, the nefarious intent of "perceiv[ing] an opportunity to get the best of her former spouse[.]" Dkt. 139-1 at 2.

While those classic literary devices might have placed Tom Clancy's novels on the *New York Times* list of best-seller *fiction*, they fail to present genuine issues of material *fact*. Indeed, the Opposition's irrelevant narrative[1] and *ad hominem* attacks highlight Plaintiff's ***abject failure*** to address the critical documents and authorities that are dispositive of the Motion.

There are no factual disputes as to the relationship between Tom Clancy and the JR Entities. The parties agree that Mr. Clancy was both their principal *and* the writer of the JREL Books and JRLP

---

[1] For example, the JR Entities have never disputed that Jack Ryan and John Clark are sufficiently developed to be copyrightable, so Plaintiff's description of those characters' traits and characteristics (Dkt. 139-1 at 5-12) is immaterial to the summary judgment issues. Plaintiff's discussion of what Robert Youdelman and Frank Curtis may have asserted about Mr. Clancy's putative rights in Jack Ryan in the mediation with the USNI is also irrelevant, and inadmissible under Fed. R. Evid. 408. *See, e.g.*, *Goodwin v. Hole No. 4, LLC*, 2007 WL 2221066, at *4 (D. Utah July 31, 2007) (finding that mediation statements were inadmissible because they "f[e]ll within the purview of Rule 408"). Plaintiff also appeals to unauthenticated, inadmissible hearsay statements purportedly made by Mr. Clancy to his attorney many months before his death. (Dkt. 139-1 at 2; Dkt. 139-4.) Even if Mr. Clancy made these statements, they cannot have the legal effect of undoing what Mr. Clancy established through his agreements and other actions in the 1980s and 1990s.

Books that are the subject of this lawsuit. The parties *also* agree that Tom Clancy (1) represented to his publisher, in his capacity as an officer of JREL and JRLP, that the JR Entities were the "Author" and "sole and exclusive owner of all rights" to his novels; *and* (2) separately, in his individual capacity, made an "unconditional guarantee" that each novel was a "work made for hire," and that JREL or JRLP was the "owner of copyright" and had the "full power and authority to enter into the Agreement" ("Guaranty"). Exs. 11, 14, 24, 29, 30.[2] The parties disagree on the *consequence* of that relationship; Plaintiff argues that the JR Entities are "alter egos" or "loan-out corporations," their separate existence should be disregarded, and the Guaranties have no effect. But Plaintiff is wrong as a matter of law. As set forth in the Motion and further below (*see* Section II.B., *infra*), when the analysis set forth in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989) ("*CCNV*") is faithfully applied to this case there can be only one conclusion: The JREL and JRLP Books are works made for hire.

Even assuming, *arguendo*, the Court could conclude that the JREL and JRLP Books were not made for hire, the undisputed material facts establish that the JR Entities own their respective copyrights by valid assignment. In her Opposition, Plaintiff points to the lack of "magic words" of transfer or assignment, Dkt. 139-1 at 24-26, but no such "magic words" are required. *Metro. Reg'l Info. Sys, Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) ("*MRIS*").

With respect to Jack Ryan and other characters, the parties *agree* that the incremental development of those characters across the series of JREL and JRLP Books are subject to copyright protection and are owned by the copyright owner(s) of those books. Dkt. 139-1 at 46-48. Again, the JR Entities are the owners.

As to the rights to the Jack Ryan character as depicted in *The Hunt for Red October* ("*Hunt*"),

---

[2] Unless otherwise stated, references to "Exs." are to the exhibits attached to the Appendix of Exhibits to Defendants and Counter-Plaintiffs' Motion for Summary Judgment (Dkt. 135-2). All emphasis in this brief has been added, unless otherwise noted.

Plaintiff again does not dispute the broad, but unambiguous, language of the 1983 assignments to the USNI (the "USNI Agreement") (Ex. 2), and the equally unambiguous language of the 1988 assignment from the USNI to JREL (Ex. 22). She only argues that under *Warner Bros. Pictures, Inc. v. Columbia Broad. Sys., Inc.*, 216 F.2d 945 (9th Cir. 1954) ("*Sam Spade*"), a transfer of the entire copyright in a work does not also transfer the characters as copyrightable elements of that work. Dkt. 139-1 at 28-29. But *Sam Spade* does not involve the transfer of an entire copyright. Plaintiff again fails to address the JR Entities' cases on this point and the post-*Hunt* agreements entered into by Mr. Clancy and JREL that *acknowledge* JREL's ownership of the Jack Ryan character.

Finally, Plaintiff does not dispute that she was put on inquiry notice of the JR Entities' claim more than three years before filing the instant lawsuit. Indeed, she ***admits*** that such inquiries were made by her prior counsel. Dkt. 139-1 at 18-19. Accordingly, the statute of limitations bars Plaintiff's claim that the Estate owns Jack Ryan. In addition, as the beneficiary of Tom Clancy's Estate, Plaintiff cannot bring authorship or ownership claims that Tom Clancy could not have brought himself. Thus, Plaintiff's claims that the Estate owns Jack Ryan or John Clark, or that the JREL and JRLP Books are not works made for hire (or owned by the JR Entities), are also untimely.

Ms. Clancy—not the JR Entities or Ms. King—has attempted to rewrite history by mischaracterizing the governing law. She does not dispute the salient facts that govern resolution of the Motion, much less establish that she is entitled to summary judgment. The JR Entities' Motion should thus be granted, and Plaintiff's cross-motion should be denied.[3]

## II.    <u>ARGUMENT</u>

### A.    The Statute of Limitations Precludes Plaintiff's Claims

The Amended Complaint makes two basic claims: (1) that the Estate owned Jack Ryan at the

---

[3] Plaintiff appears to concede that she has no standing to assert Count V, regarding ownership of the "Campus characters" (Dkt. 60 ¶¶ 151-158), *see* Dkt. 135-1 at 48, so that claim should be dismissed.

time of Tom Clancy's death (Dkt. 60 ¶¶ 114-121); and (2) that the JREL and JRLP Books are not

works made for hire, and JREL does not own the JREL Books (*id.* ¶¶ 130-150).[4] Plaintiff agrees that,

to be timely, Plaintiff's lawsuit must have been filed "within three years after the claim accrued." 17

U.S.C. § 507(b). Plaintiff also agrees that an ownership or authorship claim accrues "only once, when

a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Kwan v.*

*Schlein*, 634 F.3d 224, 228 (2d Cir. 2011). Plaintiff disputes when each of her claims accrued, but her

arguments are based on an incorrect reading of the governing law, and not a dispute as to the facts.

> ### 1. Plaintiff Was on Inquiry Notice of the JR Entities' Claims to the Jack Ryan Character More Than Three Years Before Filing Suit

Plaintiff does not dispute that she received a copy of the February 19, 2014 letter from Mr.

Webb, the Personal Representative of Mr. Clancy's estate, to Messrs. Youdelman and Curtis (the

"February 2014 Letter"), stating that "the Jack Ryan Character is owned by JREL" (Ex. 52 at

PR0007497). She argues that the February 2014 Letter did not cause the limitations period to start

running, because it (a) "was not written by [the JR Entities] or addressed to Ms. Clancy," and (b) "did

not place Ms. Clancy on notice of anything." Dkt. 139-1 at 18-19. Neither argument passes muster.

> ### a. The February 2014 Letter need not have come explicitly from the JR Entities or be directly addressed to the Plaintiff

Plaintiff recognizes that "no single defining event characterizes the moment of accrual." Dkt.

139-1 at 16. Direct communication between parties is not the sole means of triggering the statute of

limitations for an ownership claim. Rather, "any number of events can trigger the accrual of an

ownership claim," and "plain and express repudiation" is only *one* of these events. *Kwan*, 634 F.3d at

---

[4] Plaintiff also asserts two additional claims for relief: (1) that any assignment of the JRLP Books to JRLP is "terminable by Tom Clancy's heirs pursuant to 17 U.S.C. § 203." Dkt. 60 ¶ 150, Prayer for Relief, § A(2), and (2) the Estate owned John Clark at the time of Mr. Clancy's death, *id.* ¶¶ 122-129. Those claims are based on her underlying position that the JREL and JRLP Books are not made for hire, so the statute of limitations as applied to the work-for-hire claims will also govern her assertion as to these additional claims.

228. Indeed, courts have held that "implicit repudiation," for instance, "by conspicuously exploiting the copyright without paying royalties," can trigger accrual. *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 118 (2d Cir. 2018) (quoting *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013)). Moreover, the Second Circuit has held that many events qualify as "plain and express repudiation," including the following "example[s]":

> [W]hen a book is published without the alleged co-author's name on it, *see Kwan*, 634 F.3d at 229; when alleged co-authors are presented with a contract identifying the defendant as the 'sole owner and copyright holder,' *Zuill* [*v. Shanahan*], 80 F.3d [1366,] 1368 [(9th Cir. 1996)]; *see also Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004); or when alleged co-owners learn they are entitled to royalties that they are not receiving, *see Merchant* [*v. Levy*], 92 F.3d [51,] 53, 56 [2d Cir. 1996]; *Stone* [*v. Williams*], 970 F.2d [1043,] 1048 [(2d Cir. 1992)].

