## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ALEXANDRA M. CLANCY,            :

       Plaintiff,                :

                               Case No. 17-cv-03371-ELH

v.                              :

JACK RYAN ENTERPRISES,      :
LTD., *et al.*,

                           :

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANTS' AND COUNTER-PLAINTIFFS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
NUSINOV SMITH LLP
The Marbury Building
6225 Smith Avenue, Suite 200B
Baltimore, Maryland 21209
(410) 554-3600

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

ARGUMENT........................................................................ 1

    A.    Plaintiff's Action Is Not Barred By Limitations. ........................... 1

        1.    The Accrual Of An Heir's Copyright Action Requires Knowledge Of The Existence Of A Right........................ 1

        2.    Defendants Have Failed To Show That The February 19, 2014 Letter Placed Ms. Clancy On Inquiry Notice Of The Existence Of A Right..................................... 2

        3.    Ms. Clancy Learned Of An Existing Right, At The Earliest, On January 8, 2015. ..................................... 3

        4.    Ms. Clancy Made A Timely Assertion of Her Claim Upon Learning of the Existence of a Right. ....................... 5

        5.    The Pre-January 8, 2015 Inquiries Made By Ms. Clancy's Attorneys Do Not Show That She Was On Inquiry Notice Of The Existence Of A Right. ..................... 5

        6.    Tom Clancy Had No Claim Against The Jack Ryan Entities And, Consequently, Ms. Clancy Does Not Stand In His Shoes......................................... 7

    B.    The Post-HUNT Works Are Not Works for Hire. .......................... 8

        1.    The Jack Ryan Entities, Formed For The Sole Purpose Of "Funneling Money" For Tax Purposes,  Are *Alter Egos* And Not "Employers" Within The Meaning Of *CCNV*...................................................... 8

        2.    The Defendants' Work For Hire Analysis Ignores The History And Purpose Of The Doctrine Which Was To Allocate Rights To The One At Whose Instance The Work Was Created............................................. 11

        3.    This Court Must Reject The Defendants' Transparent Effort To Rewrite The Plain Holding Of *CCNV* And It Should Assess Clancy's Employment Status Based On The Objective Indications Of The Relationship.................. 14

4.     The Defendants' Arguments Regarding The Specific *CCNV* Criteria Are Without Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     a.     The Jack Ryan Entities Did Not Control Clancy's Creation Of His Best-Selling Fiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     b.     Tom Clancy's Unique Skills As A Best-Selling Fiction Writer Militate Against A Finding Of Employment. . . . . . . . . . . . . . . . . . . . . . . . 17

C.     The Defendants' Claimed Assignment Of Post-HUNT Works Is Illusory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.     Defendants Have Failed To Controvert Plaintiff's Showing That Clancy's Estate Owns Jack Ryan As Presented in HUNT. . . . . . . . . . . . . . . . . . 20

     1.     Defendants Have Failed To Rebut Plaintiff's Authority Establishing That USNI Could Not Transfer Jack Ryan Because It Did Not Own The Character. . . . . . . . . . . . . . . . . . 20

     2.     The Copyright Protection For A Fully Delineated Character That Has Been Given Written Expression May Be Owned Separately From The Work In Which It Appears. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     3.     JREL's Claim To A Copyright Interest In Jack Ryan Based On Collateral Evidence Is Contrary To The Explicit Requirements Of The Copyright Statute. . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Cases**

*Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bieg v. Hovnanian Enters., Inc.*, 157 F. Supp. 2d 475 (E.D. Pa. 2001). . . . . . . . . . . . . . . . . . . . 19

*Bleistein v. Donaldson Lithography Co.*, 188 U.S. 239 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Brattleboro Publishing Co. v. Winmill Publishing Corp*., 369 F.2d 565 (2d Cir. 1966). . . . . . . . 12

*Community for Creative Non-Violence v. Reid*, 490 U.S. at 730 (1989). . . . . . . . . . . . 8, 12, 15-17

*Donaldson Publishing Co. v. Bregman*, 375 F.2d 639 (2d Cir. 1967). . . . . . . . . . . . . . . . . . . . . 16

*Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737 (2d Cir. 1975). . . . . . . . . . . . . . . 9

*Fred Riley Home Building Corp. v. Cosgrove*, 864 F. Supp. 1034 (D. Kan. 1994). . . . . . . . . . 18

*Gomba Music Inc. v. Avant*, 225 F. Supp. 3d 627 (E.D. Mich. 2016). . . . . . . . . . . . . . . . . . . . . 1

*Hildreth v. Tidewater Equipment Co., Inc.*, 378 Md. 724 (2003). . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010). . . . . . . . . . . . 11

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Lamborn v. Commissioner*, No. 22461-81, 1985 Tax Ct. Memo LEXIS 198,
    50 T.C.M. (CCH) 835, T.C.M. (RIA) 85431 (T.C. Aug. 19, 1985). . . . . . . . . . . . . . . . . . . . 15

*Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106 (2d Cir. 1998). . . . . . . . . . . . . . 17

*Latin American Music Co. v. Spanish Broadcasting System, Inc.*, 232 F. Supp. 3d 384
    (S.D.N.Y. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990). . . . . . . . . . . . . . 15

*Marvel  Characters,  Inc.  v.  Simon*, 310 F.3d 280 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 14

*Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Metropolitan Regional Information Systems v. American Home Realty Network, Inc.*,

888 F. Supp. 2d 691 (D. Md. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Netzer v. Continuity Graphic Assocs.*, 963 F. Supp. 1308 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . 4

*Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533 (M.D. Fla. 1990). . . . . . . . . 23

*Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933 (N.D. Cal. 1992). . . . . . . . . . . . . . . . . . . . . 23

*Patterson v. Commissioner*, Docket Nos. 4639-64, 4640-64, 1966 Tax Ct. Memo LEXIS 44,
   T.C. Memo 1966-239, 25 T.C.M. (CCH) 1230, T.C.M. (RIA) 66239
   (T.C. Oct. 26, 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . 12

*Proven Methods Seminars, Ltd. Liability Co. v. American Grants & Affordable Housing
   Institute, Ltd. Liability Co.*, 519 F. Supp. 2d 1057 (E.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . 9

*S.A.M. Electronics, Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074 (N.D. Ill. 1999). . . . . . . . . . . . . 19

