IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALEXANDRA CLANCY,
*Plaintiff*

v.                                          Civil Action No. ELH-17-3371

JACK RYAN ENTERPRISES, LTD., *et al*,
*Defendants.*

**MEMORANDUM OPINION**

In this intellectual property case, the Court has been asked to resolve competing claims for ownership of the novels and fictional characters created by the late Thomas L. Clancy, Jr., a renowned author, better known as Tom Clancy ("Clancy" or "Decedent"). The dispute includes opposing claims of ownership of the iconic character Jack Ryan, who is featured in many of Clancy's best-selling novels. Although Clancy witnessed Jack Ryan leaping from the pages of his books to the big screen, Clancy probably never imagined a non-fictional chapter featuring Jack Ryan in a bitter familial dispute with respect to Clancy's estate.

Plaintiff Alexandra Clancy and the Decedent were married from 1999 until Clancy's death in October 2013. Together, they had one daughter. Ms. Clancy and her daughter have a combined interest of 60% in Clancy's estate. From 1969 until 1999, Clancy was married to Wanda King, with whom he had four children, and from whom he separated in or around 1996. *See* ECF 135-1 at 19[1]; ECF 136-18; *infra* note 11. Clancy's children born to Ms. King hold a combined 40% interest in the estate.

---

[1] In the Memorandum Opinion, the Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the particular submission.

On August 25, 2017, Ms. Clancy, as surviving spouse of the Decedent, filed a declaratory judgment action in the Circuit Court for Baltimore City against defendants J.W. Thompson Webb ("Topper"), as personal representative of the Estate of Thomas L. Clancy, Jr. (the "Estate"), and three separate business entities formed by Clancy: Jack Ryan Enterprises, Ltd. ("JREL" or "JRE"); Jack Ryan Limited Partnership ("JRLP"); and Rubicon, Inc. ("Rubicon"). ECF 2 (the "Complaint").[2]  She sought, *inter alia*, to resolve issues as to ownership of various fictional characters created by Clancy. *Id.*  JREL and JRLP (collectively, the "JR Entities") filed a counterclaim.  ECF 9 (the "Counterclaim").

The JR Entities timely removed the case to this Court, pursuant to 28 U.S.C. §§ 1338 and 1454.  ECF 1 (Notice of Removal).  The Court has jurisdiction because some of the claims arise under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. (the "Act" or the "Copyright Act").  And, the Court may exercise supplemental jurisdiction over the remaining claims.  *See* 28 U.S.C. § 1367; *see also* ECF 34 (Order of February 5, 2018).

On February 22, 2019, Ms. Clancy filed an Amended Complaint (ECF 60), seeking a declaration of ownership of Clancy's "literary legacy," pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* ECF 139-1 at 10.  In particular, plaintiff seeks a declaration that the Estate is the owner of Jack Ryan (Count I); John Clark (Count II); and "The Campus characters" (Count V).  Ms. Clancy also seeks a declaration that the Estate owns the rights to the "JREL Books" (Count III) and the "JRLP Books" (Count IV), on the ground that they were not created as works made for hire within the meaning of 17 U.S.C. § 101, and were not validly assigned either to JREL or JRLP. In Counts III and IV, plaintiff also seeks a declaration that, to the extent the JREL Books and JRLP Books were

---

[2] As discussed, *infra*, both Webb and Rubicon are nominal parties in this case.

validly assigned to JREL or JRLP, the assignments are terminable by the majority of Clancy's heirs, pursuant to 17 U.S.C. § 203.

The JREL Books include *The Patriot Games* (1987); *The Cardinal of the Kremlin* (1988); *Clear and Present Danger* (1989); *The Sum of All Fears* (1991); and a co-authored book, *Red Storm Rising* (1986). The JRLP Books include *Without Remorse* (1993); *Debt of Honor* (1994); and *Executive Orders* (1996). I shall sometimes refer to the JREL Books and JRLP Books collectively as the "JR Books."

The JR Entities' ownership of other books, such as *The Hunt for Red October* (1984) ("*Hunt*"), is not in dispute. And, it was in *Hunt* that Jack Ryan made his debut.

The Counterclaim asserts three claims for declaratory relief. ECF 9. In particular, defendants seek a declaration that the JR Entities "have rights in the characters [including Jack Ryan] as introduced and/or further developed in the books to which they hold the registered United States Copyright" by "reason of the agreements entered into by" Clancy (Count I) and as a matter of federal copyright law (Count II). ECF 9 at 5-9. Thus, Counts I and II of the Counterclaim are essentially the converse of Counts I through IV of the Amended Complaint. In addition, in Count III, defendants seek a declaration that "the Termination Notice" dated March 4, 2016, executed by plaintiff to terminate the transfer of the copyright ownership of *The Hunt* to the United States Naval Institute ("USNI" or the "Institute"), is "overbroad and ineffective at least to the extent that it seeks to affect the 'copyright to the characters described in Hunt.'" *Id.* at 11.

The JR Entities have moved for summary judgment on all counts of plaintiff's Amended Complaint and the Counterclaim. ECF 135. The motion is supported by a memorandum of law (ECF 135-1) (collectively, the "JR Entities' Motion") and 62 exhibits (ECF 135-3 to ECF 135-

64), of which 29 were filed under seal.  ECF 136-1 to ECF 136-29 (sealed exhibits).  They contend that plaintiff's claims in the Amended Complaint are barred by the statute of limitations under the Copyright Act, 17 U.S.C. § 507(b).  ECF 135-1 at 29.  Further, they posit that they have ownership rights as to the JR Books and the characters, including John Clark, because they were works for hire or validly assigned to the JR Entities.  *Id.* at 31-45.  Moreover, they claim that they have ownership rights as to the Jack Ryan character as delineated in *Hunt*.  *Id.* at 45-55.  In addition, the JR Entities maintain that plaintiff's Termination Notice is overbroad and ineffective.  *Id.* at 56-58.

Ms. Clancy has filed a combined cross-motion for summary judgment with respect to Counts I through IV of the Amended Complaint and opposition to the JR Entities' Motion.  ECF 139.[3]  The motion is supported by a memorandum of law (ECF 139-1) (collectively, "Plaintiff's Motion") and 33 exhibits (ECF 139-3 to ECF 139-35), of which eleven were filed under seal.  ECF 140-1 to ECF 140-11 (sealed exhibits).

Plaintiff characterizes Clancy's Estate as "sprawling and complex," with several business entities that were created to "minimize taxes" and "to shield" Clancy from liability.  ECF 139-1 at 9.  However, she insists that these "tools" were not intended to deprive Clancy of his "lucrative literary enterprise."  *Id.*  In her view, Ms. King seeks "to relitigate her divorce and to score a larger share of the literary enterprise than was provided under the divorce settlement."  *Id.* at 10.

Ms. Clancy insists that her claims are not barred by limitations.  *Id.* at 23. Further, she claims that the Estate owns the Jack Ryan character as presented in *Hunt* because a character is a

---

[3] ECF 139 is titled only as a motion for summary judgment.  But, ECF 139-1 reflects that the submission is both a cross-motion for summary judgment and an opposition to the JR Entities' Motion.  Moreover, plaintiff asserts in the text that she is entitled to summary judgment with respect to the Counterclaim.  *See* ECF 139-1 at 11.

protected element of a copyright and it was never assigned to the JR Entities. *Id.* at 31-43. And, she asserts that the JR Books were not works for hire for JREL or JRLP, so the JR Books and the characters therein, including John Clark, remained Clancy's property at his death. *Id.* at 43-54. Finally, she contends that her Termination Notice is valid. *Id.* at 56-57.

The JR Entities filed a combined opposition to Plaintiff's Motion and a reply in support of their own motion. ECF 145. Plaintiff has replied (ECF 149) and she has submitted additional exhibits. ECF 149-2 to ECF 149-7; ECF 150 (sealed exhibit).

In addition, the JR Entities filed a "Motion For Leave to File a Five-Page Surreply" (ECF 153), along with the proposed surreply. ECF 153-1 (collectively, the "Motion for Surreply"). Plaintiff opposes the Motion for Surreply. ECF 154. Defendants did not reply, and the time to do so has expired. *See* Docket.

The motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion for Surreply (ECF 153). I shall also grant the JR Entities' Motion (ECF 135) in part and deny it in part. In particular, I shall grant the JR Entities' Motion as to claims that the JR Books, including the characters therein, were validly assigned to the JR Entities. Counts II, III, and IV of the Amended Complaint and Counts I and II of the Counterclaim all include multiple claims, including as to the assignment of the JR Books and the characters therein. Therefore, I shall grant the defense motion as to Counts II, III, and IV of the Amended Complaint and Counts I and II of the Counterclaim, but only as to the claims regarding assignment. I shall otherwise deny the JR Entities' Motion. I shall also deny Plaintiff's Motion. In addition, I shall dismiss Count V of the Amended Complaint.

## I.   Factual and Procedural Background[4]

### The Hunt For Red October

Tom Clancy, a best-selling author known for his espionage thrillers, began his prolific literary career with the publication of *The Hunt for Red October* in October 1984. ECF 135-5 (Certificate of Copyright Registration). In *Hunt*, Clancy introduced the Jack Ryan character, an analyst working for the Central Intelligence Agency. Jack Ryan has been featured prominently in many of Clancy's subsequent novels and the Hollywood adaptations of Clancy's work.[5]   Plaintiff characterizes Jack Ryan as a "sustainable" character and the "most iconic" one that Clancy created.  ECF 139-1 at 9.

In 1983, Clancy submitted *Hunt* to the USNI, the Navy's publishing office, for potential publication.   ECF 135-3 at 2.   USNI and Clancy entered into a publishing agreement in Annapolis, Maryland on November 21, 1983. ECF 136-1 (the "1983 USNI Agreement").   The 1983 USNI Agreement provided, in relevant part, *id.* at 2: "Author [Tom Clancy] grants and assigns to the Publisher [USNI] the exclusive worldwide rights and any subsisting copyright, including the right to secure copyrights and any renewals or extensions thereof, in connection with a certain unpublished work provisionally entitled THE HUNT FOR RED OCTOBER…."

---

[4] The parties submitted many of the same documents as exhibits to their motions. Unless the versions differed, the Court generally cites to the JR Entities' version of the exhibit.

The parties' factual submissions were extensive. In general, I have organized the facts by topic and then by chronology.

[5] Some of the novels involving Jack Ryan include *Patriot Games* (1987); *The Cardinal of the Kremlin* (1987); *Clear and Present Danger* (1989); *The Sum of All Fears* (1984); *Debt of Honor* (1994); *Executive Orders* (1996); *The Bear and the Dragon* (2000); *Red Rabbit* (2002); *The Teeth of the Tiger* (2003); *Dead or Alive* (2010); *Locked On* (2011); *Threat Vector* (2012); and *Command Authority*. Since Clancy's death, his Estate has published additional Jack Ryan novels: *Full Force and Effect* (2014); *Commander in Chief* (2015); *Power and Empire* (2017); and *Oath of Office* (2018). ECF 139-1 at 16 n.6.

Further, the 1983 USNI Agreement included, *id.* at 3: "The Author agrees that he will not, without the written permission of the publisher, publish or permit to be published any material based on, or derived from, or directly competitive with the Work [*i.e.*, *Hunt*], so long as this agreement shall remain in force."

Thereafter, on October 29, 1984, USNI received a certificate of copyright registration for *Hunt*. See ECF 135-5. The certificate identifies Clancy as the author and USNI as the copyright claimant. *Id.*

Because of *Hunt*'s success, production companies sought to license rights to *Hunt* to create movies and television series based on the novel and its characters. On May 7, 1985, USNI, as owner of the exclusive rights, entered into an agreement with "The Red October Company," a production company, to license the motion picture and television rights to *Hunt*. ECF 136-2 (Short Form Option/Purchase Agreement). In this agreement, USNI represented that it was "the sole author of the Property [*Hunt*]…as well as the sole and exclusive owner and proprietor throughout the world of the Property and any and all rights therein…" *Id.* at 6. The same rights were subsequently assigned to Paramount Pictures Corporation ("Paramount") on July 31, 1986, after Paramount acquired all the rights of the "October Company." ECF 136-10.

### JREL

JREL, a Maryland corporation, was formed on May 28, 1985. ECF 135-8 (Articles of Incorporation). According to the Articles of Incorporation for JREL, the stated purpose of JREL was to "write, publish and sell books." *Id.* at 2. At the time, Clancy was married to King. As noted, together they had four children (the "Older Children").

Clancy was President of JREL and King was Vice-President, Treasurer, and Secretary. ECF 136-18 at 11. King, Clancy, and one daughter were the board members of the company. *Id.* at 3; ECF 136-18 at 11. Clancy had a 40% interest in JREL; King had a 40% interest; and the

Older Children each held a 5% interest.  ECF 136-18 at 11; ECF 139-31 (King Deposition Transcript, Dec. 11, 2018) at 21, Tr. 81:4-6; ECF 139-26 at 2 n.1. Clancy's 40% interest is now owned by his Estate. ECF 60, ¶ 4; ECF 135-1 at 12 n.3.

According to King, money would come to JREL through checks or direct deposits for Clancy's work, and then about "once or twice a year" King would "get the account down to just what would barely keep it open with distributions" and transfer the money to the joint bank account she shared with Clancy.  ECF 139-31 at 26-28, Tr. 100:11-101:8, 102:15-103:4, 109:5-20.  In particular, "[i]f the account got over a hundred thousand [dollars]," King would "bring it down" and transfer the money to their joint bank account.  *Id.* at 26, Tr. 101:12-13.

The office for JREL was located "wherever" King and Clancy were living at the time. *Id.* at 27, Tr. 103:16-20. The only assets of the corporation were the computers that Clancy used to write his books. *Id.* at 28, 106:11-18.  Other than Clancy, the corporation's two employees included a secretary for Clancy and an accountant. *Id.* at 29, 108:11-18.  King also noted that JREL did not provide benefits for its employees. *Id.* at 29, 111:10-12.

On August 29, 1985, shortly after JREL was formed, JREL entered into an agreement with the William Morris Agency, Inc. ("WMA"), a talent and literary agency.  ECF 136-4 (Letter from Clancy confirming the terms of the agreement, dated Aug. 29, 1985). The letter provided that WMA would be the "exclusive agent and representative throughout the world" for "all literary works and properties…created by [Tom Clancy] or owned and/or controlled by [Clancy] or any firm or corporation owned and/or controlled by [Clancy]."  *Id.* at 2. Clancy signed this agreement on behalf of himself and JREL.  *Id.* at 4.

Thereafter, JREL entered into a series of publishing agreements with G.P. Putnam's Sons, an imprint of Penguin Publishing Group, and The Berkley Publishing Group (collectively,

"Putnam"), to publish novels written by Clancy.  *See* ECF 136-5 (*Red Storm Rising*, 1985); ECF 136-6 (*Patriot Games* and *Cardinal of the Kremlin*, 1985*)*; ECF 136-7 (*Clear and Present Danger*, 1987); ECF 136-11 (*The Sum of All Fears*, 1990).[6]  These agreements provided that JREL was the "Author" of the books at issue and Putnam was the "Publisher." *Id.* In addition, Clancy signed most of the agreements on behalf of JREL, as "President of JREL."  ECF 136-5 at 13; ECF 136-6 at 14.[7]  And, each of the agreements provided: "The Author [*i.e.*, JREL] hereby represents and warrants to the Publisher…that Tom Clancy is the sole author of the Work; that the Work is or will be Tom Clancy's next book length work…that the Author is the sole and exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned pledged or otherwise encumbered the same…." ECF 136-5 at 3; ECF 136-6 at 3; ECF 136-7 at 3; ECF 136-11 at 3.

Further, in an attachment to each of the agreements, Clancy executed a letter addressed to Putnam that stated, ECF 136-5 at 15; ECF 136-6 at 12; ECF 136-7 at 13; ECF 136-11 at 15 ("Guaranty Letter" or "Guaranty"):

> I refer to the proposed agreement…("Agreement")…between Jack Ryan Enterprises, Ltd. described in the Agreement and herein as the "Author" and G.P. Putnam's Sons described in the Agreement and herein as "the Publisher", for the publication of a certain Work….
>
> I have an interest in the Author and in having the Work published by the Publisher, and as an inducement to the Publisher to enter into the Agreement, I hereby unconditionally guarantee, promise and agree with the Publisher, its successors and assigns that the Author will, in all respects, faithfully perform…. I

---

[6] Clancy wrote *Red Storm Rising* with a co-author, Larry Bond.  Therefore, the agreement for *Red Storm Rising* was executed between JREL, Larry Bond, and Putnam. *See* ECF 136-5.

[7] The agreements for *Clear and Present Danger* (ECF 136-7) and *The Sum of All Fears* (ECF 136-11) did not identify Clancy as "President of JREL" under his signature.  Nor did the *Clear and Present Danger* agreement indicate whether Clancy was signing on behalf of the entity. ECF 136-7 at 12.  But, the signature page of the agreement for *The Sum of All Fears* indicates that it was signed by Clancy on behalf of JREL. ECF 136-11 at 12.

also unconditionally guarantee that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement.

Unlike the agreements, these letters were signed by Clancy in his personal capacity. *Id.*

The certificate of copyright registration for each book identifies JREL as the author and "copyright claimant" and the "employer-for-hire of Tom Clancy" or that it was a "work made for hire." ECF 135-12 (*Red Storm Rising*, 1986); ECF 135-14 at 3 (*Patriot Games*, 1987); ECF 135-15 at 4 (*Cardinal of the Kremlin*, 1988); ECF 135-17 at 3 (*Clear and Present Danger*, 1989); ECF 135-27 at 3 (*The Sum of All Fears*, 1991).