*Gary Friedrich*, 716 F.3d at 317.[5] In the Fourth Circuit, "placement of a copyright notice on [] videos [that did not identify the plaintiff as an owner] constituted an express rejection of competing claims of authorship." *Davis v. Meridian Films, Inc.*, 14 F. App'x 178, 182 (4th Cir. 2001) (citing *Netzer v. Continuity Graphic Assoc's*, 963 F. Supp. 1308, 1315-16 (S.D.N.Y. 1997)). The guiding principle is notice: whether a "reasonably diligent plaintiff *would have been put on inquiry* as to the existence of a right," *Kwan*, 634 F.3d at 228—or, put another way, whether a claimant "knows *or has reason to know* of the injury on which the claim is premised." *Merchant*, 92 F.3d at 56 (citing *Stone*, 970 F.2d at 1048).

*Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020), on which Plaintiff relies, is not to the contrary. The excerpt Plaintiff quotes discusses the accrual of an authorship claim, not an ownership claim. *See id.* at 454 (holding that "in the context of authorship disputes, express repudiation must be made by an author herself," whereas "in the context of ownership, express repudiation can be effectuated by a non-

---

[5] *See also, e.g.*, *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (designation in movie credits was an open challenge to a plaintiff's claimed status as co-owner triggering statute of limitations); *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) ("claim for co-ownership can accrue when a book is published without the alleged co-author's name on it or alleged co-owners learn they are entitled to royalties that they are not receiving.") (internal quotations and citations omitted); *Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006) (failure to pay a putative co-owner royalties constituted "plain and express repudiation.").

5

author"). Moreover, the Sixth Circuit *acknowledged* that a claim can accrue based on actions of persons other than the directly adverse author or owner. *See id.* at 454 n.10 ("We acknowledge that some cases have discussed repudiation by a third party (such as a publisher)," because "the actions of third parties and the plaintiff may serve as circumstantial evidence of repudiation by a putative co-author or co-owner.") (citations omitted)). This may happen, for example, where the actions of a third party may be "ascribed" to the defendant. *Id.* (discussing *Aalmuhammed*, 202 F.3d at 1230).

Here, the February 2014 Letter unambiguously states that JREL owns the Jack Ryan character, made on JREL's behalf by its longtime counsel, Robert Youdelman, who Plaintiff recognizes was representing JREL at the time.[6] *See* Dkt. 139-1 at 19. Thus, Plaintiff herself ascribes the statements in that letter to JREL, and they start the accrual of Plaintiff's copyright ownership claims.

### b.    The February 2014 Letter Sufficiently Placed Plaintiff on Inquiry Notice, as Explicitly Demonstrated by Her Counsel's Investigation

Plaintiff's second argument—that the February 2014 Letter did not place Plaintiff on notice of facts on which she now bases her claims—does not save Plaintiff's claims from the statute of limitations bar. As an initial matter, *actual* knowledge is not necessary. A claim accrues "when a reasonably diligent plaintiff *would have been put on inquiry* as to the existence of a right." *Kwan*, 634 F.3d at 228. "[A] plaintiff can be charged with inquiry notice, sufficient to start the limitations clock, once he possesses information fairly suggesting some reason to investigate whether he may have suffered an injury at the hands of [another]." *Warren Freedenfeld Assoc's. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008). As the parties agree, an ownership claim accrues only once. *Kwan*, 634 F.3d at 228.

Plaintiff received the February 2014 Letter. The statement in the letter as to JREL's ownership

---

[6] Plaintiff's contention that the letter "was not meant to be[] an express assertion of ownership by anyone" (Dkt. 139 at 19) is contradicted by the unambiguous language of the letter, stating that "the Jack Ryan character is owned by JREL." Ex. 52 at PR0007497. Moreover, contrary to Plaintiff's arguments, only the arrangement for proceeds was "provisional" in nature; JREL's ownership claim was unequivocal.

of Jack Ryan was directly contrary to Ms. Clancy's claim that Tom Clancy never parted with those rights. Moreover, the letter was written only months after she purportedly heard that Mr. Clancy wanted her to "control [his] literary assets" after his death. Dkt. 139-1 at 2. The JR Entities' ownership of Jack Ryan would prevent Ms. Clancy from effectuating Mr. Clancy's alleged intent. For these reasons, the February 2014 Letter "fairly suggest[ed] some reason to investigate" the claims that the JR Entities owned Jack Ryan. *Warren Freedenfeld*, 531 F.3d at 44.

**And in fact, Ms. Clancy <u>did</u> begin to investigate**. After receiving the letter, she retained counsel to "represent her interests regarding her late husband's estate." Dkt. 139-1 at 20; Dkt. 139-22. On May 8, 2014, Mr. Webb re-sent the February 2014 letter to Plaintiff's counsel (*see* Ex. 54), after which counsel purportedly found "nothing . . . to confirm the Personal Representative's assertion of JREL's ownership." Dkt. 139-1 at 20. Plaintiff's counsel continued to request further information about JREL's ownership claims, predicated on his belief that the Estate (not JREL) was the owner of the Jack Ryan character. *Id.* at 21. Thus, the undisputed material facts reflect that the February 2014 Letter placed Plaintiff on inquiry notice—as evidenced by said inquiry.

Next, Plaintiff argues that she did not "recogni[ze] that the Personal Representative's attribution of ownership to JREL was unfounded" until receipt of "crucial documents" on January 8, 2015. Dkt. 139-1 at 21-22. But this argument is also meritless. In *Stone*, the Second Circuit rejected a similar argument. The plaintiff in that case knew that she was potentially the daughter of famous singer Hank Williams, Sr. more than three years before she commenced an action seeking, *inter alia*, ownership of copyright renewals for his extensive song repertory. 970 F.2d at 1046. Despite this knowledge, plaintiff claimed that the statute of limitations "did not run until she learned there were property interests denominated copyright renewals to which she might be entitled." *Id.* at 1049. The court rejected her argument, refusing to "adopt the proposition that to trigger the statute of limitations

not only must plaintiff know of the facts furnishing her with a cause of action, but also that those facts are sufficient to entitle her to relief." *Id.*[7] Likewise, here, Plaintiff's claim accrued when she received the letter claiming that JR Entities own Jack Ryan—*not* when she received documents leading her to believe that this claim was "unfounded."

In short, "[a]n express assertion of sole authorship or ownership will start the copyright statute of limitations running." *Netzer*, 963 F. Supp. at 1315. The February 2014 Letter contained such an expression. Plaintiff's ownership claim, which accrues only once, accrued on receipt of that letter. Plaintiff simply allowed her claim to languish, not filing her lawsuit until more than three years afterward. Thus, Plaintiff's claims are time-barred.

### 2. Plaintiff's Claims Are Precluded Because Tom Clancy Would Be Time-Barred from Asserting Them, and Plaintiff Stands in His Shoes

It is black-letter law that, if a decedent is barred from asserting a claim under a statute of limitations if he or she were alive, the personal representative of the Estate is similarly barred from asserting it. *See, e.g.*, Md. Code Ann., Est. & Trusts § 7-401(y)(1) ("A personal representative may prosecute . . . actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action *which the decedent might have commenced or prosecuted*"); 34 C.J.S. Executors & Administrators § 893 (unless a statute specifies otherwise, "[a] limitations defense that would have been available in an action by the deceased is also available against the deceased's personal representative.").[8]

---

[7] *See also Bennett v. Baskin & Sears*, 77 Md. App. 56, 63-64, 70, 75  (1988) (holding that a company was on inquiry notice, and therefore its claim against an attorney accrued, as of the date of a board meeting in which the attorney's representation was questioned, rather than the date of receipt of a special counsel's subsequent report identifying the wrongs allegedly committed); *Lutheran Hosp. v. Levy*, 60 Md. App. 227, 237 (1984) ("The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation.").

[8] *See also Schwartz v. Wasserburger*, 30 P.3d 1114, 1117 (Nev. 2001) (holding, in a breach of contract action brought by a personal representative for breach of contract during the decedent's lifetime, that "a personal representative inherits the benefits and burdens connected with the running of any applicable statute of

As explained in the Motion, the JR Entities (via Tom Clancy in his executive capacity) continually represented in publishing contracts that they were the authors and owners of the JREL and JRLP Books, and Mr. Clancy signed personal Guaranties attesting to the same. Ex. 135-1 at 22-23. If Mr. Clancy had claims that the books were not made for hire and that *he* was in fact the author and owner of them, those claims would have accrued each time he executed each of those documents. Having not filed suit for several decades after those agreements were executed, Tom Clancy would be barred from filing such a suit if he were alive today. *See Aday v. Sony Music Entm't, Inc.*, 1997 WL 598410, at *4-5 (S.D.N.Y. Sept. 24, 1997) (finding a musician's challenge to a "work for hire" provision in his publishing contracts was time-barred because the contracts were entered into 19 years before the he filed suit). Thus, Ms. Clancy, who is the primary beneficiary of Mr. Clancy's Estate, is also barred from suing on these claims.