*Seven Arts Filmed Entertainment Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251
   (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tribull v. Tribull*, 208 Md. 490 (1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Waite v. Umg Recordings, Inc.*, No. 19-cv-1091 (LAK), 2020 U.S. Dist. LEXIS 56198,
   2020 WL 1530794 (S.D.N.Y. Mar. 31, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*,
   216 F.2d 945 (9th Cir. 1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Weinstein Co. v. Smokewood Entertainment Group, LLC*, 664 F. Supp. 2d 332
   (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statutes**

17 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17 U.S.C. § 102(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 U.S.C. § 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 U.S.C. § 204. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

**Other Authorities**

Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 HARV. J. SPORTS & ENT. L. 55
   (Winter 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

AMERICAN HERITAGE DICTIONARY (4th ed.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (2d ed.). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>**MEMORANDUM OF LAW**</u>

Alexandra M. Clancy, by her attorneys, submits this Reply Memorandum of Law in support of her Cross-Motion for Summary Judgment and in opposition to the Defendants' and Counter-Plaintiffs' Motion for Summary Judgment.

**ARGUMENT**

**A.      Plaintiff's Action Is Not Barred By Limitations.**

**1.      The Accrual Of An Heir's Copyright Action Requires Knowledge Of The Existence Of A Right.**

Defendants insist that the Personal Representative's February 19, 2014 letter placed Ms. Clancy on inquiry notice and that her suit is therefore untimely. Def. Reply Memo. at 4-7. They have failed, however, to show that as of that date Ms. Clancy was on inquiry notice of the existence of a right belonging to the Estate.

As discussed in the opening brief, a plaintiff in a copyright ownership dispute is placed on inquiry notice when she learns of the existence of a right, *see Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992) (ownership claim accrues when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right"), or that ownership has been repudiated, *see Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) (claim of co-ownership "accrue when plain and express repudiation of co-ownership is communicated to the claimant"). As between co-authors, the defining event is typically "express repudiation," but in other contexts, the search for evidence of express repudiation can often prove to be a pointless exercise.[1] "A co-author knows that he or she

---

[1] Courts have questioned the application of the "express repudiation" test outside the context of co-authorship disputes. *See, e.g., Seven Arts Filmed Entertainment Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1256 (9th Cir. 2013) (observing that the application of the accrual-upon-express-repudiation "rule to encompass claims against those who are not in a close relationship could introduce uncertainty into the enforcement of copyrights and require copyright holders to file suit against any third party that might be deemed to have repudiated the copyright owner's title"); *Gomba Music Inc. v. Avant*, 225 F. Supp. 3d 627,

jointly created a work from the moment of its creation" and, thus, knows that he has an interest worthy of protection. *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996). The same cannot be said of heirs. With heirs, accrual is unlikely to turn on express repudiation because repudiation requires the "assertion of an adverse claim of ownership"[2] that can only occur where the "existence of a right" is already known. In this context, the Second Circuit's formulation, recognizing that "any number of events can trigger the accrual of an ownership claim," provided that they establish the "existence of a right," is a more effective yardstick. *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011). Using this test, it is immediately apparent that the Defendants' limitations argument simply lacks merit.

> **2.     Defendants Have Failed To Show That The February 19, 2014 Letter Placed Ms. Clancy On Inquiry Notice Of The Existence Of A Right.**

The Defendants contend that the February 19, 2014 letter is proof that Ms. Clancy was on inquiry notice because it shows that JREL was contesting ownership of the right to Jack Ryan. The argument is unpersuasive for the reasons cited in Plaintiff's opening memorandum: namely, that (1) JREL itself asserted no interest and (2) the Personal Representative's letter merely related the "non-binding" arrangement he had made based on the opinion of Clancy's former intellectual property lawyer, Robert Youdelman. Plaintiff's Opening Memo. at 18-19. Moreover, to be on inquiry notice that rights are contested, a plaintiff must first know that the rights exist. Prior to January 8, 2015, Ms. Clancy had no basis for concluding that the Estate had any ownership of Tom's Clancy's characters. Far from *contesting* rights, the February 19, 2014 letter merely announced one lawyer's

---

640-41 (E.D. Mich. 2016) (noting that there is "reason to question whether the plain and express repudiation rule applies here instead of the discovery rule").

[2] *See Latin American Music Co. v. Spanish Broadcasting System, Inc.*, 232 F. Supp. 3d 384, 389-90 (S.D.N.Y. 2017) (noting "'express assertion' of adverse ownership that triggers the running of the statute").

opinion of who, out of all the possible parties, owned Jack Ryan after Clancy's death.

It must be recalled that prior to August 25, 2014, Ms. Clancy possessed *no* information even suggesting that the Estate had an existing right. As of that date, Ms. Clancy's sole knowledge was, as related in the Personal Representative's February 19, 2014 letter, that one of Tom Clancy's long-time intellectual property lawyers (Robert Youdelman) had advised the Estate that Jack Ryan belonged to JREL. At that time, Ms. Clancy had absolutely no contradictory information.

As the result of an inquiry made by her attorneys, on May 8, 2014 the Personal Representative supplied her attorneys with a copy of the posthumous Penguin book contract dated March 14, 2014, a copy of the February 19, 2014 correspondence, the corporate charter and bylaws of JREL, and documents reflecting the election of new officers of JREL. There was nothing in any of these documents to suggest the existence of a right – that is, that the Estate owned Jack Ryan. Moreover, in the absence of evidence of the existence of a right, any assertion of ownership by another party cannot constitute repudiation, because there is nothing to repudiate. In other words, even if the February 19, 2014 letter can be construed as an assertion of ownership by JREL, it cannot be construed as an "express assertion of *adverse* ownership." *See Latin American Music Co. v. Spanish Broadcasting System, Inc.*, 232 F. Supp. 3d 384, 389-90 (S.D.N.Y. 2017) (emphasis added).

### 3. Ms. Clancy Learned Of An Existing Right, At The Earliest, On January 8, 2015.

As shown in Plaintiff's opening memorandum, the triggering event for the presentation of Ms. Clancy's copyright claim was the January 8, 2015 disclosure of the 1988 settlement agreement with USNI and the post-settlement assigment from USNI to JREL. *See* Ex. 26 to Plaintiff's Opening Memo. Because USNI's assignment came in the context of its recognition of Tom's continuing

ownership of the Jack Ryan character, it established that, contrary to the advice the Personal Representative had received from Mr. Youdelman, JREL had no claim to Jack Ryan. USNI did not assign character rights to JREL for the simple reason that it did not own them.