In addition, on May 21, 1990, JREL and Paramount entered into an agreement that gave Paramount exclusive worldwide motion picture and television rights to *Clear and Present Danger* and *Patriot Games*.  ECF 136-12. This agreement represented that JREL was "sole and exclusive owner of and proprietor throughout the world of [those works] and any and all rights therein."  *Id.* at 9.  Further, JREL represented that it "ha[d] not in any way assigned or licensed to any person or entity… any of the rights in and to the Property…including…any of the characters therein contained."  *Id.* at 10.  JREL reserved certain rights to itself, including the publishing rights to subsequently published literary works "using the character Jack Ryan (or any other principal character in the novel <u>Clear and Present Danger</u> and/or <u>Patriot Games</u>)[.]" *Id.* at 21; *see also* ECF 136-13. Clancy signed this agreement twice: once on behalf of JREL and a second time in his individual capacity, to "confirm[] all grants and representations made by" JREL in the agreement. *Id.* at 15.

**Clancy's Dispute with USNI**

In late 1987, an issue arose between Clancy and USNI regarding ownership of the Jack Ryan character.  In particular, Clancy was trying to negotiate with Viacom for a television series

based on *Patriot Games*, but questions arose as to whether such a production would interfere with the rights granted to Paramount in its agreement with USNI. ECF 135-1 at 14; ECF 139-1 at 17.  Clancy wrote to USNI on October 27, 1987, about "an unexpected problem" based on "some old contracts."  ECF 135-18 at 2. He acknowledged that, "as the contracts [were] written," he could not "negotiate a dramatic contract for subsequent Jack Ryan . . . books."  *Id.*

Thereafter, by letter of December 3, 1987, Clancy asked USNI to transfer the copyright registration for *Hunt* back to him.  ECF 135-19. He claimed that this was necessary in order for him to move forward with his negotiations with Viacom.

On January 7, 1988, USNI's counsel, Fulton Brylawski, wrote a letter to Robert Youdelman, Clancy's counsel, in response to questions about ownership rights that Clancy had raised as a result of his ongoing negotiations with Viacom.  ECF 135-20.[8]  Upon review of the relevant agreements concerning *Hunt*, Brylawski concluded that "the Institute acquired a grant and assignment of 'the exclusive worldwide rights and any subsisting copyright'… in the book THE HUNT FOR RED OCTOBER and all that Clancy reserved or retained in the book was the right to receive royalties."  *Id.* at 2.  Moreover, Brylawski noted that "the book contains a number of components or elements including the storyline, setting, characters, etc. All of these are important literary elements of the book and ownership of all of these elements including the composite whole of the book itself are the exclusive property of the Institute under [the 1983 USNI Agreement]."  *Id.*

Thereafter, on January 29, 1988, Youdelman provided Clancy with his analysis of the 1983 USNI Agreement.  ECF 135-21 (Letter from Youdelman to Clancy, dated Jan. 29, 1988).

---

[8] Youdelman, together with Frank R. Curtis, represented Clancy for intellectual property matters until Clancy's death. Mr. Youdelman passed away on December 23, 2017. NY TIMES (Dec. 25, 2017), https://www.legacy.com/obituaries/nytimes/obituary.aspx?n=robert-youdelman&pid=187626496&fhid=2248.

Youdelman concluded that the USNI Agreement constituted "a radical departure from industry practice for a first novel[.]"  *Id.* at 2.  In his view, USNI "acquired the copyright in [*Hunt*]," which gave it a continuing "interest in new books using the same characters."  *Id.*  But, "[t]he author of a novel usually retains the copyrights….The publisher customarily has no interest in new books using the same characters." *Id.*  He also noted that USNI had acquired "world-wide publishing rights" and "all motion picture, television and other rights."  *Id.*

Further, Youdelman stated that because the "contract entitles the Naval Institute Press to 50% of all you make from any book in which 'Jack Ryan' or other characters from <u>Red October</u> appear, it is our view that this alone departs so far from industry practice as to make the entire contract unconscionable."  *Id.* at 3.  He advised that "a satisfactory resolution" with USNI would permit USNI to retain "world-wide publishing rights in <u>Red October</u>" with "[a]ll other rights and the copyright" returned to Clancy.  *Id.*

Thereafter, in 1988, Clancy, through counsel, filed for arbitration with the American Arbitration Association, seeking a finding that Clancy, not USNI, owned the Jack Ryan character.  *See* ECF 140-1 (Claimant's Memorandum for the Mediator, filed September 27, 1988).  He argued that the history of the relationship between USNI and Clancy showed that Clancy never relinquished his ownership of Jack Ryan.  *Id.* at 8-18.  Clancy also asserted that he first developed the Jack Ryan character in *Patriot Games*, rather than in *Hunt*.  *Id.* at 17.

The dispute with Clancy and a separate dispute with another author were settled through mediation, embodied in a handwritten document titled "Points of Agreement," dated September 28, 1988, as well as a supplement dated December 15, 1988. ECF 136-8; ECF 136-9

(collectively, the "Settlement Agreement").[9]   According to the Settlement Agreement, Clancy

agreed to pay USNI $125,000 and, in exchange, USNI agreed to reassign the copyright in *Hunt*

to Clancy. ECF 136-8 at 9.  The Settlement Agreement provided, in part, *id.*:

> The Institute will reassign the copyrights in THE HUNT FOR RED OCTOBER
> and THE FLIGHT OF THE INTRUDER including without limitation all rights in
> and to the books, to Tom Clancy and Stephen Coonts, respectively, or their
> respective designees, exclusive of book publishing rights. Without limiting the
> foregoing, the parties acknowledge that all rights in and to the characters are the
> sole property of the authors. The use of the characters in connection with RED
> OCTOBER is subject to the other terms of this agreement.

Further, in the supplement of December 15, 1988 (ECF 136-9), the parties agreed that

"the settlement amount of $125,000, with respect to <u>The Hunt For Red October</u>, shall be paid to

the Press by Jack Ryan Enterprises, Ltd."  *Id.* at 2.  And, it noted: "All new printings of <u>The Hunt</u>

<u>For Red October</u> shall bear copyright notice in the name of Jack Ryan Enterprises, Ltd." *Id.* at 3.

Thereafter, USNI assigned the rights in *Hunt* to JREL through a "Transfer of Ownership

of Copyright and Assignment," executed between USNI and JREL on December 19, 1988.  ECF

135-24 ("Transfer Agreement").  The Transfer Agreement provided, *id.* at 2:

> For and in consideration of the sum of Ten ($10.00) Dollars and other
> good and valuable consideration paid to The United States Naval Institute
> (hereinafter referred to as "Assignor") by Jack Ryan Enterprises, Ltd. (hereinafter
> referred to as "Assignee") receipt of which is hereby duly acknowledged,
> Assignor [*i.e.*, USNI]  hereby grants, sells, assigns, transfers and sets over to
> Assignee [*i.e.*, JREL], its successors and assigns, absolutely and forever:
>
> > (1) The exclusive worldwide rights of every kind and nature (now or
> > hereafter known), any subsisting copyright, (including the right to
> > secure copyright and any renewals or extensions thereof); and
>
> > (2) Except with respect to "book publishing rights" as defined below, all
> > agreements with third parties authorizing the exercise of any rights;

---

[9] The USNI Settlement Agreement also resolved a dispute between USNI and Stephen
Coonts, another author who was represented by Youdelman at the time. ECF 136-8 at 2. Coonts'
book was called *The Flight of the Intruder*.

in and to the work called <u>The Hunt For Red October</u>[.]

The Transfer Agreement also provided that USNI's assignment was "subject, in all events, to the Assignor's continuing exclusive license to exercise and authorize the exercise of book publishing rights in the Work [*i.e.*, *Hunt*]… and the Assignor's continuing right to receive its contractual share of income from the exercise of non-book publishing rights in the Work [*i.e.*, *Hunt*], in accordance with the terms of the Agreements between Assignor and Thomas L. Clancy, Jr. dated November 21, 1983 and September 28, 1988." *Id.*

After the transfer, JREL and Paramount entered an agreement dated May 2, 1989, clarifying the ownership rights to the motion picture, television, and literary rights in *Hunt*. ECF 136-10. The letter agreement, which Clancy signed on behalf of JREL, confirmed that USNI had assigned its interest in the 1985 agreement with Red October Company to JREL, and the Red October Company assigned its equivalent interest to Paramount. *Id.* at 2. An attachment to the agreement, titled "Reserved Rights," set forth the rights "reserved to Owner [*i.e.*, JREL] for Owner's use and disposition[.]" *Id.* at 5. Notably, the "Reserved Rights" included "[a]ll literary property…using the character 'Jack Ryan'(or any other principal character in <u>The Hunt For Red October</u>)…." *Id.*

JREL subsequently entered into other contracts for novels and movies featuring Jack Ryan. For example, on April 30, 1990, JREL and Putnam entered into a contract for the novel, *The Sum of All Fears*. *See* ECF 136-1.[10] The work featured Jack Ryan, John Clark, and Ding Chavez. JREL was identified as the author and owner of the work made for hire in the certificate of copyright registration for the book. *See* ECF 135-27 at 3. And, on May 21, 1990, JREL and Paramount entered into an agreement that gave Paramount exclusive worldwide motion picture

---

[10] The book initially had a different title.

and television rights to *Clear and Present Danger* as well as *Patriot Games*. ECF 136-12.

## JRLP

Clancy formed JRLP, a Maryland limited partnership, on February 26, 1992. ECF 135-30 ("JRLP Partnership Agreement"). According to the JRLP Partnership Agreement, the purpose of the partnership was "to write, publish and sell books" and "also to do all things necessary, convenient or incidental to the achievement of the foregoing." *Id.* at 10. Both Clancy and King signed the agreement. *Id.* at 34. And, the agreement represented that Clancy and King each held a 1% general partner interest and a 49% limited partner interest in the partnership. *Id.* at 35; *see* ECF 136-18 at 13. Clancy's 50% interest is now owned by the Estate. ECF 60, ¶ 5; ECF 135-1 at 18 n.5.

King testified that the office location of JRLP was always "wherever" Clancy and King were living at the time. ECF 139-31 at 32, Tr. 122:15-17. According to the parties' marital Separation Agreement (ECF 136-18), discussed *infra*, both Clancy and King were to "remain employed by JRLP at an annual salary of $25,000, or such other equal amount as may be agreed by the parties." *Id.* at 14.

Soon after JRLP was formed, on July 27, 1992, JRLP entered into a publishing contract with Putnam for the novel titled "WITHOUT REMORSE." ECF 136-14. *Without Remorse* is well known for providing the back story to Clancy's character, John Clark, who appears in *Patriot Games*, *Clear and Present Danger*, *Cardinal of the Kremlin*, and *The Sum of All Fears*. ECF 139-1 at 18-19.

Like the agreements between JREL and Putnam, the contract identified JRLP as the author and exclusive owner of all rights in the work. *Id.* at 3. And, it was signed by Clancy on behalf of JRLP. *Id.* at 3, 11. The agreement also included an attached letter with the same guarantees that Clancy had previously provided in the Guaranty Letters attached to the

agreements with JREL, stating that he acknowledged that the work was made for hire and that JRLP was the owner of the copyright for the work. *Id.* at 15.

JRLP entered into another publishing agreement with Putnam on October 5, 1993, for the publication of two additional thriller novels.  ECF 136-15.  The agreement provided that one of the works, tentatively titled "DEBT OF HONOR," "shall be a new thriller featuring Jack Ryan," and the other "shall be a new thriller featuring John Clark."  *Id.* The second book was ultimately called *Executive Orders*.

This agreement contained the same language as the 1992 agreement between JRLP and Putnam, including a Guaranty Letter.  *See id.* at 17.  Moreover, the certificate of copyright registration for all three books identified JRLP as the copyright claimant and the employer for hire.  *See* ECF 135-33 (*Without Remorse*, 1993); ECF 135-34 (*Debt of Honor*, 1994); ECF 135-35 (*Executive Orders*, 1996).

### Clancy's Employment Agreements

In 1992 and then in 1994, Clancy entered into employment agreements with both JREL and JRLP. ECF 135-61 (JREL Employment Agreement); ECF 135-62 (JRLP Employment Agreement); ECF 139-34 (Second JREL Employment Agreement). Clancy's initial agreement with JREL, executed on February 4, 1992, provided: "Employer hereby agrees to employ Employee as President of Employer, subject to the general direction, approval and control of the Board of Directors and as a writer of its books."  ECF 135-61 at 2.  Further, the agreement stated: "Employer and Employee acknowledge and agree that the relationship between them under this Agreement is that of 'employer-employee' and that this Agreement shall be so construed."  *Id.* at 8.

Soon after, on February 26, 1992, Clancy executed the JRLP Employment Agreement. *See* ECF 135-62. He signed as "employee" and King signed on behalf of the "employer."  *Id.* at

5. Under the agreement, Clancy was the CEO of JRLP. *Id.* at 2. Further, the "Duties" section stated: "It is understood and agreed that Employee will faithfully and diligently serve Employer to the best of his ability in his position as Chief Executive Officer, with the understanding that one of Employee's principal duties will be to write books for Employer…." *Id.* at 3.

Moreover, the JRLP Agreement provided: "In consideration of the receipt of compensation as provided hereunder, Employee hereby assigns and transfers to Employer his entire right, title and interest in and to any and all books written by Employee either solely or jointly with others during the course of his employment with Employer." *Id.* at 3.

Clancy executed the Second JREL Employment Agreement on January 1, 1994. ECF 139-34. It provided that Clancy would be the Chief Executive Officer ("CEO") of JREL. *Id.* at 1. In addition, the agreement included the following provision on the assignment of rights: "In consideration of the receipt of compensation as provided hereunder, Employee hereby continues to assign and transfer to Employer his entire right, title and interest in and to any books written by Employee either solely or jointly with others pursuant to any third party contract or agreement of Employer." *Id.* at 2.

King explained that, for both JREL and JRLP, Clancy would share his books with her upon their completion. ECF 139-31 at 32, Tr. 124:11-16. However, she was not involved in decisions about the books, the characters, or the storylines. *Id.*, Tr. 124:17-125:5. Nor did she set deadlines for Clancy to finish a book by a certain date. *Id.* at 32, Tr. 125:6-9.

### Rubicon

Clancy formed Rubicon, a Maryland corporation, on or about November 15, 1995, after he separated from King. *See* ECF 135-36 (Articles of Incorporation); ECF 135-1 at 19. In

contrast with JREL and JRLP, Rubicon was owned entirely by Clancy. *Id.*[11]  The parties agree that Rubicon is now an asset of Clancy's Estate. *Id.*

On July 31, 1997, Clancy, in his personal capacity, contracted with Putnam to write two more "thrillers." ECF 136-16 (1997 Putnam Contract).  The next day, Clancy executed a "Revocable Assignment and Qualified Assumption" agreement, assigning to Rubicon his rights and obligations under the 1997 Putnam Contract.  ECF 136-17.  *Rainbow Six*, which features John Clark, was the first novel published under the 1997 Putnam Contract. ECF 136-19.

<h3 align="center">The Separation Agreement and the Divorce</h3>

Clancy and King "voluntarily separated" on November 1, 1996, and executed a separation agreement governing the division of their property on December 28, 1998.  ECF 136-18 (the "Separation Agreement") at 4.  Notably, the terms of the Separation Agreement are "irrevocably binding on the parties, their respective heirs, personal representatives and assigns[.]" *Id.* ¶ 34.

The Separation Agreement included sections on the ownership and control of JREL and JRLP.  It provided, in part: "Husband [*i.e.*, Clancy], Wife [*i.e.*, King] and Michelle Clancy [one of the Older Children] are the only directors of JREL. Husband is the President, and Wife is the Vice President, Treasurer and Secretary of JREL." *Id.* ¶ 13(A).  Further, the Separation Agreement stated that Clancy, as "president of JREL," would "have the usual powers of the chief executive of a personal service corporation, including the power to negotiate and sign on behalf of JREL royalty and other contracts…" *Id.* And, with respect to JRLP, Clancy would "act as the

---

[11]  Under Maryland law, property acquired during a marriage is generally "marital property," regardless of title.  *See* Md. Code (2019 Repl. Vol.), § 8-201(e) of the Family Law Article.  According to defendants, King and Clancy separated prior to the formation of Rubicon in November 1995.  ECF 135-1 at 19.  However, the Separation Agreement (ECF 136-18) specifies that they separated on November 1, 1996.  *Id.* at 4.

managing partner of JRLP" and thus would "have the usual powers of a managing partner to negotiate and sign on behalf of the Partnership royalty and other contracts…." *Id.* ¶ 14(A).

The Separation Agreement also provided, *id.* ¶ 15(B):

> In the event that Husband or an entity affiliated with him (other than the JRLP or JREL) signs a contract with any third party relating to the story line, in whole or in part (and characters in connection therewith) from works owned by JRLP or JREL (other than incidental use, such as flashbacks), Husband shall cause the contract to be assigned to JRLP or JREL as the case may be. Otherwise, Husband shall be free to use the characters in the works owned by the JRLP or JREL in any sequel to any of those works or in any other future work that Husband may create without the approval of or obligation to Wife.

*See also* ECF 135-41 (JREL "Unanimous Written Consent of Directors," dated Dec. 28, 1998); ECF 135-42 ("Consent of General and Limited Partnership JRLP," dated Dec. 29, 1998).

Further, the Separation Agreement included two lists of literary works, attached as Exhibits A and B to the Separation Agreement, listing the "assets" of JREL and JRLP, respectively. *Id.* at 31-32. According to Exhibit A, the assets of JREL include *The Hunt for Red October*; *Red Storm Rising* ("of which Larry Bond owns 50%"); *Patriot Games*; *The Cardinal of the Kremlin*; *Clear and Present Danger*; *The Sum of All Fears*; *The Tom Clancy Companion*; and *Submarine.  Id.* at 31.  And, according to Exhibit B, JRLP's assets include *Without Remorse*; *Debt of Honor*; *Executive Orders*; and *Rainbow Six* ("to be assigned"), among others.  *Id.* at 32.