In arguing that Plaintiff's claims as to the authorship status of the JREL and JRLP Books are not time-barred, Plaintiff asserts that "the [JR] Entities never asserted ownership while Clancy was alive for the simple reason that the entities were merely Clancy's alter egos." Dkt. 139-1 at 22. Even if this were true—it is not, as shown in Section II.B.1 below—the statute of limitations is not treated any differently in an alleged "alter ego" (or "closely-held company") context. The JR Entities executed publishing agreements with Putnam averring that *they* were the "Authors" and owners of the JREL and JRLP Books. Exs. 11, 14, 23, 24, 29, 30. Such statements expressly repudiated the notion that Mr. Clancy was himself the "Author" or owner of those books. That Mr. Clancy executed the agreements on behalf of the JR Entities would have given him *more* notice—not less—of the repudiation, giving him more opportunity to challenge the for-hire status of his books while he was alive. Accordingly,

---

limitations, measured from when the cause of action first accrued in favor of the decedent."). While Ms. Clancy is not herself the personal representative of Mr. Clancy's Estate, she is essentially bringing authorship and ownership claims on the Estate's behalf, and should similarly inherit the burdens associated with the running of the statute of limitations, measured from when those claims accrued for Tom Clancy.

the grounds for applying the statute of limitations to preclude Ms. Clancy's authorship-related claims are even stronger than they would be if Mr. Clancy did not hold himself out as an employee and agent of his own companies.

**B.    The JREL Books and JRLP Books Are Works Made for Hire**

**1.    There Is No Evidence that JREL and JRLP Were Tom Clancy's "Alter Egos"**

Plaintiff's argument that the JREL and JRLP Books are not made for hire rests on her argument that the JR Entities are "alter egos" of Tom Clancy (Dkt. 139-1 at 15, 41) and "mere shells for funneling book revenue" (*id.* at 42), and therefore, the Court should just disregard the corporate form. Plaintiff's assertion that the JR Entities are Tom Clancy's "alter egos" is unsubstantiated.[9]

The "alter ego" theory is most often applied to pierce the corporate veil to reach assets of a corporation's shareholders by disregarding the corporate form, where "the corporate entity has been used as a subterfuge and to observe it would work an injustice." *Hildreth v. Tidewater Equipment Co., Inc.*, 378 Md. 724, 735 (2003) (internal citations omitted). The rationale for the "alter ego" doctrine is that "if the shareholders or the corporations themselves disregard the proper formalities of a corporation, then the law will do likewise as necessary to protect individual and corporate creditors." *Id.*[10] The doctrine must be applied only "with great caution" and "in exceptional circumstances," considering factors such as: "(1) whether the corporation is inadequately capitalized, fails to observe

---

[9] Plaintiff cites to *M & A Assoc's v. VCX, Inc.*, 657 F. Supp. 454 (E.D. Mich. 1987), a non-binding case that pre-dated *CCNV*. Dkt. 139-1 at 41. *M & A* stated in one sentence that a film producer "exercised complete control of" his film production company, "which served as his mere alter ego." *Id.* at 459. *M & A* is totally irrelevant, as it does not contain any analysis of whether the company should have been accorded "alter ego" treatment under the governing law, and does not even apply the current test for determining whether a work is made for hire.

[10] The JR Entities were formed under Maryland law, and "Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil." *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 309 (1999). Under Maryland law, a court may disregard an entity's separate existence and pierce the corporate veil only to prevent fraud or enforce a paramount equity, *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 310 (1975), neither of which is alleged here.

10

corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records." *Id.*

Here, Ms. Clancy has not asserted that ***any*** of these factors apply. To the contrary, JREL had a Charter and By-laws, it had a Board of Directors, and there were annual meetings or actions in lieu of annual meetings. *See, e.g.*, Exs. 6, 54. The proceeds from the contracts for the books or other media were deposited into the entity. *See, e.g.*, Dkt. 139-31, 98:14-21. The withdrawal of funds was *pro rata* based on ownership interests held by Mr. Clancy, Ms. King and their children. *See, e.g.*, *id.* at 81:4-6; 81:15-82:4. The entity kept its own books and records and filed its tax returns. *See, e.g.*, *id.* at 89:4-17. The divorce between the two majority owners resulted in a series of procedures to continue recognition of the separate corporate and partnership existence of the entities. Exs. 37, 39, 40. The undisputed material facts do not support a conclusion that the JR Entities were "alter egos" of Mr. Clancy.

> **2.     Even if the JR Entities Are Considered Analogous to "Loan-Out" Corporations, Tom Clancy Could Agree with the JR Entities to Perform Writing Duties As an Employee of Those Companies**

Having failed to adduce any evidence supporting its "alter ego" theory, Plaintiff next argues that—like "loan-out" corporations used in some creative industries, through which an artist or writer performs services for a third party—the JR Entities were formed for tax advantages, but their separate existence should be disregarded as a "legal fiction" for purposes of the work-for-hire analysis. Dkt. 139-1 at 38-39. This is untenable. "[P]eople cannot use a corporate structure for some purposes – *e.g.* taking advantage of tax benefits – and then disavow it for others." *Waite v. UMG Recordings, Inc.*, 2020 WL 1530794, at *9 (S.D.N.Y. Mar. 31, 2020) (rejecting attempt to disregard an artist's loan-out company in a copyright dispute on the ground that it was "only a tax-planning device").

Plaintiff relies on a law review article which concedes that screenwriters who set up and own

loan-out companies "are probably employees [of those companies] for purposes of the tax code." Dkt. 139-1 at 38-39 (quoting Michael H. Davis, *The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright*, 18 Cardozo Arts & Ent. L.J. 93, 117 (2000) ("Davis")). While Davis opines that "it is *not clear* that such writers are truly employees under the work for hire doctrine," *id.*, he does not perform the required analysis under *CCNV. Id.* at 111 n.108 (acknowledging that "the complete argument of [*CCNV*] is beyond the scope of [his] article"). Moreover, other commentators have concluded that the owners of loan-out corporations are not only employees under the tax code, but also under the "work for hire" provision of the Copyright Act:

> Ironically, many of the performers who have made the greatest contributions to sound recordings may already have forfeited their termination rights in those recordings. ***Those recording artists who render their services through loan-out corporations are in fact employees of those corporations, and any performances they render in that capacity are already works made for hire***.

Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375, 403-04 (2002). Plaintiff has not cited any *legal* authority adopting Davis' contrary viewpoint.

### 3.    A Master-Servant Relationship Can Exist Between a Small Corporation or Partnership and One of Its Principals

Rather than disregard the entities that Tom Clancy created and owned, the Court should *embrace* their separate legal existence, and apply the work-for-hire analysis of *CCNV* keeping in mind the legitimate function of the JR Entities and the dual role that Tom Clancy played within them. It is not unusual for companies to have an employment relationship with one of their owners.

Plaintiff's attempt to discredit *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010) ("*JJV*") is misguided. As discussed in the Motion (Dkt. 135-1 at 28-29), the crux of the Ninth Circuit's holding was that Ashley Gasper (in his personal capacity) could agree with himself (in his capacity as president and sole shareholder of JJV) that creative functions be performed either within his duties as an employee of JJV, or outside of those duties:

12

> JJV as employer and Gasper as employee ***could certainly agree*** as to the scope of the employee's employment . . . Since JJV was Gasper, ***JJV intended whatever Gasper intended***, and if Gasper intended that his creative work be outside the scope of his employment with JJV, there was no one to disagree.

*JJV*, 617 F.3d at 1156.

Plaintiff cites *JJV* for the opposite argument, i.e., that "there is no real distinction between an author and his 'one-man shop.'" Dkt. 139-1 at 41. But Plaintiff misses the point of *JJV*. The Ninth Circuit clearly recognized the distinction between "JJV as employer" and "Gasper as employee." Otherwise, there would be no reason for the court to have discussed what JJV and Gasper could "agree to" or that "no one [could] disagree" with JJV's and Gasper's mutual intent. *JJV*, 617 F.3d at 1156. It just so happened that Gasper (the individual) and JJV (the company) mutually intended that Gasper's work as performer and director would be outside the scope of his employment. But they could have mutually intended differently. If ***that*** were the intent—i.e., if JJV and Gasper agreed that Gasper's work would fall within the scope of his employment—there would similarly be "no one to disagree."

Thus, while Plaintiff dismisses the premise that a creative individual and a closely-held company owned or controlled by that individual can agree with themselves as a "risible premise" and "unalloyed fiction," Dkt. 139-1 at 40, 41, *JJV* in fact blesses that premise. Tom Clancy (as writer) and Tom Clancy (as executive of the JR Entities) could have and did form a mutual intent as to what he would do wearing his employee "hat," and what he would do outside of that capacity. There is "no one to disagree" with that intent—certainly not Plaintiff. The Court should treat the arrangement between Mr. Clancy and the JR Entities as legitimate, and interpret the *CCNV* factors in light of that relationship.

### 4.   In Light of the Nature of the Relationship Between Tom Clancy and the JR Entities, the *CCNV* and Restatement Factors Favor a Conclusion that the JREL Books and JRLP Books Were Made for Hire

In arguing that the JREL and JRLP Books are not works made for hire, Plaintiff provides a chart purporting to apply the factors enumerated in *CCNV*, comparing certain facts in that case to

certain facts of the instant case. Dkt. 139-1 at 41-42. But Plaintiff makes an inappropriate direct comparison that does not take into account the vastly different circumstances in each case. "[T]he consideration of [the *CCNV*] factors must relate to the particular relationship under consideration." *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). Thus, factors that may be important with respect to one specific relationship may be unimportant with respect to another. *See Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 110-11 (2d Cir. 1998) ("Not all the [*CCNV*] factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us.").