Defendants counter, citing *Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992), that "Plaintiff's claim accrued when she received the letter claiming that the JR Entities own Jack Ryan – *not* when she received documents leading her to believe that this claim was 'unfounded.'" Def. Reply Memo. at 8. *Stone*, however, actually supports Ms. Clancy's position. There, the Second Circuit emphazied that Ms. Stone's limitations argument was unpersuasive not because she asserted she was not on notice of some *fact* but because she claimed she did not appreciate the *legal significance* of the facts. *Id.* at 1049. Here, by contrast, the *fact* of the 1988 character dispute with USNI, the *fact* of the 1988 USNI settlement, and the *fact* of the post-settlement assignment from USNI to JREL were not revealed to Ms. Clancy until January 8, 2015. It is these facts pertaining to the Estate, and not the opinions expressed in the Personal Representative's February 19, 2014 letter pertaining to JREL, that put Ms. Clancy on inquiry of the  Estate's right.

Nor does Defendants' reliance on *Netzer v. Continuity Graphic Assocs.*, 963 F. Supp. 1308 (S.D.N.Y. 1997), compel a different conclusion. Def. Reply Memo. at 8. Defendants cite *Netzer* for the proposition that "[a]n express assertion of sole authorship or ownership will start the copyright statute running." *Id.* at 1315. However, *Netzer* was a dispute between co-authors and, as discussed above, an assertion of ownership by one author necessarily places the other author on inquiry notice. The same cannot be said of heirs. Here, it was disclosure of the 1988 settlement and assignment that first alerted Ms. Clancy to the existence of the Estate's right. The Personal Representative's "non-binding" arrangement regarding JREL's ownership did no such thing.

4

### 4. Ms. Clancy Made A Timely Assertion of Her Claim Upon Learning of the Existence of a Right.

On February 1, 2017, the Personal Representative filed in the Orphans' Court for Baltimore City his Revised Second Administration Account. Ex. 1. Ms. Clancy filed exceptions to the Account, based on the Personal Representative's failure to assert Mr. Clancy's ownership of Jack Ryan. Ex. 2. The adjudication of Ms. Clancy's exceptions would have required the Orphans' Court to consider questions that are outside its jurisdiction. Accordingly, on July 26, 2017, it stayed all proceedings and authorized and directed Ms. Clancy to file a declaratory judgment action in a court of general jurisdiction within 30 days.[3]  Ex. 3. In compliance with the Orphans' Court Order, on August 25, 2017, Ms. Clancy timely filed this action in the Circuit Court for Baltimore City a little more than two years and seven months after being placed on inquiry notice of the existence of a right.[4]

### 5. The Pre-January 8, 2015 Inquiries Made By Ms. Clancy's Attorneys Do Not Show That She Was On Inquiry Notice Of The Existence Of A Right.

Defendants misleadingly contend that the proof that Ms. Clancy was on inquiry notice on February 19, 2014 is that she "did begin to investigate" after receiving the letter of that date. Def. Reply Memo. at 7. Their interpretation seriously mischaracterizes the record.

The Personal Representative's February 19, 2014 disclosure came in the context of his negotiation of a two-book deal. Ms. Clancy was not a party to the contract negotiations. The Personal Representative and the Jack Ryan entities were moving rapidly to ink publishing and media deals

---

[3]  Maryland law recognizes that where an estate administrator is unable or unwilling to take action to pursue an estate asset, an estate beneficiary has standing to make her own claim. *Tribull v. Tribull*, 208 Md. 490 (1956) (holding that residuary legatee had standing to sue to where executor refused or was unwilling to take legal action).

[4]  On November 13, 2017, the Jack Ryan Entities removed the Baltimore City action to this Court.

that could prejudice Ms. Clancy's rights before she even knew what those rights were.[5] In fact, by November 2014, she faced pressure from the Personal Representative to acquiesce both to his Petition to the Orphans' Court for authority to negotiate a four-book deal (on top of the two-book deal that he had already negotiated) and to an allocation agreement when, unlike the Estate and the Jack Ryan Entities, she had no information regarding the intellectual property rights of the respective parties. *See* Ex. 24 to Plaintiff's Opening Memo.

It is in this context that her counsel pressed the Personal Representative for information. Far from establishing inquiry notice, these events merely show a recently widowed woman pressured by the swift current of events to rapidly inform herself about the contours of her husband's Estate.[6]

---

[5] Ms. Clancy's attempts to protect her interests until she could learn the facts were frustrated by the Defendants' machinations. In December 2014, owing to Ms. Clancy's expressed concerns regarding the finality of agreements allocating revenue derived from post-mortem publishing contracts, the Orphans' Court, rejecting the objections of the Jack Ryan Entities, ordered that all proceeds from publishing contracts be placed in escrow. Ex. 4. In 2019, Ms. Clancy learned that the Personal Representative had not complied with the Orphans' Court order and that the disputed funds were never placed in escrow. Ex. 5, Dep. of T. Webb at 72:7-73:15. She also learned that, on September 19, 2016, the Jack Ryan Entities informed the Personal Representative that, notwithstanding the Orphans' Court order, they would not under any circumstances agree to escrow proceeds from any intellectual property contract. *See* Ex. 17, Plaintiff's Opening Memo. She further learned that the Jack Ryan Entities had already distributed funds allocated to them. Ex. 5, Dep. of T. Webb at 72:7-73:15. The Personal Representative admitted in his deposition testimony that he was "not aware of any agreement that would require [the distributees] to return money either to escrow or to the estate …." *Id*. Thus, while the Personal Representative assured the parties in his February 19, 2014 letter that all allocation agreements would be non-binding, the Jack Ryan Entities surreptitiously worked to make that assurance meaningless.

[6] Ms. Clancy's concern that information was not evenly distributed proved sound. She would subsequently learn that the Estate and the Jack Ryan Entities had retained Tom Clancy's former intellectual property lawyers and that these lawyers were actively assisting them in planning actions that would prejudice Ms. Clancy's interests. For example, Frank Curtis wrote a July 27, 2016 memorandum to the Personal Representative and counsel for the Jack Ryan Entities that offered a blueprint for reaping maximum benefits at the expense of Ms. Clancy and her daughter, leaving them with as little choice and residual rights as possible. Ex. 6. Curtis suggested that the Estate and the Jack Ryan Entities should frustrate Ms. Clancy's termination notice by preparing and licensing "in advance of October 2019 several Jack Ryan sequel books, to be published in later years."