In addition to the note about the assignment of *Rainbow Six* in the Exhibit B assets list, a separate provision of the Separation Agreement explicitly assigned *Rainbow Six* from Clancy to JRLP.  *Id.* ¶ 14(B).  In addition, Clancy executed a separate assignment agreement for *Rainbow Six* to JLRP on December 1, 1998 (ECF 140-11), assigning "all right, title and interest in and to the novel Rainbow Six" to JRLP.  *Id.* at 2.  That agreement also "partially revoke[d]" the

assignment of *Rainbow Six* to Rubicon. *Id.*[12]

Also on December 28, 1998, the directors of JREL, Clancy, King, and one of the Older Children, executed "Jack Ryan Enterprises, Ltd. Unanimous Written Consent of Directors."  *See* ECF 135-41.  In addition, Clancy and King executed a "Consent of General and Limited Partners of JRLP."  ECF 135-42. Consistent with the Separation Agreement, these agreements authorized Clancy "to use the characters in the works owned by [JREL or JRLP] . . . without the approval of [JREL or JRLP]" or King.  ECF 135-41 at 4; ECF 135-42 at 4.

The divorce decree of January 6, 1999, incorporated the Separation Agreement.  ECF 139-1 at 21.  Clancy married plaintiff about six months after his divorce from King.  ECF 135-43.[13]  As noted, together they had one child.

On July 7, 1999 and then on February 15, 2001, JRLP executed a "Memorandum of Agreement" with Paramount for the motion picture rights for *Rainbow Six* and *Without Remorse*, respectively. ECF 136-20; ECF 136-22. On each date, JREL and Paramount executed an "Amendment" to their previous agreement regarding *Clear and Present Danger* (ECF 136-12). *See* ECF 136-21; ECF 136-23. Because *Rainbow Six* and *Without Remorse* feature the same characters—John Clark and Ding Chavez—as *Clear and Present Danger*, the amendments clarified that Paramount had the right to use those characters in its productions of *Rainbow Six* and *Without Remorse*, notwithstanding any language to the contrary in prior agreements. ECF 136-21 at 2; ECF 136-23 at 2. The amendments also stated: "JRE[L] and Clancy shall continue

---

[12] According to plaintiff, the Separation Agreement "erroneously attributed ownership of certain works" to the JR Entities, but "it correctly acknowledges Clancy's retention of ownership of the Jack Ryan character."  ECF 139-1 at 21.

[13] At the time, Ms. Clancy was 32 years old and Clancy was 52 years of age.  *See* ECF 135-43.

to have the exclusive right to use the characters 'Clark' and 'Chavez' for any and all purposes." *Id.* Clancy signed these amendments on behalf of JREL.

After Clancy's divorce from King, he continued to publish novels, including *The Bear and the Dragon* (2000), *Red Rabbit* (2002), and *The Teeth of the Tiger* (2003), featuring Jack Ryan and "The Campus" characters, under contracts executed by Rubicon.  ECF 135-1 at 21; ECF 149 at 13-14.  "The Campus" characters include Dominic Caruso, Brian Caruso, and Jack Ryan, Jr. ECF 60, ¶ 84. Clancy published these books without the agreement of the JR Entities. *Id.*  And, no proceeds were paid to the JR entities. ECF 135-1 at 21.

In 2008, Paramount announced that it was developing a new movie, *Jack Ryan: Shadow Recruit,* featuring Jack Ryan, which would not be based on any of Clancy's previous novels. ECF 136-26 at 2. Based on emails between Clancy and his representatives, news of this film caused some concern over whether Paramount had a right independently to develop the Jack Ryan character. *Id.* In particular, in an email of January 26, 2008, Michael Ovitz, Clancy's agent, wrote to Clancy, *id.* at 2 (emphasis in original): "The problem with all of this is that you have no legal way to stop them from using your Jack Ryan character, because long before I met you, prior representatives gave away the rights to use JACK RYAN to Paramount, at their discretion…without your permission OR involvement." Further, Ovitz explained that "there is no legal action we can take…." *Id.*

Thereafter, Clancy's representatives tried to resolve the dispute with Paramount by "reshap[ing]…the arrangements with Paramount covering further use of the 'Jack Ryan' character." ECF 136-25. In an email of June 19, 2008, discussing this "reshap[ing]", Youdelman reminded Ovitz that the "'Jack Ryan' character is owned by Jack Ryan Enterprises Ltd, an entity in which Wanda [King] and the children have an interest[.]" *Id.* at 2.

Paramount eventually paid to use the Jack Ryan character in the new movie. ECF 136-26. In an email from Youdelman on June 12, 2013, discussing this transaction, Youdelman explained, *id.* at 2: "Note…that while the Memorandum provides for payment to Rubicon for the studio sequels, the money will go to the appropriate entity, as was the case with the picture to be released in December where the payment received by Rubicon was paid over to Jack Ryan Enterprises." According to defendants, Rubicon ultimately transferred the payment from Paramount to JREL. ECF 135-1 at 22.

### Clancy's Death and Posthumous Work

Clancy passed away on October 1, 2013, at the age of 66.  *See* Julie Bosman, *Tom Clancy, Best-Selling Master of Military Thrillers, Dies at 66*, N.Y. TIMES (Oct. 2, 2013), https://www.nytimes.com/2013/10/03/books/tom-clancy-best-selling-novelist-of-military-thrillers-dies-at-66.html.  After Clancy's death, Putnam continued to devise new proposals for the publication of certain post-death books authored by a contract-writer. *See, e.g.*, ECF 135-53; ECF 140-8.

On November 26, 2013, Youdelman and Curtis sent a memorandum to Webb and Sheila Sachs,[14] the attorney representing King and the Older Children, to explain a proposal that they had received from Putnam to publish two additional "Tom Clancy" novels in 2014. ECF 135-53. The memo explained that Putnam wanted to publish one novel focusing on the Jack Ryan character and the other featuring "The Campus" characters. *Id.* at. 2. Further, it advised that, "[i]n connection with any such publishing agreement, there also needs to be an agreement on the division of proceeds among the Clancy entities."  *Id.* at 4.  To that end, they proposed a division based on their understanding of the ownership interests of each Clancy entity. *Id.*  But, they

---

[14] Ms. Sachs is now deceased.

asserted that any agreement on the division is up to "[Webb] (on behalf of Rubicon and the

Estate) and Wanda [King] (on behalf of JREL and JRLP)." *Id.*

Youdelman and Curtis explained, *id.*:

> As we see it, there are four entities involved and what each can contribute to future books is as follows:

> > Jack Ryan Enterprises Ltd. can contribute material from Tom's first six novels books [sic], of which five involve Jack Ryan (the exception is <u>Red Storm Rising</u>).  Thus, JREL can contribute the character of Jack Ryan as created and developed in those books, plus a number of secondary characters and other elements, including the first appearances (in secondary roles) of John Clark and Ding Chavez.

> > Jack Ryan Limited Partnership can contribute material from Tom's next four novels, which include the emergence of Clark and Chavez as major characters, as well as the further development of Ryan and other characters and elements.

> > Rubicon, Inc. can contribute material from Tom's last eight novels, of which seven involve Jack Ryan (the exception of Against All Enemies). These books introduced The Campus, whose primary participants are two characters from the earlier books (John Clark and Ding Chavez) and several new characters, including Dominic Caruso, Gerald Hendley, Jack Ryan Jr., Sam Driscoll and Gavin Biery. The books also involve some further development of the earlier characters (Ryan Sr., Clark and Chavez) and other elements.

> > The Clancy Estate can authorize the use of Tom's name on new books.

> The relative importance of each of these elements is obviously somewhat subjective and not subject to some precise mathematical formula. As we see it, the most important (indeed, indispensable) elements for each book are the main character (Ryan or Caruso) and the use of Tom's name, though the other characters and elements from Tom's past books are also important.

And, they said: "A decision on the division of the proceeds from each book requires an

agreement among the entities in question."  *Id*. at 5.

Webb wrote to Youdelman and Curtis on February 19, 2014, with a copy to plaintiff,

explaining the determination of the allocation of proceeds among the Clancy entities for the two

books discussed in the memo of November 26, 2013. *See* ECF 135-54 ("2014 Letter").  Webb

stated, *id.* at 2:

> Sheila [Sachs] and I are in agreement that The Campus book would be viewed as
> principally a Rubicon, Inc. property and the Jack Ryan book would be viewed
> principally as a JREL property. This is largely based on your advice that the Jack
> Ryan character is owned by JREL and Dominic Caruso and other Campus
> characters are owned by Rubicon.  As a result, Sheila and I propose that proceeds
> from The Campus book would be divided as follows: one-third to Rubicon, Inc.
> for the characters, one-third to Tom's estate for use of his name, and the
> remaining third to be divided equally among JREL, JRLP, Rubicon and Tom's
> estate. Proceeds from the Jack Ryan book would be divided as follows: one-third
> to JREL, one-third to Tom's estate and one-third to be divided equally among
> JREL, JRLP, Rubicon and Tom's estate.

Further, Webb stated: "By agreeing to the arrangement for proceeds of these two books, we do

not intend to bind any of the current parties nor future owners of Tom's name or any of the

business entities." *Id.*

As discussed below, on April 29, 2014, plaintiff advised Webb that she had retained her

own counsel.  *See* ECF 139-22.  And, on May 8, 2014, Webb sent various documents to the new

attorney.  ECF 129-23.

Subsequently, on May 28, 2014, plaintiff advised that she approved of the publication of

the first book in the proposal from Putnam. ECF 135-57. This novel, titled *Full Force and Effect,*

featured the Jack Ryan character.  ECF 139-1 at 22.

Thereafter, in March 2015, the Estate, Rubicon, JREL, and JRLP, collectively as the

"Author," executed a four-book deal with Putnam as the "Publisher." ECF 140-8.  As in 2014,

the parties agreed to the following allocation of revenues for the two "Jack Ryan Novels"

included in the deal: 1/3 to JREL, 1/3 to the Estate, and 1/3 divided equally among JREL, JRLP,

Rubicon, and the Estate. *Id.* at 2-3.

**Plaintiff's Investigation and Notice of Termination**

On April 29, 2014, plaintiff retained Lansing Palmer of New York and Norman Smith of Baltimore "to represent her in connection with the estate of her late husband."  ECF 139-22 (Letter from Lansing Palmer to Webb, dated Apr. 29, 2014).  And, on May 8, 2014, Webb sent Palmer a number of documents relating to the latest book deals and corporate governance documents for JRLP and JREL.  ECF 139-23.

Following review of the documents, plaintiff's lawyers asked Webb to explain the basis for his determination regarding the ownership of Clancy's characters. ECF 139-25.  And, in an email of November 24, 2014, George Reynolds, one of Webb's lawyers, wrote: "I have addressed your question of last evening with Topper and he has confirmed that Robert Youdelman is the one who determined that the Jack Ryan character is owned by JREL. His basis for this determination is that a character belongs to the author who first creates the character in a published work of intellectual property, which in this case was Tom in Hunt for Red October. Tom transferred all his rights regarding [*Hunt*] to JREL sometime ago, making it the owner of the Ryan character."  *Id.*

Thereafter, on December 2, 2014, Palmer sent a letter to Reynolds requesting documentation to support Youdelman's ownership determination. ECF 139-26. Palmer stated: "While we believe that the Estate, through its ownership in Rubicon, may be entitled to all proceeds from the current proposed book deals, and that the Estate, through Rubicon, also may have been entitled to the entire proceeds from the two book deal described in Topper's February 19, 2014 letter, we invite you to send us any evidence to the contrary."  *Id.* at 3; *see also* ECF 139-27 (second letter from Palmer to Webb's attorneys requesting documents, dated Dec. 30, 2014).

In response, on January 8, 2015, Robert Brennan, one of Webb's attorneys, wrote to Smith, enclosing a disk containing additional documents pertaining to copyright ownership concerning Clancy's work.  ECF 139-28 ("2015 Disclosure").  Of import here, the documents included the 1983 USNI Agreement, the USNI Settlement Agreement, and the Transfer Agreement.  *Id.*

On March 4, 2016, plaintiff served notice on interested parties, pursuant to 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10, to terminate and recapture the rights to *Hunt*, including all character rights.  *See* ECF 135-58 (the "Termination Notice").  The Termination Notice was effective as of October 9, 2019.  *Id.* ¶ 4.  It stated, *id.* ¶ 3:

> This Notice of Termination applies to the literary work entitled "The Hunt for Red October," authored by Tom Clancy and published under the Transfer on October 3, 1984 (the "Work"), and all rights under copyright therein, including, but not limited to, all rights under U.S. Copyright Reg. No. TX0001475353, and, to the extent such rights were conveyed under the transfer, all rights under copyright to the characters described in the Work.

### The Estate and Related Litigation

The "Last Will Of Thomas L. Clancy, Jr." (the "Will") was admitted to probate on October 10, 2013, in the Orphans' Court for Baltimore City.  ECF 135-51. The Will, executed in June 2007, *id.* at 22, left Clancy's personal and real property to Ms. Clancy and created three residuary trusts: a marital trust for the benefit of Ms. Clancy; a family trust for the benefit of Ms. Clancy and their daughter; and a trust for the Older Children. *See Michelle Bandy et al. v. Alexandra Clancy*, 449 Md. 577, 589, 144 A.3d 802, 810 (2016).[15]

In connection with the valuation of the Estate, Webb submitted an inventory of the Estate's assets to the Orphans' Court on January 10, 2014.  ECF 135-52. The inventory included all of Clancy's property assets at his death, but did not include any information as to his

---

[15] Michelle Bandy is the oldest child born to the union of King and Clancy.

intellectual property assets.  *See id.* Plaintiff asserts that Webb, "who had all the information," and was "acting in conjunction with" the JR Entities, "made all the decisions," even though she was "the largest beneficiary of the Estate . . . ."  ECF 139-1 at 21-22.

In September 2014, plaintiff brought suit in the Orphans' Court concerning taxes.  *Bandy*, 449 Md. 577, 144 A.3d 802. Ms. Clancy sought a declaratory judgment to the effect that the family trust was not obligated to pay federal and state estate taxes. The Older Children and Webb opposed plaintiff's motion and posited that the tax liability should be divided between the trusts. *Id.* at 598, 144 A.3d at 814. The Orphans' Court determined that it was clear from the text of the Will that Clancy intended the family trust to be free of any federal and state estate tax liability. *Id.* at 596-97, 144 A.3d at 813-14. The Older Children appealed the ruling and, in a four to three decision, the Maryland Court of Appeals affirmed.  *See Bandy*, 449 Md. 577, 144 A.3d 802.

On February 1, 2017, Webb filed a "Revised Second Administration Account" in the Orphans' Court (ECF 149-2) and plaintiff filed "Exceptions to the Revised Second Administration Account."  ECF 149-3.  In the Exceptions, plaintiff claimed that the distribution of revenues from post-death publications "do[es] not reflect the amounts to which the Estate, directly and through its ownership interest in Rubicon…is actually entitled, by reason of the decedent's ownership of the character 'Jack Ryan' and otherwise." ECF 149-3 at 1. As a result of the exceptions raised by plaintiff, the Orphans' Court, by Consent Order dated July 25, 2017, stayed the proceedings and directed plaintiff to file a declaratory judgment action in a court of general jurisdiction.  ECF 149-4.

Thereafter, plaintiff filed suit in the Circuit Court for Baltimore City on August 25, 2017, seeking declaratory judgments under Maryland law. ECF 1. And, as noted, the JR Entities filed a

Counterclaim and removed the case to this Court on November 13, 2017. ECF 1; ECF 9.  Webb
also filed a counterclaim. ECF 12.

On November 14, 2017, I directed the parties to submit simultaneous memoranda
concerning the Court's exercise of subject matter jurisdiction.  ECF 14.  The JR Entities (ECF
17), Rubicon and Webb (ECF 18), and plaintiff (ECF 26) submitted memoranda. Thereafter, I
determined that the JR Entities adequately alleged jurisdiction in Count II of the Counterclaim
because they alleged a theory of ownership that plausibly "arises under" the Copyright Act, 17
U.S.C §§ 101 *et seq*.  ECF 34.  Therefore, I found that the Court has jurisdiction with respect to
the Counterclaim, pursuant to 28 U.S.C. §§ 1454 and 1338.  In addition, I determined to exercise
supplemental jurisdiction over the other claims, pursuant to 28 U.S.C. § 1367. *Id.*

On February 22, 2019, with the consent of defendants, plaintiff filed an Amended
Complaint.  ECF 50.  And, on June 21, 2019, Webb moved for summary judgment as to his
counterclaim (ECF 82), which plaintiff opposed.  ECF 85.  Webb replied.  ECF 93.  Before the
Court ruled on Webb's pending motion, Webb and plaintiff jointly stipulated to the dismissal of
Webb's counterclaim.  ECF 119; ECF 120. And, Webb's motion for summary judgment was
subsequently terminated. *See* Docket.  Moreover, according to defendants, Webb is now a
nominal party in the case.  *See* ECF 135-1 at 9 n.1. And, because Rubicon is wholly owned by
the Estate, Rubicon is also a nominal party. *See* ECF 85 at 10.

After extensive discovery and numerous settlement conferences that ultimately were not
successful, *see* docket, the parties filed the motions that are now pending before this Court.

## II.   Motion for Surreply

As noted, the JR Entities filed a Motion for Surreply (ECF 153), along with the proposed
surreply.  *See* ECF 153-1.  Ms. Clancy opposes the Motion for Surreply.  ECF 154.

28

In the Motion for Surreply, the JR Entities contend that a surreply is necessary because plaintiff raised "new arguments in her Reply and submitted six (6) new exhibits."  ECF 153 at 1 n.1. They explain that their five-page surreply is limited to three specific matters: "addressing the inapplicability of previously uncited authority [by plaintiff] purportedly disregarding a corporate entity as an 'alter ego' for copyright purposes;" "addressing the inapplicability of the 'instance and expense test' in determining whether a work is one for hire under copyright law, an argument which Ms. Clancy raised for the first time in her Reply;" and, "addressing the inapplicability" of six new exhibits that plaintiff submitted with her reply. ECF 153 at 2.

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court.  The filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a), but they are generally disfavored."  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g.*, *Chubb & Son v. C & C Complete Servs., LLC,* 919 F. Supp. 2d 666, 679 (D. Md. 2013).  Generally, a surreply is permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted).  Conversely, a surreply is usually not permitted if the content is merely responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003).