In *CCNV*, the hiring party was "a nonprofit unincorporated association dedicated to eliminating homelessness in America," and the hired party was a sculptor unaffiliated with the nonprofit, whom the nonprofit had engaged to create the sculpture at issue. 490 U.S. at 733-34. In contrast, the JR Entities were specifically created by Tom Clancy and his family "[t]o write, publish, and sell books," Exs. 6, 28, and Mr. Clancy signed agreements in both his individual and executive capacities. *See, e.g.*, Exs. 11, 14, 24, 29, 30. The JR Entities were responsible for furnishing books to Putnam, his publisher, and Mr. Clancy separately guaranteed that the books were works made for hire and that the JR Entities were the author and copyright owner thereof. Exs. 11, 14, 24, 29, 30.

Consideration of "all of the incidents of the relationship" *favors* treating the JREL and JRLP Books as works made for hire. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125-26 (9th Cir. 2010). While addressed in the Motion (*see* Dkt. 135-1 at 26-31), the JR Entities respond to Plaintiff's arguments as to each factor below.

### a.   The hiring party's right to control the manner and means by which the product is accomplished

Plaintiff argues that *CCNV* "eschewed" consideration of whether "the hiring party had the right to control the product even if that control was never practically exercised." Dkt. 139-1 at 37. That is

14

an inaccurate statement. Under *CCNV*, the "right to control the manner and means by which the product is accomplished" is highly relevant. *CCNV*, 490 U.S. at 751. Even after *CCNV*, courts have found that the lack of *actual exercise* of that control is not determinative. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.,* 380 F.3d 624, 642 (2d Cir. 2004). As the Second Circuit held:

> The fact that [renowned choreographer Martha] Graham was extremely talented understandably explains the Center's disinclination to exercise control over the details of her work, but does not preclude the sort of employee relationship that results in a work for hire. The Restatement (Second) of Agency notes that there are many occupations in which the employer would not normally exercise control over the details of the employee's work. The "control or right to control needed to establish the relation of master and servant may be very attenuated." Restatement (Second) of Agency § 220(1) cmt. d (1958). The Restatement offers the example of a "full-time cook" over whose culinary activity "it is understood that the employer will exercise no control." *Id.* The Restatement further notes that "ship captains and managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them." *Id.* § 220(1) cmt. a.

*Id.*[11] Similarly, the fact that Ms. King "played no role in Clancy's work" (Dkt. 139-1 at 40) is irrelevant under the circumstances of this case. Like Martha Graham, or the "full-time cook" or "ship captain" of the Restatement, that Tom Clancy was talented enough for the JR Entities' other stakeholders to leave him alone does not indicate he was an independent contractor.

Aside from Ms. King's lack of actual direction given to Mr. Clancy, Plaintiff offers no evidence supporting her theory that the JR Entities "did not control Tom's work." Dkt. 139-1 at 42. Indeed, under *JJV*, Mr. Clancy could arrange his responsibilities among his corporate and individual capacities as he saw fit, giving his companies potential or actual control of his activities in his personal capacity for purposes of the work-for-hire analysis. *See* Section II.B.3, *supra*. In signing contracts on behalf of those entities, Mr. Clancy (in his executive capacity) obligated himself (in his personal capacity) to

---

[11] Plaintiff argues that *Martha Graham* "bears no resemblance to a situation, such as Clancy's, where an artist uses the legal fiction of a loan-out company to achieve tax savings." Dkt. 139-1 at 41 n.30. But the principles of *Martha Graham* discussed herein are applicable to the present case.

perform services as a writer, so that his fiduciary responsibilities to the other owners of the JR Entities could be fulfilled. *See, e.g.*, Exs. 11, 14, 24, 29, 30. That is a manner of control. Moreover, there is no dispute that JREL had a Board of Directors, which could override Mr. Clancy's decisions if it wanted to. Ex. 6. The fact the Board never ultimately did so has no bearing on whether it had the *right* to control the manner and means by which the product is accomplished. *Martha Graham,* 380 F.3d at 642. Accordingly, there is no genuine dispute of material fact that this factor favors treating the JREL and JRLP Books as works made for hire.

### b.     The skill required

The fact that Tom Clancy was a talented writer should not "weigh in the balance" of determining Mr. Clancy's status, because it is not "actually indicative of agency in the particular circumstances before" this Court. *Langman Fabrics*, 160 F.3d at 110-11. Martha Graham, and the cook or the ship's captain in the Restatement, were all exceptionally skilled, but that did not detract from their status as employees because they were employed to provide skilled services by companies in the business of furnishing those same services. *See Martha Graham*, 380 F.3d at 642; *see also Byce*, 600 F.3d at 1128 (holding that while "computer programming is a skilled profession . . . JustMed's regular business requires it to employ programmers"); *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 669 (7th Cir. 1986) (skilled baseball players were employees of their teams). In contrast, the plaintiff in *CCNV* was a nonprofit organization which was not in the business of creating sculptures, *see* 490 U.S. at 733-34, so the skill required to be a sculptor favored independent contractor status in that case.

In this case, the JR Entities were formed for the purpose of creating books for sale (*see* Ex. 6), which is an inherently skilled purpose. That Mr. Clancy was skilled as a writer does not favor an independent contractor status in this context.

### c.     The source of the instrumentalities and tools

Plaintiff concedes that "JREL paid for [Mr. Clancy's] computer," and that this factor favors treating Mr. Clancy as an employee. Dkt. 139-1 at 42.

### d.      The location of the work

It is true that Mr. Clancy worked out of his home, but as Ms. King testified, that was also the JR Entities' office location. Ex. Dkt. 139-31, 103:16-20. In contrast, in *CCNV*, Reid worked out of his home, but that was a ***different*** location from CCNV's offices. *CCNV*, 490 U.S. at 752. Thus, this factor favors treating Mr. Clancy as an employee. *See Dumas v. Gommerman*, 865 F.2d 1093, 1105 (9th Cir. 1989) (relevant test is "whether the artist worked in his or her own studio ***or on the premises of the buyer***"), *cited with approval* in *CCNV*, 490 U.S. at 751 & n.21. Alternatively, the location of Mr. Clancy's work is not "actually indicative of agency in the particular circumstances before" this Court, and is therefore not determinative. *Langman Fabrics*, 160 F.3d at 110-11; *see also Byce*, 600 F.3d at 1127 ("The nature of the business and the work similarly means that Byce's ability to set his own hours and the fact that he worked from home are not particularly relevant.").

### e.      The duration of the relationship between the parties

It is undisputed that Mr. Clancy had a longstanding relationship with the JR Entities. This favors the finding of a work-for-hire relationship. Dkt. 139-1 at 42.

### f.      Whether the hiring party has the right to assign additional projects to the hired party

As discussed above, where a creative individual is also a principal of his or her closely-held entity, he or she may arrange "control" among his corporate and individual capacities, including the "right to assign additional projects," as he or she sees fit. *See* Section II.B.3, *supra*; *JJV*, 617 F.3d at 1156. Thus, Tom Clancy in his executive capacity could assign projects (i.e., additional books) to Tom Clancy in his personal capacity. Mr. Clancy in fact did so by contracting for books to be delivered to his publisher—including multi-book contracts. *See* Exs. 11, 14, 24, 29, 30.

17

g.      **The extent of the hired party's discretion over when and how long to work**

As discussed above, where a creative individual is also a principal of his or her closely-held entity, he or she may arrange "control" among his corporate and individual capacities, including the control over "when and how long to work," as he or she sees fit. *See* Section II.B.3, *supra*; *JJV*, 617 F.3d at 1156. Thus, Tom Clancy in his executive capacity could control when and how Tom Clancy in his personal capacity worked. Moreover, this factor is not decisive in the circumstances of this case. *See Byce*, 600 F.3d at 1127 ("The nature of the business and the work similarly means that Byce's ability to set his own hours and the fact that he worked from home are not particularly relevant.").

h.      **The method of payment**

Plaintiff does not dispute that Mr. Clancy was not paid on "completion of a specific job," which would favor independent contractor status. *CCNV*, 490 U.S. at 753. She observes that the "proceeds" of book sales were "deposited in [the] company account," and then deposited into the owners' personal accounts once such proceeds exceeded a given amount. Dkt. 139-1 at 42. But that arrangement is not indicative of independent contractor status. Indeed, *CCNV* "reject[ed] the suggestion . . . that the § 101(1) term 'employee' refers only to formal, salaried employees." *CCNV*, 490 U.S. at 742 n.8.

i.      **The hired party's role in hiring and paying assistants**

Plaintiff's argument that Mr. Clancy "had total discretion in hiring and paying assistants" (Dkt. 139-1 at 42) is not supported by admissible evidence. Moreover, as discussed above, where a creative individual is also a principal of his or her closely-held entity, he or she may arrange "control" among his corporate and individual capacities, including the "role in hiring and paying assistants," as he or she sees fit. *See* Section II.B.3, *supra*; *JJV*, 617 F.3d at 1156. Moreover, Mr. Clancy's assistants were paid by the JR Entities. *See* Dkt. 139-31, 97:16-98:13.

j.      **Whether the work is part of the regular business of the hiring party and whether the hiring party is "in business"**

18

Plaintiff does not support her statement that the "Jack Ryan Entities are 'not businesses at all'" with any relevant, admissible evidence, and appears to ascribe a special meaning to what it means to be a "business." The plaintiff in *CCNV* was a non-profit organization, and not in the business of creating sculptures. Accordingly, the Supreme Court said CCNV was "not a business at all" and Reid's activities were not part of the organization's regular business. 490 U.S. at 753. In contrast, here, the undisputed material facts demonstrate that the JR Entities were for-profit enterprises, were formed for the express purpose of "writ[ing], publish[ing] and sell[ing] books," and that Tom Clancy wrote those books. Exs. 6, 28. Thus, this factor favors treating the JREL and JRLP Books as works made for hire.