6

**6.      Tom Clancy Had No Claim Against The Jack
Ryan Entities And, Consequently, Ms. Clancy
Does Not Stand In His Shoes.**

Defendants' insistence that the Plaintiff's action is barred by limitations also turns on their

contention that her action accrued during Tom's lifetime because she "stands in Tom's shoes." Def.

Reply Memo. at 8. The Defendants' assumption is fatally incorrect. Tom Clancy had no claim to

bring. He was not adverse to JREL or JRLP because these entities were his *alter egos*.[7] JREL and

JRLP had no management independent of Tom. They did not have separate strategies or business

objectives. They made *no claim* to Jack Ryan during Clancy's lifetime. They first asserted ownership

of the character well after his death.

If, as Defendants suggest, the Jack Ryan Entities were distinct from Tom during his lifetime,

it would mean that their own intellectual property claims accrued many years ago and are now time-

barred. It is beyond dispute that Clancy took actions during his lifetime that were contrary to claimed

ownership interests of the Jack Ryan Entities. By way of example, he negotiated and signed a 1999

divorce agreement that purported to dispose of JREL and JRLP interests without any input from

those entities and without their signature. *See* Ex. 13 to Plaintiff's Opening Memo. Also, after 1997,

he wrote and published derivative works without ever obtaining permission from the Jack Ryan

Entities for the use of either the original Jack Ryan character or the incremental character

developments in what they claim are Jack Ryan Entity works. By way of example, he published the

following Jack Ryan works without their agreement:  THE BEAR AND THE DRAGON (2000), RED

---

[7] Citing Maryland law on piercing corporate veils, *see Hildreth v. Tidewater Equipment Co., Inc.*, 378 Md. 724 (2003), Defendants misleadingly argue that Plaintiff has failed to meet the standard for establishing an *alter ego*. Def. Reply Memo. at 10-11. This authority is inapposite for the reasons discussed in Section B(1) which follows.

7

RABBIT (2002) and THE TEETH OF THE TIGER (2003), DEAD OR ALIVE (2010), LOCKED ON (2011), THREAT VECTOR (2012) and COMMAND AUTHORITY (2013). Acts of this nature certainly would have put truly "independent" and "distinct" entities on inquiry notice of a copyright ownership dispute. However, the Jack Ryan Entities never pursued legal action against Clancy for the obvious reason that they *were* Clancy's *alter egos*.

**B.     The Post-HUNT Works Are Not Works for Hire.**

**1.     The Jack Ryan Entities, Formed For The Sole Purpose Of "Funneling Money" For Tax Purposes, Are *Alter Egos* And Not "Employers" Within The Meaning Of *CCNV*.[8]**

Defendants take issue with Ms. Clancy's contention that the Jack Ryan Entities were merely Tom Clancy's *alter egos*. Their objections are unfounded.

First, Defendants contend that Ms. Clancy has produced no evidence to support her *alter ego* theory. Def. Reply Memo. at 11. To the contrary, in her opening memorandum, Plaintiff recounted in detail the testimony of Ms. King, the sole surviving member of the Jack Ryan Entities, supporting the conclusion that the Jack Ryan Entities are mere shells that served as Clancy's *alter egos*. Plaintiff's Opening Memo. at 39-40. Thus, Defendants' contention that Ms. Clancy has produced no evidence supporting her position is demonstrably false. Furthermore, Defendants have cited no contrary testimony, so Ms. King's evidence is unrebutted.

Nonetheless, citing inapposite Maryland law on piercing corporate veils, *see Hildreth v. Tidewater Equipment Co., Inc.*, 378 Md. 724 (2003), Defendants argue that Plaintiff has failed to meet the standard for establishing an *alter ego*. Def. Reply Memo. at 10-11. If the case at bar was

---

[8] *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989).

about holding Tom Clancy, or his Estate, personally liable for the debts of the Jack Ryan Entities, the Defendants' argument might have some marginal relevance. However, in the context of this case, it has none. The issue here is not Clancy's personal liability for the Jack Ryan Entities' debts but, instead, ownership of intellectual property. The question before the Court is whether companies created solely because, as Ms. King herself testified, they "were "advised by our accountant that it would be better for us taxwise to funnel the money" from book sales through a corporation, are even remotely consonant with the Supreme Court's conception of work for hire.[9]

In the context of intellectual property ownership, the *alter ego* characterization is simply a shorthand description of a shell company that has no genuine separate purpose from that of the artist. *See, e.g., Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 747 (2d Cir. 1975) (finding that corporation was artist's alter ego and that a transfer from the corporation was "analogous to a transfer from the individual author"); *Proven Methods Seminars, Ltd. Liability Co. v. American Grants & Affordable Housing Institute, Ltd. Liability Co.*, 519 F. Supp. 2d 1057, 1064 (E.D. Cal. 2007) (holding the plaintiffs were "proper owners of relevant copyrights" registered in name of CRH Inc. where it was undisputed "that CRH Inc. is a common law general partnership and 'alter ego' formed by the principals of plaintiffs"). These cases use the term in its generic, everyday sense, that is, an *alter ego* is "another side of oneself," *see* AMERICAN HERITAGE DICTIONARY (4th ed.), or "another aspect of oneself," *see* WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (2d ed.).

The *Epoch* case represents a very early example of an individual artist using a shell corporation to conduct business and a court, for intellectual property purposes, treating the individual and the corporation as one. The case involved D.W. Griffith and the infamous film, *The Birth of A*

---

[9]  *See* Ex. 29 to Plaintiff's Opening Memo., W. King Dep. Tr. at 78:10-79:2.

*Nation*. In 1914 Griffith produced and directed the film. In 1915, he applied for and received a copyright registration in the name of the David W. Griffith Corporation (referred to in the opinion as "DWG Corp."), a company controlled by him. The copyright for the original term of 28 years was thereafter assigned by the corporation to Epoch. *Id.* at 741. In 1942, Epoch applied to renew the copyright describing itself as both the "author" and "the proprietor of copyright in a work made for hire."[10] Epoch represented that Griffith was an employee who made the work for hire. A renewal certificate was issued by the Copyright Office in the name of Epoch as "the proprietor in a work made for hire."