According to plaintiff, "all of the issues for which the Defendants wish to have a 'final word' have been presented in prior briefing."  ECF 154 at 2. In particular, plaintiff contends that she raised the "instance and expense" test "to rebut" defendants' arguments regarding work for

hire, which was not a new issue. *Id.* However, plaintiff does not claim that the prior briefing presented the two other issues that the JR Entities seek to address.

In my view, defendants are entitled to file the Surreply because plaintiff introduced new evidence in her reply. In particular, plaintiff submitted six new exhibits with respect to the dispute regarding the statute of limitations, discussed *infra*. ECF 149-2 to ECF 149-7. The exhibits include four filings from the Orphans' Court proceedings (ECF 149-2 to ECF 149-5); an excerpt from the deposition of Webb (ECF 149-6); and a memorandum from Curtis, Clancy's intellectual property attorney, regarding Ms. Clancy's Termination Notice (ECF 149-7). Although plaintiff's averments are largely consistent with the allegations in Plaintiff's Motion, the exhibits introduce new facts to support her argument concerning inquiry notice.  Because defendants have the right to respond, I shall grant the Motion for Surreply.

### III.  Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557,

585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.   "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004; *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v.*

*Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, __ F.3d __,

2021 WL 329878, at *3 (4th Cir. Feb. 2, 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'"  *Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

## B.  The Copyright Act of 1976

Copyright protection is a product of a constitutional and statutory law.  The Copyright Act of 1976, predicated on Article 1, § 8 of the Constitution, protects "original works of authorship fixed in any tangible medium of expression . . . ."  17 U.S.C. § 102.[16]  The Act's "protection commences as soon as the original work is created and fixed in some tangible form . . . ."  *Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591, 596 (4th Cir. 2013).

The Fourth Circuit explained in *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) (some modifications in original):

> The Copyright Act, enacted on the authority of Article I, § 8, of the Constitution, confers on creators of original works a limited monopoly in their works of authorship to advance an important public purpose.  "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired."  *Sony Corp. of Am. v.*

---

[16] The Constitution states, in part: "The Congress shall have Power…To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. 1 § 8, cl. 8.

*Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).  The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius."  *Id.* (quoting *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948)); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985).

A copyright grants its owner the exclusive use of the work, including the right to reproduce and distribute copies of the work; to prepare derivative works; and to perform or display the work publicly.  *See* 17 U.S.C. § 106; *see Everly v. Everly*, 958 F.3d 442, 449 (6th Cir. 2020) (quoting 17 U.S.C. § 106); *see also CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984)) (alteration in *CoStar*).  Under the Act, "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author . . . ."  17 U.S.C. § 501.

Under the Act, copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a).  "The author of a given work is 'the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'"  *Shaul v. Cherry Valley–Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004) (quoting *Accord Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989)). There is an exception, however, for "works made for hire."  With respect to "a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . ."  17 U.S.C. § 201(b).  In that circumstance, "unless the parties have expressly agreed otherwise in a written instrument signed by them," the employer "owns all of the rights comprised in the copyright."  *Id.*; *see Reid*, 490 U.S. at 737.

Ownership of a copyright may be transferred in whole or in part, and any of the exclusive rights of a copyright owner may be owned separately.  *See* 17 U.S.C. § 201(d).  The transfer may be made "by any means of conveyance" and "may be bequeathed by will or pass as personal

property . . . ." *Id.*  According to the Act, a "transfer of copyright ownership" is "an assignment, mortgage, exclusive license, or any other conveyance…of a copyright or of any of the exclusive rights comprised in a copyright…but not including a nonexclusive license." *Id.* § 101.

However, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a); *see also Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc*., 380 F.3d 624, 643 (2d Cir. 2004) ("A valid assignment of statutory copyright must be in writing."), *cert. denied*, 544 U.S. 1060 (2005). The writing "must explicitly convey a party's intention" to relinquish the copyright interest. *Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 565 (S.D.N.Y. 2014).  This "serves the purpose of 'enhanc[ing] predictability and certainty of ownership – Congress's paramount goal when it revised the Act in 1976.'" *Metropolitan Regional Information Systems, Inc*., 722 F.3d at 600 (alterations in *Metropolitan*).

Nevertheless, "a writing memorializing the assignment of copyright interests 'doesn't have to be the Magna Carta; a one-line pro forma statement will do.' However, the terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear." *Papa's–June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1158–59 (S.D.N.Y. 1996) (quoting *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990), cert. denied, 498 U.S. 1103 (1991)).

Of relevance here, copyright ownership that results from a work made for hire is different from ownership resulting from the assignment of an author's interest. *TD Bank N.A. v. Hill*, 928 F.3d 259, 273 (3d Cir. 2019). If a work qualifies as a work for hire, the Act regards the employer

as the author, and the copyright presumptively vests in the employer, unless the parties agree otherwise. 17 U.S.C. § 201(b).  In contrast, if a work does not satisfy the statutory definition of a work for hire, the author may still assign the copyright ownership, but the author "retains certain non-waivable rights to cancel the transfer after 35-40 years…"  *Hill*, 928 F.3d at 273 (citing 17 U.S.C. § 203(a)(3)).

## IV.   Discussion

### A.  Statute of Limitations

As noted, the JR Entities contend that all of the claims in the Amended Complaint are barred by the statute of limitations in the Copyright Act, codified at 17 U.S.C. § 507(b).  ECF 135-1 at 29; ECF 145 at 11-18. In particular, defendants posit that the "basic claims" in the Amended Complaint—that the Estate owns Jack Ryan and that the JR Books were not works made for hire or validly assigned to the JR Entities—are time barred. And, according to the defendants, plaintiff's other claims—that she has the right to terminate any assignment to the JR Entities and that the Estate owns John Clark—"are based on her underlying position that the JREL and JRLP Books are not made for hire."  ECF 145 at 12 n.4.  Therefore, defendants assert that their defense of limitations governs all of plaintiff's remaining claims.  *Id.*  Plaintiff vigorously disagrees that her claims are barred by limitations.  ECF 139-1 at 23-30; ECF 149 at 7-12.

Section 507(b) of the Copyright Act provides: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 667, 669-70 (2014) (discussing the statute of limitations for the Act); *Davis v. Meridian Films, Inc.*, 14 F. App'x 178, 181 (4th Cir. 2001) ("Both coauthorship and infringement claims are subject to a three-year statute of limitations.").

However, claims for infringement and claims for ownership are subject to different accrual standards. *Davis*, 14 F. App'x at 181; *see Webster v. Dean Guitars*, 955 F.3d 1270, 1275 (11th Cir. 2020) ("[O]ther circuits draw a distinction between the accrual or copyright infringement and copyright ownership claims."). A claim to ownership, as in this case, "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Davis*, 14 F. App'x at 181; *see Everly*, 958 F.3d at 450; *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007); *see also Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) ("An ownership claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'").

Most circuits have determined that copyright ownership claims accrue "when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004); *see Everly*, 958 F.3d at 450; *see also Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006) (concluding that an alleged copyright co-owner's "declaratory judgment rights accrued when it knew or had reason to know of the injury upon which the claim is based"); *Santa-Rosa v. Combo Records*, 471 F.3d 224, 228 (1st Cir. 2006) ("[A] claim for declaratory judgment of ownership accrues when the plaintiff 'knew of the alleged grounds for the ownership claim.'"), *cert. denied*, 550 U.S. 926 (2007); *see also Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) ("[C]laims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of the repudiation.").

"[A]ny number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" *Kwan*, 634 F.3d at 228 (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997)). The Second Circuit

has identified various events that may trigger accrual.  In *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013), it said that accrual may occur, *id.* at 317,

> when a book is published without the alleged co-author's name on it, *see Kwan*, 634 F.3d at 229; when alleged co-authors are presented with a contract identifying the defendant as the 'sole owner and copyright holder,' *Zuill*, 80 F.3d at 1368; *see also Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004); or when alleged co-owners learn they are entitled to royalties that they are not receiving, *see Merchant* [*v. Levy*], 92 F.3d [51,] 53, 56 [2d Cir. 1996]; *Stone* [*v. Williams*], 970 F.2d [1043,] 1048 [(2d Cir. 1992)].

And, "in the context of ownership, express repudiation can be effectuated by a non-author who has been assigned ownership rights by an author…" *Everly*, 958 F.3d at 454.

To my knowledge, the Fourth Circuit opined only once on the events that trigger the accrual of an ownership claim.  *See Davis*, 14 F. App'x at 181.  In *Davis*, the Fourth Circuit said that a "coauthorship claim, like any civil claim, accrues when a reasonably diligent plaintiff 'knows or has reason to know of the injury upon which the claim is premised.'" *Id.* (quoting *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996), *cert. denied*, 519 U.S. 1108 (1997)).  But, it applied the express repudiation test without deciding whether it is a different standard than the ordinary notice rules governing copyright accrual. *Davis*, 14 F. App'x at 182 ("Even assuming that [plaintiff] is correct in his assertion that the 'express repudiation' standard is somehow higher than the ordinary standard for the accrual of a civil copyright claim, [defendant's] placement of a copyright notice on the videos constituted an express rejection of competing claims of authorship.").

Defendants insist that plaintiff's suit, filed on August 25, 2017, is untimely.  ECF 135-1 at 29-30.  They assert that, as to plaintiff's claim that the Estate owns the character rights to Jack Ryan, the claim accrued, at the latest, on February 19, 2014, when Webb wrote to Youdelman and Curtis, with a copy to plaintiff (ECF 135-54, the "2014 Letter").  *See* ECF 135-1 at 30. In

38

that letter, Webb wrote: "Sheila [Sachs] and I are in agreement that The Campus book would be viewed as principally a Rubicon, Inc. property and the Jack Ryan book would be viewed principally as a JREL property. This is largely based on your advice that the Jack Ryan character is owned by JREL…"   ECF 135-54 at 2.   Defendants contend that this letter was an "unequivocal" ownership claim with respect to Jack Ryan (ECF 145 at 14 n.6) and "an express repudiation of the Estate's claim to ownership."  ECF 135-1 at 29-30.

Further, the JR Entities maintain that, at the very least, the 2014 Letter put plaintiff on inquiry notice because it "'fairly suggest[e]d some reason to investigate' the claims that the JR Entities owned Jack Ryan." *Id.* (quoting *Warren Freedenfeld Assoc's. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008)).  Moreover, defendants contend that plaintiff "***did begin to investigate***" after receipt of the 2014 Letter, as evidenced by continuing inquiries of plaintiff's lawyers throughout 2014 about JREL's ownership claims.  ECF 145 at 15 (emphasis in original); *see* ECF 139-23; ECF 139-25; ECF 139-26.  In addition, the JR Entities maintain that plaintiff's assertion that the 2014 Letter did not put her on inquiry notice is "directly contrary" to her "claim that Tom Clancy never parted with those [ownership] rights" and that Clancy purportedly told plaintiff  that he "wanted her to 'control [his] literary assets' after his death."  ECF 145 at 15 (quoting ECF 139-1 at 10) (alteration in original).

Defendants also posit that plaintiff's work for hire claims with respect to the JR Books are barred by limitations. ECF 135-1 at 31; ECF 145 at 16-17. They assert that Clancy would have been time-barred from presenting them if he were alive, and "Ms. Clancy stands in Mr. Clancy's shoes as beneficiary of his estate."  ECF 135-1 at 31.

In her opposition, plaintiff does not dispute that she received the 2014 Letter. But, she maintains that it did not trigger inquiry notice.  In her view, the "triggering event for the

presentation" of her copyright claim was the "January 8, 2015 disclosure [from Webb's counsel] of the 1988 settlement agreement with USNI and the post-settlement assignment from USNI to JREL," ECF 149 at 8, which "established that…JREL had no claim to Jack Ryan." *Id.* at 10.

According to Ms. Clancy, prior to her receipt of these documents, she "had no basis for concluding that the Estate had any ownership of Tom's [sic] Clancy's characters." *Id.* at 8. And, she reasons, "in the absence of evidence of the existence of a right, any assertion of ownership by another party cannot constitute repudiation, because there is nothing to repudiate." *Id.* at 9. Therefore, plaintiff concludes: "Far from contesting rights, the February 19, 2014 letter merely announced one lawyer's opinion of who, out of all the possible parties, owned Jack Ryan after Clancy's death." *Id.* at 8-9.

Further, plaintiff contests defendants' assertion that she began to investigate JREL's ownership claim after she received the 2014 Letter. She argues that her lawyers' inquiries about ownership were motivated by questions and concerns surrounding the posthumous book-deal negotiations (*see* ECF 135-53; ECF 140-8), not the declaration of ownership in the 2014 Letter. ECF 149 at 12. Plaintiff posits: "Far from establishing inquiry notice, these [inquiries] merely show a recently widowed woman pressured by the swift current of events to rapidly inform herself about the contours of her husband's Estate." *Id.*

Both sides rely on *Stone v. Williams,* 970 F.2d 1043 (2d Cir. 1992), *cert. denied*, 508 U.S. 96 (1993), to support their respective positions. In *Stone*, the out-of-wedlock daughter of the famous country singer, Hank Williams, Sr., sued for her share of her father's renewal copyright royalties.

Stone was not raised by Williams; she was adopted at a young age and, throughout her childhood, was entirely unaware of her possible relationship to Williams. *Id.* at 1048. Further,

she alleged that the defendants had conspired for decades to conceal her status as Williams's daughter. *Id.* at 1046. In 1973, when Stone was 20 years old, her adoptive mother told her of the possibility that she might be Williams's daughter. *Id.* at 1048.

In October 1979, Stone notified the Alabama Department of Pensions and Security that her adoptive mother had told her that Williams might be her biological father. *Id.* And, in 1985, she sued for her ownership rights to copyrights originally held by Williams and renewed by Williams's son, widow, and various assignees. *Id.* at 1046. Stone argued that, "even assuming she knew in" October 1979 that Williams was her father, that knowledge was insufficient to commence the running of the limitations period because "the statute did not run until she learned there were property interests…to which she might be entitled." *Id.* at 1049.

The court reasoned that the "statute of limitations did not begin to run until plaintiff had reason to know of the facts giving rise to her statutory entitlement, *i.e.*, that she was a child of Williams. Accordingly, for plaintiff's cause of action to have accrued—for plaintiff to have known or have had reason to know of her injury—'knowledge' that Williams, Sr. was her natural father was essential." *Id.* But, the court concluded that Stone was on notice of the possible relationship and potential copyright claims by October 1979. *Id.* at 1048.

The Second Circuit explained that as long as the plaintiff knew "of the facts and circumstances" that furnished the cause of action, it did not matter if she knew "the legal rights that stem[ed] from certain facts." *Id.* at 1049. And, the court was of the view that "a reasonably diligent person in plaintiff's position would have been put on inquiry as to the existence of a right to renewals in Williams, Sr.'s works" as of the date that she was aware that she might be Williams's daughter. *Id.*

41

Defendants contend that, as in *Stone*, plaintiff's ownership "claim accrued when she received the letter claiming that JR Entities own Jack Ryan," *i.e.*, when she knew of the facts furnishing her cause of action, and "*not* when she received documents leading her to believe that this claim was 'unfounded.'"  ECF 145 at 16 (emphasis in original).

Plaintiff counters that *Stone* supports her position.  ECF 149 at 10.  She points out that the *Stone* Court reasoned that "Stone's limitations argument was unpersuasive not because she asserted she was not on notice of some fact but because she claimed she did not appreciate the legal significance of the facts." *Id.*  In contrast, argues plaintiff, "the fact of the 1988 character dispute with USNI, the fact of the 1988 USNI settlement, and the fact of the post-settlement assignment from USNI to JREL" were not revealed to her until January 8, 2015. *Id.*

Determining when a reasonable person would have been put on inquiry notice as to an ownership claim is a fact sensitive inquiry.  *See, e.g.*, *Everly*, 958 F.3d at 458 (finding the history of the communications between the parties presented a genuine factual dispute as to whether defendant expressly repudiated plaintiff's authorship of relevant work); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (finding that the record left open a genuine issue of fact as to when authorship was initially repudiated); *Zuill*, 80 F.3d at 1369 (discussing multiple factors, including a compensation agreement and notice of copyright placed on the work itself to determine accrual date); *see also Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008) ("It stands to reason that determining when a reasonable person would have become aware of a copyright infringement is a fact-sensitive enterprise.").

Notably, "[i]f there is a genuine dispute of material fact as to when the plaintiff was on inquiry notice, summary judgment is inappropriate." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Bank of New York v. Sheff*, 382

Md. 235, 243, 854 A.2d 1269, 1275 (2004)), *aff'd*, 495 Fed. App'x. 350 (4th Cir. 2012).  Indeed, questions of discovery and accrual are ordinarily questions of fact for the jury. *See, e.g.*, *Shetterly v. Raymark Industries, Inc.*, 117 F.3d 776 (4th Cir. 1997).

Defendants claim that the facts are undisputed and that the only issue is what legal test to apply. Although it is undisputed that plaintiff was copied on the 2014 Letter, this fact does not unambiguously demonstrate that the 2014 Letter constituted an assertion by defendants of their ownership, or that the 2014 Letter was sufficient to put plaintiff on inquiry notice.

To be sure, the language of the 2014 Letter could be construed as an assertion of ownership by JREL with regard to the Jack Ryan character. As noted, in that letter, Webb stated that "the Jack Ryan book would be viewed principally as a JREL property. This is largely based on [Youdelman and Curtis's] advice that the Jack Ryan character is owned by JREL…." ECF 135-54 at 3.  A reasonable juror could find, as defendants argue, that the 2014 Letter is an express repudiation of the Estate's ownership of the Jack Ryan character that put plaintiff on notice of her ownership claim.  But, such a conclusion is not compelled.

The 2014 Letter could be understood merely to concern book deals after Clancy's death. ECF 139-1 at 26-27; *see, e.g.*, ECF 135-53.   Indeed, Webb stated: "By agreeing to the arrangement for proceeds of these two books, we do not intend to bind any of the current parties nor future owners of Tom's name or any of the business entities."  ECF 135-54 at 3. A jury could also find that plaintiff did not know that the Estate might have ownership rights in the character at that time. Thus, a jury could conclude that a reasonably diligent person reading that letter would not necessarily have been put on inquiry notice.