> **k.    The provision of employee benefits and the tax treatment of the hired party**

As discussed in the Motion (Dkt. 135-1 at 30), whether the JR Entities provided Mr. Clancy with employee benefits or withheld taxes is not "actually indicative of agency" and should not be considered in the circumstances at bar. *Langman Fabrics*, 160 F.3d at 110-11; *see also Byce*, 600 F.3d at 1128 ("JustMed's treatment of Byce with regard to taxes, benefits, and employment forms is more likely attributable to the start-up nature of the business than to Byce's alleged status as an independent contractor"); *JAH IP Holdings, LLC v. Mascio*, 2014 WL 6477923, at *7 (D. Colo. Nov. 19, 2014) (where creator "occupie[s] the role of both employee and co-owner" of a small business, the lack of "payroll withholdings typically applicable to employees" does not indicate an "independent contractor arrangement"). In any case, Plaintiff does not dispute that JRLP provided health insurance for Mr. Clancy. Dkt. 135-1 at 30 n.16; Ex. 37 ¶¶ 7, 14A.

> **l.    Whether the parties believe they are creating the relation of master and servant**

Contrary to Plaintiff's arguments, the belief of the parties to a relationship is an appropriate factor to consider in determining whether a work is made for hire. Of note, the factors specifically enumerated in *CCNV*—the skill required, the source of the instrumentalities and tools, etc.—were

19

"*among*" the factors relevant to the work-for-hire inquiry. 490 U.S. at 751. The Supreme Court cited the Restatement (Second) of Agency § 220(2) ("Restatement") with approval, noting that the factors listed therein were "nonexhaustive." *Id.* at 752. Among the factors discussed in the Restatement is "whether the parties believe they are creating the relation of master and servant." Restatement § 220(2)(i). Thus, considering whether Mr. Clancy in his individual and representative capacities believed that a master-servant relationship existed is wholly consistent with *CCNV*. And indeed, in *Cilecek*, the Fourth Circuit held that this factor is an appropriate consideration in determining whether a person is an employee or independent contractor. 115 F.3d at 262-63.

Plaintiff argues that the Court should ignore *Cilecek* because it is "not a copyright case." Dkt 139-1 at 38 n.26. But the Supreme Court specifically held that by using the term "employee" in the Copyright Act, "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine" in general, and did not hold it meant something special in copyright cases. *CCNV*, 490 U.S. at 740. In coming up with its list of specifically enumerated factors, the Court cited heavily to non-copyright cases and the Restatement. *Id.* at 751-52 & n.18-31. Thus, under *CCNV*, it is proper to look to non-copyright cases and the Restatement to determine whether a master-servant relationship has been formed. Indeed, courts have considered the parties' belief and understanding as to whether a master-servant relationship existed, as set forth in *Cilecek* and the Restatement, in copyright cases. *See Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc's, Inc.*, 119 F.3d 55, 61 (1st Cir. 1997) ("The understanding of the parties as to the nature of their relationship is also probative of the existence of a conventional master-servant relationship as understood by common law agency doctrine."); *Byce*, 600 F.3d at 1126 n.5 (the fact that "both Liebler and JustMed believed they had an employee-employer relationship . . . cuts in favor of similarly finding Byce an employee").

The undisputed facts in this case show that Tom Clancy, acting both in a representative

capacity on behalf of the JR Entities and individually, believed an employer-employee relationship existed. Among other things, Mr. Clancy signed *every* publishing agreement with Putnam in his executive capacity, and agreed (on behalf of JREL and JRLP) that the JR Entities were the "Authors" of the works. Exs. 11, 14, 24, 29, 30. He also signed *every* Guaranty in connection with those agreements in his personal capacity, "unconditionally guarantee[ing] that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author [defined as JREL or JRLP] is the owner of copyright in the Work and has full power and authority to enter into the Agreement." *Id.*[12]  Accordingly, the "belief of the parties" factor weighs strongly in favor of the JREL and JRLP Books being works made for hire.

Faced with irrefutable evidence of Tom Clancy's intent and belief, Plaintiff argues that the JR Entities "in effect argue for some form of copyright-by-estoppel" by evoking the Guaranties. Dkt. 139-1 at 43. But that is not true. The JR Entities do not argue that the JREL and JRLP Books are works made for hire *solely* because Mr. Clancy executed the Guaranties, and do not advocate for a rule precluding Ms. Clancy from arguing to the contrary on that basis. Indeed, the JR Entities concede, as they must, that "the manner in which the parties designate the relationship is not controlling[.]" *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002); *see also TD Bank N.A. v. Hill*, 928 F.3d 259, 273 (3d Cir. 2019) ("[A]n agreement whereby works prepared by the employee that are not prepared within the scope of employment are nevertheless deemed to be 'works made for hire' will

---

[12] Plaintiff speculates that the Guaranties were "required by Clancy's publisher, as they are routinely when publishers deal with artists operating through loan-out companies, to ensure that the company's obligation was indeed Clancy's – in other words, to give the publisher the assurance that Clancy would not breach, give a big shrug, and hide behind the loan-out company." Dkt. 139-1 at 45. However, Plaintiff does not substantiate her naked assertion that a guaranty was routinely required or, even if it was, that it had to contain a statement that the work was made for hire. The parties could have assured Putnam "that the company's obligation was indeed Clancy's" by using a letter agreement *without* an acknowledgment that the works were made for hire. The publishing agreements reflect the parties made numerous changes to the initially proffered agreement. *See, e.g.*, Exs. 11, 14, 24, 29, 30. If Mr. Clancy had not truly believed that he wrote books in his capacity as the JR Entities' employee, he could have easily crossed out the "work for hire" language in the Guaranty. ***He did not***.

not *in itself* convert such works into the 'for hire' category.") (citation omitted).

But just because agreements designating works as made for hire is not *controlling* does not mean that such documents are *irrelevant*. In the circumstances of this case, the Guaranties are extremely relevant. Unlike a settlement agreement resolving litigation that retroactively deemed a comic book character to be a "work made for hire" decades after its inception, *see Simon*, 310 F.3d at 283-84, the Guaranties here were substantially contemporaneous with the creation of each JREL and JRLP Book and are highly relevant evidence of Mr. Clancy's understanding at the time that the relationship between the JR Entities and himself was one of master and servant. Mr. Clancy was not in the position of an aspiring author at the mercy of a heavy-handed entity. He was both an established writer and officer of the entity. His intent is probative evidence that a master-servant relationship exists, to be weighed in conjunction with all of the other factors underlying the work-for-hire determination.

Appropriately weighing and evaluating all of the relevant *CCNV* and Restatement factors compels the conclusion that the JREL and JRLP Books are works made for hire. This conclusion also comports with common sense. Mr. Clancy made the informed decisions to set up the JR Entities, through which he would provide his services as a writer. There are advantages *and* disadvantages of that arrangement, and "people cannot use a corporate structure for some purposes – *e.g.* taking advantage of tax benefits – and then disavow it for others." *Waite*, 2020 WL 1530794, at *9. Mr. Clancy never attempted to do so during his life, and Plaintiff should not be permitted to do so, either.

## C.    The Undisputed Material Facts Establish that the JREL Books and JRLP Books (and the Characters as Developed Therein) Are Owned by JREL and JRLP

Because the JREL Books and JRLP Books are works made for hire, the JR Entities are considered the *authors* of those books, and thus own "all of the rights comprised in the copyright[s]" to those books. 17 U.S.C. § 201(b). Plaintiff admits that a "character is a protected copyrightable element of a copyrighted work." Dkt. 139-1 at 26. Thus, the characters Jack Ryan, John Clark, Ding

22

Chavez, and others appearing in the JREL Books and JRLP Books, are "comprised in the copyright[s]" to those books, and the JR Entities own those characters as a matter of law.