In 1959, the Defendant, Killiam Shows, was granted a quitclaim deed in the copyright by Griffith's estate and thereafter it distributed the film to theatrical and television outlets. Epoch sued for infringement. It urged the court to treat the corporate assignment as granting it renewal rights. However, recognizing that the corporation was Griffith's *alter ego*, the court declined to do so:

> While Epoch correctly observes that the assignment here is from a corporation and not from an individual author, we do not think that difference is critical here, where the corporation was controlled by the author. The policy behind the rule of construction restricting an assignment to the original term unless it refers to renewal rights is to protect authors from inadvertent transfers of renewal rights. That policy, it is true, might not govern a transfer from a corporation unrelated to the author. Here, however, *DWG Corp. was in effect the author's alter ego*. [] The policy behind the rule of construction that favors the author's retention of renewal rights, therefore, is served by application of the rule in such a situation. The transfer from the DWG Corp. is analogous to a transfer from the individual author….

*Id.* at 747 (emphasis added) (citations omitted). Because an assignment from Griffith individually would not have granted Epoch renewal rights, the assignment from his *alter ego* shell corporation did not either. In light of its true nature, the company was disregarded for the purpose of determining

---

[10] Epoch would only be entitled to renew the copyright if it was the original author. *Id.* at 743.

copyright ownership.

Similarly, the court rejected Epoch's work for hire rationale:

[T]here is no evidence of any employer-employee relationship between Majestic or Epoch, on the one hand, and D. W. Griffith, on the other. There is no contract of employment, record of salary payments, or proof that Majestic or Epoch supervised or controlled Griffith in the making of the picture.

*Id.* at 742.

The Jack Ryan Entities, like the DWG Corporation, did not play any role in the creation of Clancy's novels. Aside from Defendants' fanciful description of Tom in his "executive" hat giving orders to Tom in his "writer" hat, they offer no concrete evidence to the contrary. Def. Reply Memo. at 13. Just as DWG Corporation was disregarded for the purpose of determining intellectual property ownership, Clancy's *alter ego* companies must be disregarded in determining the ownership of Clancy's work.[11]

        **2.**      **The Defendants' Work For Hire Analysis Ignores The History And Purpose Of The Doctrine Which Was To Allocate Rights To The One At Whose Instance The Work Was Created.**

Defendants urge this Court to disregard the evidence that they had no role in Clancy's work, "treat them as legitimate," and grant them ownership of the vast majority of that work. Def. Reply Memo. at 13. The issue is not legitimacy. It is undisputed that the companies were established in

---

[11] Defendants' continuing reliance on *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010) is unavailing. In that case, it was undisputed that Jules Jordan Video's ("JJV") owner, Gasper, was an employee. *Id.* at 1155. The district court had concluded that neither Gasper nor JJV had standing – Gasper because his creations were works for hire and JJV because its copyright registration was invalid. In reversing, the Ninth Circuit never resolved the question of work for hire, noting only that the district court's analysis was flawed in making findings regarding JJV's intent that were contrary to Gasper's testimony since JJV and Gasper were one and the same. However, the Ninth Circuit found it unnecessary to resolve the work for hire issue.

accordance with Maryland law. The issue is whether the Defendants satisfy the requirements of Section 101 of the Copyright Act as interpreted by the Supreme Court in *CCNV*.

The Defendants' position would have this Court disregard *CCNV's* conclusion that "in using the term 'employee,' the parties and Congress meant to refer to a hired party in a *conventional employment relationship.*" *CCNV*, 490 U.S. at 743 (emphasis added). Granting them ownership would pervert the purpose of the work for hire doctrine. There is nothing in Defendants' memorandum that suggests, much less shows, that their request for judgment in their favor is consistent with the purpose of the work for hire doctrine.

Originally, work for hire was a judicially-crafted gloss on the Copyright Act. The doctrine was first endorsed by the Supreme Court in *Bleistein v. Donaldson Lithography Co.*, 188 U.S. 239 (1903). The work for hire doctrine recognized that "there is a presumption in the absence of an express contractual reservation to the contrary, that the copyright shall be in the person *at whose instance and expense* the work is done." *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567 (2d Cir. 1966) (citing NIMMER ON COPYRIGHT 238 (1964)) (emphasis added). The rationale of the work for hire doctrine was said to be "'that the motivating factor in producing the work was the employer who induced the creation . . . .'" *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972) (quoting Note, *Renewal of Copyright – Section 23 of the Copyright Act of 1909*, 44 COLUM. L. REV. 712, 716 (1944)).

A one-man loan-out company, whatever its tax merits, fails this test. The company is never the motivating factor in the creation of the work. A loan-out corporation, although a duly organized corporation, "is a legal fiction … typically wholly owned by an artist,  the  sole function of which is to 'loanout' the services of the artist-owner to producers and other potential employers." Aaron

12

J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 HARV. J. SPORTS & ENT. L. 55, 90 (Winter 2012). As these two scholars have noted:

> Although styled as an employer-employee relationship, the typical loan-out's employee is an employee in name only. While nominatively drawing a salary and benefits from the corporation, the loan-out company's employee will personally decide (often with the help of an agent or manager not separately or formally employed by the loan-out) which types of projects to create. There is usually no direction or guidance from an employer, because *there is usually no true employer at all* ….

*Id.* at 90 (emphasis added). Tellingly, the authors also suggest that to obtain the desired tax benefits a loan-out corporation must at least pay "*lip service*" to the "corporation's ability to exercise control, *however unrealistic this may be in practice*." *Id.* (emphasis added).

Tom Clancy did not write his best-sellers at the "instance and expense" of the Jack Ryan Entities. The inspiration was all Tom's. The motivation was entirely his. What was said of the artist in *Donaldson Publishing Co. v. Bregman*, 375 F.2d 639 (2d Cir. 1967), applies with equal force to Clancy and the Jack Ryan Entities:

> *Donaldson* … involved an author who was the dominant person in the corporation alleged to be his employer [and] it could not be said that his work was done at the "instance" of the corporation.

*Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972) (commenting on *Donaldson Publishing Co. v. Bregman*, 375 F.2d 639 (2d Cir. 1967)). The rationale for applying work for hire – that the person who is the motivating force should be rewarded with the copyright – simply has no meaningful application under these facts.