Accordingly, I cannot determine as a matter of law that the 2014 Letter put plaintiff on inquiry notice of an ownership dispute.  It follows that I cannot conclude that the statute of limitations bars plaintiff's claim of ownership as to Jack Ryan.

Defendants fare no better as to their limitations argument with respect to the work for hire claims.  As noted, defendants argue that plaintiff's work for hire claims are precluded because Clancy would have been time-barred from asserting them, and plaintiff "stands in [Clancy's] shoes" as the "primary beneficiary" of the Estate. ECF 145 at 16-17. According to defendants, the JR Entities "continually represented in publishing contracts that they were the authors and owners" of the JR Books, so Clancy's claims against the entities "would have accrued each time he executed" those agreements. *Id.* at 17.

Conversely, plaintiff contends that defendants' argument mistakenly "relies on the assumption that the claims existed during Clancy's lifetime." ECF 139-1 at 30. In reality, she posits, Clancy "was not adverse" to the JR Entities because they "were his *alter egos*." ECF 149 at 13 (emphasis in original). Thus, the JR Entities did not repudiate Clancy's ownership until after Clancy's death. *Id.*

Neither side has pointed to any precedent that is directly on point. But, it seems clear that regardless of whether plaintiff is "stand[ing] in Mr. Clancy's shoes" as his heir or whether the JR Entities were Clancy's alter egos, the dispute did not exist when Clancy was alive. In other words, the JR Entities never asserted ownership over the JR Books or Clancy's characters in a way that was adverse to Clancy's interests.

For instance, Clancy continued to be credited as the author of his books and received profits from their sales. *Cf. Everly v. Everly*, 352 F. Supp. 3d 834, 844 (M.D. Tenn. 2018) (holding that a claim for a declaration of authorship brought by alleged author's heirs was time-

barred because the author did not timely challenge an express repudiation of authorship that included removing the author's name from the work), *rev'd on other grounds*, 958 F.3d 442 (6th Cir. 2020); *Rice v. Music Royalty Consulting, Inc.*, 397 F. Supp. 3d 996, 1009 (E.D. Mich. 2019) (finding a copyright ownership claim brought by the personal representative of the estate of a deceased author to be time-barred when the author signed an agreement conveying his rights in the work, including his right to derive future income from the works, more than three years before the filing of the complaint). Further, during his life Clancy was entitled, in his discretion, to use and develop the characters in the JR Books. *See, e.g.*, ECF 136-18, ¶ 15(b).

In sum, Clancy had no claim against the JR Entities during his lifetime, nor did he ever pursue legal action against the JR Entities. Therefore, the work for hire claims could not have accrued and are not barred by limitations.

Accordingly, I shall deny the JR Entities' Motion with respect to their limitations claims.

### B.  Authorship and Work Made for Hire

The JR Entities contend that they are entitled to summary judgment with respect to Counts I through IV of the Amended Complaint and Count II of the Counterclaim because the JR Books were written as works made for hire for the JR Entities.  ECF 135-1 at 31-45.  As a result, argue defendants, the JR Entities own all of the copyrightable elements of the books, including the characters delineated in them.  *Id.* at 42-45.

Plaintiff disagrees, claiming that Clancy's "relationship" with the JR Entities "had none of the earmarks of a true employee relationship."   ECF 139-1 at 47. And, she asserts that defendants are, "in effect," arguing "for some form of copyright-by-estoppel." *Id.* at 51.

As indicated earlier, under the Copyright Act, copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a).  However, there is an exception for "works

made for hire," in which case "'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." *Reid*, 490 U.S. at 737 (quoting 17 U.S.C. § 201(b)).

Section 101 of the Copyright Act provides that a work is "for hire" under two sets of circumstances:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

Neither side argues that any of the books were "specially ordered or commissioned." Therefore, the question is whether Clancy was an employee of the JR Entities who wrote the JR Books within the scope of his employment. The Act does not define the terms "employee" or "employment," however, leaving the application of the terms to the courts.

In *Reid*, 490 U.S. 730, the Supreme Court addressed the question of whether an individual is an employee or an independent contractor under the work for hire doctrine. *Reid* involved conflicting ownership claims with respect to a sculpture that was prepared by an artist at the request of a group devoted to advocacy of rights for the homeless. *Id.* at 733.

The Court noted that "the term 'employee' should be understood in light of the general common law of agency." *Id.* at 741. It set out a non-exhaustive list of factors to consider, *id.* at 751-52 (citing Restatement § 220(2)):

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the

location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party….No one of these factors is determinative.

The Court acknowledged that the organization oversaw production of the work to ensure that the sculpture met specifications, but concluded that all other factors supported a finding that the artist was an independent contractor, not an employee. *Id.* at 752-53.  The artist was a skilled sculptor, used his own tools, and worked in his own studio for only two months, with discretion over when to work. *Id.* Further, sculpting was not the organization's business, it had no right to assign the artist additional work, and it paid the artist a flat sum, without benefits, and did not withhold taxes.  *Id.*  Therefore, the Court affirmed the lower court's finding that the sculptor was not an employee, but rather an independent contractor.  As a result, the sculpture was not a work made for hire. *Id.*  On a policy level, the Court observed that its construction of the work for hire provision was intended to support "Congress' paramount goal in revising the 1976 [Copyright] Act of enhancing predictability and certainty of copyright ownership."  *Id.* at 749.

Courts do not apply the *Reid* factors mechanistically and only consider the factors that are relevant in each case.  *See Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095-97 (6th Cir. 1995); *Aymes v. Bonelli*, 980 F.2d 857, 861-62 (2d Cir. 1992) (Because no one factor is dispositive, the factors "should be weighed according to their significance in the case" and irrelevant factors may be ignored.).  But, the Second Circuit has identified five factors that "will be significant in virtually every situation": the hiring party's right of control over the hired party; the skill required of the hired person; the provision of employee benefits; the tax treatment

of the hired party; and whether the hiring party has the right to assign additional projects to the hired party. *Aymes*, 980 F.2d at 861.

Of particular relevance here, courts focus "on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002). Therefore, "a bare statement [in a contract] that a particular work is 'for hire,' says nothing about the scope of an individual's employment and cannot suffice on its own" to vest ownership in an employer. *Hill*, 928 F.3d at 272 (Court's alterations); *see Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 87 (2d Cir. 1995) ("The use of [the words employ or employment agreement] does not transform them into 'magic words' imbued with legally controlling significance.") (Court's alterations), *cert. denied*, 517 U.S. 1208 (1996); 1 NIMMER ON COPYRIGHT § 5.03(B)(1)(b)(ii) (stating that "an agreement…whereby works prepared by the employee that are not prepared within the scope of employment are nevertheless deemed to be 'works made for hire' will not in itself convert such works into the 'for hire' category").

Resolution involves a mixed question of law and fact. Notably, "[q]uestions of historical fact relevant to applying each factor are for the finder of fact…but the ultimate determination, on settled facts, of whether a work qualifies as a work-for-hire is a question of law…" *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 110-11 (2d Cir. 1998) (citing *Carter*, 71 F.3d at 85; *Aymes*, 980 F.2d at 861).

The JR Entities argue that application of the *Reid* factors inescapably leads to the conclusion that Clancy created the books as an employee within the scope of his employment for the JR Entities. ECF 145 at 22-30. In contrast, plaintiff asserts that Clancy was neither an employee nor agent of the JR Entities. ECF 139-1 at 44. Rather, the JR Entities were Clancy's

"alter egos" or "loan-out companies," created "to reduce [Clancy's] taxes and to avoid personal liability." *Id.* at 46.   According to plaintiff, the JR Entities are mere "shells," not "true businesses . . . ." *Id.* at 47.   Moreover, she points out that Clancy "took direction from no one," and the JR Entities had no control over his creative work. *Id.* at 48.   Because the works were not made for hire, Clancy retained ownership over the JR Books and the characters in them until his death. *Id.* at 46.

Three of the factors highlighted in *Aymes,* 980 F.2d 857—the right of control over the hired party, the provision of employee benefits, and tax treatment—are particularly relevant to this case.   They weigh against work for hire status.

First, the evidence demonstrates that neither of the JR Entities made any attempt to "control the manner and means" by which Clancy's books were written. *Reid*, 490 U.S. at 751-52. King, the only other individual who was involved in the operation of either entity, acknowledged that Clancy had complete autonomy with respect to every aspect of his books. ECF 139-31 at 32-33, Tr. 124:20-125:14. Although King may have reviewed Clancy's books upon completion, Clancy chose what books to write and when to work on them. *Id.* at 32, Tr. 124:17-125:9.

Moreover, Clancy was a co-owner of both entities.   ECF 135-8; ECF 135-30.   And, in cases where the hired party is also an owner or partner of the company asserting ownership, courts have declined to find a work made for hire because of the company's lack of control over the owner. In *Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010), for example, the court determined that the relationship between the plaintiff, a co-owner of the business, and the business was not an agency relationship. *Id.* at 824.   As a co-owner of the LLC, the court found that the plaintiff had "an inherent right to control the business," was not "under control of" the

LLC, and therefore the work could not be considered to be made for hire. *Id.* at 824 (citing *Heimerdinger v. Collins*, 2009 WL 1743764, at *4 (D. Utah June 18, 2009) (rejecting work-for-hire claim on ground that partners are generally not employees of the partnership); *Brown v. Flowers*, 297 F. Supp. 2d 846, 852 (D.N.C. 2003) (plaintiff who alleged in complaint only that he was an equal partner with party asserting copyright ownership did not allege employer/employee relationship and thus failed to state claim for ownership under the work-for-hire doctrine)); *see also M & A Assocs., Inc. v. VCX, Inc.*, 657 F. Supp. 454, 459-60 (E.D. Mich. 1987) ("Buckley was not an employee of [his company]. Buckley, not [his company], was the motivating force in producing the film. He exercised complete control of the corporation, which served as his mere alter ego. There simply was no supervision of his work other than his own. As a result, Buckley owned all rights to the film upon its creation and could transfer those rights to M & A."), *aff'd*, 856 F. 2d 195 (6th Cir. 1988); *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir. 1967) (where author was the dominant person in the corporation, court could not find that his work was done at the "instance" of the corporation), *cert. denied*, 389 U.S. 1036 (1968).

As defendants note, however, the right to control the product is not necessarily dispositive. *Reid*, 490 U.S. at 752 (cautioning that "the extent of control the hiring party exercises over the details of the product is not dispositive."); *Marco v. Accent Publishing Co.*, 969 F.2d 1547, 1551 (3d Cir. 1992) ("[C]ourts should keep this factor in perspective, since it resembles the 'control of the product' test rejected by the Supreme Court in [*Reid*]."). In fact, courts often find that the control factor is not determinative in cases involving artists with specialized skills, like Clancy. *See Martha Graham*, 380 F.3d at 642; *Carter*, 71 F.3d at 86-88 (finding that sculptors with complete artistic freedom were employees).

50

But, the cases cited above are distinguishable based on other factors that supported findings of employment. In particular, the hired parties in *Martha Graham* and *Carter* received salaries and employee benefits and were treated as employees for purposes of taxation. As discussed below, however, there is no evidence that, during the relevant period, Clancy received a regular salary or the tax treatment of an employee.

Notably, courts have generally stressed the probative value of a hired party's employee benefits and tax treatment in regard to the *Reid* analysis. *See, e.g., Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir. 1999); *Aymes*, 980 F.2d at 863 ("[E]very case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes."). To illustrate, in *Martha Graham*, 380 F.3d 624, on which defendants rely, the court found that the foundation's famous dance choreographer, by whom the foundation was formed and for whom it was named, was an employee, even though the foundation exercised no control over her works. *Id.* at 642. The choreographer received employee benefits, reimbursement for personal expenses, and a salary from the foundation; the foundation withheld income and social security taxes from her salary; the choreographer "created her dances on [the foundation's] premises and with the [foundation's] resources;" and her choreography was a "regular activity of the" foundation. *Id.* The court concluded: "All these factors weigh in favor of finding an employment relation between [the choreographer] and [the foundation]." *Id.* at 641-42; *see also Carter*, 71 F.3d at 86 (stating that "the provision of employee benefits and the tax treatment of the plaintiffs weigh strongly in favor of employee status").

Clancy did not receive a regular salary and, with the exception of health insurance, he did not receive employee benefits from either of the JR Entities. ECF 139-31 at 28-29, Tr. 109:15-

110:5.  According to King, proceeds from book sales accumulated in the company account until the balance reached about $100,000, at which point she would distribute the money into the couple's joint personal bank account. ECF 139-31 at 26. In addition, there is no evidence that the JR Entities treated Clancy as an employee for purposes of taxation. *See* ECF 145 at 27; ECF 139-1 at 50.

In some cases, the lack of benefits or failure to withhold taxes was not dispositive. In *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010), for instance, the court applied the *Reid* factors to find a work for hire employment relationship between Byce, the hired party, and JustMed, the hiring party, even in the absence of employment benefits and W-2 tax treatment for Byce.  *Id.* at 1128.  The Ninth Circuit noted that "the contemplated duration of the relationship, the tasks Byce did for JustMed, the fact that Byce earned a salary from JustMed, and the nature of JustMed's business all support the finding that Byce was an employee."  *Id.*  at 1126.  The court "dr[e]w some guidance in weighing the factors from JustMed's status as a technology start-up company."  *Id.*  In its view, "JustMed's treatment of Byce with regard to taxes, benefits, and employment forms" was "more likely attributable to the start-up nature of the business than to Byce's alleged status as an independent contractor."  *Id.*  at 1128.  Therefore, the matter of benefits and tax treatment did not rebut the evidence that Byce was an employee.  *Id.*

But here, the JR Entities were not start-ups in the same sense as JustMed.  And, Clancy was not paid a regular salary, unlike in *Byce*.  Thus, *Byce* does not advance defendants' position.

Nevertheless, there are factors that support a finding that Clancy was an employee of the JR Entities. JREL paid for the computer that Clancy used to write the books (ECF 139-31 at 29, Tr. 106:11-18); Clancy worked for both entities for an extended period of time; Clancy's work was part of the regular business of the entities; and Clancy received health benefits. *See Horror*

*Inc. v. Miller*, 355 F. Supp. 3d 273, 311 (D. Conn. 2018) (finding that screenplay project was part of filmmaker's regular business, weighing in favor of screenwriter's employee status); *Huebbe v. Okla. Casting Co.*, 663 F. Supp. 2d 1196, 1207 (W.D. Okla. 2009) (finding that sculptor who used hiring party's tools and materials was an employee).

Moreover, defendants argue that the fact that the parties believed they were creating an employment relationship is relevant and weighs in favor of an employee-employer relationship. ECF 145 at 27-28 (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 262 (4th Cir. 1997), *cert. denied*, 522 U.S. 1049 (1998)).  In addition to the employment agreements between Clancy and the JR Entities (ECF 135-61; ECF 135-62; ECF 139-34), defendants point to the publishing agreements between the JR Entities and Putnam as evidence that Clancy believed the books were made for hire; the publishing agreements, signed by Clancy, represented that the JR Entities were the "Authors" of the works and that the works were made for hire. *See* ECF 135-5; ECF 136-6; ECF 136-7; ECF 136-11; ECF 136-14; ECF 136-15.  Further, all of the certificates of copyright registrations for the JR Books represent that the books were works made for hire.  *See* ECF 135-14; ECF135-15; ECF 135-17; ECF 135-27; ECF 135-33; ECF 135-34; ECF 135-35; *Langman Fabrics*, 160 F.3d at 111 (Plaintiff is "entitled to a [rebuttable] statutory presumption of the validity of the facts stated in its copyright registration.").

To be sure, these agreements do evidence an intent by Clancy to form an employment relationship.  But, they do not necessarily "suffice on [their] own" to overcome the factors that weigh against finding a work for hire relationship.  *See Hill*, 928 F.3d at 272 (finding that guarantee language, by itself, did not suffice to make a manuscript a work made for hire); *Gary Friedrich Enterprises, LLC*, 716 F.3d 302 (form work-for-hire agreement between publisher and freelance author who had developed "Ghost Rider" comic book character and story could not

render Ghost Rider a "work made for hire" ex post facto under Copyright Act, even if the extrinsic evidence under New York law showed that parties intended to do so).

On balance, I cannot conclude, as a matter of law, that Clancy was an employee of the JR Entities and that his books were made for hire.  Conversely, some factors weigh in favor of a finding of works for hire.

In sum, there is a genuine dispute of material fact as to whether Clancy was an employee of the JR Entities under the *Reid* test.  *See Kennedy v. Gish, Sherwood & Friends Inc.*, 143 F. Supp. 3d 898, 906 (E.D. Mo. 2015) (even though professional photographer controlled his companies and had specialized skill, the photographer received a salary and employee benefits, court found genuine issue of material fact as to whether photographer was an employee under the *Reid* test).  Therefore, I shall deny the JR Entities' Motion and the Plaintiff's Motion as to Counts II, III, and IV of the Amended Complaint and Count II of the Counterclaim with respect to the work for hire claims.

### C.  Alleged Copyright Assignments from Clancy to the JR Entities

The parties do not dispute that JREL owns the copyright to *Hunt*, which introduces and begins development of the Jack Ryan character.  ECF 145 at 35. However, the parties disagree over whether the copyright in Jack Ryan, as developed in *Hunt*, was assigned to USNI and then JREL, along with the copyright in *Hunt* or, instead, whether Clancy retained the copyright in Jack Ryan at the time of his death.

Further, the JR Entities contend that, regardless of the success of their work for hire claims, the JR Entities own the JR Books and the characters therein because the copyrights were validly assigned to them by Clancy, pursuant to 17 U.S.C. § 204(a).  ECF 135-1 at 40-43; ECF

54

145 at 23. Plaintiff counters that any purported assignment of the JR Books to the JR Entities was ineffective.  ECF 139-1 at 52; ECF 149 at 24-25.