Alternatively, even assuming that the JREL Books and JRLP Books were *not* works made for hire, the JR Entities would *still* own the copyrights. As explained in the JR Entities' Motion (*see* Dkt. 135-1 at 31-34), those copyrights have been validly transferred. There are several written instruments, signed by Tom Clancy, that memorialize the transfer of copyright in each book from Tom Clancy to JREL and JRLP, respectively, including the publishing agreements with Putnam for each book (signed by Tom Clancy in his executive capacity); the Guaranty letters accompanying those agreements (signed by Tom Clancy in his personal capacity); and the Separation Agreement acknowledging JREL and JRLP's ownership in the JREL and JRLP Books. Plaintiff does not seriously contest this point, and to the extent she does, her arguments are not supported by admissible evidence or legal authority.

In her Opposition, Plaintiff argues that, to transfer a copyright, a "signed writing" must exist that "unambiguously evince[s] an intent to transfer ownership" (*see* Dkt. 139-1 at 24-25), and that the Guaranties do not "satisfy the statutory test" because they "contain no words of assignment or transfer." *Id.* at 45. But Plaintiff's arguments are contrary to black-letter law. To satisfy the statutory test, "a qualifying writing under Section 204(a) ***need not contain . . . any particular 'magic words[.]'*** " *MRIS*, 722 F.3d at 600; *see also Hill*, 928 F.3d at 274 ("The agreement need not comply with any formalities or invoke particular language to constitute an assignment").[13] "[A] written instrument that fails to use the words 'copyright' or 'transfer' can still be sufficient under § 204(a)." *Capital Concepts, Inc. v. Mountain Corp.*, 2012 WL 6761880, at *7 (W.D. Va. Dec. 30, 2012). Moreover, the writing need not effectuate a ***present*** assignment of a copyright; rather, a transfer may be made orally or by conduct,

---

[13] *See also Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 392 (5th Cir. 2005) ("Nor does the writing have to contain any particular language."); *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) ("No magic words must be included in a document to satisfy § 204(a)").

and "later validated in writing." *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 833 n.4 (3d Cir. 2011).

The later writing "validates the transfer *ab initio*." *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995).[14]

Plaintiff makes no attempt to distinguish this case from *Hill*—because that case is indistinguishable. As the Third Circuit held with respect to the ***the identical guaranty***:

> Hill's assurance that the manuscript "is a work made for hire" . . . denotes an intent to relinquish his interest in the copyright. . . . The use of the definite article "the" in "[Commerce Bank] is *the* owner of copyright" also implies that Commerce Bank is the sole owner of the copyright . . . . And this implication gains force in the second half of that sentence, which provides that Commerce Bank has "full power" to execute the publishing agreement, because a co-owner lacks the authority to grant a truly exclusive license without the consent of all co-owners. . . . Finally, any lingering doubt is dispelled by the letter's reference to the publishing agreement, which states that Commerce Bank "is *the sole* and *exclusive* owner of all rights granted to the Publisher in this Agreement."

*Hill*, 928 F.3d at 275 (emphasis in original) (internal citations omitted). The language of Tom Clancy's Guaranty mirrors the letter agreement in *Hill*. The "work for hire" assurance, even if it incorrectly designated the books, indicates Tom Clancy's intent to relinquish his interest in the copyright in the JREL and JRLP Books to JREL and JRLP, respectively.[15] The Guaranties state that JREL or JRLP is the owner of the copyright in each book, using the definite article "the" to indicate *sole* ownership. And the Guaranties state that "Author" (defined to be JREL or JRLP) had "full power" to execute the publishing agreement, again indicating the JR Entities held sole ownership. Finally, each Guaranty refers to the accompanying publishing agreement, which states that JREL or JRLP "is the sole and exclusive owner of all rights granted to the Publisher in this Agreement." Exs. 11, 14, 24, 29, 30.

---

[14] *See also, e.g.*, *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996) ("[A] prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral grant"); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982) ("[T]he [writing] requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement.")

[15] *See also Capital Concepts*, 2012 WL 6761880, at *2, *8 (holding an agreement incorrectly describing a work as "made for hire" nonetheless validly assigned copyright to the transferee).

Accordingly, just as the language of the letter agreement in *Hill* "convey[ed] an unmistakable intent" to "transfer . . any interest [the writer] possessed in the manuscript," *id.*, the exact same language in each Guaranty unambiguously conveys Tom Clancy's intent to transfer any interest *he* may have had in the JREL and JRLP Books to the JR Entities. Whether interpreting each Guaranty as a "present transfer" of copyright, *Hill*, 928 F.3d at 275, or as a note or memorandum validating earlier transfers between Mr. Clancy and the JR Entities by conduct, *see Barefoot Architect*, 632 F.3d at 833 n.4,[16] the result is the same: The Guaranties suffice under 17 U.S.C. § 204(a) to establish, as a matter of law, that the JR Entities own the JREL and JRLP Books by valid transfer, assuming *arguendo* that they are not works made for hire.

Moreover, as discussed in the Motion (Dkt. 135-1 at 11, 32-33), the Separation Agreement provided that the JREL Books were "assets of JREL" (Ex. 37 at PR0003996, 4015), and that the JRLP Books were "assets of JRLP" (*id.* at PR0003998, 4016).[17] The Separation Agreement was signed by Tom Clancy. *Id.* at PR0004013. Thus, the Separation Agreement further serves to memorialize earlier transfers of ownership of the JREL and JRLP Books to JREL and JRLP. While Plaintiff argues that the Separation Agreement "does not contain words of transfer" (Dkt. 139-1 at 13), no such "magic words" are needed. *MRIS*, 722 F.3d at 600. Finally, Tom Clancy signed an employment agreement *explicitly* assigning copyrights in his works to JRLP (to the extent they were not made for hire), containing "magic words" of present assignment. Ex. 60 at ¶ 7 ("Employee *hereby assigns and*

---

[16] The JR Entities respectfully submit that this latter interpretation is correct. For instance, the employment agreement between Tom Clancy and JRLP contains language of assignment (*see* Ex. 60 at ¶ 7); the Guaranties for the JRLP Books post-date that employment agreement, and thus simply confirm what had already occurred. The same is true for the JREL Books, even though the memorialized transfer occurred orally or by conduct.

[17] Plaintiff claims that the Separation Agreement "erroneously attributed ownership of certain works to the Jack Ryan Entities." Dkt. 139-1 at 13. However, the notion that both parties, and their capable counsel, "erroneously" distributed some of the most significant marital assets during the lengthy negotiations leading up to this agreement, strains credulity. Indeed, Plaintiff does not provide any support for this baseless claim.

25

*transfers to Employer* his entire right, title and interest in and to any books written by Employee….").[18]

The cases cited by Plaintiff—*Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561 (S.D.N.Y. 2014), *Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50 (1st Cir. 2005), and *Brown v. Flowers*, 297 F. Supp. 2d 846 (M.D.N.C. 2003) (*see* Dkt. 139-1 at 25-26)—do not support Plaintiff's contention that a transfer did not occur here. In *Tjeknavorian*, the defendant, a financier of plaintiff's film, produced emails relating to the expectations of the film's timeline and budget, the filmmaker's "previous practice of assigning copyright in completed projects to his previous sponsors," statements that the plaintiff and defendant were "co-producing" the film, and payments made from the financier to the plaintiff. 56 F. Supp. 3d at 566. None of those items suggested "the existence of a writing sufficient to transfer copyright," and the court declined to infer such a transfer "from the parties' course of dealing." *Id.* at 566, 567. In *Venegas-Hernandez*, the court held that a statement on a spreadsheet saying: "Those works detailed above belong to me, Guillermo Venegas Lloveras. Founder member of SPACEM," did not transfer the copyrights in those works to LAMCO, the putative *transferee* (indeed, it made no mention of the transferee). 424 F.3d at 60. In *Brown*, the court held that a partnership agreement that "ma[de] no mention of any copyright ownership, or of any transfer of copyright ownership," did not effectively transfer copyright from a partner to the partnership. 297 F. Supp. 2d at 853.

Unlike *Tjeknavorian*, *Venegas-Hernandez*, and *Brown*, the Guaranty letters and the Separation Agreement—signed by Tom Clancy—*do* explicitly state that the JR Entities owned the JREL and JRLP Books. *See* Exs. 11, 14, 24, 29, 30, 37. That is enough to memorialize the fact that the transfer of copyright from Mr. Clancy to the JR Entities had occurred. The fact that the words "assign" or

---

[18] Plaintiff only argues that this assignment is of "doubtful effectiveness" because of the alleged "lack of a bona fide employment relationship." Dkt. 139-1 at 45. But of course, anyone can assign a copyright to anyone else, even if they are not a "bona fide" employee.

"transfer" are not used is immaterial. *See MRIS*, 722 F.3d at 600 (no "magic words" are required).