13

    **3.**    **This Court Must Reject The Defendants'
Transparent Effort To Rewrite The Plain Holding
Of *CCNV* And It Should Assess Clancy's
Employment Status Based On The Objective
Indications Of The Relationship.**

In discussing the individual factors of *CCNV*, and seeking to avoid the inescapable import of Plaintiff's chart in her opening memorandum, Defendants offer a "creative" reinterpretation of the *CCNV* factors that would, if widely adopted, effectively eviscerate that opinion. In resolving a split among the circuits regarding the proper standard for invoking work for hire, the Supreme Court never embraced the notion that "token" compliance or mere "lip service" satisfied the statute. To the contrary, the Court emphasized that only employment, true employment, would suffice. Defendants' contrary interpretation must therefore be rejected.

Defendants argue that Tom Clancy could agree with the Jack Ryan Entities to perform writing duties as an employee. Def. Reply Memo. at 11. Put simply, this misses the point. What they "agreed" to on paper is not controlling. The parties may not simply "agree" that a given work shall be a work for hire. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002). The test is what the objective facts demonstrate. Courts focus "on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Id.* The *Marvel* court stressed that "under agency law, 'the manner in which the parties designate the relationship is not controlling.'" *Id.* The facts – using the criteria established by the Supreme Court – establish that a genuine master-servant relationship never existed.

Contrary to the Rules of this Court, Defendants rely upon an unpublished decision to support their contention that a party cannot use a corporate structure for one purpose – *e.g.*, tax avoidance – but rely on individual status for others. Def. Reply Memo. at 11 (citing *Waite v. Umg Recordings*,

14

*Inc.*, No. 19-cv-1091 (LAK), 2020 U.S. Dist. LEXIS 56198, 2020 WL 1530794, at * 9 (S.D.N.Y. Mar. 31, 2020).[12] But this really begs the question of whether the Jack Ryan Entities ever satisfied the *CCNV* criteria. In *Waite*, there was no question that the works were in fact works for hire. In the case at bar, by contrast, the Defendants have entirely failed to establish that the Jack Ryan Entities satisfy *CCNV's* objective test.

### 4. The Defendants' Arguments Regarding The Specific *CCNV* Criteria Are Without Merit.

In continuing to urge this Court to find that Clancy's post-HUNT works are works for hire, Defendants take issue with Plaintiff's analysis of *CCNV*, contending that "Plaintiff makes an inappropriate direct comparison that does not take into account the vastly different circumstances in each case." Def. Reply Memo. at 24. But the simple fact is, as revealed in Ms. King's unrebutted testimony as summarized in the chart in Plaintiff's Opening Memorandum, that Clancy's relationship with the Jack Ryan Entities fails to meet the overwhelming majority of *CCNV* factors. Defendants' true problem with Plaintiff's comparison is that it is so apt. Indeed, Clancy's relationship with the Jack Ryan Entities failed to meet any of the factors deemed by the courts to be truly significant and controlling.

---

[12] Defendants cite no published authority for this proposition. Furthermore, the ruling's logic is questionable. The tax code and the Copyright Act are two entirely separate bodies of law serving different purposes. The mere fact that a corporation does not meet the test for effective tax avoidance, *see, e.g., Patterson v. Commissioner*, Docket Nos. 4639-64, 4640-64, 1966 Tax Ct. Memo LEXIS 44, T.C. Memo 1966-239, 25 T.C.M. (CCH) 1230, T.C.M. (RIA) 66239 (T.C. Oct. 26, 1966) (court held that the corporation boxer used to shield income from taxes "should not be recognized for income tax purposes"); *Lamborn v. Commissioner*, No. 22461-81, 1985 Tax Ct. Memo LEXIS 198, 50 T.C.M. (CCH) 835, T.C.M. (RIA) 85431 (T.C. Aug. 19, 1985) (holding that taxpayer's shell corporation should be disregarded for income tax purposes"), does not mean that the corporation is a nullity. Similarly, corporations that fail the "work for hire" test, *see, e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990) (drafting company held to be independent contractor), are, presumably, otherwise valid corporations. An author might use a loan-out corporation for tax avoidance, fail to persuade the I.R.S., and thereafter assert rights of individual authorship.

> **a.    The Jack Ryan Entities Did Not Control Clancy's Creation Of His Best-Selling Fiction.**

Defendants offer no evidence to support their contention that they ever exercised control over Clancy. They offer instead an exercise in sophistry that would make *CCNV* truly meaningless: namely, that the "executive" Tom Clancy controlled the "employee" Tom Clancy.

Wanda King's unrebutted testimony established that, as the only other Jack Ryan executive, she played no role in Clancy's work. She did not review his progress, did not discuss plots or characters during their development, did not set deadlines for him, and did not tell him which books to write. Ex. 29 to Plaintiff's Opening Memo., W. King Dep. Tr. at 124:13-16, 124:17-19, 124:20-125:2, 125:3-5. *See* at 124:17-125:5. She further affirmed that no one else played a role in the Jack Ryan Entities who could have supervised or controlled Clancy's work or given him new assignments. *Id.* at 125:10-14.

Ms. King's testimony established, also, that the Jack Ryan Entities were mere shells. She testified that the Jack Ryan Entities did not conduct annual meetings during the relevant period. *See Id.* at 110: 9-13. Even with respect to finances, Ms. King admitted that the royalties were simply funneled into the Jack Ryan account and, when it reached $100,000, she unilaterally and without formal corporate action swept the balance into the couple's joint checking account. *Id.* at 100:1-101:13. It strains credulity to suggest that these shell companies were in any position to exercise control over Clancy's work.

Clancy's relationship with the Jack Ryan Entities bears a strong relationship to that of Walter Donaldson in *Donaldson Publishing Co. v. Bregman*, 375 F.2d 639 (2d Cir. 1967). In rejecting work for hire there, the Second Circuit held:

This lack of control over Donaldson's performance, Donaldson's dominant role in the corporation, his freedom to engage in profitable outside activities without sharing the proceeds with defendant, the absence of any fixed salary and the language of the agreement itself indicate that Donaldson was not an "employee" in the substantial sense required by the Copyright Act.

*Id.* at 643.