### 1.  Principles of Contract Interpretation

"The validity and import of an assignment generally is governed by state contract law." *See Hill*, 928 F.3d at 273-74; *see Roger Miller Music, Inc.*, 477 F.3d at 392; *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999). "The Copyright Act merely adds that an assignment must be memorialized by an 'instrument of conveyance, or a note or a memorandum of the transfer, … in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Hill*, 928 F.3d at 274 (quoting 17 U.S.C. § 204(a)).

The JR Entities were both formed in Maryland (ECF 135-8; ECF 135-30) and the relevant agreements were signed in Maryland. ECF 136-1; ECF 135-24.  It is undisputed that Maryland law applies to the interpretation of assignments in the relevant agreements.  ECF 135-1 at 49; ECF 149 at 17-18.   Therefore, I turn to review the principles of contract interpretation under Maryland law.

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).  To determine the parties' intention, courts look first to the written language of the contract.  *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,*

346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). Maryland courts "adhere[] to the principle of the objective interpretation of contracts….If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *see Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014).

"'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Accordingly, when interpreting a contract, the court's "task … is not to discern the actual

mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

The question of whether a contract is ambiguous is one of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). Of relevance here, "[u]nder the objective view [of contract interpretation], a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (citation omitted); *see Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 87, 5 A.3d 683, 690-91 (2010) (citation omitted); *Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d at 547 (citations omitted); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999).

Notably, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Ashton*, 354 Md. at 340, 731 A.2d at 444-45; *see Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris*, 353 Md. at 436, 727 A.2d at 363.

A court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the

terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris*, 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010); *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. 152, 157-58, 582 A.2d 493, 495 (1990). Among other things, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977). But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353 Md. at 441, 727 A.2d at 366.

Of relevance here, if a court determines as a matter of law that the contract is ambiguous, "'it may yet examine evidence extrinsic to the contract that is included in the summary judgment

materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir. 1993)).  Nevertheless, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'" *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126); *see Sheridan v. Nationwide Ret. Sols., Inc.*, 313 F. App'x 615, 619 (4th Cir. 2009).

Generally, "'ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co.*, 415 Md. at 334, 999 A.2d at 1078 (citation omitted).  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'" *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015).

### 2.   Alleged Assignment of Ownership from Clancy to JR Entities

Ownership of a copyright is freely transferrable "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d)(1).  However, "[a] transfer of ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or a memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Id.* § 204(a).

Section 204(a)'s "requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to

sign a piece of paper saying so." *Effects Assocs.*, 908 F.2d at 557; *see also Gaiman*, 360 F.3d at

650 ("copyright assignments must be in writing"). A writing "evidencing the transfer [of

copyright ownership] need not be lengthy or detailed, but it must evidence the transfer with

reasonable clarity." *Rico Records Distribs. v. Ithier*, No. 04 Civ. 9782(JSR), 2006 WL 846488, at

*1 (S.D.N.Y. Mar. 30, 2006) (internal citations omitted); *see also Weinstein Co. v. Smokewood*

*Entertainment Grp., LLC*, 664 F. Supp. 2d 332, 340 (S.D.N.Y. 2009).   Further, the signed

writing must clearly reveal an intent to transfer. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822,

831 (3d Cir. 2011) (assignor of copyright must "manifest an intention to transfer the right to

another person"); *Metropolitan Regional Info. Syst., Inc. v. American Home Realty Network*, 888

F. Supp. 2d 691, 708 (D. Md. 2012) (assignment of copyright must "reveal clear and unequivocal

intent to transfer rights"), *aff'd*, 722 F.3d 591 (4th Cir. 2013); *Weinstein Co.*, 664 F. Supp. 2d at

342 ("intention of a copyright owner seeking to transfer an ownership interest must be clear and

unequivocal"); *Foraste v. Brown University*, 290 F. Supp. 2d 234, 240 (D. R.I. 2003); *Bieg v.*

*Hovnanian Enterprises*, 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001); *Papa's-June Music, Inc.*, 921

F. Supp. 2d at 1159.

    However, the writing "need not contain an elaborate explanation nor any particular

'magic words.'"  *Metropolitan Regional Info. Syst.*, 722 F.3d at 600; *see Lyrick Studios, Inc. v.*

*Big Idea Prods., Inc.*, 420 F.3d 388, 392 (5th Cir. 2005) ("Nor does the writing have to contain

any particular language."); *ITOFCA, Inc., v. Mega Trans Logistics, Inc.*, 322 F.3d 928, 931 (7th

Cir. 2003) (rejecting argument that writing must refer to "copyright" and concluding that the

term "all assets" covers copyright); *Radio Television Espanola S.A. v. New World Entm't, Ltd.*,

183 F.3d 922, 927 (9th Cir. 1999) ("No magic words must be included in a document to satisfy §

204(a)."); 3 NIMMER ON COPYRIGHT § 10.03(2) ("As with all matters of contract law, the essence

of the inquiry here is to effectuate the intent of the parties. Accordingly, even though a written instrument may lack the terms 'transfer' and 'copyright,' it still may suffice to evidence their mutual intent to transfer the copyright interest.").

Moreover, the Section 204 requirement may be satisfied by an oral assignment that is subsequently ratified or confirmed by a written memorandum of the transfer. *Barefoot Architect*, 632 F.3d at 831 ("Under the statute's plain terms it is clear that an oral transfer can be given legal effect by a subsequent signed writing."); *Lyrick Studios*, 420 F.3d at 392 ("An after-the-fact writing can validate an agreement from the date of its inception, at least against challenges to the agreement by third parties."); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003); *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982).  But, "courts do not lightly infer that a party has assigned his interest in a copyright, particularly given the Copyright Act's writing requirement, and in doubtful cases, a document should not be construed to divest an author completely of his ownership interest." *Hill*, 928 F.3d at 275; *see Konigsberg Intern., Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) (letter agreement written three and a half years after alleged oral agreement was not substantially contemporaneous and not the type of writing contemplated by § 204 to effect a copyright transfer); *see also, e.g., Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 500 (5th Cir. 2012) (endorsed check for royalties did not constitute an assignment); *Radio Television Espanola,* 183 F.3d at 927 (fax referencing a deal without any indication of its terms and another discussing contract negotiations did not satisfy the writing requirement).

As mentioned previously, Section 204 "enhances predictability and certainty of copyright ownership – 'Congress' paramount goal' when it revised the Act in 1976." *Effects Assocs.*, 908 F.2d at 557 (quoting *Reid*, 490 U.S. at 748).  Therefore, any ambiguity concerning an alleged

transfer must be construed in favor of the original copyright holder in order to satisfy the purpose of Section 204(a).  *Effects Assocs.*, 908 F.2d at 557; *Bieg*, 157 F. Supp. 2d at 480.  In considering the purpose underlying the requirements of Section 204(a), the Ninth Circuit has explained: "Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price."  *Effects Assocs.*, 908 F.2d at 557; *see Metropolitan Regional*, 722 F.3d at 600; *Weinstein Co.*, 664 F. Supp. 2d at 342 ("The purpose of the signed writing requirement is to ensure that the copyright owner deliberately transfers its ownership interest and that the owner does so in a way that provides the parties with a clear guide to their rights and responsibilities."); *Foraste*, 290 F. Supp. 2d at 239 (recognizing that reasons for § 204(a) writing requirement include "spelling out the terms of the deal to prevent misunderstandings; forcing the parties to clarify their thinking and consider problems that could potentially arise; and determining precisely which rights are to be transferred").

Of relevance here, "[c]ourts have held that, in situations 'where the copyright [author] appears to have no dispute with its [assignee] on this matter, it would be anomalous to permit a third party infringer to invoke [the § 204(a) signed writing requirement] against the [assignee].'" *Metropolitan Regional*, 722 F.3d at 600 (quoting *Eden Toys*, 697 F.2d at 36) (alterations in *Metropolitan Regional*); *see Kindergartners Count, Inc. v. Demoulin*, 249 F. Supp. 2d 1214, 1221 n.22 (D. Kan. 2003) (Section 204(a) "was intended to resolve disputes between owners and alleged transferee[s], and was not intended to operate for the benefit of a third-party infringer when there is no dispute between the owner and the transferee.").  Moreover, "when courts have found the post-deal writing sufficient, the party challenging the writing has been an alleged

infringer who is an outsider to the deal." *Lyrick Studios*, 420 F.3d at 394 (citing *Billy-Bob Teeth*, 329 F.3d at 590; *Eden Toys*, 697 F.2d at 30-31; *Kaplan Co., Inc. v. Panaria Int'l, Inc.*, No. 96-Civ.-7973, 1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998)).

Defendants assert that there are "several written instruments, signed by Tom Clancy, that memorialize the transfer of copyright in each book from Tom Clancy to JREL and JRLP, respectively." ECF 145 at 23. These instruments include the publishing agreements with Putnam; the Guaranty Letters accompanying those agreements; and the Separation Agreement that acknowledges ownership of the books by JREL and JRLP. In particular, defendants contend that the Guaranty Letters and the Separation Agreement operate as written "note[s] or memorand[a]" validating earlier transfers between the JR Entities and Clancy. ECF 135-1 at 40-41. Alternatively, defendants assert that, "[a]t the very least, each Guaranty, when executed, operated as a transfer of copyright ownership to JREL (or JRLP), because the language of each Guaranty 'denotes an intent to relinquish [Mr. Clancy's] interest in the copyright.'" ECF 135-1 at 33 (quoting *Hill*, 928 F.3d at 275) (alterations by defendants).

In response, plaintiff contends that these are not the kind of documents that "qualify as assignments" under Section 204. ECF 149 at 24. She posits that "none of the referenced documents are between Clancy and JREL or JRLP," *id.*, and none of them "set forth the clear and unequivocal intent to transfer required by Section 204." *Id.* at 25.

I begin with an examination of the relevant documents. First, the publishing agreements, formed between the JR Entities and Putnam for each of the JR Books, provided that either JREL or JRLP is the "Author" of the relevant book and Putnam is the "Publisher." *See* ECF 136-5; ECF 136-6; ECF 136-7; ECF 136-11; ECF 136-14; ECF 136-15. Further, each agreement represented that JREL or JRLP is the "sole and exclusive owner of all rights granted to the

Publisher in this agreement." ECF 136-5 at 3; ECF 136-6 at 3; ECF 136-7 at 3; ECF 136-11 at 3; ECF 136-14 at 3; ECF 136-15 at 3.

In addition, each Guaranty, appended to each publishing agreement, referenced the relevant agreement, confirmed that the relevant JR Entity was the "Author," and represented that the relevant work was made for hire. ECF 136-5 at 15; ECF 136-6 at 12; ECF 136-7 at 13; ECF 136-11 at 15; ECF 136-14 at 15; ECF 136-15 at 17. For example, the Guaranty appended to the publishing agreement for *Cardinal of the Kremlin* and *Patriot Games* provided, ECF 136-6 at 12: "I refer to the proposed agreement…('Agreement')…between Jack Ryan Enterprises, Ltd. described in the Agreement and herein as the 'Author' and [Putnam]." Further, the Guaranty represented "that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author [*i.e.*, JREL] is the owner of copyright in the Work and has full power and authority to enter into the Agreement." *Id.*; *see also* ECF 136-5 at 15; ECF 136-7 at 13; ECF 136-11 at 15; ECF 136-14 at 15; ECF 136-15 at 17. Each Guaranty was signed by Clancy in his personal capacity.

The second document on which defendants rely is the Separation Agreement. ECF 136-18. As noted, the Separation Agreement, executed in 1998, includes two lists of Clancy's literary works that constitute the "assets" of JREL and JRLP. ECF 136-18 at 31-32. Pursuant to the Separation Agreement, JREL's assets include *The Hunt for Red October*, *Red Storm Rising*, *Patriot Games*, *The Cardinal of the Kremlin*, *Clear and Present Danger*, and *The Sum of All Fears*. *Id.* at 31. And, JRLP's assets include *Without Remorse*, *Debt of Honor*, *Executive Order*, and *Rainbow Six* ("to be assigned"). *Id.* at 32.

Clancy also executed employment agreements with both JREL and JRLP that included provisions regarding the assignment of rights. ECF 135-61; ECF 135-62; ECF 139-24. The

64

JRLP Employment Agreement was executed in 1992.  It stated: "In consideration of the receipt of compensation as provided hereunder, Employee hereby assigns and transfers to Employer his entire right, title and interest in and to any and all books written by Employee either solely or jointly with others during the course of his employment with Employer." ECF 135-62 at 3.  But, that was before any of the works purportedly owned by JRLP were published.   In particular, *Without Remorse* was published in 1993; *Debt of Honor* was published in 1994; and *Executive Orders* was published in 1996.

Clancy's first employment agreement with JREL was also executed in February 1992.  It did not contain any provision on assignments.  *See* ECF 135-61.  But, Clancy and JREL executed a second employment agreement on January 1, 1994, containing language similar to the 1992 agreement with JRLP. *See* ECF 139-24. It stated, *id.*:  "In consideration of the receipt of compensation as provided hereunder, Employee hereby continues to assign and transfer to Employer his entire right, title and interest in and to any books written by Employee either solely or jointly with others pursuant to any third party contract or agreement of Employer."

Plaintiff appears to concede that the JRLP Books were validly assigned to JRLP. ECF 60, ¶ 1(d); ECF 139-1 at 53. As noted, the JRLP Employment Agreement was executed before publication of the three works owned by JRLP.  Therefore, the purported assignment reflects Clancy's intention to transfer his rights in the works he was about to write under contracts executed by JRLP.  This intent is confirmed by the language in the publishing agreements and the Guaranty for each book.  *See* ECF 136-14 (*Without Remorse*); ECF 136-15 (*Debt of Honor* and *Executive Order*).   It is also confirmed by the certificates of copyright registration that identify JRLP as the owner of the copyrights of the books (ECF 135-33; ECF 135-34; ECF 135-

35), and the fact that these three books were listed as JRLP's assets in the Separation Agreement. *See* ECF 136-18 at 32.

The Second JREL Employment Agreement, executed in 1994, also contained an assignment provision. *See* ECF 139-24. But, all of the JREL Books were published before 1991. As noted, these books include *Red Storm Rising* (1986); *Patriot Games* (1987); *The Cardinal of the Kremlin* (1988); *Clear and Present Danger* (1989); and *The Sum of All Fears* (1991). Given that the books were published before the assignment, Clancy's intent is in dispute. However, the second JREL employment agreement can be viewed as a subsequent writing that memorialized an earlier agreement. *See, e.g., Great Southern Homes, Inc. v. Johnson & Thompson Realtors*, 797 F. Supp. 609, 612 (M.D. Tenn. 1992) (finding writing signed after suit was filed validly memorialized an earlier oral agreement and satisfied the writing requirement).

Notably, the other instruments concerning the JREL Books confirm Clancy's intent to transfer ownership of the copyrights to the JREL Books to JREL. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) (reviewing circumstances surrounding the alleged transfer to confirm the intent to transfer demonstrated in the writing). As with the JRLP Books, Clancy executed the publishing agreements and Guaranty Letters for all the JREL Books that define JREL as the "Author" (ECF 136-5 at 15; ECF 136-6 at 12; ECF 136-7 at 13; ECF 136-11 at 15); the certificates of copyright registration for all the books identify JREL as the copyright owner (ECF 135-12; ECF 135-14; ECF 135-15; ECF 135-17; ECF 135-27); and the Separation Agreement lists all of these book as assets of JREL (ECF 136-18 at 31). *See Sony Music Entertainment v. Cox Communications, Inc.*, 426 F. Supp. 3d 217 (E.D. Va. 2019) (establishing ownership even though chain of title documents were missing, by submitting declarations from executives concerning copyright validity and ownership, merger and

acquisition agreements, and other business agreements bearing on ownership); *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 149 F. Supp. 3d 634, 644 (E.D. Va. 2015) (company established ownership of copyrights that listed company as claimant on certificate of registration, where company produced both the certificates of registration and relevant merger and acquisition agreements between company and the entity listed as the claimant on the certificates) (citing *Univ. Furniture Int'l, Inc., v. Collezione Europa USA*, 618 F.3d 417, 428 (4th Cir. 2010)).

The Third Circuit's ruling in *Hill*, 928 F.3d 259, is instructive.  The court addressed the effect of a publishing agreement between Commerce Bank and a publisher relating to publication of a manuscript written by the bank's founder and CEO, Vernon Hill, II. In the publishing agreement, Commerce Bank was defined as the "Author," and it "represented and warranted that it was the exclusive owner of all rights conveyed in the manuscript."  *Id.* at 266.  The Agreement said, *id.* (alterations in original):

> The Author [i.e., Commerce Bank] hereby represents and warrants ... that Vernon Hill is the sole author of the Work; that the Work is or will be Vernon Hill's next book length work ...; that the Author is the sole and exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned, pledged or otherwise encumbered the same; ... that the Author has full power to enter into this Agreement and to make the grants herein contained.

Hill, the bank's founder, signed a letter to the publisher that referred to an attached copy of the publishing agreement and provided, *id.* at 266-67 (alterations in original):

> I hereby unconditionally guarantee, promise and agree with the Publisher, its successors and assigns that the Author [i.e., Commerce Bank] will, in all respects, faithfully perform and fulfill all obligations of the Agreement on its part to be performed and fulfilled at the time and in the manner therein provided. I also unconditionally guarantee that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement.

The book was never published and the bank terminated the publishing agreement. *Id.* at 267. Hill subsequently sought to use portions of the manuscript. *Id.* This led the bank to register the work with the Copyright Office. *Id.* The district court concluded that the manuscript was a work for hire, because the letter agreement between Hill and the bank said so, and the copyright vested with the bank as Hill's employer. *Id.*

On appeal, the court agreed with the district court that the bank was the "sole owner of the copyright." *Id.* at 275. But, in contrast to the lower court, the Third Circuit did not find that ownership vested with the bank under the work for hire doctrine. *Id.* at 273. Rather, ownership vested in the bank through an assignment of rights. *Id.* The court determined that the founder's "commitments together convey an unmistakable intent to effect a present transfer of any interest he possessed in the manuscript. Hill's assurance that the manuscript 'is a work made for hire,'. . . though insufficient to actually render it for hire, denotes an intent to relinquish his interest in the copyright." *Id.* (citing 1 NIMMER ON COPYRIGHT § 5.03(B)(1)(b)(ii)).