**D.    At Tom Clancy's Death, JREL Owned the Jack Ryan Character As Developed and Delineated in *Hunt* as a Matter of Law**

**1.    The Unambiguous Language of the USNI Agreement Conveyed the Entire Copyright in *Hunt*, Including Its Characters, to USNI**

Plaintiff does not dispute that under the 1983 USNI Agreement, Tom Clancy assigned to the USNI "***the exclusive worldwide rights and any subsisting copyright*** . . . in connection with" *Hunt*. Ex. 2 at RYFC000711. Plaintiff further does not dispute that the assignment from USNI to JREL conveyed "***[t]he exclusive worldwide rights of every kind and nature (now or hereafter known)***, [and] ***any subsisting copyright***" in *Hunt*. Ex. 22. Plaintiff does not contend that these words are ambiguous. "The exclusive worldwide rights [of every kind and nature]" and "any subsisting copyright" in "connection with" *Hunt* are express, clear, unambiguous, and broad. They include each and every right in the bundle of rights that comprise a copyright in a work. *See* 17 U.S.C. § 106. Plaintiff ***agrees*** that character rights are part of that bundle. *See* Dkt. 139-1 at 26. Thus, by transferring "the exclusive worldwide rights" and "any subsisting copyright" in connection with *Hunt*, copyright in Jack Ryan (as developed in *Hunt*) was transferred along with the rest of the copyright in *Hunt* to USNI, and then to JREL, as a matter of law.

Faced with the unambiguous breadth of the transfer language, Plaintiff can only argue that under the *Sam Spade* case, "the general transfer of an underlying work's copyright does not transfer exclusive character rights." Dkt. 139-1 at 28.[19] But the JR Entities have already debunked that argument. *Sam Spade* did not involve "the general transfer of an underlying work's copyright," *see* Dkt. 135-1 at 42-43, and is therefore wholly inapposite.

Plaintiff has not cited to any case where a transferor somehow retains character rights after the

---

[19] In other words, Plaintiff would require the USNI Agreement to have stated, "I hereby transfer the entire copyright in this book, as well as the exclusive character rights to the characters in that book."

*entire* copyright to a work was transferred without reservation, and the JR Entities do not know of any such case. Plaintiff *admits* that *Sam Spade* involved the grant of "movie rights" to a book, *The Maltese Falcon*—not the grant of an entire copyright in that book. Dkt. 139-1 at 28. The same is true for all of the other cases that Plaintiff contends follow *Sam Spade* (*see id.* at 29-31); they *all* involve something less than a general grant of an entire copyright in a book. *See e.g.*, *Goodis v. United Artists TV, Inc.*, 425 F.2d 397 (2d Cir. 1970) (involving grant of motion picture rights and television broadcast rights); *Trust Co. Bank v. MGM*, 593 F. Supp. 580 (N.D. Ga. 1985), *aff'd*, 772 F.2d 740 (11th Cir. 1985) (involving three grants of motion picture rights including, with respect to one of them, an explicit prohibition on sequels); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (2d Cir. 1965) (lyrics rights); *Caldwell v. ABKCO Music & Records, Inc.*, 703 N.Y.S.2d 97 (App. Div. 1st Dep't 2000) (involving recording rights, which the court held to exclude synchronization rights); *Jim Henson Prods. v. John T. Brady & Assoc's*, 16 F. Supp. 2d 259 (S.D.N.Y. 1997) (involving a *license*, not assignment, of the right to use puppets in an advertisement). *None* of the cases cited by Plaintiff involve agreements like the USNI Agreement—an outright transfer of copyright to an entire work. In contrast, in *Burnett v. Warner Bros. Pictures, Inc.* 493 N.Y.S. 2d 326 (App. Div. 1985), *aff'd* 492 N.E.2d 1231 (N.Y. 1986), the court held that a broad transfer of the *entire* copyright includes the transfer of character rights. Plaintiff has nothing to say about *Burnett*, and for good reason; it is on all fours with this case.

Plaintiff surmises that *Sam Spade* "transformed the intellectual property bar's approach," such that contracts were routinely drafted to permit authors to retain character rights except if character rights were explicitly mentioned. Dkt. 139-1 at 30-31. But even if that notion were supported by admissible evidence (it is not),[20] it would not govern this case, because, as Mr. Youdelman advised

---

[20] Plaintiff cites to Harry Olsson's expert testimony from *Jim Henson*, purporting to describe *Sam Spade*'s "effect on contract drafting" in the late 1950s. Dkt. 139-1 at 30-31. Mr. Olsson's testimony is inadmissible hearsay here. Fed. R. Evid. 802.

Mr. Clancy, the USNI Agreement was a "radical departure from industry practice." Ex. 19 at RYC0000877. As Mr. Youdelman explained:

> The Naval Institute Press acquired the copyright in your work. The author of a novel usually retains the copyright. (The practice with text/technical books is somewhat different.) The publisher customarily has no interest in new books using the same characters.

*Id.*[21] The publishing agreements between the JR Entities and Putnam are drafted much differently than the USNI Agreement, such that the Author retains the copyright to the book, including, *inter alia*, the right to make derivative works incorporating the same characters. *See* Ex. 11 ¶¶ 1, 2, 28(a). Construing the USNI Agreement to transfer *all* rights under the copyright (including character rights) will not interfere with the traditional practice of authors retaining sequel rights.

### 2.     Copyright in a Character Cannot Be Owned Separately from the Expression Delineating That Character

Plaintiff further argues that the Copyright Act of 1976's elimination of the so-called "doctrine of indivisibility" in its predecessor statute (the 1909 Act) permit a person to own copyright in a character separate from the work in which the character appears. Dkt. 139-1 at 31-32. Plaintiff misinterprets the law. "Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately." 17 U.S.C. § 201(d)(2). The "exclusive rights comprised in a copyright" refer to the rights to, *inter alia*, reproduce, prepare derivative works based on, distribute, perform, and display a ***copyrighted work***. *Id.* § 106(1)-(6). However, the fact that these exclusive rights are divisible under the 1976 Act does ***not*** permit an idea to be owned, separate from the authorship ***expressing*** that idea. *See id.* § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

---

[21] Mr. Clancy's assignment of the copyright probably came about because, as Ms. King testified in her deposition, he refused to hire a lawyer to review the contract proffered by USNI. Dkt. 139-31 at 69:16-70:10.

As discussed in the JR Entities' Motion (Dkt. 135-1 at 37-40), ownership of a character—disembodied from the expression depicting that character—would amount to protection of a mere idea. The Copyright Office agrees. *See Conan Properties Int'l LLC v. Sanchez*, 2018 WL 4522099, at * 6, 9 n.11 (E.D.N.Y. June 8, 2018) ("*Conan I*") (citing U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §§ 313.4(H), 618.8(A)(8), 804.3(B), 911 (3d ed. 2017)).[22] So do courts, which have inextricably linked ownership of characters to ownership of works in which those characters appear. *See Warner Bros., Inc. v. Am. Broad. Cos.,* 720 F.2d 231, 235 (2d Cir. 1983) ("Plaintiffs own the copyrights in various works embodying the character Superman **and have thereby** acquired copyright protection for the character itself"); Dkt. 135-1 at 18 & n.9. Plaintiff never addresses this argument, and fails to cite any authority to the contrary.[23]

### 3.     JREL's Ownership of Jack Ryan Is Supported by Additional Evidence

Even if (i) copyright to *Hunt* were divisible in the manner Plaintiff supposes (it is not) and (ii) the language of the USNI Agreement did not, on its face, transfer ownership of the Jack Ryan character to USNI when it transferred *Hunt* (it does), the undisputed evidence of record demonstrates that, in any case, the USNI owned, and JREL now owns, Jack Ryan as developed in *Hunt*.

In the Motion, the JR Entities explain how additional evidence demonstrates transfer of the Jack Ryan character to the USNI and then to JREL. Dkt. 135-1 at 44-47. Plaintiff fails to address those arguments. Instead, relying heavily on her flawed interpretation of *Sam Spade*, she argues that the

---

[22] *See also* U.S. Copyright Office, Compendium of Copyright Office Practices § 202.02(l) (2d ed. 1984) ("The copyright law does not provide for the copyright registration of characters as such. However, original works of authorship describing, depicting, or embodying a character are registrable if otherwise in order.").

[23] The cases cited by Plaintiff (*see* Dkt. 139-1 at 31-32) address vastly different circumstances. *See Goodis*, 425 F.2d at 399-400 (regarding the sufficiency of a copyright notice under the 1909 Act); *Gardner v. Nike, Inc.*, 279 F.3d 774, 778-79 (9th Cir. 2002) (addressing an exclusive licensee's right to sub-license); *Fleischer Studios, Inc. v. A.V.E.L.A.., Inc.*, 654 F.3d 958, 962 n.1 (9th Cir. 2011) (remarking that, under the 1909 Act, there was an "absence of an on-point binding precedent" prohibiting transferring a "character copyright . . . separately from the copyright-creating work," but not addressing the idea/expression dichotomy issues that would result if such a transfer were permitted).

30

USNI Agreement "makes no reference to characters and contains no assignment of them" (Dkt. 139-1 at 33), despite assigning the entire copyright in *Hunt*. She also resorts to unsupported suppositions about what the USNI received and what it was aware of, which are not even relevant to interpreting unambiguous contractual language. *Walton v. Mariner Health of Md*., *Inc.*, 391 Md. 643, 660 (2006) (the meaning of an unambiguous contract "is limited to the four corners of the agreement.").