      **b.**     **Tom Clancy's Unique Skills As A
Best-Selling Fiction Writer Militate
Against A Finding Of Employment.**

Selectively and egregiously misquoting *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106 (2d Cir. 1998), Defendants argue that Clancy's skills as a writer "should not 'weigh in the balance' of determining Mr. Clancy's status, because it is not "actually indicative of agency in the particular circumstances before'" this Court. Def. Reply Memo. at 16. Aside from the fact that Defendants effectively ask this Court to resist the unambiguous holding of *CCNV*, the fact is that Defendants' butchered quote cannot be found in *Langman Fabrics*. *Langman Fabrics* actually stands for the opposite proposition, that the skill required is of particular importance and almost always significant. The full and honest quote from *Langman Fabrics* is as follows:

Not all the Reid factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us. [citation omitted.] Five of the Reid factors are of *particular importance* and will *almost always be significant*:

(1) the hiring party's right to control the manner and means of creation; (2) *the skill required* [of the hired person]; (3) the provision of employee benefits; (4) the tax treatment of the hired party; (5) whether the hiring party has the right to assign additional projects to the hired party.

160 F.3d at 110-11 (quoting *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992)) (emphasis added).

It is no surprise that Defendants are keen to minimize the centrality of Clancy's skill to the work for hire analysis. The fact is that Clancy's phenomenal talent and skill meant that he required

neither supervision nor control. He alone channeled his creative energy. This factor weighs most heavily against a finding of work for hire.

### C.      The Defendants' Claimed Assignment Of Post-HUNT Works Is Illusory.

Defendants contend that even if the post-HUNT works are not works for hire, there are documents that effectively assigned rights to the works and their characters to JREL and JRLP. They point to the publishing agreements with Putnam for each book, the Guaranty letters accompanying those agreements, and the Property Agreement between Clancy and his ex-spouse. Def. Reply Memo. at 23. None of these qualify as assignments under, or otherwise the satisfy the requirements of, Section 204.

First, none of the referenced documents are between Clancy and JREL or JRLP. The publishing agreements are between one of the Jack Ryan Entities and Putnam. The Guaranty letters are between Clancy and Putnam. The divorce agreement is between Clancy and his ex-wife. A document relied upon as an assignment must be between the affected parties – in this case, Tom Clancy and the Jack Ryan Entities. *See, e.g., Woods v. Resnick*, 725 F. Supp. 2d 809, 826 (W.D. Wis. 2010). In *Woods*, the court rejected the assertion that a document qualified as an assignment where the written document was not between the purported assignor and the assignee, but between the purported assignor *and a third-party*. Furthermore, the publishing agreements were signed by Clancy as an officer of one of the Jack Ryan Entities. Clancy could not assign, as an officer of a company, rights which he held personally. *See, e.g., Fred Riley Home Building Corp. v. Cosgrove*, 864 F. Supp. 1034, 1044 (D. Kan. 1994) (finding assignment invalid where it was executed in individual capacity and not by authorized representative of corporate copyright holder).

Beyond this, none of these documents set forth the clear and unequivocal intent to transfer required by Section 204. Defendants stress that an assignment need not contain "magic words." Def. Reply Memo. at 23. This is true. This does not mean that just any old words will do. Section 204 is the Copyright Act's statute of frauds and it imposes real requirements for the validity of any transfer rights. The signed writing must clearly reveal an intent to transfer. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 831 (3d Cir. 2011) (assignor of copyright must "manifest an intention to transfer the right to another person"); *Metropolitan Regional Information Systems v. American Home Realty Network, Inc.*, 888 F. Supp. 2d 691 (D. Md. 2012) (assignment of copyright must "reveal clear and unequivocal intent to transfer rights"); *S.A.M. Electronics, Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1080 (N.D. Ill. 1999) ("instrument conveying the transfer must demonstrate an intent to transfer the copyright"); *Weinstein Co. v. Smokewood Entertainment Group, LLC*, 664 F. Supp. 2d 332, 338 (S.D.N.Y. 2009) ("intention of a copyright owner seeking to transfer an ownership interest must be clear and unequivocal"); *Bieg v. Hovnanian Enters., Inc.*, 157 F. Supp. 2d 475 (E.D. Pa. 2001) (for a valid transfer of copyright ownership the transfer document must be "must be clear").

The documents cited by Defendants all lack words of transfer or conveyance. Given the Copyright Act's requirement that the "clearest language is necessary to divest the author of the fruits of his labor," *see Warner Brothers Pictures, Inc. v. Columbia Broadcasting Pictures, Inc.*, 216 F.2d 945, 949 (9th Cir. 1954), the cited documents fail to satisfy the Copyright Act's statute of frauds. Thus these cannot constitute assignments from Clancy to either JREL or JRLP.[13]

---

[13] Defendants' contention that *TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019), compels a different result is unpersuasive in light of that court's apparent disregard for the plain language of the statute. Despite the court's concession that "courts do not lightly infer that a party has assigned his interest in a copyright, particularly given the Copyright Act's writing requirement, and in doubtful cases, a document should not be construed to divest an author completely of his ownership interest," *id.* at 275, it treated

19

### D.  Defendants Have Failed To Controvert Plaintiff's Showing That Clancy's Estate Owns Jack Ryan As Presented in HUNT.

Faced with the irrefutable evidence that Tom Clancy never assigned his rights to Jack Ryan, and the incontrovertible law permitting the divisibility of copyright, Defendants have responded with a hodgepodge of misleading and irrelevant arguments in support of their claim to Jack Ryan. The Copyright Act in plain and simple terms dictates how a copyright interest is alienated. Anything else has no bearing on the question of ownership.

#### 1.  Defendants Have Failed To Rebut Plaintiff's Authority Establishing That USNI Could Not Transfer Jack Ryan Because It Did Not Own The Character.

In urging this Court to find that they own Jack Ryan, the Defendants' argument presumes that USNI owned the Jack Ryan character when it assigned its rights to JREL. Def. Reply Memo. at 27. Defendants are conspicuously silent regarding USNI's pre-assignment settlement with Clancy acknowledging Clancy's ownership of the HUNT character rights. Defendants also blithely sail past the cases cited in Plaintiff's opening memorandum, *see* Opening Memorandum at 34, holding that a party cannot assign what it does not own. Def. Reply Memo. at 27. Defendants' telling failure to address these facts or distinguish Plaintiff's authority is stark proof that they have no claim.