Further the court reasoned, *id.* (emphasis and alterations in original):

> The use of the definite article "the" in "[Commerce Bank] is *the* owner of copyright" also implies that Commerce Bank is the sole owner of the copyright . . . . And this implication gains force in the second half of that sentence, which provides that Commerce Bank has "full power" to execute the publishing agreement, because a co-owner lacks the authority to grant a truly exclusive license without the consent of all co-owners. . . . Finally, any lingering doubt is dispelled by the letter's reference to the publishing agreement, which states that Commerce Bank "is *the sole* and *exclusive* owner of all rights granted to the Publisher in this Agreement."

The language used in the publishing agreements and in each Guaranty is almost identical to the language used in the comparable documents in *Hill*. As in *Hill*, the Guaranty Letters state that JREL or JRLP is the owner of the copyright for each particular book, using the definite article "the" to indicate "sole ownership." ECF 136-5 at 15; ECF 136-6 at 12; ECF 136-7 at 13;

ECF 136-11 at 15; ECF 136-14 at 15; ECF 136-15 at 17. And, each Guaranty states that the "Author" (JREL or JRLP) had "full power to execute the publishing agreement." *Id.* Moreover, the Guaranty Letters refer to the accompanying publishing agreements, which state that JREL or JRLP "is the sole and exclusive owner of all rights granted to the Publisher in this Agreement." ECF 136-5 at 3; ECF 136-6 at 3; ECF 136-7 at 3; ECF 136-11 at 3; ECF 136-14 at 3; ECF 136-15 at 3.

Furthermore, the facts of this case are readily distinguishable from cases where courts have found writings insufficient to meet the Section 204 requirements. In *Woods*, 725 F. Supp. 2d 809, for instance, the court considered whether documents between an alleged author and a third party company were sufficient to satisfy Section 204(a)'s requirements. *Id.* at 825-826. There, the company alleging ownership, F&I Source, produced a service agreement that the plaintiff had signed with a third party company, 3M, which provided: "Except for the limited rights herein expressly granted to 3M, all rights in the Software and Services…are reserved to F&I Source throughout the world for the exclusive use or other disposition by F&I Source at any time…" *Id.* The defendants also pointed to the company's service agreement, which provided: "The licensor… shall remain the sole and exclusive owner of all rights, title and interest in all copyrighted information contained herein. This web site and contents are protected by copyright, trademark and other intellectual property laws." *Id.* at 826. The court noted: "While these documents could be viewed as circumstantial admissions by [the employee claiming ownership], neither is an actual assignment of the copyright from [the employee] to F&I Source. Instead the documents confirm the rights that exist between F&I Source and third parties." *Id.* The court concluded that "the written documents are not between [the employee] and F&I Source and they do not contain any terms clearly identifying the terms of any transfer deal between the two. As

such, they are insufficient to constitute a valid assignment under § 204(a)."  *Id.; see also Pamfiloff v. Giant Records*, 794 F. Supp. 933, 936 (N.D. Cal. 1992) (holding that an agreement which made no reference to "publishing rights or rights to musical compositions" was not sufficient writing under § 204(a)).

Notably, the *Woods* Court did not hold that the documents could not constitute an assignment because they were not between the purported assignor and the assignee. *Woods*, 725 F. Supp. 2d at 826; *see also Hill*, 928 F.3d at 275 n.8 ("To the extent that Hill suggests that an assignment would fail unless he entered into an agreement directly with the assignee (Commerce Bank), he is mistaken.") (citing Restatement (Second) of Contracts § 327 (1981)). Moreover, the relevant agreement in *Woods* explicitly delineated the rights that existed between the company and the third party.  And, there were no additional written indications of ownership and assignment in that case.  *See Woods*, F. Supp. 2d at 826; *see also Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (concluding that legend on back of checks issued by magazine publisher to pay artist for paintings prepared for magazine, indicating that payee assigned "all right, title and interest" in described painting, insufficient to transfer copyright in painting to publisher; legend did not mention word "copyright" and evidence was conflicting as to whether parties intended one-time transfer of reproduction rights or transfer that included copyright), *cert. denied*, 516 U.S. 1010 (1995); *Price v. Fox Entertainment Group, Inc.*, 473 F. Supp. 2d 446, 460 (S.D.N.Y. 2007) (concluding that mere existence of partnership and its supporting documents and certificates did not satisfy § 204(a) because "those documents by their terms do not transfer the copyright itself").

In contrast, the comparable documents in this case—the publishing agreements—specifically set out the ownership rights of JREL and JRLP. And, the Guaranty Letters and the

employment agreements specifically mention the word "copyright" and clearly evidence an intent to transfer.

Plaintiff insists that the fact that Clancy explicitly included a separate provision about *Rainbow Six* in the Separation Agreement, and executed a separate agreement to assign the novel to JRLP, demonstrates that Clancy "certainly knew how" to make a valid assignment but chose not to do so for the other JR Books. ECF 149 at 29. However, that Clancy explicitly assigned *Rainbow Six* in the Separation Agreement, and wrote a separate assignment agreement, is not dispositive, because *Rainbow Six* is distinguishable from the other JR Books.

*Rainbow Six* was published in 1998, *after* Clancy's separation from King, and in connection with Clancy's formation of Rubicon. ECF 136-19. Therefore, unlike the other JR Books, which were written prior to the divorce and pursuant to agreements executed by either JRLP or JREL, *Rainbow Six* was written pursuant to an agreement executed by Rubicon. As a result, and in contrast with the JR Books, it had to be explicitly assigned in order to be transferred to JRLP. Thus, Ms. Clancy has not provided any relevant evidence showing that Clancy did not intend to transfer ownership to the JR Entities. *See* ECF 139-1 at 52-53; ECF 149 at 24-25; *cf. Playboy Enterprises*, 53 F.3d at 564.

Moreover, the Court is not persuaded that the parties' failure to use any particular words of transfer or the timing of the written agreements is dispositive. Rather, considering all the documents as a whole—the Guaranty Letters, together with the publishing agreements, employment agreements, and copyright certificates—it is clear that Clancy intended to transfer copyright ownership to the JR Entities and satisfied the requirements of an assignment under Section 204(a) of the Copyright Act. *See Hill*, 928 F.3d at 276.

The Court must also consider how this finding impacts the ownership of the characters featured in the JR Books. With the exception of the Jack Ryan character as developed in *Hunt*, the parties appear to agree that whoever owns the copyright to these works will also own the rights to the characters or the incremental character developments therein. ECF 135-1 at 42-45; ECF 139-1 at 55-56; ECF 145 at 40. In fact, plaintiff posits that if the Court concludes that the JR Books were validly assigned either to JREL or JRLP, then "the rights to any incremental development would belong to the relevant Jack Ryan Entity." ECF 139-1 at 56. Therefore, the characters as they are developed in the JR Books, like the books themselves, are owned by the JR Entities. *See Silverman v. CBS Inc.,* 870 F.2d 40, 49 (2d Cir.), *cert. denied*, 492 U.S. 907 (1989) ("copyrights in derivative works secure protection … for the incremental additions of originality contributed by the authors"); *Klinger v. Conan Doyle Estate, Ltd.,* 755 F.3d 496, 501 (7th Cir. 2014) (same), *cert. denied*, 574 U.S. 976 (2014).

Plaintiff's only contention to the contrary is that Clancy retained ownership over John Clark. ECF 139-1 at 54. She argues that *Without Remorse*, which revolved around John Clark and filled in much of his back story, was not a work for hire, and Clancy never specifically transferred his rights to the John Clark character to the JR Entities, so it remained his property at death. *Id.* However, plaintiff does not address how the Court should consider ownership over John Clark if *Without Remorse* was validly assigned to JRLP. *See id.* Nor does she allege any facts to support a claim that John Clark was not transferred along with the copyright to the novel. *See id.* Therefore, contrary to plaintiff's contention, John Clark, as depicted in *Without Remorse*, is owned by JRLP, along with the novel.

I must separately consider ownership rights over the Jack Ryan character, as developed in *Hunt*. I otherwise conclude that the characters developed in the JR Books, like the books

themselves, were validly assigned to the JR Entities. *See Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 235 (2d Cir. 1983) ("Plaintiffs own the copyrights in various works embodying the character Superman and have thereby acquired copyright protection for the character itself"); *Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 68 (D. Conn. 1997) ("The owner of a copyright in various works embodying a character can acquire copyright protection for the character itself.").

Accordingly, I shall deny Plaintiff's Motion and grant the JR Entities' Motion as to Counts II, III and IV of the Amended Complaint and Counts I and II of the Counterclaim, to the extent the counts are based on claims of assignment. However, this ruling does not pertain to Jack Ryan, discussed *infra*.

### 3.   Ownership of the Jack Ryan Character

As noted, the parties vigorously dispute whether the assignment to USNI of the copyright to *Hunt*, and the later assignment of *Hunt* to JREL, also included the copyright in Jack Ryan, a character who debuted in *Hunt*.

Defendants argue, *inter alia*, that Clancy assigned the copyright in *Hunt* to USNI "without reservation," and therefore USNI also acquired the right to the Jack Ryan character. ECF 135-1 at 45. Accordingly, defendants contend that when USNI assigned the copyright in *Hunt* to JREL, "it also assigned the rights to Jack Ryan as delineated in *Hunt* to JREL." *Id.*

Plaintiff observes that Jack Ryan "is a fully delineated, distinctive and iconic character," and hugely "important to the Clancy franchise . . . ." ECF 139-1 at 40. She concedes that the rights to *Hunt* were assigned to USNI and JREL, but she disputes assignment of the Jack Ryan character. She posits: "The 1983 [USNI] Contract *does not* grant USNI any rights to the characters featured in HUNT or to sequels or derivative works. None can be inferred." *Id.* at 41

(emphasis in original).  And, she argues that USNI "could not transfer to JREL what it did not own . . . .  Thus, there was never any transfer of the Jack Ryan character."  *Id.* at 42.  In her view, Clancy's rights to the character passed to his Estate.  *Id.* at 43.

Characters are not enumerated in the Copyright Act as a separate class of copyrightable work. *See* 17 U.S.C. § 201 et *seq.*  Nonetheless, courts have recognized protections for fictional characters when developed with enough specificity so as to constitute protectable expression. *See, e.g., Daniels v. Walt Disney Co.*, 958 F.3d 767, 773-74 (9th Cir. 2020), *cert. denied*, __ U.S. __, 2021 WL 78089 (2021); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 120-21 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931).

The controlling principle for character protection has emerged from Judge Learned Hand's opinion in *Nichols*, 45 F.2d 119.  There, he suggested that characters may be protected "quite independently of the 'plot' proper," but colorfully added, *id.* at 121:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

As indicated by Judge Hand, copyright protection is available only "for characters that are especially distinctive." 1 NIMMER ON COPYRIGHT § 2.12. To meet this standard, a character must be "sufficiently delineated" and display "consistent, identifiable character traits and attributes." *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003) (citing *Toho Co., Ltd. v. William Morrow & Co., Inc.*, 33 F. Supp. 2d 1206, 1215 (C.D. Cal. 1998) (considering the copyrightability of Godzilla)).

In applying Judge Hand's standard, courts have extended copyright protections to both literary and graphic characters.  *Daniels*, 958 F.3d at 773-74 (recognizing that courts have "extended copyright protection to characters—both literary and graphic---that constitute 'the story being told' in a work") (quoting *Warner Bros. Pictures, Inc. v. Columbia Broad. System, Inc.*, 216 F.2d 945, 950 (9th Cir. 1954), *cert. denied*, 348 U.S. 971 (1955)); *see also Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431, at *7 (C.D. Cal. Apr. 25, 1989).   But, "[a]s a practical matter, a graphically depicted character is much more likely than a literary character to be fleshed out in sufficient detail so as to warrant copyright protection."  *Anderson,* 1989 WL 206431, at *7 (concluding that Rocky characters are highly delineated and are the "story being told" in the movies Rocky I, II, III.).   Therefore, copyright protections have primarily been afforded to cartoon characters or characters visually depicted in a television series or in a movie. *See, e.g., Am. Broad. Cos.*, 720 F.2d at 240-45 (finding copyright protection was available for the character of Superman); *Walt Disney Prod. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) ("While many literary characters may embody little more than an unprotected idea…a comic book character, which has physical as well as conceptual qualities, is more likely to contain some unique elements of expression."); *Fleischer Studios, Inc., v. A.V.E.L.A., Inc.*, 772 F. Supp. 2d 1135, 1144 (C.D. Cal. 2008) ("Generally, literary characters are entitled to somewhat limited copyright protection; however, far greater protection has been afforded cartoon characters."), *aff'd*, 654 F.3d 958 (9th Cir. 2011); *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc.*, 443 F. Supp. 291, 301 (S.D.N.Y. 1977) (finding that the characters in the movie "Star Wars" were protected from infringement). And, a "court may decide on summary judgment whether a character deserves copyright protection." *Bach v. Forever Living Products U.S., Inc.*, 473 F. Supp. 2d 1127, 1133 (W.D. Wash. 2007) (citing *Air Pirates*, 581 F.2d at 754-55).

The protection of fictional characters separate from their underlying work is based on a theory of divisible copyrights. Section 201(d)(2) of the Copyright Act provides:

> Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified in section 106, may be transferred…and owned separately.  The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by his title.

This provision is understood to constitute an "'explicit statutory recognition of the principle of divisibility of copyright.'"  *Gardner v. Nike*, 279 F.3d 774, 779 (9th Cir. 2002) (quoting 17 U.S.C. § 201).

In light of these principles, the question is not only whether Jack Ryan was sufficiently delineated in *Hunt* to warrant separate copyright protection, but also whether the assignment of the *Hunt* copyright to USNI and then JREL included the transfer of ownership over Jack Ryan. The parties agree that Jack Ryan is sufficiently developed to be copyrightable. *See* ECF 139-1 at 40; ECF 145 at 9 n.1. Therefore, I will focus on the assignment of rights.

Three agreements are pertinent to the question of whether the rights to Jack Ryan were transferred to USNI or JREL.

First, the 1983 USNI Agreement provided, in relevant part: "Author [*i.e.*, Clancy] grants and assigns to the Publisher [*i.e.*, USNI] the exclusive worldwide rights and any subsisting copyright, including the right to secure copyrights and any renewals or extensions thereof, in connection with a certain unpublished work provisionally entitled THE HUNT FOR RED OCTOBER…." ECF 136-1.

Second, the Settlement Agreement between Clancy and USNI, executed on September 28, 1988, is relevant.  ECF 136-8.  It reassigned the copyright in *Hunt* to Clancy, and provided, *id.* at 9 (emphasis in original):

> The Institute will reassign the copyrights in THE HUNT FOR RED OCTOBER…including without limitation all rights in and to the book[s], to Tom Clancy…or [his] respective designee[], exclusive of book publishing rights. Without limiting the foregoing, the parties acknowledge that all rights in and to the characters are the sole property of the [author, *i.e.*, Tom Clancy]. The use of the characters in connection with RED OCTOBER is subject to the other terms of this agreement.

Third, the Transfer Agreement, executed on December 19, 1988, formalized the assignment of *Hunt* from USNI to JREL after the settlement.  ECF 135-24.  It granted JREL "[t]he exclusive worldwide rights of every kind and nature (now or hereafter known), [and] any subsisting copyright, (including the right to secure copyright and any renewals or extensions thereof)…." *Id.*

According to plaintiff, if the parties meant to assign to USNI and then JREL the character rights to Jack Ryan, then they could have and would have said so in these agreements. *Id.* at 43. Further, she claims that the USNI Settlement Agreement "made explicit that Clancy, not USNI, owned the HUNT characters."  ECF 139-1 at 42.  Claiming that USNI never owned Jack Ryan in the first place, plaintiff contends, as noted, that USNI "could not transfer to JREL what it did not own." ECF 139-1 at 42.

Plaintiff relies, *inter alia*, on *Columbia Broad.*, 216 F.2d 945 (the "*Sam Spade*" case). ECF 139-1 at 36-37. In that case, the mystery writer Dashiell Hammett entered into a contract with Alfred A. Knopf, Inc. ("Knopf") to publish his work, *The Maltese Falcon*, in book form. *Id.* at 946.  Thereafter, Knopf and Hammett entered into a contract with Warner Brothers to give the movie production company "certain defined rights to the Maltese Falcon," including the "rights to the use of the Maltese Falcon 'writings' in motion pictures, radio, and television." *Id.* at 946-47. In 1946, Hammett used the *Maltese Falcon* characters in other writings, which led Warner Brothers to sue for copyright infringement and "unfair use and competition" because

Warner Brothers claimed that it had acquired the exclusive right to the use of the book, including individual characters in the book.  *Id.* at 948. Conversely, Hammett and the other defendants argued that "the rights acquired by Warner are those specifically mentioned in the conveying or granting instruments," which do not mention the right to the use of the characters, so the instruments "do not convey any exclusive right to the use of characters." *Id.* The court agreed with the defendants.

The Ninth Circuit observed that "the clearest language is necessary to divest the author of the fruits of his labor." *Id.* at 949 (internal citation omitted).  Construing the contracts between the parties, it said, *id.*:

> We are of the opinion that since the use of characters and character names are nowhere specifically mentioned in the agreements, but that other items, including the title, 'The Maltese Falcon', and their use are specifically mentioned as being granted, that the character rights with the names cannot be held to be within the grants, and that under the doctrine of *ejusdem generis*, general language cannot be held to include them.