Most critically, Plaintiff fails to even acknowledge the post-assignment agreements entered into by JREL and Paramount regarding movie rights—*executed by Mr. Clancy*—confirming that JREL owned the Jack Ryan character. *See, e.g.*, Exs. 26, 27, 43, 45. Mr. Clancy could not have executed these documents if ownership of Jack Ryan were vested in him personally. At the very least, even if Tom Clancy somehow retained the copyright to Jack Ryan and did not transfer it to the USNI, these JREL/Paramount contracts qualify as notes or memoranda of an earlier transfer (orally or by conduct) from Tom Clancy to JREL. *See* Section II.C, *supra*; Dkt. 135-1 at 31-34.[24]

Plaintiff further does not address the movie *Jack Ryan: Shadow Recruit*, which was not based on any of Mr. Clancy's novels, and *the payment made by Rubicon to JREL* due to JREL's ownership of the character. *See* Dkt. 135-1 at 13-14. By this time, *Hunt* had been assigned to the USNI and then to JREL, and the issues surrounding the ownership of the Jack Ryan character had been settled. Mr. Clancy had long been divorced from Ms. King, and had every reason to insist he owned Jack Ryan and that payment be made to him personally (or to his new company, Rubicon). That did not happen. Instead, Paramount's mistaken payment to Rubicon was transferred to JREL, *specifically because*

---

[24] If this were the result, then the Notice of Termination served by Ms. Clancy would be ineffective. Under the Copyright Act, a notice of termination must contain "[t]he date of execution of the grant being terminated" and "[a] brief statement reasonably identifying the grant to which the notice of termination applies." 37 C.F.R. § 201.10(b)(2)(iii), (v). Ms. Clancy's Notice of Termination identifies the grant being terminated as "the agreement between [Tom Clancy] and the [USNI], dated November 21, 1983." Ex. 56 at 1. If the rights to Jack Ryan were transferred to JREL from Tom Clancy himself via a subsequent transfer as described herein, Ms. Clancy's Notice of Termination does not identify that grant, and would thus be ineffective to terminate it.

*JREL owned Jack Ryan*. Plaintiff has nothing to say about this turn of events, because it conclusively favors the JR Entities. Accordingly, there is no genuine dispute that JREL owns character rights to Jack Ryan (as developed in *Hunt*) as a matter of law.

### 4. The JR Entities Own Jack Ryan as Delineated in Post-*Hunt* Novels, and Are Entitled to Proceeds from Post-Death Works Featuring Jack Ryan

In her Opposition, Plaintiff contends that she "has never made any such claim" that Mr. Clancy's estate "owns the Jack Ryan character outright," and instead argues that the Amended Complaint more narrowly "alleges that the Estate owns the Jack Ryan character as developed in *Hunt*." Dkt. 139-1 at 46. But that is not true. Ms. Clancy seeks a declaratory judgment that "Tom Clancy owned the Jack Ryan character at the time of his death," that "ownership of the Jack Ryan character passed to the Estate," that "the Defendants JREL and JRLP had no ownership interest in the Jack Ryan character" and "no right to share in revenue from any post-death published works on the basis of any ownership of the Jack Ryan character." Dkt. 60 at ¶ 121, Prayer for Relief. The relief sought is not limited to Jack Ryan as delineated in *Hunt*, but instead seeks to deprive the JR Entities of ***any*** ownership whatsoever of Jack Ryan, or proceeds deriving therefrom.

But as Plaintiff concedes, "the rights to any incremental development" of the Jack Ryan character in any of the JREL or JRLP Books would therefore "belong to the relevant Jack Ryan Entity." Dkt. 139-1 at 48; *see also* Dkt. 135-1 at 34-37. And, as discussed above, the JR Entities own the copyrights in the JREL and JRLP Books, either as works made for hire or because they were validly assigned. Because the copyright in each derivative work is "independent of" the work on which copyright in the previous novel on which the derivative work is based, 17 U.S.C. § 103(b), the JR Entities have a *separate and independent* right to exclude third parties from preparing derivative works based on the Jack Ryan character *as developed* in the JREL and/or JRLP Books.[25] Plaintiff's prayer

---

[25] As a practical matter, a third party seeking to create new Jack Ryan works would need to obtain a license from

32

for relief following Count I appears to dispute that premise. However, for the foregoing reasons, unless the Court determines that the Estate owned every one of the JREL and JRLP Books in which Jack Ryan appears, Plaintiff cannot prevail on Count I of her Amended Complaint—even if the Court were to accept all of Plaintiff's arguments regarding Jack Ryan as he appears in *Hunt*.

### E.   The Undisputed Material Facts Establish that the JR Entities Have Ownership Rights in the John Clark Character

Plaintiff argues that Mr. Clancy's Estate owns the character rights to John Clark because the JRLP Book, *Without Remorse*, was not a work made for hire. (Dkt. 139-1 at 46.) Plaintiff's arguments are meritless. ***First***, *Without Remorse*, like all of the JREL and JRLP Books, is a work made for hire. *See* Dkt. 135-1 at 10; Section II.B., *supra*. And even if *Without Remorse* is not a work made for hire, it was validly transferred to JRLP. *See* Section II.C, *supra*. The copyright to John Clark as developed in *Without Remorse* was transferred along with the copyright to the novel. *See id.*

***Second***, John Clark first appeared in *Cardinal of the Kremlin*, a JREL Book published in 1988, and was developed across many subsequent JREL and JRLP Books. *See* Dkt. 135-1 at 5-6, 9-10; *see also* Dkt. 60 ¶ 45. As is the case with Jack Ryan, the owner of each book featuring John Clark is the owner of the John Clark character as developed in that book (indeed, John Clark as featured in *Without Remorse* is a derivative work of the character as featured in previously published novels). And, the JR Entities are the owners of each of the above-listed books, either as works made for hire or as valid assignee of the copyrights therein.

For these reasons, summary judgment should be granted that the JR Entities have ownership rights in John Clark.

---

the JR Entities, instead of or in addition to one from the relevant owner(s) of *Hunt*, due to the ongoing incremental development of the character across the JREL and JRLP Books.

**F.     There Is No Genuine Dispute of Material Fact that the Termination Notice, to the Extent It Is Valid, Is Overbroad in Its Purported Effect**

Plaintiff does not contest that the Termination Notice purports to recapture "***all*** rights . . . to the characters described in [*Hunt*]." Ex. 56 ¶ 3. But, as a matter of law, a notice of termination *cannot* result in her recapturing "all" rights, rendering the Termination Notice overbroad for the reasons set forth in the JR Entities' Motion. Indeed, Plaintiff *agrees* with many of the JR Entities' arguments in the Motion, conceding that termination results in reversion to "Ms. Clancy (50%), Page (10%) and 10% to each of Clancy's children from his first marriage (the 'Older Children')." Dkt. 139-1 at 49.

In the Opposition, Plaintiff argues that "any party seeking to create a new work containing the Jack Ryan character must obtain a license from" Plaintiff, her daughter, and the four Older Children, because "the Jack Ryan character was originally created in *Hunt*" and "all works created after *Hunt* containing the Jack Ryan character are derivative works of *Hunt*." *Id.* Plaintiff's argument is incorrect.

***First***, not every use of Jack Ryan needs a license from Plaintiff. Rather, a third party wanting to create and sell a new Jack Ryan work in the United States can obtain a non-exclusive license from *any one* of the post-termination owners. *See* Dkt. 135-1 at 50 n.30. To the extent the third party wants to create a work featuring Jack Ryan outside of the United States, the right to license such a use belongs to JREL (not Plaintiff), because the Termination Notice, even if it is valid, cannot recapture foreign copyrights. *See* Dkt. 135-1 at 49 & n.29.

***Second***, to the extent Plaintiff argues that third parties seeking to use Jack Ryan must obtain a license ***only*** from the post-termination owners of *Hunt* (and not *also* from the JR Entities), Plaintiff is, again, wrong. Jack Ryan has been developed over a series of novels, which were authored and are owned by the JR Entities (as works made for hire or otherwise). *See* Section II.D.4, *supra;* Dkt. 135-1 at 24-34. Because the copyright in each derivative work is "independent of" the copyright in the previous novel on which the derivative work is based, 17 U.S.C. § 103(b), the JR Entities have a

34

*separate and independent* right to exclude third parties from preparing derivative works based on the

Jack Ryan character *as developed* in each book. The Termination Notice, even if it is valid, does not

destroy the JR Entities' rights to exclude use of those more fully-developed depictions of Jack Ryan.

## III. <u>CONCLUSION</u>

For all of the foregoing reasons, the JR Entities respectfully request that the Court grant their

motion for summary judgment and deny Plaintiff's cross-motion.


Dated: August 20, 2020                              */s/ Jerrold A. Thrope*
                                                    Jerrold A. Thrope (Fed. Bar No. 01376)
Scott J. Bornstein (*pro hac vice*)                 GORDON FEINBLATT LLC
Justin A. MacLean (*pro hac vice*)                  233 East Redwood Street
GREENBERG TRAURIG, LLP                              Baltimore, Maryland 21202
MetLife Building                                    Tel.: (410) 576-4295
200 Park Avenue                                     Fax: (410) 576-4269
New York, NY 10166                                  jthrope@gfrlaw.com
Tel: (212) 801-9200
Fax: (212) 801-6400                                 *Attorneys for Defendants Jack Ryan*
bornsteins@gtlaw.com                                *Enterprises, Ltd. and Jack Ryan Limited*
macleanj@gtlaw.com                                  *Partnership*

35