---

documents having no words of transfer as an assignment. The court's action generated a strongly worded dissent in which the dissenting judge noted that the court had gone out of its way to adopt arguments never presented by TD Bank and that "the specific letter at issue here still fails to manifest 'an unmistakable intent to effect a present transfer" of Hill's copyright interest.'" *Id.* at 291. In light of the fact that the case is not controlling in this circuit, the Court should accord it little, if any, weight.

## 2. The Copyright Protection For A Fully Delineated Character That Has Been Given Written Expression May Be Owned Separately From The Work In Which It Appears.

In her opening memorandum, Ms. Clancy noted that Defendants' argument that a character cannot be owned separately from its work runs afoul of the 1976 amendments to the Copyright Act. As amended, Section 201 provides that "any of the exclusive rights comprised in a copyright … may be transferred … and owned separately." Defendants concede that among the exclusive rights comprised in a copyright are character rights, as they must, since they ask the Court for an award of character rights. Thus Section 201 plainly shows that character rights may be transferred and owned separately. The statute effectively strips Defendants' argument of all credibility.

Confronted with the reality that the 1976 amendments expressly endorse the divisibility of copyright, Defendants attempt to salvage their argument that a character cannot be owned separately from its work by citing Section 102(b) of the Copyright Act. Def. Reply Memo. at 29. Section 102(b) provides that copyright protection does not extend to an idea. Defendants contend that this shows that an idea cannot be owned separately from the work expressing the idea and, hence, notwithstanding the clear import of the 1976 amendments, a character cannot be owned separately from its work. Def. Reply Memo. at 29.

The flaw in Defendants' syllogism is that a character that merits copyright protection is not a mere idea. To enjoy copyright protection, characters must be fully delineated and distinctive. The writer must develop the character and his/her characteristics *in writing*. This fully delineated character passes from being a mere idea to being a written expression and it is the written expression, not the mere idea, that enjoys protection.

21

Plaintiff has demonstrated that both Jack Ryan and John Clark were fully delineated in HUNT and WITHOUT REMORSE, respectively. Defendants concede that the delineation of these characters is undisputed. Def. Reply Memo. at 1, n. 1 ("the JR Entities have never disputed that Jack Ryan and John Clark are sufficiently developed to be copyrightable"). Accordingly, the written expressions of the Jack Ryan and John Clark characters are capable of being owned separately from the works in which they appeared.

3.     **JREL's Claim To A Copyright Interest In Jack Ryan Based On Collateral Evidence Is Contrary To The Explicit Requirements Of The Copyright Statute.**

As in their opening Memorandum, Defendants continue to cite collateral evidence in support of their claim to Jack Ryan. Def. Reply Memo. at 30-31. They claim that ownership is established by a signed agreement between JREL and Paramount regarding movie rights "confirming that JREL owned the Jack Ryan character." *Id.* They further claim that another Clancy-owned company, Rubicon, paid JREL royalties for the movie *Shadow Recruit*, a 2014 Paramount picture featuring Jack Ryan in an original story not written by Mr. Clancy or based on any previous Clancy works. *Id.*

In support of their estoppel-like theory, Defendants argue that although *Shadow Recruit* was made and released long after Mr. Clancy's divorce from Ms. King, Mr. Clancy did not insist that the use fee for the film be paid to him or to his post-divorce company, Rubicon. It is unclear – and the Defendants do not identify –  under what Paramount agreement the studio sequel was made.  But while making much of the *Shadow Recruit* payment, the Defendants ignore the fact that in the post-divorce period, after 1997, Mr. Clancy himself wrote seven Jack Ryan novels without agreement with, objection by, or payment to the Jack Ryan Entities. *See* page 7.

This effort to create copyright interests by estoppel is unavailing. The statute is plain. A copyright interest can only be transferred by written assignment. As addressed in Plaintiff's opening brief, there is no such thing as copyright by estoppel. *See, e.g., Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992) ("this court will not allow the doctrine of equitable estoppel to be invoked to transfer ownership of the copyright which originally vested in the works' authors"); *Neva, Inc. v. Christian Duplications International, Inc.*, 743 F. Supp. 1533, 1548 (M.D. Fla. 1990) (while estoppel "may be properly asserted in an infringement action, they are not properly asserted in this action to determine the ownership of the copyright").

Plaintiff does not dispute that Clancy was not always consistent in his approach to these matters. We do not know, and we will never know, whether Clancy was aware of these inconsistencies. The extant records show a man who, like his characters, could be impatient with red tape and bureaucracy. That he might have been less than fastidious about ensuring consistency does not seem particularly farfetched. But even if this is what occurred, it does not change the fact that the Copyright Act is explicit regarding the methods for transferring ownership and Defendants have failed to demonstrate the existence of any document that complies with the requirements of the Act. The law books are filled with examples of situations where an intended result was frustrated because one of the actors failed to honor the formalities. If Clancy wanted JREL to have ownership of his character rights, he needed to comply with the statute. He certainly knew how to do it, as evidenced by his explicit assignment of the rights to RAINBOW SIX. His failure to do it with respect to the Jack Ryan Entities is fatal to their claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiff, Alexandra M. Clancy, respectfully requests that the Court grant her cross-motion for summary judgment and deny the Defendants' and Counter-Plaintiffs' motion for summary judgment.

Respectfully submitted,

/s/ *Norman L. Smith*
Norman L. Smith, Fed Bar No. 24057
nsmith@nusinovsmith.com
Jeffrey E. Nusinov, Fed. Bar No. 26701
jnusinov@nusinovsmith.com
Paul D. Raschke, Fed. Bar No. 03428
praschke@nusinovsmith.com
NUSINOV SMITH LLP
The Marbury Building
6225 Smith Avenue, Suite 200B
Baltimore, Maryland 21209
(410) 554-3600

*Attorneys for Plaintiff*

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 17, 2020, a copy of the foregoing document was served in compliance with ECF guidelines on:

> Robert S. Brennan, Esquire
> Miles & Stockbridge, P.C.
> 100 Light Street
> Baltimore, MD 21202
>
> Jerrold A. Thrope, Esquire
> Gordon Feinblatt, LLC
> 233 E. Redwood Street
> Baltimore, Maryland 21202
>
> Scott J. Bornstein, Esquire
> Justin A. MacLean, Esquire
> Greenberg Traurig, LLP
> MetLife Building
> 200 Park Avenue
> New York, NY 10166

 /s/ *Norman L. Smith*
Norman L. Smith

25