The court also said that if "silence in the instruments" is deemed "ambiguous," the "custom and practice demonstrate that such rights are not customarily parted with by authors. . . ." *Id.* at 948.  Rather, the "characters . . . are customarily retained and used in the intricacies of subsequent but different tales."  *Id.*

However, plaintiff's reliance on this case is misplaced because the facts are distinguishable. In contrast to the contract in *Sam Spade*, the assignment to USNI and then JREL did not include "certain defined and detailed exclusive rights," *id.* at 946-47, but rather a broad and general grant of rights to an entire novel. In the 1983 USNI Agreement, Clancy assigned to USNI "the exclusive worldwide rights and any subsisting copyright" in connection with *Hunt*. ECF 136-1. Subsequently, in expansive language, USNI assigned to JREL the "exclusive

worldwide rights of every kind and nature . . . ." as well as "any subsisting copyright" in *Hunt*.
ECF 135-24 at 2.

Moreover, as defendants point out, the other cases cited by plaintiff to support her
argument are distinguishable because they all involve assignments with "less than a general grant
of an entire copyright."  ECF 145 at 36; *see, e.g.*, *Trust Co. Bank v. MGM*, 593 F. Supp. 580
(N.D. Ga. 1985) (finding grant of motion picture rights did not implicitly carry with it a grant of
sequel rights), *aff'd*, 772 F.2d 740 (11th Cir. 1985); *Jim Henson Prods. v. John T. Brady &
Assoc's*, 16 F. Supp. 2d 259 (S.D.N.Y. 1997) (finding a license, not assignment, of the right to
use puppets in an advertisement did not constitute a grant of general ownership); *Caldwell v.
ABKCO Music & Records, Inc.*, 703 N.Y.S.2d 97 (App. Div. 1st Dep't 2000) (finding a
recording license did not include synchronization rights without plaintiffs' participation based on
custom and practice pertaining to synchronization licensing).

On the other hand, those cases on which plaintiff relies do not compel a factfinder to
determine that a general assignment of a copyright necessarily includes character rights. And,
defendants point to only one case where a court determined that a broad transfer of the entire
copyright included the transfer of character rights.  ECF 135-1 at 51 (citing *Burnett v. Warner
Bros. Pictures, Inc.*, 493 N.Y.S. 2d 326 (App. Div. 1985), *aff'd* 492 N.E.2d 1231 (N.Y. 1986)).

In my view, neither side's position is compelled by the case law.  Whether the rights to
Jack Ryan were assigned to USNI or JREL, as part of the assignment of rights to *Hunt*, depends
on the interpretation of the three relevant agreements.  As outlined earlier, the task of interpreting
a contract begins with the text. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660,
894 A.2d 584, 594 (2006).  Applying the tools of contract interpretation, I conclude that the

assignment of rights to Jack Ryan is ambiguous because at least one of the relevant agreements—the Settlement Agreement—is susceptible to multiple interpretations.

The plain reading of the broad language of the relevant provisions in the 1983 USNI Agreement and the 1988 Transfer Agreement is that the assignments included all copyrights with respect to *Hunt*, inclusive of character rights.  Because the relevant provisions did not provide any details or define any specific rights with respect to *Hunt*, it was not necessary to specify that characters were included in the general grant.  *Cf. Columbia Broad.*, 216 F.2d at 949.

But, the Settlement Agreement, executed on September 28, 1988, three months prior to the Transfer Agreement, contains specific language about character rights. Thus, the question is whether the text of the Settlement Agreement reflected an acknowledgement by USNI that Clancy had retained character rights after the 1983 USNI Agreement, or whether it reassigned the character rights to Clancy, along with the rights to *Hunt*.

Under one reading of the Settlement Agreement, USNI was reassigning the copyright in *Hunt* to Clancy, while also acknowledging that Clancy retained the rights to the characters in *Hunt*.  *See* ECF 136-8 at 9. The fact that the agreement mentions the character rights in a separate sentence suggests that those rights were not included in the general reassignment of rights.  Further, the phrase "without limiting the foregoing," at the beginning of the sentence concerning character rights, arguably supports a distinction between the general reassignment of copyright in the book and the character rights.

But, a reasonable person could also read the two sentences of the Settlement Agreement to mean that the character rights were part of what was being reassigned to Clancy. For instance, to the extent that ownership of character rights was part of the dispute that led to the Settlement

Agreement, the parties included a separate sentence on character rights for emphasis. Therefore, the plain reading of the text does not compel a particular interpretation as a matter of law.

As indicated, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d at 363 (citation omitted).  Because the relevant provision in the Settlement Agreement is susceptible to more than one meaning, the resulting assignment to JREL, as delineated in the Transfer Agreement, is also ambiguous. Therefore, I may look to extrinsic evidence in an effort to ascertain the parties' intent. *See Cty. Commissioners of Charles Cty.*, 366 Md. at 444, 784 A.2d at 556; *Washington Metro. Area Transit Auth.*, 476 F.3d at 235. And, as noted, "if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.'" *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir. 1993)).  Conversely, if "'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.'" *Washington Metro. Area Transit Auth.*, 476 F.3d at 235 (quoting *Goodman*, 7 F.3d at 1126).  Thus, if the contract is ambiguous, I may only grant summary judgment if extrinsic evidence of the parties' intentions compels a particular interpretation as a matter of law.  *See Sheridan v. Nationwide Ret. Sols., Inc.*, 313 F. App'x 615, 619 (4th Cir. 2009).

Defendants argue that extrinsic evidence demonstrates that "Clancy repeatedly indicated his understanding that copyright in Jack Ryan was transferred to JREL" because he treated JREL as the owner of all rights in *Hunt*, including rights in the Jack Ryan character.  ECF 135-1 at 54-55.  For example, the agreements between JREL and Paramount, regarding motion picture rights

for *Hunt*, "reserved" rights for JREL to use Jack Ryan in "author-written sequels."  ECF 136-10 at 5; ECF 136-12 at 21; *see also* ECF 136-13; ECF 136-21; ECF 136-23.   According to defendants, these reservations "would not have been necessary or possible if JREL did not have those rights."  ECF 135-1 at 55.  And, they assert that Clancy "could not have executed these documents if ownership of Jack Ryan were vested in him personally." ECF 145 at 39.

However, three of the agreements that defendants cite for support (ECF 136-13; ECF 136-21; ECF 136-23) do not advance their argument. These agreements, executed between JREL and Paramount, state that "[JREL] *and Clancy* shall continue to have the exclusive right to use the characters '*Clark*' and '*Chavez*' for any and all purposes." ECF 136-13 at 2; ECF 136-21 at 2; ECF 136-23 at 2 (emphasis added). Although this language helps to confirm JREL's ownership interest in John Clark and Ding Chavez, it does not say anything about JREL's rights to Jack Ryan. Moreover, the agreements confirm that Clancy also had the "exclusive right" to use those characters. Therefore, they do not clarify Clancy's intent as to ownership over the Jack Ryan character.

Further, defendants point to the fact that Rubicon transferred to JREL the payment it received from Paramount for the film *Jack Ryan: Shadow Recruit*. ECF 145 at 39 (citing ECF 136-26 at 2). According to defendants, "Paramount's mistaken payment to Rubicon was transferred to JREL, ***specifically because JREL owned Jack Ryan.***"  ECF 145 at 39-40 (emphasis in original).  However, as plaintiff points out, defendants have not provided sufficient information about this movie deal, including any relevant contracts, to determine the significance of this exchange and the transfer of funds from Rubicon to JREL.

Plaintiff, on the other hand, relies on the timing of Clancy's work on the *Patriot Games* to support her interpretation of the 1983 USNI Agreement.  ECF 139-1 at 41. Ms. Clancy claims

that Clancy was working on *Patriot Games*, which features the origin story of Jack Ryan, around the same time as *Hunt* and submitted draft chapters of *Patriot Games* to USNI in 1983.  ECF 139-1 at 16.  According to plaintiff, the fact that USNI would have already received "three draft chapters" of the *Patriot Games* by the time Clancy and USNI executed the agreement in 1983, indicates that "USNI was well aware that Clancy intended to use Jack Ryan in derivative works." *Id.*  Therefore, she posits that Clancy always retained the rights to the character. *Id.*

It is true that *Patriot Games* is a prequel to *Hunt* and provides the origin story of the Jack Ryan character.  But, the evidence does not unequivocally establish that Clancy worked on the *Patriot Games* before *Hunt*. The three draft chapters that Clancy allegedly submitted to USNI in 1983 are not dated.  *See* ECF 139-11. Further, King did not believe that Clancy submitted the *Patriot Games* to USNI before the publication of *Hunt*. *See, e.g.,* ECF 139-31, Tr. 132:14-17.  To the contrary, King testified to her belief that Clancy did not start working on *Patriot Games* until after he completed *Hunt*, and possibly not until after December 1986.  ECF 139-31, Tr. 168:1-14; Tr. 57:12-18.

Further, Ms. Clancy asserts that "the relatively modest compensation paid by USNI to Tom Clancy ($5,000 plus royalties ranging from 14% to 21% of net), was insufficient to support the 'complete surrender of the characters made famous' in HUNT."  ECF 139-1 at 41 (citing ECF 136-1 at 3).  Therefore, she argues that the 1983 USNI Agreement could not have encompassed the character rights to Jack Ryan. *Id.* But, plaintiff does not provide evidence to establish whether this sum actually constituted modest compensation at the time, especially given the fact that Clancy was not a well known author during this period.

Both sides rely on a provision of the Separation Agreement to support their respective positions.  It states, in part, ECF 136-18, ¶ 15(B) (emphasis added):

> In the event that Husband or an entity affiliated with him (other than the JRLP or
> JREL) signs a contract with any third party relating to the story line, in whole or
> in part (and characters in connection therewith) from works owned by JRLP or
> JREL (other than incidental use, such as flashbacks), Husband shall cause the
> contract to be assigned to JRLP or JREL as the case may be. Otherwise, Husband
> *shall be free to use the characters in the works owned by JRLP or JREL* in any
> sequel to any of those works or in any other future work that Husband may create
> without the approval of or obligation to Wife.

Plaintiff claims that this provision acknowledged "Clancy's retention of ownership of the Jack Ryan character" by recognizing "Clancy's continuing right to the use of his characters in derivative works." ECF 139-1 at 21. Conversely, defendants contend that this provision "unambiguously denotes a license to, i.e., a grant of authorization for, a particular use (in this case, the use of JREL/JRLP-owned characters in future works)." ECF 135-1 at 55 n.36. And, they add that this "permission need not have been provided had Mr. Clancy owned the characters separately from the books owned by the JR Entities." *Id.* at 55.

Each interpretation seems plausible. After the divorce, Clancy wrote seven novels featuring Jack Ryan "without agreement with, objection by, or payment to the Jack Ryan Entities." ECF 149 at 28.[17] The fact that he was able to use the Jack Ryan character in these novels supports the view that the provision in the Separation Agreement confirmed Clancy's retention of ownership of the Jack Ryan character, as plaintiff argues. *See* ECF 149 at 28. But, as defendants contend, it could also establish that JREL owned the Jack Ryan character, but that Clancy had the right to use the character in his work as a result of the grant of authorization in the Separation Agreement. ECF 135-1 at 55.

In sum, the sources on which both parties rely support their particular interpretations of the agreements, but they are not dispositive. "[S]ummary judgment is appropriate when the

---

[17] These novels include *The Bear and the Dragon* (2000); *Red Rabbit* (2002); *The Teeth of the Tiger* (2003); *Dead or Alive* (2010); *Locked On* (2011); *Threat Vector* (2012); and *Command Authority* (2013).

contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth.*, 476 F.3d at 235; *see also Morrison v. Nissan Co.*, *Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979) (noting courts should cautious in granting summary judgment where issues of intent relate to an ambiguous contract or document). Here, the agreements are ambiguous as to the assignment of character rights in *Hunt*. And, the ambiguity cannot be definitively resolved by reference to extrinsic evidence.

Given the evidence presented by both sides, I cannot conclude that a reasonable jury would have to agree with one or the other. Therefore, I must deny summary judgment as to Count I of the Amended Complaint and Counts I and II of the Counterclaim with respect to ownership of the Jack Ryan character.

### D.  Ownership of The Campus Characters

Under Count V of the Amended Complaint, plaintiff seeks a declaration that the Estate is the owner of "The Campus" characters, including Jack Ryan, Jr., Dominic Caruso, and Brian Caruso. ECF 60 at 27-28. The JR Entities seek summary judgment or dismissal of Count V because the JR Entities "have never claimed to 'own' [The Campus characters], or sought to derive revenue from any works 'on the basis' of ownership of such characters." ECF 135-1 at 56. Therefore, defendants claim that Count V should be dismissed for lack of subject matter jurisdiction because the claim is not "based on an actual controversy." *Id.*

Plaintiff does not address Count V or defendants' argument in her filings. *See* ECF 139-1; ECF 149.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

In a case of actual controversy within its jurisdiction...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In order to bring a declaratory judgment action under 28 U.S.C. § 2201, the plaintiff must establish the existence of a dispute that is "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that [is] 'real and substantial.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). This is necessary in order to satisfy the case or controversy requirement of Article III of the Constitution. *Id.* at 126-27.

Defendants' argument would have been more appropriate in a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1).  Nonetheless, I may consider it at this juncture because federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists" at any juncture of a case. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

Because defendants assert that they have not sought to assert ownership over or derive revenue from The Campus characters, and plaintiff has not disputed this assertion, there does not appear to be an actual controversy with respect to Count V.  Accordingly, I shall dismiss Count V of the Amended Complaint for lack of subject matter jurisdiction.

### E.  The Termination Notice

As noted, plaintiff and her daughter, born to plaintiff's union with Clancy, filed a Termination Notice on March 4, 2016, to terminate and recapture the rights to *Hunt*.  ECF 135-58. The Termination Notice states, *id.* ¶ 3:

> This Notice of Termination applies to the literary work entitled "The Hunt for Red October," authored by Tom Clancy and published under the Transfer on October 3, 1984 (the "work"), and all rights under copyright therein, including, but not limited to, all rights under U.S. Copyright Reg. No. TX0001475353, and, to the extent such rights were conveyed under the transfer, all rights under copyright to the characters described in the work.

In Count III of the Counterclaim, defendants seek a declaration that the Termination Notice is "overbroad and ineffective at least to the extent it seeks to affect the 'copyright to the characters described in 'Hunt.''"   ECF 9, ¶ 63.   And, in the JR Entities' Motion, defendants contend that they are entitled to summary judgment with respect to Count III of the Counterclaim because the Termination Notice is "vastly overbroad."   ECF 135-1 at 56-57.   In particular, defendants assert that the Termination Notice "cannot recapture foreign copyrights."   ECF 145 at 42.   Further, they posit that "termination does not affect the ownership of copyright in the incremental developments to the character" in the post-*Hunt* books in which the Jack Ryan character has been further developed.   ECF 135-1 at 57.

In response, plaintiff argues that she holds a 50% interest as the surviving spouse and each of Clancy's five children holds a 10% interest.   ECF 139-1 at 57.   Therefore, together with her daughter, they have a combined 60% majority interest, with "standing to terminate the transfer of rights in Hunt."   *Id.*   Thus, she argues that "any party seeking to create a new work containing the Jack Ryan character must obtain a license from these parties."   *Id.*

In adopting the Copyright Act, Congress created a "termination right" that allows an author to recapture a prior transfer of copyrights. Under Section 203 of the Copyright Act, authors of works created on or after January 1, 1978, may terminate transfers of a license or copyright in those works thirty-five years from the date of the grant's execution. 17 U.S.C. § 203(a)(3).

Termination is available for all works "executed by the author," other than those "made for hire." *Id.* § 203(a). Termination is effected by service of a notice of termination by the author or an appropriate proportion of statutorily-defined heirs, within a specified time frame. *Id.* §§ 203(a)(1)-(4).   Upon the effective date of termination, the grant is terminated and "all

rights…that were covered by the terminated grants revert to the author," or his statutory heirs. *Id.* § 203(b).

Congress placed certain limitations on what authors (or their heirs) could gain from exercising the termination right. *See Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1140 (C.D. Cal. 2008). The "termination of a grant under this section affects only those rights covered by the grants that arise under this title [*i.e.*, U.S. copyright law], and in no way affects rights arising under…foreign laws." 17 U.S.C. § 203(b)(5). Therefore, the worldwide grant of copyright is only subject to termination insofar as its U.S. component is concerned, but not subject to termination in the rest of the world. *See Siegel,* 542 F. Supp. 2d at 1142 (holding that a termination notice for Superman "affects only the *domestic* portion of [the] worldwide grant," but "*not* effective as to the remainder of the grant, that is, defendants' exploitation of the work abroad under the aegis of foreign copyright laws.") (emphasis in original); *see also* 3 NIMMER ON COPYRIGHT § 11.02(B)(2) (A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States.). Therefore, the purported effect of plaintiff's Termination Notice can only apply to the domestic copyright in *Hunt*, not its foreign copyrights.

The Copyright Act also provides, notwithstanding a termination of rights, as follows, 17 U.S.C. § 203(b)(1):

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

This means that derivative works created before the effective date of the termination may continue to be exploited after termination. However, new derivative works based on works covered by the terminated grant are not permissible.

The language of plaintiff's Termination Notice does not indicate that plaintiff seeks to terminate any rights beyond those protected by the copyright in *Hunt*. ECF 135-58.  In fact, the Termination Notice specifies that plaintiff only seeks to terminate rights to the characters as described in *Hunt*, and only to the extent that they were "conveyed under the transfer." *Id.* ¶ 3. And, neither side indicates that plaintiff has tried to recapture any rights—either from derivative works or foreign copyrights—that would be outside the bounds of the Termination Notice. *See* ECF 135-1 at 57; ECF 139-1 at 57.  In fact, defendants fail to provide any evidence that demonstrates the existence of an actual controversy with respect to the Termination Notice. *See* ECF 135-1 at 57; ECF 145 at 42.

Therefore, I shall deny the JR Entities' Motion with respect to Count III of the Counterclaim.

## V.   Conclusion

For the foregoing reasons, I shall grant the JR Entities' Motion (ECF 135), in part and deny it, in part.  And, I shall deny Plaintiff's Motion (ECF 139).

An Order follows, consistent with this Memorandum Opinion.

Date: February 10, 2021                    _____/s/_____
                                           Ellen L. Hollander
                                           United States District Judge